NO. 17-15611-BB

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff/appellee,*

v.

SCOTT JOSEPH TRADER,
*Defendant/appellant.*

On Appeal from the United States District Court
for the Southern District of Florida

APPENDIX OF THE APPELLANT
SCOTT JOSEPH TRADER

MICHAEL CARUSO
Federal Public Defender

Fletcher Peacock
Assistant Federal Public Defender
Attorney for Appellant Trader
109 North 2nd Street
Fort Pierce, Florida 34950
Tel. (772) 489-2123

# INDEX TO APPENDIX

Docket Sheet .......................................................................... A

Indictment ............................................................................ 7

Motion to Suppress Illegally Obtained Evidence ................................... 13

Government's Response to Defendant's Motion to Suppress ................. 14

Order Denying Defendant's Motion to Suppress .................................. 15

Plea Agreement ...................................................................... 21

Report and Recommendation ..................................................... 23

Presentence Investigation Report ........................................ **Sealed Exh**

Joint Corrections and Defense Objections to the

    Presentence Investigation Report .................................... 30

Motion for Downward Variance ............................................... 34

Paperless Order Adopting Report and Recommendation ..................... 38

Judgment Imposing Sentence ................................................... 40

Notice of Appeal .................................................................... 44

Transcript of Change of Plea (Proceedings held 9/29/17) ..................... 52

Transcript of Sentencing (Proceedings held 12/7/17) ........................ 56

Certificate of Service ................................................................

# DE-A

# U.S. District Court
## Southern District of Florida (Ft Pierce)
## CRIMINAL DOCKET FOR CASE #: 2:17-cr-14047-DMM-1

Case title: USA v. Trader
Magistrate judge case number: 2:17-mj-00060-WM

Date Filed: 06/13/2017
Date Terminated: 12/08/2017

---

Assigned to: Judge Donald M.
Middlebrooks
Referred to: Magistrate Judge Shaniek M.
Maynard

Appeals court case number: 17-15611-B

## Defendant (1)

**Scott Joseph Trader**
16118-104
*ENGLISH; DOB:1985*
*TERMINATED: 12/08/2017*

represented by **Noticing FPD-FTP**
Email: ftp_ecf@fd.org
*TERMINATED: 06/02/2017*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender Appointment*

**Fletcher Peacock**
Federal Public Defender's Office
109 North 2nd Street
Fort Pierce, FL 34950
772-489-2123
Fax: 772-489-3997
Email: fletcher_peacock@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender Appointment*

## Pending Counts

COERCION OR ENTICEMENT OF
FEMALE
(1)

ACTIVITIES RE MATERIAL
CONSTITUTING/CONTAINING CHILD
PORNO
(2-3)

## Disposition

IMPRISONMENT: Life. This term consists
of Life as to Count 1, 240 months as to
Counts 2 and 3 and 360 months as to each
of Counts 4 and 5, all to be served
concurrently. SUPERVISED RELEASE:
Life. This term consist of Life as to each of
Counts 1 through 5, to run concurrently.

IMPRISONMENT: Life. This term consists
of Life as to Count 1, 240 months as to
Counts 2 and 3 and 360 months as to each
of Counts 4 and 5, all to be served
concurrently. SUPERVISED RELEASE:
Life. This term consist of Life as to each of
Counts 1 through 5, to run concurrently.

IMPRISONMENT: Life. This term consists of Life as to Count 1, 240 months as to Counts 2 and 3 and 360 months as to each of Counts 4 and 5, all to be served concurrently. SUPERVISED RELEASE: Life. This term consist of Life as to each of Counts 1 through 5, to run concurrently.

SELLING OR BUYING OF CHILDREN (4-5)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

None

**Disposition**

**Highest Offense Level (Terminated)**

None

**Complaints**

18:2252A.F Receiving and Distributing Material Involving the Sexual Exploitation of Minors. 18:2251.F Employing, Using, Persuading, Inducing, Enticing or Coercing a Minor to Engage in Sexually Explicit Activity for the Purpose of Producing any Visual Depiction of Such Conduct.

**Disposition**

IMPRISONMENT: Life. This term consists of Life as to Count 1, 240 months as to Counts 2 and 3 and 360 months as to each of Counts 4 and 5, all to be served concurrently. SUPERVISED RELEASE: Life. This term consist of Life as to each of Counts 1 through 5, to run concurrently.

**Plaintiff**

**USA**

represented by **Marton Gyires**
US Attorney's Office
101 South Highway 1
Suite 3100
Fort Pierce, FL 34950
772-293-0952
Fax: 772-595-3606
Email: marton.gyires@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Antonia J. Barnes**
United States Attorney's Office
500 South Australian Avenue
Suite 400
West Palm Beach, FL 33401
561-820-8711
Fax: 655-9785
Email: antonia.barnes@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/01/2017 | 1 | CRIMINAL COMPLAINT sworn and subscribed to by S/A Brian Ray, Homeland Security Investigations and signed by Magistrate Judge William Matthewman on 6/1/2017 as to Scott Joseph Trader (1). (kza) (Additional attachment(s) added on 6/1/2017: # 1 Restricted Unredacted Indictment Restricted Criminal Complaint) (kza). [2:17-mj-00060-WM] (Entered: 06/01/2017) |
| 06/01/2017 | 2 | PAPERLESS Minute Order for proceedings held before Magistrate Judge William Matthewman: Initial Appearance as to Scott Joseph Trader held on 6/1/2017. Date of Arrest or Surrender: 6/1/2017. Total time in court: 15 minutes. Defendant requests six (6) days for Detention Hearing. The Court finds good cause. Detention Hearing set for 6/9/2017 at 10:00 AM in West Palm Beach Division before WPB Duty Magistrate. Preliminary Examination/Arraignment set for 6/15/2017 at 10:00 AM in West Palm Beach Division before WPB Duty Magistrate.The Government moves to redact the Criminal Complaint - The Court grants the motion - Unredacted Criminal complaint to be filed as restricted and sealed. Attorney Appearance(s): Marton Gyires and Kristy Militello. Attorney added: Noticing FPD-FTP for Scott Joseph Trader. (Digital 10:55:10) Signed by Magistrate Judge William Matthewman on 6/1/2017. (kza) [2:17-mj-00060-WM] (Entered: 06/01/2017) |
| 06/01/2017 | | Arrest of Scott Joseph Trader (ail) [2:17-mj-00060-WM] (Entered: 06/02/2017) |
| 06/02/2017 | 3 | Notice of Assignment of Assistant Federal Public Defender as to Scott Joseph Trader. Attorney Fletcher Peacock added. Attorney Noticing FPD-FTP terminated.. Attorney Fletcher Peacock added to party Scott Joseph Trader(pty:dft). (Peacock, Fletcher) [2:17-mj-00060-WM] (Entered: 06/02/2017) |
| 06/02/2017 | 4 | Invocation of Right to Silence and Counsel by Scott Joseph Trader (Peacock, Fletcher) [2:17-mj-00060-WM] (Entered: 06/02/2017) |
| 06/09/2017 | 5 | PAPERLESS Minute Order for proceedings held before Magistrate Judge William Matthewman: Status Conference Re: Detention as to Scott Joseph Trader held on 6/9/2017. The Defendant stipulates to pretrial detention with the right to revisit at a later date. Written order to be issued. Total time in court: 3 minutes. Attorney Appearance(s): Marton Gyires and Fletcher Peacock. (Digital 10:05:14) Signed by Magistrate Judge William Matthewman on 6/9/2017. (kza) [2:17-mj-00060-WM] (Entered: 06/09/2017) |
| 06/09/2017 | 6 | PRETRIAL DETENTION ORDER as to Scott Joseph Trader Signed by Magistrate Judge William Matthewman on 6/9/2017. (kza) [2:17-mj-00060-WM] (Entered: 06/13/2017) |
| 06/13/2017 | 7 | INDICTMENT as to Scott Joseph Trader (1) count(s) 1, 2-3, 4-5; FORFEITURE. (tmn) (Additional attachment(s) added on 6/13/2017: # 1 Restricted Unredacted Indictment) (tmn). (Entered: 06/13/2017) |
| 06/15/2017 | 8 | PAPERLESS Minute Order for proceedings held before Magistrate Judge James M. Hopkins: **ARRAIGNMENT** as to Scott Joseph Trader (1) Count 1,2-3,4-5 held on 6/15/2017. Defendant present. Defendant advised of maximum penalties. Total time in court: 2 minutes. Attorney Appearance(s): AUSA Marie Villafana, AFPD Neison Marks (Digital 10:11:23) PAPERLESS STANDING DISCOVERY ORDER: The defendant(s) having been arraigned this date in open Court, it is Ordered that within 14 days of the date of this order that all parties to this action shall review and comply with Southern District of Florida Local Rules 88.10 (Criminal Discovery), and 88.9(c) (Motions in Criminal Cases). Upon a sufficient showing, the Court may at any time, upon a properly filed motion, order that the |

| | | |
|---|---|---|
| | | USCA11 Case: 17-15011 Document 24 by Date Filed: 9/10/2017 deferred, or make such other order as is appropriate. It is expected by the Court, however, that counsel for both sides shall make a good faith effort to comply with the letter and spirit of this Standing Order. It shall be the continuing duty of counsel for both sides to immediately reveal to opposing counsel all newly discovered information or other material within the scope of Local Rule 88.10. Signed by Magistrate Judge James M. Hopkins on 6/15/2017. (tmn) (Entered: 06/15/2017) |
| 06/16/2017 | 9 | ORDER SETTING JURY TRIAL as to Scott Joseph Trader: TELEPHONIC Calendar Call/Status Conference set for 8/16/2017 at 10:00 AM before Judge Donald M. Middlebrooks. Jury Trial set for 8/21/2017 at 09:00 AM in Fort Pierce Division before Judge Donald M. Middlebrooks. Signed by Judge Donald M. Middlebrooks on 6/16/2017. (gm1)<br><br>**Pattern Jury Instruction Builder -** To access the latest, up to date changes to the 11th Circuit Pattern Jury Instructions go to https://pji.ca11.uscourts.gov or click here. (Entered: 06/16/2017) |
| 06/28/2017 | 10 | First RESPONSE to Standing Discovery Order by USA as to Scott Joseph Trader (Gyires, Marton) (Entered: 06/28/2017) |
| 07/05/2017 | | Magistrate Judge update in case as to Scott Joseph Trader. Magistrate Judge Shaniek M. Maynard added. (cga) (Entered: 07/07/2017) |
| 08/07/2017 | 11 | Unopposed MOTION to Continue Trial by Scott Joseph Trader. Responses due by 8/21/2017 (Peacock, Fletcher) (Entered: 08/07/2017) |
| 08/09/2017 | 12 | ORDER CONTINUING TRIAL as to Scott Joseph Trader Re: 11 Unopposed MOTION to Continue Trial . Jury Trial is set for 10/2/2017 at 09:30 AM in Fort Pierce Division before Judge Jose E. Martinez. The deadline for timely acceptance of responsibility is extended to September 5, 2017 by 3:00 pm. Counsel shall notify Judge Middlebrooks' Chambers and the Government by 3 pm on September 5 if Defendant will be changing his plea. - Motions terminated: 11 Unopposed MOTION to Continue Trial filed by Scott Joseph Trader. Signed by Judge Donald M. Middlebrooks on 8/9/2017. (gm1) (Entered: 08/09/2017) |
| 09/06/2017 | 13 | MOTION to Suppress Illegally Obtained Evidence by Scott Joseph Trader. (Peacock, Fletcher) (Entered: 09/06/2017) |
| 09/20/2017 | 14 | RESPONSE in Opposition by USA as to Scott Joseph Trader re 13 MOTION to Suppress Illegally Obtained Evidence Replies due by 9/27/2017. (Attachments: # 1 Exhibit Exhibit 1- Search warrant, application, affidavit, and attachments) (Gyires, Marton) (Entered: 09/20/2017) |
| 09/25/2017 | 15 | ORDER denying 13 Defendant's Motion to Suppress as to Scott Joseph Trader (1). Signed by Judge Donald M. Middlebrooks on 9/25/2017. (gm1) (Entered: 09/25/2017) |
| 09/26/2017 | 16 | Order Referring to Magistrate Judge Shaniek M. Maynard for Change of Plea Hearing as to Scott Joseph Trader. Signed by Judge Donald M. Middlebrooks on 9/26/2017. (gm1) (Entered: 09/26/2017) |
| 09/26/2017 | | Terminate Hearing as to Scott Joseph Trader - The trial scheduled for Monday, October 2, 2017 is cancelled. Change of plea hearing to be set before Magistrate Judge Maynard. (gm1) (Entered: 09/26/2017) |
| 09/28/2017 | 17 | PAPERLESS NOTICE OF HEARING as to Scott Joseph Trader Change of Plea Hearing set for 9/29/2017 10:00 AM in Fort Pierce Division before Judge Maynard. Signed plea agreement provided to Chambers. (cga) (Entered: 09/28/2017) |
| 09/29/2017 | 18 | Minute Order for proceedings held before Magistrate Judge Shaniek M. Maynard: Change |

| | | |
|---|---|---|
| | | USCA11 Case 1:17-cr-80102-DMM-SMM 1 as to Scott Joseph Trader Filed 09/29/2017 Scott Joseph Trader Page 2 of 5 Guilty Count 1,2-3,4-5. (Digital 10.29.17 to 11.06.32 Recall 11.35.05 FTP-FJL/4074) Signed by Magistrate Judge Shaniek M. Maynard on 9/29/2017. (cga) (Entered: 09/29/2017) |
| 09/29/2017 | 19 | NOTICE OF SENTENCING HEARING as to Scott Joseph Trader. Sentencing set for 11/30/2017 11:00 AM in West Palm Beach Division before Judge Donald M. Middlebrooks. (cga) (Entered: 09/29/2017) |
| 09/29/2017 | 20 | Notice of Presentence Investigation Assignment of Scott Joseph Trader to US Probation Officer Frances Weisberg in the West Palm Beach U.S. Probation Office and he/she can be contacted at 561 804-6899 or Frances_Weisberg@flsp.uscourts.gov. (mhz2) (Entered: 09/29/2017) |
| 09/29/2017 | 21 | PLEA AGREEMENT as to Scott Joseph Trader (cga) (Entered: 09/29/2017) |
| 09/29/2017 | 22 | FACTUAL PROFFER STATEMENT as to Scott Joseph Trader (cga) (Entered: 09/29/2017) |
| 10/02/2017 | 23 | REPORT AND RECOMMENDATIONS on Plea of Guilty as to Scott Joseph Trader. Objections to R&R due by 10/16/2017 Signed by Magistrate Judge Shaniek M. Maynard on 10/2/2017. (cga) (Entered: 10/02/2017) |
| 10/10/2017 | 24 | MOTION for Forfeiture of Property *PRELIMINARY ORDER OF FORFEITURE* by USA as to Scott Joseph Trader. Attorney Antonia J. Barnes added to party USA(pty:pla). Responses due by 10/24/2017 (Attachments: # 1 Text of Proposed Order (Preliminary Order of Forfeiture))(Barnes, Antonia) (Entered: 10/10/2017) |
| 10/20/2017 | 25 | PRELIMINARY ORDER OF FORFEITURE granting 24 Motion for Forfeiture of Property as to Scott Joseph Trader (1). Signed by Judge Donald M. Middlebrooks on 10/20/2017. (lan) (Entered: 10/20/2017) |
| 11/01/2017 | 26 | Acknowledgment of Service on 10/31/17 by USA as to Scott Joseph Trader re 25 PRELIMINARY ORDER OF FORFEITURE granting 24 Motion for Forfeiture of Property as to Scott Joseph Trader (1). Signed by Judge Donald M. Middlebrooks on 10/20/2017. (lan) 1) One (1) Samsung SM-G920T smartphone; 2) One (1) LG G6 smartphone; 3) One (1) 16GB San Disk SD card; 4) One (1) WD My Passport Ultra external hard drive; 5) Nine (9) media storage cards, consisting of two SD cards, four micro SD cards, and three SIM cards; 7) One (1) Toshiba C655D-S5202 Laptop Computer (Barnes, Antonia) (Entered: 11/01/2017) |
| 11/03/2017 | 27 | DRAFT Disclosure of Presentence Investigation Report of Scott Joseph Trader. This is a limited access document. Report access provided to attorneys Marton Gyires, Fletcher Peacock by USPO (Attachments: # 1 Position of Parties)(mhz2) (Entered: 11/03/2017) |
| 11/17/2017 | 28 | Joint MOTION to Continue Sentencing Hearing by Scott Joseph Trader. Responses due by 12/1/2017 (Peacock, Fletcher) (Entered: 11/17/2017) |
| 11/17/2017 | 29 | ENDORSED ORDER granting 28 Motion to Continue Sentencing Hearing as to Scott Joseph Trader (1). Sentencing is reset for 12/7/2017 at 11:00 AM in West Palm Beach Division before Judge Donald M. Middlebrooks. Signed by Judge Donald M. Middlebrooks on 11/17/2017. (gm1) (Entered: 11/17/2017) |
| 11/28/2017 | 30 | OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT by USA as to Scott Joseph Trader *including joint corrections and defense objections that the government opposes* (Gyires, Marton) (Entered: 11/28/2017) |
| 11/29/2017 | 31 | SERVICE (Proof) by Publication by USA as to Scott Joseph Trader Last Publication date 11/24/2017. Claims/Positions/Written Defenses/Answers/etc., due by 12/27/2017. |

| | | |
|---|---|---|
| | | USCA11 Case: 18-11561 Document 24 Date Filed: 09/10/2018 Barnes, Page: 9 of 215 red: 11/29/2017) |
| 11/30/2017 | 32 | FINAL Rev. 1 Addendum 1 Disclosure of Presentence Investigation Report of Scott Joseph Trader. This is a limited access document. Report access provided to attorneys Marton Gyires,Fletcher Peacock by USPO (Attachments: # 1 Addendum)(mhz2) (Entered: 11/30/2017) |
| 11/30/2017 | 33 | SENTENCING MEMORANDUM by USA as to Scott Joseph Trader (Gyires, Marton) (Entered: 11/30/2017) |
| 12/06/2017 | 34 | MOTION FOR DOWNWARD VARIANCE by Scott Joseph Trader. Responses due by 12/20/2017 (Peacock, Fletcher) Modified relief on 12/6/2017 (mc). (Entered: 12/06/2017) |
| 12/06/2017 | 35 | FINAL Addendum 2 Disclosure of Presentence Investigation Report of Scott Joseph Trader. This is a limited access document. Report access provided to attorneys Marton Gyires, Fletcher Peacock by USPO (Attachments: # 1 Addendum, # 2 Second Addendum) (mmn2) (Entered: 12/06/2017) |
| 12/06/2017 | 36 | NOTICE *OF FILING* by Scott Joseph Trader (Attachments: # 1 Letters of Consideration) (Peacock, Fletcher) (Entered: 12/06/2017) |
| 12/07/2017 | 37 | PAPERLESS Minute Entry for proceedings held before Judge Donald M. Middlebrooks: Sentencing held on 12/7/2017 as to Scott Joseph Trader. Attorney Appearance(s): Marton Gyires, AUSA and Fletcher Peacock, AFPD. Sworn and testified: Special Agent, Brian Ray and Dr. Michael Brannon, Psychologist. Government's Exhibits 1 (CD) and 2 (extraction reports of text messages) admitted and Defendant's Exhibit 1 (Dr. Brannon's report under seal) admitted. Sentence imposed: Life imprisonment, supervised release for a term of Life, restitution to be determined and $500 special assessment. Total time in court: 2 hour(s) : 15 minutes. Court Reporter: Diane Miller, 561-514-3728 / Diane_Miller@flsd.uscourts.gov. (gm1) (Entered: 12/07/2017) |
| 12/07/2017 | 38 | ENDORSED ORDER ADOPTING REPORT AND RECOMMENDATIONS as to Scott Joseph Trader for 23 Report and Recommendations on Guilty Plea - Motions terminated: 23 REPORT AND RECOMMENDATIONS on Plea of Guilty as to Scott Joseph Trader. Signed by Judge Donald M. Middlebrooks on 12/7/2017. (gm1) (Entered: 12/07/2017) |
| 12/07/2017 | 39 | EXHIBIT LIST from Sentencing held on 12/7/2017 by USA and Scott Joseph Trader as to Scott Joseph Trader. (gm1) (Entered: 12/07/2017) |
| 12/08/2017 | 40 | JUDGMENT as to Scott Joseph Trader (1), 1, 2-3, 4-5, IMPRISONMENT: Life. This term consists of Life as to Count 1, 240 months as to Counts 2 and 3 and 360 months as to each of Counts 4 and 5, all to be served concurrently. SUPERVISED RELEASE: Life. This term consist of Life as to each of Counts 1 through 5, to run concurrently. Assessment: $500.00. Closing Case for Defendant. Signed by Judge Donald M. Middlebrooks on 12/8/2017. (mc) **NOTICE: If there are sealed documents in this case, they may be unsealed after 1 year or as directed by Court Order, unless they have been designated to be permanently sealed. See Local Rule 5.4 and Administrative Order 2014-69.** (Entered: 12/08/2017) |
| 12/08/2017 | 41 | CERTIFICATE of Compliance Re Admitted Evidence for exhibit(s): 1,2 as to Scott Joseph Trader by Marton Gyires (Attachments: # 1 Exhibit Photo of disc, # 2 Exhibit Report) (Gyires, Marton) (Entered: 12/08/2017) |
| 12/08/2017 | 42 | CLERK'S Notice Instructing counsel to arrange for pick up of the original sentencing exhibits within five days at the U.S. District Court/ Southern District of Florida Room 202 |

| 12/08/2017 | 43 | RELEASE OF EXHIBITS as to Scott Joseph Trader. Released to: Hilda I. Fernandez (USAO) (mc) (Entered: 12/11/2017) |
|---|---|---|
| 12/18/2017 | 44 | NOTICE OF APPEAL by Scott Joseph Trader Re: 40 Judgment,,. Filing fee $ 505.00.. USA/FPD Filer - No Filing Fee Required. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under Transcript Information. (Peacock, Fletcher) (Entered: 12/18/2017) |
| 12/19/2017 | | Transmission of Notice of Appeal and Docket Sheet as to Scott Joseph Trader to US Court of Appeals re 44 Notice of Appeal - Final Judgment, Notice has been electronically mailed. (hh) (Entered: 12/19/2017) |
| 12/20/2017 | 45 | Acknowledgment of Receipt of NOA from USCA as to Scott Joseph Trader re 44 Notice of Appeal - Final Judgment, date received by USCA: 12/19/17. USCA Case Number: 17-15611-B. (hh) (Entered: 12/20/2017) |
| 12/21/2017 | 46 | TRANSCRIPT INFORMATION FORM as to Scott Joseph Trader re 44 Notice of Appeal - Final Judgment, filed by Scott Joseph Trader. Change of Plea transcript(s) ordered. Order placed by Fletcher Peacock. Email sent to Court Reporter Coordinator. (Peacock, Fletcher) (Entered: 12/21/2017) |
| 12/21/2017 | 47 | TRANSCRIPT INFORMATION FORM as to Scott Joseph Trader re 44 Notice of Appeal - Final Judgment, filed by Scott Joseph Trader. Sentencing transcript(s) ordered. Order placed by Fletcher Peacock. Email sent to Court Reporter Coordinator. (Peacock, Fletcher) (Entered: 12/21/2017) |
| 12/29/2017 | 48 | MOTION for Forfeiture of Property *final order of forfeiture* by USA as to Scott Joseph Trader. Responses due by 1/12/2018 (Attachments: # 1 Text of Proposed Order final order of forfeiture)(Barnes, Antonia) (Entered: 12/29/2017) |
| 01/02/2018 | 49 | FINAL ORDER of Forfeiture granting 48 Motion for Forfeiture of Property as to Scott Joseph Trader (1). Signed by Judge Donald M. Middlebrooks on 1/2/2018. (asl) (Entered: 01/02/2018) |
| 01/02/2018 | 50 | COURT REPORTER ACKNOWLEDGMENT as to Scott Joseph Trader re 47 Transcript Information Form,. Court Reporter: Diane Miller, 561-514-3728 / Diane_Miller@flsd.uscourts.gov. (dmr) (Entered: 01/02/2018) |
| 01/04/2018 | 51 | FINAL after sentencing Addendum 2 Disclosure of Presentence Investigation Report of Scott Joseph Trader. This is a limited access document. Report access provided to attorneys Marton Gyires,Fletcher Peacock by USPO (Attachments: # 1 First Addendum, # 2 Second Addendum)(mhz2) (Entered: 01/04/2018) |
| 01/12/2018 | 52 | TRANSCRIPT of Change of Plea as to Scott Joseph Trader held on 9/29/17 before Magistrate Judge Shaniek M. Maynard, 1-39 pages, re: 44 Notice of Appeal - Final Judgment, Court Reporter: Carl Schanzleh, 305-523-5635. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/2/2018. Redacted Transcript Deadline set for 2/12/2018. Release of Transcript Restriction set for 4/12/2018. (Attachments: # 1 Designation Access Form)(hh) (Entered: 01/12/2018) |
| 01/12/2018 | 53 | TRANSCRIPT NOTIFICATION as to Scott Joseph Trader - by Fletcher Peacock, Esq. has/have been filed by Court Reporter: Carl Schanzleh, 305-523-5635 re 44 Notice of Appeal - Final Judgment, 46 Transcript Information Form,. (hh) (Entered: 01/12/2018) |

| | | |
|---|---|---|
| 01/28/2018 | 54 | TRANSCRIPT of Sentencing Hearing as to Scott Joseph Trader held on 12/7/2017 before Judge Donald M. Middlebrooks, 1-125 pages, Court Reporter: Diane Miller, 561-514-3728 / Diane_Miller@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/20/2018. Redacted Transcript Deadline set for 2/28/2018. Release of Transcript Restriction set for 4/30/2018. (dmr) (Entered: 01/28/2018) |
| 01/31/2018 | 55 | TRANSCRIPT NOTIFICATION as to Scott Joseph Trader - has/have been filed by re 50 Court Reporter Acknowledgment, 47 Transcript Information Form,. (dmr) (Entered: 01/31/2018) |
| 01/31/2018 | 56 | CORRECTED TRANSCRIPT of Sentencing Hearing as to Scott Joseph Trader held on 12/7/2017 before Judge Donald M. Middlebrooks, 1-125 pages, Court Reporter: Diane Miller, 561-514-3728 / Diane_Miller@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/21/2018. Redacted Transcript Deadline set for 3/5/2018. Release of Transcript Restriction set for 5/1/2018. (dmr) (Entered: 01/31/2018) |
| 02/05/2018 | 57 | NOTICE OF HEARING as to Scott Joseph Trader: Restitution Hearing set for 3/1/2018 at 10:00 AM in West Palm Beach Division before Judge Donald M. Middlebrooks. Defendant will not be produced for the hearing unless specifically requested by counsel at least 30 days in advance. If the parties reach an agreement with regard to restitution, a stipulation shall be filed and the hearing will be cancelled.(gm1) (Entered: 02/05/2018) |
| 02/07/2018 | 58 | Acknowledgment of Service on 1/16/18 by USA as to Scott Joseph Trader re 49 FINAL ORDER of Forfeiture granting 48 Motion for Forfeiture of Property as to Scott Joseph Trader (1). Signed by Judge Donald M. Middlebrooks on 1/2/2018. (asl) 1) One (1) Samsung SM-G920T smartphone; 2) One (1) LG G6 smartphone; 3) One (1) 16GB San Disk SD card; 4) One (1) WD My Passport Ultra external hard drive; 5) Nine (9) media storage cards, consisting of two SD cards, four micro SD cards, and three SIM cards; 7) One (1) Toshiba C655D-S5202 Laptop Computer (Barnes, Antonia) (Entered: 02/07/2018) |
| 02/28/2018 | 59 | NOTICE *regarding restitution* by USA as to Scott Joseph Trader re 57 Notice of Hearing, (Gyires, Marton) (Entered: 02/28/2018) |
| 02/28/2018 | | NOTICE CANCELLING Restitution Hearing as to Scott Joseph Trader. The restitution hearing scheduled for March 1, 2018 is cancelled. The Government filed a notice indicating its not seeking restitution in this case. (gm1) (Entered: 02/28/2018) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/30/2018 14:02:05 | | | |
| **PACER Login:** | fpd00017:2550580:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:17-cr-14047-DMM |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

# DE-7

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-14047-Cr-Middlebrooks/UnassignedMag

**18 U.S.C. § 2422(b)**
**18 U.S.C. §§ 2252(a)(2) & (b)(1)**
**18 U.S.C. §§ 2252(a)(4)(B) & (b)(2)**
**18 U.S.C. §§ 2251(a) & (e)**

**UNITED STATES OF AMERICA,**

v.

**SCOTT JOSEPH TRADER,**

**Defendant.**

_____ /



FILED BY ___ *TM* ___
Deputy Clerk

**Jun 13, 2017**

STEVEN M. LARIMORE
CLERK U.S. DISTRICT CT.
S.D. OF FLA. West Palm Beach

## INDICTMENT

The Grand Jury charges that:

### COUNT ONE

From on or about May 15, 2017, through on or about May 31, 2017, in St. Lucie County, in the Southern District of Florida, and elsewhere, the defendant,

### SCOTT JOSEPH TRADER,

using any facility and means of interstate and foreign commerce, did knowingly persuade, induce, entice, and coerce any individual who had not attained the age of eighteen years, that is, "Victim # 1," to engage in any sexual activity for which any person can be charged with a criminal offense under the law of Florida, in violation of Title 18, United States Code, Section 2422(b).

### COUNT TWO

On or about May 30, 2017, in St. Lucie County, in the Southern District of Florida, and elsewhere, the defendant,

### SCOTT JOSEPH TRADER,

did knowingly distribute any visual depiction, using any means and facility of interstate and foreign commerce and that has been shipped and transported in interstate and foreign commerce by any means, including by computer, and the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2), and such visual depiction was of such sexually explicit conduct; in violation of Title 18, United States Code, Sections 2252(a)(2) and (b)(1).

## COUNT THREE

On or about June 1, 2017, in St. Lucie County, in the Southern District of Florida, the defendant,

## SCOTT JOSEPH TRADER,

did knowingly possess matter, that is, a Samsung SM-G920T smartphone, an LG G6 smartphone, a 16GB San Disk SD card, and a WD My Passport Ultra external hard drive, which contained any visual depiction that had been shipped and transported using any means and facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce, by any means, including by computer, and which was produced using materials that have been mailed, shipped, and transported in and affecting interstate and foreign commerce, by any means, including by computer, and the production of such visual depiction having involved the use of minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2), and such visual depiction was of such conduct, in violation of Title 18, United States Code, Sections 2252(a)(4)(B) and (b)(2).

Pursuant to Title 18, United States Code, Section 2252(b)(2), it is further alleged that such visual depiction included a prepubescent minor and a minor who had not attained twelve (12) years of age.

2

## COUNT FOUR

From on or about September 30, 2015, through on or about May 31, 2017, in St. Lucie County, in the Southern District of Florida, and elsewhere, the defendant,

### SCOTT JOSEPH TRADER,

did use, persuade, induce, entice and coerce, a minor, that is, "Victim # 2," to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, and that visual depiction was produced using materials that had been mailed, shipped, and transported in interstate and foreign commerce, by any means; in violation of Title 18, United States Code, Sections 2251(a) and 2251(e).

## COUNT FIVE

From on or about November 21, 2014 through on or about November 28, 2015, in St. Lucie County, in the Southern District of Florida, and elsewhere, the defendant,

### SCOTT JOSEPH TRADER,

did use, persuade, induce, entice and coerce, a minor, that is, "Victim # 3," to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, and that visual depiction was produced using materials that had been mailed, shipped, and transported in interstate and foreign commerce, by any means; in violation of Title 18, United States Code, Sections 2251(a) and 2251(e).

## FORFEITURE

Upon conviction of any of the violations alleged in Counts 1 through 5 of this Indictment, the defendant, **SCOTT JOSEPH TRADER**, shall forfeit to the United States any visual depiction, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped or received in violation of the law;

3

any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense; and any property, real or personal, used or intended to be used to commit or to promote the commission of such offense or any property traceable to such property, including, but not limited to, the following:

      a) One (1) Samsung SM-G920T smartphone;
      b) One (1) LG G6 smartphone;
      c) One (1) 16GB San Disk SD card; and
      d) One (1) WD My Passport Ultra external hard drive.

All pursuant to Title 18, United States Code, Section 2253.

A TRUE BILL

_____
FOREPERSON

_____ for
BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

_____
MARTON GYIRES
ASSISTANT UNITED STATES ATTORNEY

4

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**

**CASE NO.** _____

v.

**CERTIFICATE OF TRIAL ATTORNEY\***

**SCOTT JOSEPH TRADER,**

_____ **Defendant. /**    **Indictment Case Information:**

**Court Division:** (Select One)

| | | |
|---|---|---|
| ____ | Miami | ____ Key West |
| ____ | FTL | ____ WPB   _X_ FTP |

New Defendant(s)          Yes ____ No ____
Number of New Defendants      ____
Total number of counts       ____

I do hereby certify that:

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:    (Yes or No)   _No_
    List language and/or dialect _____

4.  This case will take    _3-5_    days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

    (Check only one)                                   (Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _X_ | | Petty | ____ |
| II | 6 to 10 days | ____ | | Minor | ____ |
| III | 11 to 20 days | ____ | | Misdem. | ____ |
| IV | 21 to 60 days | ____ | | Felony | _X_ |
| V | 61 days and over | ____ | | | |

6.  Has this case been previously filed in this District Court?  (Yes or No) __No__

If yes:
Judge: _____    Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?    (Yes or No) _Yes_
If yes:
Magistrate Case No.
Related Miscellaneous numbers: _____ 17-mj-00060-WM _____
Defendant(s) in federal custody as of ___ 06/01/2017 ___
Defendant(s) in state custody as of _____
Rule 20 from the _____    District of _____

Is this a potential death penalty case? (Yes or No)    _No_

7.  Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?    ____ Yes  _X_ No

8.  Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?    ____ Yes  _X_ No

_____
MARTON GYIRES
ASSISTANT UNITED STATES ATTORNEY

\*Penalty Sheet(s) attached

REV 4/8/08

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

CASE NO. _____

**Defendant's Name:  SCOTT JOSEPH TRADER**

| COUNT | VIOLATION | U.S. CODE | MAX. PENALTY |
|-------|-----------|-----------|--------------|
| 1 | Enticement of a minor to engage in sexual activity | 18:2422(b) | At least 10 years and up to life imprisonment $250,000 fine SR: at least 5 years up to life $100 Special Assessment $5,000 Special Assessment unless indigent |
| 2 | Distribution of material containing visual depictions of sexual exploitation of minors | 18: 2252(a)(2) & (b)(1) | At least 5 years and up to 20 years' imprisonment; $250,000 fine; SR: at least 5 years up to life; $100 Special Assessment $5,000 Special Assessment unless indigent |
| 3 | Possession of matter containing visual depictions of sexual exploitation of minors | 18: 2252(a)(4)(B) & (b)(2) | Up to 20 years' imprisonment $250,000 fine; SR: at least 5 years up to life $100 Special Assessment $5,000 Special Assessment unless indigent |
| 4 & 5 | Production of material containing visual depictions of sexual exploitation of minors | 18: 2251(a) & (e); | At least 15 years and up to 30 years' imprisonment; $250,000 fine; SR: at least 5 years up to life; $100 Special Assessment $5,000 Special Assessment unless indigent |

# DE-13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-14047-CR-MIDDLEBROOKS

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

SCOTT JOSEPH TRADER,

     Defendant.

_____/

## **MOTION TO SUPPRESS ILLEGALLY OBTAINED EVIDENCE**

The defendant Scott Trader, through counsel, requests that the Court suppress any and all illegally seized evidence upon the following grounds:

### **Statement of Facts**

On May 30, 2017, the police department of Thomasville, North Carolina received a complaint that several unknown men had engaged in inappropriate on-line sexual chats with the complainant's nine year old step-daughter, had sent the girl images of child pornography, and had requested that the girl send nude images of herself. The Thomasville police then contacted the U.S. Department of Homeland Security (HSI).

An HSI special agent in North Carolina inspected the girl's computer tablet and learned that the girl was accessing the social media service "Say Hi." "Say Hi" is a social media application for adults 18 and older. On her profile page, the girl claimed to be "Vitoria Jones," an adult, and had posted two "self-images" which appeared to be a woman in her late twenties.

The review further revealed that the suspect user went by the name "Scott."

"Vitoria" began the "Say Hi" chat session with "Scott" by contacting him and asking:  "Hi boyfriend.  Can you chat please."  "Vitoria" then told "Scott" that she had a gift, "Jojo bows," for his kids.[1]  "Vitoria" then requested that "Scott" send pictures of his kids.  "Scott" sent two pictures of fully clothed children and asks "Vitoria" to send a photo of her child.  "Vitoria" sent a picture of a clothed adolescent female and made the comment:  "My kids are cute," followed by "I know honey our kids are cute."  To this point, "Vitoria" was clearly posing as an adult female with minor female children.

"Scott" then asked "Vitoria" to send a picture of "your daughter naked." "Vitoria" responded:  "Yours frist."  (sic).  "Scott" responded by sending what appears to be a widely circulated Internet nude image of an apparent adolescent female along with the statement:  "My youngest daughter."  Approximately one minute later "Scott" sent a second nude female apparent adolescent image, also widely circulated on the Internet, and the comment:   "My oldest daughter." "Vitoria then sent two nude images of an adolescent female to "Scott."  "Scott" then sent a short video of what appears to be an adult male rubbing his penis on the vagina of an adolescent female.  He chatted that the video was "Me and my daughter."

Approximately 20 minutes later, "Vitoria" again contacts "Scott" on "Say Hi" and sends "Scott" two nude images of herself.  "Vitoria" requested nude photos of "Scott."  "Scott" sent a short video of a man masturbating and two still photos of an

---

[1] Apparently, "Jojo Bows" are large colorful hair bows popular among adolescent females.

erect penis.  "Vitoria" then requested a photo of "Scott's" face.  "Scott" sent a still photo of an adult male's face.  The image allegedly matched the facial image posted on "Scott's" "Say Hi" user profile page.  All communications between the girl and Scott took place over the "Say Hi" application.

HSI Special Agent Cory Brant who was investigating the complaint, noticed that "Scott's" user profile on "Say Hi" indicated that he also was active on another social media service, "KiK," under the user name "Daddyhasafunnyface."   Because "Say Hi" is a China-based company, Agent Brant was concerned that any request to "Say Hi" for "Scott's" subscriber records would take too long.  Consequently, he sent an "Emergency Situation Disclosure Request by Law Enforcement" to "KiK" instead.  In that emergency request, Agent Brant claimed that the request involved a situation "involving death or serious physical injury."  Agent Brant then stated: "The KiK user identified below is believed to be actively molesting and sexually exploiting a minor in his custody and/or control.  This subject is also involved in the sexual exploitation of other minors."  Agent Brant requested that "KiK" produce "the *last known customer name and email address and recent IP addresses* used by the account holder."  Agent Brant failed to inform "KiK" that its service was not used in the suspected illegal activity.

"KiK" responded with 29 pages, listing the "basic subscriber information, and the most recent 30 days of IP addresses if available associated with the Kik user name you provided."   The "subscriber information" included the email address associated with the "KiK" account, "strader0227@yahoo.com."  It also showed that there were 594 logins to the "Daddyhasafunnyface" account from 42 different IP addresses during the 30 days prior to May 31, 2017.

Armed with the IP addresses and the email address, Agent Brant then sent an additional emergency disclosure request to Comcast Corporation, the Internet provider for IP address "76.110.46.46.234 on 05/31/2017 at 6:36:32 UTC."  In that request, Agent Brant described the emergency as follows:  "This subject is believed to have raped his daughter last night and sent videos depicting the rape to others.  Since it appears that this subject is raping a child under his custody or control and the offenses are actively taking place this emergency request is being sought."  In the next section of the request, Agent Brant states:  "The threat appears to be ongoing and the child is continually being sexually abused.  It appears the child involved was sexually abused as early as last night."  Comcast responded that the subscriber to the IP address was assigned to "Shelly Trader, 1189 SW Edinburgh Dr., Port St. Lucie, 34953…"

Agent Brant then appears to have enlisted the assistance of HSI agents in this district.  Local HSI Special Agent Brian Ray conducted a property records search for the 1189 Edinburgh Drive residence and learned that it was purchased by Leon Bonano and Shelly Trader-Bonano on June 16, 2016.  He also conducted a drivers license records (DAVID) check of "Scott Trader."  Scott Trader's residence address is listed in those records as 4286 Carl Street, Port St. Lucie, Florida.  His mailing address was listed as 1189 S.W. Edinburgh Drive, Port St. Lucie, Florida.

Agent Ray also ran a criminal records check on Scott Trader.  It showed that Mr. Trader had been charged with Promoting a Sexual Performance by a Child, Lewd Behavior, and Possession of Child Pornography in 2012.  All of those charges were dismissed and Mr. Trader pled no contest to a single count of Child Neglect.  Mr. Trader was not "convicted;" adjudication was withheld.  In December of 2016,

Mr. Trader was charged with Lewd Behavior.  He has pled not guilty and was on bond at the time of his arrest in this case.  He is presumed innocent.

Finally, Agent Ray conducted a brief surveillance of 1189 S.W. Edinburgh Drive and witnessed an adult woman and a female child, approximately two years of age, enter the residence.  He never saw Mr. Trader during the surveillance.

HSI agents then applied for a search warrant for 1189 Edinburgh Drive.  HSI Special Agent Lori Cercy submitted a sworn affidavit in which she related the investigation of Agents Brant and Ray.  On May 31, 2017, The Honorable William Matthewman, United States Magistrate Judge, signed a search warrant for the residence.

On June 1, 2017, the search warrant was executed.  In a bedroom allegedly shared by Mr. Trader and his wife, agents located two smart phones, nine SD cards, and a portable hard drive.  A forensic examination of these items revealed evidence of child pornography.   Some of the photos/videos allegedly depict Mr. Trader involved in sexual behavior with minors.   These items are the subject of the indictment in this case.

### Grounds For Suppression

1. **The release of "Kik" customer records, without a warrant or exigent circumstances, was a violation of Mr. Trader's reasonable privacy expectation under the Fourth Amendment.  There were no exigent circumstances supporting the "KiK" release of Mr. Trader's subscriber information.**

2. **The affidavit in support of the search warrant failed to show probable cause on its face.  *Leon* does not save the search.**

**Memorandum of Law**

**The release of "Kik" customer records, without a warrant or exigent circumstances, was a violation of Mr. Trader's reasonable privacy expectation under the Fourth Amendment. There were no exigent circumstances supporting the "KiK" release of Mr. Trader's subscriber information.**

At the time that Agent Brant requested subscriber information from "KiK," Mr. Trader had a reasonable privacy interest in that information.  Accordingly, because no warrant was obtained to permit the release of information, the government must show that the release was due to an exception to the warrant requirement.  The purported exception, exigent circumstances, did not exist.  The subscriber information and any evidence obtained as a result of its release should be suppressed.

Initially, the defendant acknowledges *United States v. Davis*, 785 F.3d 489 (11th Cir. 2015), in which the Eleventh Circuit held, *en banc*, that cellular phone subscribers do not have a Fourth Amendment privacy interest in their cellular phone call data.  However, the defendant contends that the instant case is distinguishable, or, in the alternative, *Davis* was wrongly decided.

The holding in *Davis* was based on the "third party doctrine," first espoused by the Supreme Court in *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619 (1976). That doctrine holds that one who voluntarily divulges information to a third party no longer retains a reasonable expectation of privacy in such information.  Three years after *Miller*, in *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577 (1979), the Court extended the doctrine to include telephone numbers dialed by the defendant and recorded and released by the phone company.  "When he used his phone, petitioner voluntarily conveyed numerical information to the telephone company

and 'exposed' that information to its equipment in the ordinary course of business."
*Id.* at 744.

The type of information released in the instant case is different and much more deserving of privacy protection.  First, and perhaps most important, "KiK" released the email address of the subscriber.  As anyone in modern society knows, one's email address is often the first part of the secured entry process for Internet accounts.  Everything from bank account and credit card access to on-line entertaining and dating services is now accessed through the use of one's email address.  Revealing an email address can literally reveal the entirety of an individual's private life.  Security concerns abound.  *See e.g., Five Reasons You Shouldn't Give Out Your Email Address,* Adam Levin, ABC News*, http://abcnews.go.com/Business/reasons-give-email-candy/story?id=31373966.*

Next, "KiK" released the subscriber's "IP addresses."  An IP address is the exact Internet electronic address of the particular Internet subscriber account.  In addition to indicating the specific location of the user at the time of use, a significant portion of the user's Internet history could be recovered.  A sophisticated and unscrupulous snooper can uncover intimate details about the user's Internet activities.  *See, What Is An IP Address And What Can It Reveal About You*, Cale Weissman, Business Insider, 2015, http://www.businessinsider.com/ip-address-what-they-can-reveal-about-you-2015-5.  Additionally, it is important to note that an IP address is not provided by the subscriber to an application provider such as "KiK."  Instead, the IP address is assigned by the subscriber's Internet provider, without input or control of the subscriber.

These items are very different to the cellphone call data considered in *Davis*. They are the keys to the content of an Internet subscriber's activity. Clearly, an individual has a reasonable and legitimate privacy interest in his or her email address and IP address.

The defendant acknowledges that he has found no case which clearly recognizes a Fourth Amendment privacy interest in personal email addresses or IP addresses. However, due to the pervasive nature of the Internet and its effect on personal communications, courts and legislatures have recognized the need for greater protections of individual privacy in the medium. "Rapid changes in the dynamics of communication and information transmission are evident not just in the technology itself but in what society accepts as proper behavior." *City of Ontario v. Quon*, 560 U.S. 746, 759 130 S.Ct. 2619, 2629 (2010).

Congress has expressly recognized a privacy interest in Internet subscriber information. In 1986, after the *Miller* and *Smith* decisions,[2] Congress enacted the Electronic Communications Privacy Act. 18 U.S.C. § 2702, *et seq*. In § 2702, Congress strictly limited the conditions under which electronic communications providers can release subscriber information to law enforcement and other third parties. The pertinent provision reads as follows:

(a) Prohibitions. --- Except as provided in subsection (b) or (c) –

. . .

(3) a provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service

---

[2] Congress is presumed to be thoroughly aware of Supreme Court precedent when enacting legislation. *North Star Steel Co. v. Thomas*, 515 U.S. 29, 115 S.Ct. 1927 (1995).

(not including the contents of communications covered by paragraph (1) or (2) to any government entity.

. . .

(b) Exceptions for disclosure of customer records. –

(4)  to a government entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency;

The Eleventh Circuit has found that email addresses are "personal information" worthy of protection.  *See, e.g., United States v. Hastie*, 854 F.3d 1298 (11th Cir. 2017) (email address is protected "personal information" under the Drivers Privacy Protection Act, 18 U.S.C. § 2721 *et seq*.)  Other federal courts have recognized a right of privacy in one's email address as well.  *Government Accountability Project v. U.S. Department of State*, 699 F.Supp. 2d 97 (D.C. 2010) (individual's right of privacy in email address precluded release under FOIA.  Many states have also codified a right to privacy in one's personal email address.  *See, e.g.*, O.C.G.A. § 50–18–72(20)(A); Cal. Gov't Code § 6254.4;  5 Ill. Comp. Stat. 140/7(1)(c); Tex. Gov't Code § 552.102(a).  These recognitions of the changing nature of modern communication support the conclusion that *Miller* and *Smith* are no longer sufficient to define or enforce an individual's privacy rights under the Fourth Amendment.

Recently, the Supreme Court expanded Fourth Amendment protection to data, even though that data may have been provided to a third party.  In *Riley v. California*, ___ U.S. ___, 134 S.Ct. 2473 (2014), the Court noted that with today's technology, the average cell phone user is likely to not even know if her Internet information is kept on her phone or is stored in "the Cloud."  "The United States

concedes that the search incident to arrest exception may not be stretched to cover a search of files accessed remotely---that is, a search of files stored in the cloud.  Such a search would be like finding a key in a suspect's pocket and arguing that it allowed law enforcement to unlock and search a house."  This partial abrogation of *Miller* and *Smith*, and the "third party doctrine," indicates that the High Court now questions the efficacy of those decisions in today's communications landscape.

As noted, the release of an email address and IP address allow unscrupulous law enforcement or other third parties to examine the content and patterns of a subscriber's Internet use.  Those pieces of private information were also "keys" in which Mr. Trader had a reasonable and legitimate privacy interest.  "The judiciary must not allow the ubiquity of technology---which threatens to cause greater and greater intrusions into our private lives---to erode our constitutional protections." *Davis*, 785 F.3d at 533 (J. Martin, dissenting).

The defendant further contends that there was no exception to the warrant requirement which authorized the release of information in this case.  The HSI agents presumably relied on the exception stated in 18 U.S.C. § 2702(c)(4), *supra*, *i.e.*, "an emergency involving death or serious physical injury."  In the context of a Fourth Amendment search this exception would be most similar to "exigent circumstances."

Initially, the exception of exigent circumstances should be restricted to instances of immediate life threatening danger.  It should not be sanctioned as an investigative tool as used in this case.

"The exigent circumstances doctrine applies only when the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate

action." *United States v. Satterfield,* 743 F.2d 827, 844 (11th Cir.1984).   "[W]hen exigent circumstances demand an immediate response, particularly where there is danger to human life, protection of the public becomes paramount and can justify a limited, warrantless intrusion into the home." *United States v. Holloway,* 290 F.3d 1331, 1334 (11th Cir.2002). The government bears the burden of proving that the exception applies and must establish both an exigency and probable cause.  *Id.*

In a similar, although arguably more serious, situation the Eleventh Circuit declined to find that exigent circumstances existed.  In *United States v. Davis*, 313 F.3d 1300 (11th Cir. 2002) the Florida Department of Children and Family Services received a detailed report from a civilian caller who stated that the defendant was holding captive in his trailer home a girl, age fifteen, to whom he was providing drugs and with whom he was having sexual intercourse. The caller also reported that appellant possessed guns and explosives.  Police arrived at the scene and, without a warrant, entered and searched the defendant's house.  On appeal, the Eleventh Circuit refused to conclude that the information constituted exigent circumstances, but instead upheld the seizure of a firearm based upon the independent source doctrine.

The information possessed by HSI agents in this case is even less reliable and less in quantity than that in *Davis*.  Here, the agents had photographs which revealed no identities and no certainty that the individuals in the photographs were actually who "Scott" alleged them to be.  There was no certainty that the "Scott" accessing "Say Hi" was also the "KiK" account holder.  In short, the agent had nothing more than a hunch.  Last, there was no allegation of a kidnapping, illegal drugs, dangerous firearms or explosives.  There was no allegation that someone's

life was in danger.  There simply were not exigent circumstances which permitted the obtaining of private information without first acquiring a warrant.  Any and all evidence obtained as a result of the illegal search must be suppressed.

**The affidavit in support of the search warrant failed to show probable cause on its face.**

Despite the fact that agents obtained a warrant to search the Trader residence, the warrant affidavit failed to state probable cause to believe that evidence of a crime committed by "Say Hi" user "Scott" would be found at the Trader house.  The agents' substitution of information regarding "KiK" user "Daddyhasafunnyface" and his/her connection to the residence was insufficient to establish probable cause that evidence of the "Say Hi" crime would be found at the same house.  There was no evidence that the IP address used by the "KiK" subscriber had been used any crimes whatsoever.  And the idea that the IP address associated with the "KiK" account would be the same as that associated with the suspect "Say Hi" account was nothing more than a hunch on the part of agents.

Moreover, the agents could make little or no connection between Scott Trader and the residence to be searched---his mother's residence.  The mere listing of Mrs. Trader's residence as a mailing address for Scott Trader with the Department of Motor Vehicles was insufficient for probable cause.  This too was simply a hunch.

"It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found *at the premises to be searched." United States v. Martin*, 297 F.3d 1308 (2002) (internal citations omitted) (emphasis added).  Thus, the affidavit must contain "sufficient information to conclude that a fair probability existed that seizable

evidence would be found in the place sought to be searched." *Id.* Specifically, the affidavit must establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity. *Id.*

In the instant case, there was no connection shown between the residence to be searched and the alleged criminal activity on "Say Hi." The suspect user of "Say Hi," even if he/she was also the "Kik" user, could have used a million other IP addresses. Combined with the fact that the agents could establish little or no contact between the defendant and the residence to be searched, it is clear that probable cause did not exist.

In *United States v. Contreras-Rodriguez*, 291 Fed. Appx. 989 (11th Cir. 2008), the Eleventh Circuit found probable cause lacking in a similar situation. There, agents applied for a search warrant based upon evidence that the property owners were housing and employing illegal aliens. The affidavit also requested leave to search other residences on the suspects' property, but failed to state probable cause connecting those other residences to the illegal activity. The court found the resulting warrant deficient, but denied exclusion based on *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 3420 (1984).

Had the agents in this case obtained the IP address from the "Say Hi" user and connected it to the Trader residence, probable cause may have existed. Instead, they just relied on a hunch that the IP address would be the same. That hunch was not probable cause. The effect of issuing a warrant based on the HSI agents' hypothesis was to sanction an exploratory search of the Trader residence based on a hunch, which is impermissible. *See Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976) (Fourth Amendment is designed specifically to

prohibit the use of general warrants whereby the authorities engage in "a general, exploratory rummaging in a person's belongings.").

The defendant urges that *Leon* does not save the search in this case. The exclusionary rule does not bar the use of evidence seized by police officers acting in good faith reliance on a search warrant issued by a neutral and detached magistrate, even though it is later found to be deficient. However, the "good faith" exception to the exclusionary rule does not apply when: 1) the judge was intentionally misled by police in the search warrant affidavit; 2) the judge wholly abandoned her detached and neutral role; 3) the warrant was based upon an affidavit so lacking in probable cause as to render official belief in its existence entirely unreasonable; and 4) the warrant was so facially deficient by failing to particularize the place to be searched or things to be seized that reasonable officers could not presume it to be valid. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405 (1984).

In this case, as noted, the warrant affidavit was so lacking in probable cause that it was unreasonable for the officers to assume that it was valid. A reasonably well-trained officer would have known that the affidavit lacked probable cause.

"Our reading of *Leon* persuades us that the proper test is whether the *officer* acted in objective good faith under all the circumstances. The focus in *Leon* is on the officer. '[T]he officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable....'" *United States v. Taxacher*, 902 F.3d 867, 871 (11th Cir. 1990) (quoting *Leon*). "The good-faith inquiry is confined to the objectively

ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.*

The instant affidavit stated no connection between the residence and any criminal activity whatsoever.  A well-trained HSI special agent knows that a search warrant affidavit must state probable cause to believe that evidence of a specific crime will be found at a specific place to be searched.  In this case, the agent was required to show that evidence of the "Say Hi" crime would probably be found at Mrs. Trader's residence.  It was, and is, obvious that supplying the Court with the IP address for an Internet application not connected with the suspect offense does not constitute probable cause.  The agents did, or should have, known better.

Finally, the defendant requests that the Court conduct an evidentiary hearing and oral argument of the issues.  If permitted, the defendant would offer expert testimony regarding the nature of personal email addresses and IP addresses and the need for privacy of those matters.

WHEREFORE the defendant requests that the Court grant the motion and suppress any and all evidence seized as a result of the search.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER


By:   *s/Fletcher Peacock*
Fletcher Peacock
Assistant Federal Public Defender
Florida Bar No. 441996
109 North Second Street
Fort Pierce, Florida 34950
Tel:  772-489-2123
Fax: 772-489-3997
E-Mail: Fletcher_Peacock@fd.org

15

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on September 6, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:  <u>*s/Fletcher Peacock*, AFPD</u>
Fletcher Peacock

<u>**SERVICE LIST**</u>

**UNITED STATES v. SCOTT JOSEPH TRADER**
**Case No. 17-14047-CR-MIDDLEBROOKS**
**United States District Court, Southern District of Florida**


**Fletcher Peacock**
**Fletcher_Peacock@fd.org**
**Assistant Federal Public Defender**
109 North Second Street
Fort Pierce, FL 34950
Tel: 772-489-2123
Fax: 772-489-3997
Attorney for Trader
Notices of Electronic Filing


**Marton Gyires**
**marton.gyires@usdoj.gov**
**Assistant United States Attorney**
United States Attorney's Office
101 South U.S. Hwy 1, Suite 3100
Fort Pierce, Florida 34950
Tel:  772-293-0952
Fax: 772-595-3606
Notice of Electronic Filing

# DE-14

<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 17-cr-14047-MIDDLEBROOKS**

</div>

**UNITED STATES OF AMERICA**

**vs.**

**SCOTT JOSEPH TRADER,**

      **Defendant.**

_____/

<div align="center">

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS**

</div>

**I.**    **Introduction**

The government files this response to the defendant Scott Joseph Trader's motion to suppress illegally obtained evidence.  This is a child exploitation case in which the defendant is charged by Indictment with: enticement of a minor to engage in sexual activity in violation of 18:2422(b) (Count 1); distribution of material containing visual depictions of sexual exploitation of minors, in violation of 18: 2252(a)(2) & (b)(1) (Count 2); possession of matter containing visual depictions of sexual exploitation of minors in violation of 18: 2252(a)(4)(B) & (b)(2) (Count 3), and production of material containing visual depictions of sexual exploitation of minors in violation of 18: 2251(a) & (e) (Counts 4 and 5).  The defendant was arrested at his home during the early morning hours of June 1, 2017 after law enforcement executed a search warrant at the residence.  The search warrant, application, affidavit, and attachments are attached to this pleading as Exhibit 1.[1]  During the search of the home pursuant to the warrant, police found voluminous and overwhelming evidence against the defendant with respect to the charges in the indictment.

---

[1] Dates of birth have been redacted from the affidavit.

<div align="center">1</div>

The defendant seeks to suppress all of that evidence by making two claims: Issue #1) he claims that the search warrant affidavit relied on illegally obtained evidence, namely, subscriber information that was given to law enforcement by a social media company without a warrant; and Issue #2) he claims that the search warrant lacked probable cause on its face.   The defendant's motions should be denied.  As to obtaining subscriber information without a warrant, the defendant admits he has not found a single case to support his claim.  To the contrary, there are numerous cases across the country that have held that law enforcement can obtain subscriber information from various Internet service providers and telephone companies merely with a subpoena and without a warrant.  As to the defendant's claim that the warrant lacked probable cause, this too lacks merit, as evidenced by the facts contained in the attached search warrant affidavit.

The government further submits that since these issues are questions of law, not fact, the Court can reach its conclusion by reviewing the attached search warrant affidavit and briefs, and need not hold an evidentiary hearing.  "[W]here a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing independent of the trial to receive evidence on any issue necessary to the determination of the motion."  United States v. Cooper, 203 F.3d 1279, 1285 (11th Cir. 2000). The Court need not rely on the first few pages of the defendant's motion containing a "statement of facts." See e.g., United States v. Robinson, 336 F.3d 1293, 1297 (11th Cir. 2003) (suppression court is not required to look beyond four corners of search warrant application to ensure that executing officer's reliance on warrant was reasonable, for purpose of applying Leon good faith exception to exclusionary rule).

## II.   **Facts**

The facts relevant to make a ruling are contained in the attached search warrant affidavit.[2]

The warrant authorized the search of the property located at 1189 SW Edinburgh Drive, Port St.

Lucie, Florida, 34953.  Some relevant portions of the affidavit are also copied here:

> On 30 May 2017, the Thomasville Police Department, North Carolina, received a complaint from the stepfather of a 9 year old victim. The complainant reported his discovery of explicit chat communications between the victim and her chat partner "Scott" on Smartphone Application #1. The complainant provided the victim's mobile device to police for examination. The Thomasville Police Department requested the assistance of HSI Winston-Salem in furthering the investigation.

> HSI Winston-Salem's examination of the victim's device revealed text communications with Scott on the evening of 30 May 2017, using Smartphone Application #1. The victim provided Scott pictures which clearly indicated she was a preteen female. Scott requested nude images from the victim and transmitted a child pornography video to the victim. The video was a 37 second long depiction of an adult male rubbing his penis on the vagina of a preteen female. Scott claimed the female depicted in the video was his daughter. Scott also sent a masturbation video to the victim, along with a still image which depicted Scott's face.

> Scott had a profile on Smartphone Application #1. The profile had a picture of his face, along with an apparent minor female. The face depicted in the still image transmitted to the victim matched the Scott profile image. Scott also listed his username for Smartphone Application #2.

> Smartphone Application #1 is headquartered outside of the United States and it is unknown if they will respond to United States process. Smartphone Application #2 was sent an emergency disclosure request for the subscriber information associated with the user name provided in the Smartphone Application #1 "Scott" user profile. Smartphone Application #2 responded, indicating the email account associated with the account was strader0227@yahoo.com. Smartphone Application #2 also provided a login history, indicating there were logons to the account from IP address 76.110.46.234 starting 1 May 2017, through 31 May 2017, at 06:36 UTC. The IP address is registered to Comcast. The Smartphone Application #2 profile picture matched the aforementioned "Scott" profile and still image pictures.

---

[2] The facts of the entire investigation are of course far more extensive than just the facts in the search warrant application.

Comcast was sent an emergency disclosure request for the subscriber information associated with IP address 76.110.46.234 on 31 May 2017 at 06:36 UTC. Comcast responded, identifying the subscriber as Shelly Trader, 1189 SW Edinburgh Drive, Port St. Lucie, Florida, 34953.

On 31 May 2017, Special Agent Ray conducted a property records search for 1189 SW Edinburgh Drive, Port St. Lucie, Florida, on the St. Lucie County Property Appraiser's website. According to the website, 1189 SW Edinburgh Drive, Port St. Lucie, Florida was purchased by Leon Bonanno and Shelly Trader-Bonanno on 16 June 2016.

Special Agent Ray conducted a check of the Florida Department of Highway Safety and Motor Vehicle (DHSMV) records which indicated that on 1 August 2016, Scott TRADER, born [xx] June 19[xx], listed his mailing address as 1189 SW Edinburgh Drive, Port St. Lucie, Florida, 34953. TRADER's Driver License photograph matches the aforementioned "Scott" user profile and transmitted images.  TRADER did not update his residential address, 4286 SW Carl Street, Port St. Lucie, Florida, which was also Shelly Trader-Bonanno's, address until the purchase of the 1189 SW Edinburgh Drive property. According to DHSMV records, Shelly Trader-Bonanno was born [x] July 19[xx], which is consistent with her being Scott TRADER's mother.

Special Agent Ray conducted a criminal history record check which revealed that in 2012, Scott TRADER was arrested by the Port St. Lucie Police Department for Promoting a Sexual Performance by a Child, Lewd Behavior, and Possession of Child Pornography. Those charges were dropped/abandoned, and TRADER was convicted for Felony Child Neglect. In December 2016, TRADER was arrested for Lewd Behavior – Molesting a Victim less than 12 years of age.

On 31 May 2017, surveillance of 1189 SW Edinburgh Drive, Port St. Lucie, Florida, was established by HSI Ft. Pierce Agents. A female child, approximately two years of age, was seen entering the residence.

## III. Discussion

### A. Issue #1.  Obtaining subscriber information without a warrant is proper under the Fourth Amendment and the Electronic Communications Privacy Act.

#### i. Subscriber Information and the Fourth Amendment

The defendant argues that he has an expectation of privacy in the subscriber information,

that is, an email address and IP address, that law enforcement obtained from "Kik," which is

"Smartphone application #2" in the affidavit.[3]  The defendant in his motion admits that he "has found no case which clearly recognizes a Fourth Amendment privacy interest in personal email addresses or IP addresses." [DE 13 at 8].  Neither has the government.  To the contrary, the government has found numerous cases holding the exact opposite—that obtaining subscriber information, including IP addresses and email addresses, does not require a search warrant.

"[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." Smith v. Maryland, 442 U.S. 735, 740 (1979).  A person claiming a violation of the Fourth Amendment must demonstrate that he has a subjective expectation of privacy and that society is prepared to recognize that expectation as objectively reasonable.  Rakas v. Illinois, 439 U.S. 128, 143 (1978).  The third-party doctrine applies when someone voluntarily discloses information to a third party; an expectation of privacy in such information fails the objectively reasonable prong. See Smith, 442 U.S. at 743–44, 99 S.Ct. 2577; see, e.g., U.S. v. Davis, 785 F.3d 498, 511–12 (11th Cir. 2015).

All federal courts that have addressed the instant issue "uniformly agree that, because of the third-party doctrine, computer users lack a reasonable expectation of privacy in their IP addresses, subscriber information, and similar descriptive information they disclose to third parties [such as internet service providers] to facilitate Internet service." United States v. Taylor, 2017 WL 1437511, at *6 (N.D. Ala. Apr. 24, 2017) (a District Court in the 11th Circuit citing numerous cases); see also U.S. v. Beckett, 369 Fed.Appx. 52, 56 (11th Cir. 2010) (unpublished) (a person has no reasonable expectation of privacy in identifying information, including IP addresses,

---

[3] The affidavit mentioned "Smartphone Application #1" and "Smartphone Application #2," without specifying the names of the applications.  Although not referenced in the affidavit, the government agrees with the statements in the defendant's motion indicating that "SayHi" is Application #1 and "Kik" is #2.

transmitted for ISPs and phone providers to provide service); <u>U.S. v. Carpenter</u>, 819 F.3d 880, 887 (6th Cir. 2016) ("The Fourth Amendment protects the content of the modern-day letter, the email. But courts have not (yet, at least) extended those protections to the internet analogue to envelope markings, namely the metadata used to route internet communications, like sender and recipient addresses on an email, or IP addresses."); <u>U.S. v. Weast</u>, 811 F.3d 743, 748 (5th Cir. 2016) (holding that the Fourth Amendment does not protect IP addresses or peer-to-peer shared files); <u>United States v. Forrester</u>, 512 F.3d 500, 510 (9th Cir. 2008) ("Like telephone numbers [in the context of pen registers], which provide instructions to the 'switching equipment that processed those numbers,' e-mail to/from addresses and IP addresses are not merely passively conveyed through third party equipment, but rather are voluntarily turned over in order to direct the third party's servers."); <u>United States v. Christie</u>, 624 F.3d 558, 573–74 (3d Cir. 2010) ("Similarly, no reasonable expectation of privacy exists in an IP address, because that information is also conveyed to and, indeed, from third parties, including ISPs."); <u>Guest v. Leis</u>, 255 F.3d 325, 336 (6th Cir. 2001) (holding, in a non-criminal context, that "computer users do not have a legitimate expectation of privacy in their subscriber information because they have conveyed it to another person-the system operator"); <u>United States v. Hambrick</u>, 225 F.3d 656 (4th Cir. 2000) (unpublished) (holding that there was no legitimate expectation of privacy in noncontent customer information provided to an internet service provider by one of its customers); <u>United States v. Werdene</u>, No. 15-434, 2016 WL 3002376 (E.D. Pa. May 18, 2016) ("a necessary aspect of the Tor network is the initial transmission of a user's IP address to a third party . . . "[I]n order for a prospective user to use the Tor network[,] they must disclose information, including their IP addresses, to unknown individuals running Tor nodes, so that their communications can be directed toward their destinations."); <u>United States v. Adams,</u> 2016 WL 4212079 at *4, Case no. 6:16-cr-

11-Orl-40GJK, August 10, 2016 (M.D. FL) ("Applying these principles, the Court finds Defendant

does not have a reasonable expectation of privacy in the IP address associated with the computer

he used to access Playpen [a global online forum dedicated to the advertisement and distribution

of child pornography]"); United States v. Michaud, No. 3:15-CR-05351-RJB, 2016 WL 337263, at

*7 (W.D. Wash. Jan. 28, 2016) ("Mr. Michaud has no reasonable expectation of privacy of the

most significant information gathered by deployment of the NIT, Mr. Michaud's assigned IP

address, which ultimately led to Mr. Michaud's geographic location."); United States v. D'Andrea,

497 F.Supp.2d 117, 120 (D.Mass. 2007) ("The Smith line of cases has led federal courts to

uniformly conclude that internet users have no reasonable expectation of privacy in their subscriber

information, the length of their stored files, and other noncontent data to which service providers

must have access."); Freedman v. America Online, Inc., 412 F.Supp.2d 174, 181 (D.Conn. 2005)

("In the cases in which the issue has been considered, courts have universally found that, for

purposes of the Fourth Amendment, a subscriber does not maintain a reasonable expectation of

privacy with respect to his subscriber information."); United States v. Sherr, 400 F.Supp.2d 843,

848 (D.Md. 2005) ("The courts that have already addressed this issue ... uniformly have found that

individuals have no Fourth Amendment privacy interest in subscriber information given to an

ISP."); United States v. Cox, 190 F.Supp.2d 330, 332 (N.D.N.Y. 2002) (same); United States v.

Kennedy, 81 F.Supp.2d 1103, 1110 (D.Kan. 2000) ("Defendant's constitutional rights were not

violated when [internet provider] divulged his subscriber information to the government.

Defendant has not demonstrated an objectively reasonable legitimate expectation of privacy in his

subscriber information.").

     The 11th Circuit unpublished Beckett case explains the rationale:

        Beckett could not have had a reasonable expectation of privacy in the
        information that was obtained from the ISPs and the phone companies. The

investigators did not recover any information related to content. **Rather, the information consisted of the identifying information transmitted during internet usage and phone calls that is necessary for the ISPs and phone companies to perform their services. It is unreasonable for Beckett to have been unaware that such information was being transmitted to the ISPs and phone companies and so he "assumed the risk that the company would reveal to police the [information]."** <u>Smith</u>, 442 U.S. at 744, 99 S.Ct. at 2582 ("When he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business.").  Accordingly, we affirm in this respect.

<u>Beckett</u>, 369 Fed.Appx. at 56 (emphasis added).

The defendant makes no mention of the vast number of cases across the country that have ruled against him on this issue.  The defendant does point out <u>United States v. Davis</u>, 785 F.3d 498, 511 (11th Circuit 2015), which held that the government's obtaining a § 2703(d) court order for the production of MetroPCS's business records containing historical cell tower location information did <u>not</u> violate the Fourth Amendment.  The holding and rationale in <u>Davis</u> is essentially the same as the issue here, but it involved historical cell tower information from a phone company rather than subscriber information from a smartphone application company (Kik).  Just like the numerous cases cited above in the context of IP addresses, the <u>Davis</u> Court likewise relied on the third-party doctrine, saying "Davis can assert neither ownership nor possession of the third-party's business records he sought to suppress [ . . .] Instead, those cell tower records were created by MetroPCS, stored on its own premises, and subject to its control." <u>Id.</u>  The defendant attempts to distinguish the phone records in <u>Davis</u> from the issue of IP  and email addresses in this case, but flatly ignores ample precedent that is precisely on point as to IP and email addresses, which are cited above.[4]

---

[4] The government has not found a published 11th Circuit case directly holding that computer users lack a reasonable expectation of privacy in their IP addresses or email address.  But the above-cited cases do include: an unpublished 11th Circuit case (Beckett); the published 11th Circuit case <u>Davis</u>, which uses the same rationale; two District Courts in the 11th Circuit (<u>Taylor</u> and <u>Adams</u>); numerous published circuit cases from other circuits; and numerous district court cases from other circuits.  There are in fact many more cases that can be cited, and neither the government nor defense has found a single case holding the opposite.

As such, there is ample precedent to resolve the Fourth Amendment issue in the government's favor.

ii.   The Electronic Communications Privacy Act

The defendant references the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2701-2712 and argues that there were "no exigent circumstances supporting the 'Kik' release of Mr. Trader's subscriber information." [DE at 6, 8, 10-12].   The ECPA has no bearing on the outcome of this case.  First of all, if the defendant is arguing that there was a violation of that Act, he is mistaken.  Second, even if there was a violation of the ECPA, suppression is not a remedy.    To be clear, no law imposes "exigent circumstances" to obtain subscriber information. The proper framework for obtaining subscriber information under the ECPA is the following.

The stored communication portion of the ECPA regulates how the government can obtain stored customer or subscriber records from providers such as Internet service providers and telephone companies.  Whenever agents or prosecutors seek stored email, account records, or subscriber information from a provider, they must comply with ECPA.  When the government intends to obtain subscriber records from a provider in connection with a criminal investigation, the most relevant ECPA provisions are 18 U.S.C. § 2703, which applies when the government seeks to compel production of the records, and 18 U.S.C. § 2702, which applies when a provider is willing to disclose the records voluntarily to the government.  Section 2702 is what applies in this case and is the section that the defendant apparently claims was violated.  [DE 13 at 8-10].

Under 18 U.S.C. § 2702(c)(4), a provider "may divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) [. . .]  to a governmental entity, **if the provider, in good faith, believes** that an

emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency." (emphasis added).

In this case, the search warrant affidavit explained that Kik responded to an "emergency disclosure request." By virtue of the fact that Kik responded, it is clear that **Kik believed** an emergency did exist and provided the government with subscriber information. This is wholly proper under the plain language of the ECPA and there is no indication whatsoever that the ECPA was violated in this case. It does not matter if there was an objective emergency or not, although the affidavit does contains facts showing there was indeed an emergency. The ECPA explicitly states that what matters is whether the provider believed in good faith that there was an emergency, and that clearly was the case here.

Even if there somehow was a violation of the ECPA, it does not matter, because the statute specifically states that suppression is not a remedy. 18 U.S.C. § 2708 ("The [damages] remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter."). Circuit courts have agreed. See e.g., United States v. Beckett, 369 Fed. Appx. 52, 55-56 (11th Cir. 2010) (unpublished) (("The ECPA does not statutorily provide for suppression of evidence obtained as a result of violations of the Act . . .The ECPA authorizes an aggrieved party to file a civil action for the 'knowing or intentional' violation of the Act.") (quoting 18 U.S.C. § 2707(a)); United States v. Smith, 155 F.3d 1051, 1056 (9th Cir. 1998), cert. denied, 525 U.S. 1071(1999) ("the Stored Communications Act expressly rules out exclusion as a remedy"). Instead, civil suits are available for statutory violations of the SCA. See 18 U.S.C. §§ 2707, 2712.

As such, litigating whether the ECPA was properly followed in this case is not necessary or proper.

In sum, the defendant's motion as to Issue #1 should be denied because obtaining subscriber information without a warrant is proper under the Fourth Amendment and the ECPA.

**B.  Issue #2.  The search warrant affidavit contained probable cause to search the house and if the Court were to hold otherwise, the good faith exception prevents suppression of the evidence.**

i.  <u>Probable Cause for the Search Warrant</u>

The defendant next argues that the search warrant affidavit lacked probable cause.  This claim has no merit.  The government respectfully submits that a reading of the affidavit proves sufficient probable cause.  In addition to simply reading the affidavit, the government will also offer the following explanation of the affidavit.

An affidavit supporting a warrant to search a residence must contain "sufficient information to conclude that a fair probability existed that seizable evidence would be found in the place sought to be searched."  <u>United States v. Martin</u>, 297 F.3d 1308, 1314 (11th Cir. 2002) (quoting <u>United States v. Pigrum</u>, 922 F.2d 249, 53 (5th Cir. 1991)).  Specifically, the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity.  <u>See Id.</u> (citing <u>United States v. Marion</u>, 238 F.3d 965, 969 (8th Cir.2001)). The affidavit in this case clearly connects all of these things.

First, the affidavit connects the defendant with criminal activity, namely, the sexting conversation had with the 9-year old victim.  The warrant explains that an image of a person's actual face was sent to a nine-year old victim, along with a masturbation video and a 37-second long child pornography video, saying:

> HSI Winston-Salem's examination of the victim's device revealed text communications with Scott on the evening of 30 May 2017, using Smartphone Application #1. The victim provided Scott pictures which clearly indicated she was a preteen female. Scott requested nude images from the victim and transmitted a child pornography video to the victim. The video was a 37 second long depiction of an adult male rubbing his penis on the vagina of a preteen female. Scott claimed

the female depicted in the video was his daughter. Scott also sent a masturbation video to the victim, along with a still image which depicted Scott's face.

The affidavit then goes on to explain that the image of the person's face that was sent to the victim matched the person depicted in the defendant's driver's license photograph, which license included his name, "Scott Joseph Trader."  The driver's license image also matched the photograph on the user profile for smart phone application #1 ("SayHi"), which was the application used to transmit child pornography with the 9-year old victim.  "Scott's" SayHi profile bore the name "Scott" (which of course is the first name on the defendant's driver's license).  The same SayHi user profile also listed "Scott's" username for another smartphone application, Kik.  That Kik profile likewise had a photo that matched the person depicted in the defendant's driver's license photo (who is the defendant).

Already at this point in the affidavit there is probable cause the defendant was engaged in the transmission/enticement/possession/production of child pornography, since a still image of the defendant's face, along with child pornography, was sent to the victim by a person who was using two smartphone apps that had the defendant's photograph as the apps' profile pictures, with one app using the name "Scott."   But there is more in the affidavit, and this next part links the defendant to the crime and to the residence.  The IP address (76.110.46.234) belonging to the device using **"Scott's" Kik app on the same date as the date of the SayHi sexting conversation** (May 30, 2017), was registered by Comcast as a subscriber residing at the target residence*,* **which is the same address listed by the defendant as his mailing address in Florida DMV records**.[5] Indeed, that same IP address (76.110.46.234) was used by "Scott's" Kik profile starting May 1, 2017, through May 31, 2017.  At this point, the government would submit that much more than

---

[5] As mentioned in the affidavit, the address listed on the defendant's driver's license itself was not the target residence; rather, the defendant listed the target residence as his mailing address with the DMV.

mere probable cause existed to connect the defendant to both the crime and the residence.  The

standard here is not beyond all doubt, it's probable cause (the relatively low standard of "a fair

probability")  <u>Illinois v. Gates</u>, 462 U.S. 213, 238,  231, 103 (1983 ("All we have required is the

kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'")).

Moreover, the end of the affidavit added even more facts to tie the defendant to the crime, saying:

> [The agent] conducted a criminal history record check which revealed that
> in 2012, Scott TRADER was arrested by the Port St. Lucie Police Department for
> Promoting a Sexual Performance by a Child, Lewd Behavior, and Possession of
> Child Pornography. Those charges were dropped/abandoned, and TRADER was
> convicted for Felony Child Neglect. In December 2016, TRADER was arrested for
> Lewd Behavior – Molesting a Victim less than 12 years of age.

As such, there was ample evidence connecting the defendant to both the crime and

residence.

The defendant's argument appears to be that there was no evidence in the affidavit that the

Kik account was used to commit any crime, and that is a basis to quash the warrant.  This argument

presupposes a totally incorrect standard for the search warrant.  The standard for the warrant here

is whether there was probable cause that evidence of a crime existed in the *house*.  The standard is

not whether there was probable cause that evidence of  a crime existed in the Kik account.  This

was not a search warrant to be served on Kik.  The Kik account was referenced in the affidavit not

to allege that it was used in a crime, but because it connected the defendant to the crime and to the

residence, and therefore helped provide the requisite probable cause to search the residence.  The

Kik account connected the defendant to the crime because the user profile for SayHi (which was

the app used to illegally communicate with the victim) listed that person's  username for Kik.  That

Kik user profile, and also the SayHi user profile, both had a photo of the defendant as their profile

pictures.  As such, it is simple common sense to think that the person using the Kik user profile

and the person using the SayHi user profile are one in the same person.  Accordingly, it is again

simple common sense to think that if one knows the location from which the user is using the Kik app on a given day, then one also knows the location from which that same user is using the SayHi app on that same day. That location was the target residence on May 30, 2017, the date of the sexting conversation and transmission of child pornography.

In sum, ample probable cause existed for the warrant and the defendant's motion should be denied.

> ii. The Good Faith Exception

Should the Court hold that the affidavit lacked probable cause, the Government would argue that the good-faith exception would still allow the evidence in this case to be admitted at trial. "Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness," Illinois v. Gates, 462 U.S., at 267, 103 S.Ct., at 2347 (WHITE, J., concurring in judgment), for "a warrant issued by a magistrate normally suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search." United States v. Ross, 456 U.S. 798, 823, n. 32, 102 S.Ct. 2157, 2172, n. 32, 72 L.Ed.2d 572 (1982). Thus, the exclusionary rule does not bar the use of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. United States v. Leon, 468 U.S. 897 (1984). Of course, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable. Id. at 922, 104 S. Ct. at 3420.

As the defendant cites in his motion, there are four situations outlined in Leon where the good faith exception to the exclusionary rule would not apply: (1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth (i.e., a Franks v. Delaware violation); (2) the

magistrate wholly abandoned his detached and neutral judicial role; (3) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant was so facially deficient by failing to particularize the place to be searched or the things to be seized, that the executing officers could not reasonably presume it to be valid. <u>United States v. Martin</u>, 297 F.3d 1308 (11th Cir. 2002); <u>United States v. Robinson</u>, 336 F.3d 1293 (11th Cir. 2003).

The defendant argues only the third option above, that the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.[6]  The question of whether a police officer's belief in the existence of probable cause underlying a search warrant was objectively reasonable is answered using the viewpoint of a reasonable officer, not a reasonable jurist.  <u>United States v. Taxacher</u>, 902 F.2d 867 (11th Cir. 1990).

In this case, the facts in the affidavit are simply too extensive for the defendant's argument to have merit.  As such, the defendant's request should be denied.[7]

In sum, the defendant's motion as to Issue #2 should be denied because the search warrant affidavit contained probable cause to search the house and if the Court were to hold otherwise, the good faith exception prevents suppression of the evidence.

---

[6] The defendant has not alleged a <u>Franks</u> violation.  Where a defendant makes a substantial preliminary showing that an affiant knowingly and intentionally included a false statement in an affidavit, or made the false statement with reckless disregard for its truth, and the false statement was necessary to the finding of probable cause, then constitutional mandate requires that a hearing be held at the defendant's request. <u>Franks v. Deleware</u>, 438 U.S. 154 (1978).  There must be a preliminary showing that a material omission or false statement can be proven, not a mere allegation or an unsupported request for a hearing.  <u>United States v. Barsoum</u>, 763 F.3d 1321, 1329 (11th Cir. 2014).  As such, there is no <u>Franks</u> issue before the Court in this case.

[7] Should the court find that the affidavit lacked probable cause and that the good faith exception does not apply, the government would perhaps also argue exigency, inevitable discovery, and other arguments it may find appropriate to prevent suppression of the evidence.

## IV.    <u>Conclusion</u>

The government respectfully requests that the Court deny the defendant's motion because 1) obtaining subscriber information without a warrant is routine, lawful police conduct, and 2) the search warrant in this case was supported by probable cause.  The government further submits that since these issues are questions of law, not fact, the Court can reach its conclusion by reviewing the attached search warrant affidavit and briefs, and need not hold an evidentiary hearing. "[W]here a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing independent of the trial to receive evidence on any issue necessary to the determination of the motion."  <u>United States v. Cooper</u>, 203 F.3d 1279, 1285 (11th Cir. 2000).  <u>See also</u> <u>United States v. Allison</u>, 953 F.2d 1346, 1350 (11th Cir. 1992) (stating that the "question of what amounts to probable cause is purely a question of law"); <u>Sablan v. Dep't of Fin. of Commonwealth of Northern Mariana Islands</u>, 856 F.2d 1317, 1322 (9th Cir. 1988) ("Like a trial, the purpose of an evidentiary hearing is to resolve disputed issues of fact.").

<div style="margin-left:40%;">

Respectfully submitted,
BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

By:    <u>/s/ Marton Gyires</u>
MARTON GYIRES
ASSISTANT UNITED STATES ATTORNEY
A#5501696
Email: marton.gyires@usdoj.gov
United States Attorney's Office
101 South U.S. Hwy. 1, Ste. 3100
Fort Pierce, Florida 34950
Telephone: 772-293-0952
Facsimile: 772-466-1020

</div>

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that I electronically filed the foregoing document with the Clerk

of Court using CM/ECF, which will transmit notification to all parties of record.

Respectfully submitted,
BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

By: <u>/s/ Marton Gyires</u>
MARTON GYIRES
ASSISTANT UNITED STATES ATTORNEY
A#5501696
Email: marton.gyires@usdoj.gov
United States Attorney's Office
101 South U.S. Hwy. 1, Ste. 3100
Fort Pierce, Florida 34950
Telephone: 772-293-0952
Facsimile: 772-466-1020

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

FILED BY _____ D.C.

**MAY 3 1 2017**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

1189 SW Edinburgh Drive, Port St. Lucie, Florida,
34953, as more fully described in Attachment A

)
)
)
)
)
)

Case No.    **17- 61 -WM**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Southern _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

by _____ Deputy Clerk

Date __6 | 1 | 2017__

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18 United States Code, Section 2252(a)(2) | Certain Activities Relating to Material Involving the Sexual Exploitation of Minors |

The application is based on these facts:

See attached affidavit of HSI Special Agent Brian Ray

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

S/A Lori Cercy, Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: *May 31, 2017*

_____
*Judge's signature*

City and state: _____ , Florida

William Matthewman, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**
**OF**
**SPECIAL AGENT**
**Lori Cercy**

## Homeland Security Investigations

Your affiant, Lori Cercy, first being duly sworn, does hereby
depose and state as follows:

### INTRODUCTION AND BACKGROUND

1.   I am a Special Agent with the U.S. Department of Homeland
Security, Homeland Security Investigations (HSI), and have been
so employed for the past 19 years.  Among my responsibilities as
a Special Agent are investigating crimes against children,
particularly offenses involving child pornography and the
exploitation of children.  I have attended and received
specialized training in this area of law enforcement, and have
both personally investigated, as well as assisted, in
investigations involving the exploitation of children.  I have
observed and reviewed hundreds of images and videos of child
pornography in all forms of media, including computer media, and
have discussed and reviewed these materials with other law
enforcement officers.  I have also spoken with many individuals
who have sexually abused children or unlawfully possessed,
distributed, or produced child pornography.  From those
conversations, I am aware of common methods individuals use to
sexually exploit children.

2.   I am responsible for enforcing Federal Criminal Statutes
relating to Homeland Security Investigations, including the
sexual exploitation of children, Title 18, United States Code,
Sections 2251-57, along with any/all violations under Title 18.

1

3.  This Affidavit is made in support of an application for a search and seizure warrant, to search and seize data and evidence from the residence of Scott TRADER, 1189 SW Edinburgh Drive, Port Saint Lucie, Florida, 34953.

4.  I am familiar with the facts and circumstances surrounding this investigation as set forth herein, from information obtained from Special Agent Brian Ray, HSI Ft. Pierce, and other law enforcement officers with personal knowledge of the evidence and activities described herein.

**FORENSIC ANALYSIS OF COMPUTERS**

5.  I consulted with Special Agent Brian Ray, an HSI Computer Forensic Examiner since 2010. Based on Special Agent Ray's knowledge, training and experience, and that of the Digital Forensics Unit at the HSI Cyber Crimes Center (C3), I know the following;

(a) Computer files or remnants of such files can be recovered months or even years after they have been accessed by a computer or other electronic device. Files downloaded to a hard drive or flash memory can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later, using computer forensic software.  Typically, when a person "deletes" a file, the data contained in the file is not actually destroyed; rather, that data remains on the hard drive (or media) until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in unallocated space or slack space – that is, in space on the hard drive (or media) that is not allocated to an active file or that is unused after a file has been allocated to a

2

set block of storage space – for long periods of time before they are overwritten.

(b) Wholly apart from user-generated files, computers and electronic devices usually contain evidence of how and when a computer or device has been used, what it has been used for, user information and peripherally connected devices. This evidence can take the form of operating system configurations, artifacts from application operation or operating systems, file system data structures, virtual memory "swap" or paging files and cache files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

(c) Similarly, files that have been viewed via the Internet are usually downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.

Thus, the ability to retrieve residue of an electronic file from a hard drive or other electronic device, depends less on when the file was created, downloaded or viewed than on a particular user's operating system, storage capacity, and habits.

6. Based Special Agent Ray's knowledge, training and experience, and that of the Digital Forensics Unit at the HSI Cyber Crimes Center (C3), I know that searching, locating and seizing evidence from computers requires agents to seize all of the computer's electronic data to be searched in a laboratory or other controlled environment. This is true because of the following;

3

(a) Volume of evidence: Computer storage devices (like hard drives, diskettes, tapes, flash memory and optical discs) can store the equivalent of millions of pages of information.  Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names on the computer or on removable media. This requires searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime.

(b) Technical requirements: Searching computer systems for criminal evidence is a highly technical process requiring a properly controlled environment. Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive code imbedded in the system as a "booby trap"), a controlled environment is necessary to complete an accurate analysis.

7.  In light of these concerns, your affiant hereby requests the Court's permission to seize all computer hardware (and associated peripherals/media/software/documentation/passwords) that is capable of containing or being used to access/produce some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware/media, at a later date, in a controlled environment, for the evidence described.

## SMARTPHONES

8.  Based Special Agent Ray's knowledge, training and experience
I know that smartphones are cellular telephones that perform many
of the functions of a computer, typically having a touchscreen
interface, Internet access, and an operating system capable of
running downloaded third party applications. Smartphone
capabilities include, but are not limited to, connecting to the
Internet via WiFi or using cellular data, storing names and phone
numbers in electronic address books and call logs; sending,
receiving, and storing text messages and email; taking, sending,
receiving, and storing still photographs and video; creating,
storing and playing back audio files; storing dates,
appointments, and other information on personal calendars; and
accessing and downloading information from the Internet.
Smartphones may also include global positioning system ("GPS")
technology for determining the location of the device. Based on
my training and experience, I know that electronic data,
sometimes including previously deleted data, can usually be
recovered from smartphones using mobile and cellular device data
extraction tools.

## CHILD PORNOGRAPHY DISTRIBUTOR/COLLECTOR CHARACTERISTICS

9.  Based upon Special Agent Ray's knowledge, training and
experience, I have learned that child pornography
distributors/collectors often collect sexually explicit or
suggestive materials (hard-core and soft-core pornography) in a
variety of media, such as explicit written accounts of the sexual
exploitation of children, photographs, magazines, motion
pictures, video tapes, books, and/or drawings or other visual
media that they use for their sexual arousal and gratification.

Child pornography distributors/collectors almost always possess and maintain their material (pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, child erotica, etc.) in the privacy and security of their homes, in their vehicles, on their person, and/or in some other secure location to which they can restrict access.

### APPLICABLE LAW

For purposes of reference herein, your Affiant is aware that:

10.  Title 18, United States Code, Section 2252 (a)(2) prohibits knowingly receiving, or distributing, any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproducing any visual depiction for distribution in interstate or foreign commerce or through the mails, if –

   (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

   (B) such visual depiction is of such conduct

11.  Title 18, United States Code, Section 2256(1) defines "minor" as "any person under the age of 18 years." Title 18, United States Code, Section 2256(2)(A) defines "sexually explicit conduct" as actual or simulated:

   (i)  sexual intercourse, including genital-

6

genital, oral-genital, anal-genital, or oral-
anal, whether between persons of the same or
opposite sex,

(ii)   bestiality,

(iii) masturbation,

(iv)   sadistic or masochistic abuse; or,

(v)    lascivious exhibition of the genitals or
pubic area of any person.

Title 18, United States Code, Section 2256(5) defines "visual
depiction" as including undeveloped film and videotape, and data
stored on computer disk or by electronic means which is capable
of conversion into a visual image.

### THE INVESTIGATION

12. On 30 May 2017, the Thomasville Police Department, North
Carolina, received a complaint from the stepfather of a 9 year
old victim. The complainant reported his discovery of explicit
chat communications between the victim and her chat partner
"Scott" on Smartphone Application #1. The complainant provided
the victim's mobile device to police for examination. The
Thomasville Police Department requested the assistance of HSI
Winston-Salem in furthering the investigation.

13.  HSI Winston-Salem's examination of the victim's device
revealed text communications with Scott on the evening of 30 May
2017, using Smartphone Application #1. The victim provided Scott
pictures which clearly indicated she was a preteen female. Scott
requested nude images from the victim and transmitted a child
pornography video to the victim. The video was a 37 second long
depiction of an adult male rubbing his penis on the vagina of a

preteen female. Scott claimed the female depicted in the video
was his daughter. Scott also sent a masturbation video to the
victim, along with a still image which depicted Scott's face.

14.   Scott had a profile on Smartphone Application #1. The
profile had a picture of his face, along with an apparent minor
female. The face depicted in the still image transmitted to the
victim matched the Scott profile image. Scott also listed his
username for Smartphone Application #2.

15.   Smartphone Application #1 is headquartered outside of the
United States and it is unknown if they will respond to United
States process. Smartphone Application #2 was sent an emergency
disclosure request for the subscriber information associated with
the user name provided in the Smartphone Application #1 "Scott"
user profile. Smartphone Application #2 responded, indicating the
email account associated with the account was
strader0227@yahoo.com. Smartphone Application #2 also provided a
login history, indicating there were logons to the account from
IP address 76.110.46.234 starting 1 May 2017, through 31 May
2017, at 06:36 UTC. The IP address is registered to Comcast. The
Smartphone Application #2 profile picture matched the
aforementioned "Scott" profile and still image pictures.

16.   Comcast was sent an emergency disclosure request for the
subscriber information associated with IP address 76.110.46.234
on 31 May 2017 at 06:36 UTC. Comcast responded, identifying the
subscriber as Shelly Trader, 1189 SW Edinburgh Drive, Port St.
Lucie, Florida, 34953.

17.   On 31 May 2017, Special Agent Ray conducted a property
records search for 1189 SW Edinburgh Drive, Port St. Lucie,

8

Florida, on the St. Lucie County Property Appraiser's website. According to the website, 1189 SW Edinburgh Drive, Port St. Lucie, Florida was purchased by Leon Bonanno and Shelly Trader-Bonanno on 16 June 2016.

18.  Special Agent Ray conducted a check of the Florida Department of Highway Safety and Motor Vehicle (DHSMV) records which indicated that on 1 August 2016, Scott TRADER, born ● June 19●, listed his mailing address as 1189 SW Edinburgh Drive, Port St. Lucie, Florida, 34953. TRADER's Driver License photograph matches the aforementioned "Scott" user profile and transmitted images. TRADER did not update his residential address, 4286 SW Carl Street, Port St. Lucie, Florida, which was also Shelly Trader-Bonanno's, address until the purchase of the 1189 SW Edinburgh Drive property. According to DHSMV records, Shelly Trader-Bonanno was born ● July 19●, which is consistent with her being Scott TRADER's mother.

19. Special Agent Ray conducted a criminal history record check which revealed that in 2012, Scott TRADER was arrested by the Port St. Lucie Police Department for Promoting a Sexual Performance by a Child, Lewd Behavior, and Possession of Child Pornography. Those charges were dropped/abandoned, and TRADER was convicted for Felony Child Neglect. In December 2016, TRADER was arrested for Lewd Behavior – Molesting a Victim less than 12 years of age.

20. On 31 May 2017, surveillance of 1189 SW Edinburgh Drive, Port St. Lucie, Florida, was established by HSI Ft. Pierce Agents. A female child, approximately two years of age, was seen entering the residence.

21.  Based on the foregoing facts, I believe there is probable cause that evidence of violations of Title 18, United States Code, Section 2252 (Certain activities relating to material involving the sexual exploitation of minors) is present, and shall be found on and shall be found on the computers, media and smartphones used or accessed at 1189 SW Edinburgh Drive, Port St. Lucie, Florida, 34953.

22. Based on the foregoing facts, I respectively submit that good cause has been established to execute this warrant at any time in the day or night.

FURTHER YOUR AFFIANTS SAYTH NAUGHT.

Lori Certy
Special Agent
Homeland Security
Investigations

Subscribed and sworn to before me this 31ᴱᵀ day of May, 2017 at Highland Beach, Florida.

William Matthewman
UNITED STATES MAGISTRATE JUDGE

Certified to be a true and correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _____ Deputy Clerk
Date 6/1/2017

10

## ATTACHMENT A
## LOCATION TO BE SEARCHED

1189 SW Edinburgh Drive, Port Saint Lucie, Florida, 34953, including
persons therein, the residence, associated vehicles/vessels and
curtilage thereof. The dwelling is a cream color single family
residence with the number 1189 affixed to the structure on the left
side of the garage. The property is located on the east side of SW
Edinburgh Drive, south of SW Becker Road.



**ATTACHMENT B**

**ITEMS AND DATA TO BE SEIZED AND LATER SEARCHED IN A CONTROLLED ENVIROMENT**

a.   Computer systems and hardware including any and all electronic devices capable of creating, converting, displaying, transmitting and/or analyzing magnetic or electronic impulses or data.   These devices include video players, digital video recorders, digital cameras, cellular phones, computers and computer peripherals such as, modems, drives, monitors, printers and other electronic devices.

b.   Computer software and passwords including any and all programs and/or instructions capable of interpretation by a computer and related devices which are stored in the form of magnetic or electronic media.   These items include but are not limited to application software, operating systems, and other programming utilized to communicate with computer components.

c.   Data stored in the form of electronic or magnetic coding on computer media and/or on media capable of being read by or displayed on a computer and/or computer related equipment or video devices.   These media/data include but are not limited to fixed hard drives, removable hard drives, network attached storage devices, data from Internet based storage, flash memory, floppy diskettes, optical storage disks, digital tape, video tape and any other media capable of storing magnetic coding.

d. Visual depictions of suspected minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256, in whatever form, including but not limited to undeveloped film, videotape, printed images, and data stored on computer disk/drive or by electronic means which is capable of conversion into a visual image.

e. User and system generated files, including references in unallocated disc space, bearing on the ownership and use of the computer/media, including but not limited to banking records, website use, documents, image files and video files.

f.   Any and all books, ledgers, records and visual depictions bearing on the production, reproduction, receipt, possession, ownership, shipment, orders, requests, trades, purchases, or transactions of any kind involving or affecting interstate commerce, including by United States Mails or by computer, of any visual depiction of minors engaged in sexually explicit conduct.

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

### for the

Southern District of Florida

FILED BY _____ D.C.

**JUN 0 1 2017**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.  17-61-WM
1189 SW Edinburgh Drive, Port St. Lucie, Florida, )
34953, as more fully described in Attachment A )
)

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____Southern_____ District of _____Florida_____
*(identify the person or describe the property to be searched and give its location)*:

-See Attachment A-

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

-See Attachment B-

**YOU ARE COMMANDED** to execute this warrant on or before  **June 10, 2017** *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____William Mattewman_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  **May 31, 2017**
**11:51 p.m.**

_William Mattewman_
*Judge's signature*

City and state: _____, Florida    William Mattewman, U.S. Magistrate Judge
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>17-61-WM | Date and time warrant executed:<br>6.1.17 @ 01:10 | Copy of warrant and inventory left with:<br>Shelly Trader |
| Inventory made in the presence of : Shelly Trader | | |
| Inventory of the property taken and name of any person(s) seized:<br><br>See attached property log of seized property. Person seized: Scott Trader | | |

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _____ Deputy Clerk
Date  6  1  2017

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:  6.1.17

_____
*Executing officer's signature*

Brian Ray, Special Agent, HSI
*Printed name and title*

Returned before me this 1ST day of June, 2017.
William Matthewman, U.S. Magistrate Judge

## ATTACHMENT A
## LOCATION TO BE SEARCHED

1189 SW Edinburgh Drive, Port Saint Lucie, Florida, 34953, including persons therein, the residence, associated vehicles/vessels and curtilage thereof. The dwelling is a cream color single family residence with the number 1189 affixed to the structure on the left side of the garage. The property is located on the east side of SW Edinburgh Drive, south of SW Becker Road.



## ATTACHMENT B

## ITEMS AND DATA TO BE SEIZED AND LATER SEARCHED IN A CONTROLLED ENVIROMENT

a.   Computer systems and hardware including any and all electronic devices capable of creating, converting, displaying, transmitting and/or analyzing magnetic or electronic impulses or data.   These devices include video players, digital video recorders, digital cameras, cellular phones, computers and computer peripherals such as, modems, drives, monitors, printers and other electronic devices.

b.   Computer software and passwords including any and all programs and/or instructions capable of interpretation by a computer and related devices which are stored in the form of magnetic or electronic media.   These items include but are not limited to application software, operating systems, and other programming utilized to communicate with computer components.

c.   Data stored in the form of electronic or magnetic coding on computer media and/or on media capable of being read by or displayed on a computer and/or computer related equipment or video devices.   These media/data include but are not limited to fixed hard drives, removable hard drives, network attached storage devices, data from Internet based storage, flash memory, floppy diskettes, optical storage disks, digital tape, video tape and any other media capable of storing magnetic coding.

d. Visual depictions of suspected minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256, in whatever form, including but not limited to undeveloped film, videotape, printed images, and data stored on computer disk/drive or by electronic means which is capable of conversion into a visual image.

e. User and system generated files, including references in unallocated disc space, bearing on the ownership and use of the computer/media, including but not limited to banking records, website use, documents, image files and video files.

f.   Any and all books, ledgers, records and visual depictions bearing on the production, reproduction, receipt, possession, ownership, shipment, orders, requests, trades, purchases, or transactions of any kind involving or affecting interstate commerce, including by United States Mails or by computer, of any visual depiction of minors engaged in sexually explicit conduct.

# DE-15

<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 17-14047-CR-MIDDLEBROOKS**

</div>

UNITED STATES OF AMERICA,

v.

SCOTT JOSEPH TRADER,

      Defendant.

_____/

<div align="center">

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

</div>

THIS CAUSE comes before the Court on Defendant Scott Joseph Trader's ("Defendant")

Motion to Suppress Illegally Obtained Evidence (DE 13) (the "Motion") filed on September 6,

2017. The United States of America (the "Government") filed a Response to the Motion (DE 14)

on September 20, 2017. For reasons stated below, Defendant's Motion to Suppress is denied.

## I.    Facts

On May 30, 2017, the Thomasville, North Carolina police department received a

complaint from a nine-year-old girl's stepfather that the minor had received explicit

communications, including pictures and video, from an unknown male user of the "Say Hi"

social media application under the username "Scott."[1] (DE 14 at 3). The stepfather provided the

minor's mobile device to Thomasville police, who then requested the assistance of the United

States Department of Homeland Security ("HSI") in Winston-Salem, North Carolina. (*Id.*).

Upon examination, HSI found explicit communications, including child pornography pictures

and a video, between the minor and Scott on May 30, 2017 on the social media application "Say

_____

[1] References in the Government's Response (DE 14) and search warrant affidavit (DE 14-1) to
Smartphone Application #1 and Smartphone Application #2 are references to "Say Hi" and
"Kik," respectively. (DE 14 at 5 n.3).

Hi." (*Id.*). One of the photos of a man's face that Scott sent the minor matched the profile picture that Scott used on his Say Hi profile. (*Id.*). Scott also listed his username for the social media application "Kik" on his Say Hi profile. (*Id.*).

Because Say Hi is headquartered outside of the United States, HSI was concerned that it may not be able to obtain Scott's subscriber information from the company promptly, if at all. (*Id.*). Instead, HSI submitted an emergency disclosure request to Kik for Scott's subscriber information based on the Kik username Scott listed on his Say Hi profile. (DE 13 at 3). In submitting the emergency disclosure request, HSI claimed that the user "is believed to be actively molesting and sexually exploiting a minor" and that the "situation involv[es] death or serious physical injury." (*Id.*). Kik responded by providing HSI with the email and recent IP addresses associated with Scott's Kik account. (*Id.*). Scott's Kik account profile picture matched Scott's profile picture on Say Hi, as well as the image of a man's face that Scott sent to the minor through Say Hi. (DE 14 at 3). The information from Kik indicated that the user logged onto the Kik account from May 1, 2017 through May 31, 2017 from the IP address 76.110.46.234 registered to Comcast. (*Id.*).

HSI sent an emergency disclosure request to Comcast for the subscriber information for the IP address disclosed by Kik. (*Id.* at 4). Comcast identified the subscriber and address associated with the IP address as Shelly Trader, Defendant's mother, 1189 S.W. Edinburgh Drive, Port St. Lucie, Florida 34953. (*Id.*). HSI conducted a records check with the Florida Department of Highway Safety and Motor Vehicle (DHSMV), which revealed that Scott Joseph Trader, Defendant, listed his mailing address as the same one associated with the IP address from which the Kik user accessed the application. (*Id.*). In addition, Defendant's driver's license photograph matched the profile pictures on both Say Hi and Kik, and the picture Scott sent to the

minor girl during the explicit chat on Say Hi. (*Id.*). HSI conducted a criminal history records check for Defendant and found that he was arrested in 2012 for "Promoting a Sexual Performance by a Child, Lewd Behavior, and Possession of Child Pornography," but those charges were "dropped/abandoned." (*Id.*). Defendant was also arrested in December 2016 for "Lewd Behavior – Molesting a Victim less than 12 years of age." (*Id.*). HSI conducted surveillance of the residence and did not see Defendant enter or leave it, but did see a female child, approximately two years of age, enter the residence. (*Id.*).

HSI then obtained a search warrant for the residence on May 31, 2017, to search and seize all computers, media, and smartphones for evidence of violations of 18 U.S.C. § 2252, related to material involving the sexual exploitation of minors. (DE 14-1 at 11). During the search executed on June 1, 2017, police "located two smart phones, nine SD cards, and a portable hard drive," which "revealed evidence of child pornography," including "depict[ing] [Defendant] involved in sexual behavior with minors." (DE 13 at 5). Defendant was subsequently arrested at his home that same day, (DE 14 at 1), and was charged in a five-count indictment for enticement of a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b) (Count 1); distribution of material containing visual depictions of sexual exploitation of minors, in violation of 18 U.S.C. § 2252(a)(2) & (b)(1) (Count 2); possession of matter containing visual depictions of sexual exploitation of minors, in violation of 18 U.S.C. § 2252(a)(4)(B) & (b)(2) (Count 3); and production of material containing visual depictions of sexual exploitation of minors in violation of 18 U.S.C. § 2251(a) & (e) (Counts 4 & 5). (DE 17 at 2–3).

On September 6, 2017, Defendant filed the instant Motion to suppress certain materials collected by the Government. (DE 13). The Government filed a Response on September 20,

2017. (DE 14). First, Defendant alleges that the search warrant relied on illegally obtained evidence – the subscriber information that the Government obtained from Kik – because the Government's request to Kik for the records amounted to a search under the Fourth Amendment that was not supported by probable cause, a warrant, or any exceptions to the warrant requirement.   (DE 13 at 5–12).   Second, Defendant challenges the search warrant the Government executed on the residence as facially lacking probable cause. (DE 13 at 5, 12–15). As a remedy, Defendant moves to suppress all of the evidence the Government collected directly or indirectly from Kik's allegedly unlawful release of Defendant's subscriber information and from the search of the residence executed pursuant to an allegedly deficient search warrant. (DE 13 at 15). Defendant also requests an evidentiary hearing and oral argument. (DE 13 at 15). For reasons stated below, Defendant's request for a hearing and motion to suppress are denied.

**II.   Discussion**

   **a.** Subscriber Information from Kik

      i. *Fourth Amendment Search*

   The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.   "[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (citations omitted).   This inquiry asks first whether "the individual manifested a subjective expectation of privacy in the object of the challenged search," and then whether "society is willing to recognize that expectation as reasonable" under an objective standard.

4

*United States v. Davis*, 785 F.3d 498, 507 (11th Cir. 2015) (en banc) (internal quotations omitted) (citations omitted).

The "third-party doctrine" dictates that when an individual voluntarily conveys information to a third party, he or she has no reasonable expectation of privacy in that information, and therefore Fourth Amendment protection does not apply. *Smith*, 442 U.S. at 743–46 (holding that individual had no reasonable expectation of privacy in records of phone numbers dialed held by phone company); *Davis*, 785 F.3d at 511–12 (holding that individual had no reasonable expectation of privacy in cell tower location records of individual's phone held by phone company). Federal courts have uniformly applied the third-party doctrine to hold that individuals have no reasonable expectation of privacy in their email addresses or internet protocol ("IP") addresses when they are voluntarily disclosed to third parties. *United States v. Beckett*, 369 F. App'x 52, 56 (11th Cir. 2010) (finding that defendant "could not have had a reasonable expectation in the [identifying] information obtained from the [internet service providers] and phone companies," including an IP address); *see, e.g.*, *United States v. Caira*, 833 F.3d 803, 806–07, 809 (7th Cir. 2016) ("Because [defendant] voluntarily shared his I.P. addresses with [a third party], he had no reasonable expectation of privacy in those addresses . . . [and so there was] no Fourth Amendment 'search.'"); *United States v. Carpenter*, 819 F.3d 880, 887 (6th Cir. 2016) ("The Fourth Amendment protects the content of the modern day letter, the email. But Courts have not (yet, at least) extended those protections to the internet analogue to envelope markings, namely the metadata used to route internet communications, like sender and recipient addresses on an email, or IP addresses." (citations omitted)); *United States v. Weast*, 811 F.3d 743, 748 (5th Cir. 2016) (holding that an individual has no reasonable expectation of privacy in IP addresses and peer-to-peer shared files); *United States v. Christie*, 624 F.3d 558,

573–74 (3d Cir. 2010) ("[N]o reasonable expectation of privacy exists in an IP address, because that information is also conveyed to and, indeed, from third parties, including ISPs."); *United States v. Perrine*, 518 F.3d 1196, 1204–05 (10th Cir. 2008) (holding that individuals have no reasonable expectation of privacy in subscriber information, including IP addresses, held by internet providers); *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) ("[E]-mail and Internet users have no expectation of privacy in the to/from addresses of their messages or the IP addresses of the websites they visit . . . . [E]-mail to/from addresses and IP addresses are not merely passively conveyed through third party equipment, but are voluntarily turned over in order to direct the third party's servers.").

When the government conducts an illegal search under the Fourth Amendment, the exclusionary rule applies such that "[e]vidence seized as a result of [the] illegal search may not be used by the government in a subsequent criminal prosecution." *United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).

Here, the Government did not engage in a Fourth Amendment search when it obtained Defendant's subscriber information, including his email and IP addresses, from Kik. When Defendant decided to sign up for and use Kik, he voluntarily disclosed his email and IP addresses to Kik in order to use the application. *See, e.g.*, *Caira*, 833 F.3d at 809; *Beckett*, 369 F. App'x at 56; *Forrester*, 512 F.3d at 510. Pursuant to the third-party doctrine, Defendant had no reasonable expectation of privacy in his email or IP addresses when he voluntarily disclosed them to Kik. *See, e.g.*, *Beckett*, 369 F. App'x at 56. Since Defendant had no reasonable expectation of privacy in that information, the Government did not conduct a search under the Fourth Amendment when it asked Kik to voluntarily disclose Defendant's information, and Kik complied. *See id*; *Smith*, 442 U.S. at 743–44; *Davis*, 785 F.3d at 511–12.

6

Defendant cites no cases supporting his argument that he had a reasonable expectation of privacy in his email and IP address. Instead, Defendant contends that the enormous effect the Internet has had on personal communications requires "greater protections of individual privacy in the medium." (DE 13 at 7–8). Notwithstanding the merits of Defendant's point, "thoughtful arguments for changing the underlying and prevailing law . . . should be directed to Congress and the state legislatures rather than to the federal courts." *Davis*, 785 F.3d at 512.

Defendant also argues that any evidence obtained from Kik's release of Defendant's subscriber information must be suppressed because it was an illegal search without a warrant that does not fall into two exceptions to the warrant requirement: (1) search incident to arrest (DE 13 at 9–10), and (2) exigent circumstances (DE 13 at 10–12). Defendant cites to *Riley v. California*, __ U.S. __, 134 S. Ct. 2473 (2014), for the proposition that the Supreme Court abrogated part of the third-party doctrine when it limited law enforcement's ability to search an arrestee's cell phone incident to arrest without a warrant. (DE 13 at 9–10). He then cites to *United States v. Davis*, 313 F.3d 1300 (11th Cir. 2002), to argue that the facts at issue here do not demonstrate as great a danger to human life as they did in *Davis*, where the exigent circumstances exception to the warrant requirement was rejected. (DE 13 at 11–12). Unfortunately, Defendant's arguments regarding the applicability of exceptions to the warrant requirement are disconnected from the issue here because there was no search in this case. Absent a Fourth Amendment search, the Government did not need to obtain a warrant or even have probable cause before receiving the information voluntarily provided by Kik. The Government's receipt of Defendant's subscriber information from Kik was not a search under the Fourth Amendment, and therefore any evidence obtained as a result is not suppressed.

7

ii. *Electronic Communications Privacy Act*

Aside from the Fourth Amendment, Congress has taken steps to protect the digital privacy of individuals through the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2701 et seq. In relevant part, the ECPA prohibits "a provider of a remote computing service or electronic communication service to the public [from] knowingly divulg[ing] a record or other information pertaining to a subscriber to or customer of such service . . . to any governmental entity." 18 U.S.C. § 2702(a)(3). However, this general prohibition on providers disclosing information about subscribers or customers to governmental entities is lifted "if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency." 18 U.S.C. § 2702(c)(4). Under the ECPA, an aggrieved party may file a civil suit against the provider or the United States for damages or administrative sanctions. 18 U.S.C. § 2707(c), § 2712(a) (allowing damages actions against providers and the United States, respectively); 18 U.S.C. 2707(d), 2712(c) (allowing administrative discipline against providers and the United States, respectively). The statute is the exclusive source of possible remedies for aggrieved parties. 18 U.S.C. § 2708 ("The remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter."). The suppression of any material obtained by a governmental entity from a provider in violation of the ECPA is not one of those exclusive statutory remedies. *See, e.g.*, *Beckett*, 369 F. App'x at 55–56 ("The ECPA does not statutorily provide for suppression of evidence obtained as a result of violations of the Act." (citing *United States v. Steiger*, 318 F.3d 1039, 1051 (11th Cir. 2003))).

Here, the Government and Kik complied with the ECPA, and, even if they did not, suppression is not an appropriate remedy. Kik, as a "provider of a remote computing service or

8

electronic communication service to the public," was required to refrain from giving subscriber information to the Government, 18 U.S.C. § 2702(a)(3), unless Kik "in good faith, believe[d] that an emergency involving danger of death or serious physical injury" required the disclosure of such information, 18 U.S.C. § 2702(c)(4).  As Defendant admits, in making its request for Defendant's information to Kik, the Government represented that the user "is believed to be actively molesting and sexually exploiting a minor" and that the "situation involv[es] death or serious physical injury."  (DE 13 at 3).  Based on the Government's representation to Kik, it is reasonable that Kik, in good faith, believed that there was such an emergency present when it decided to provide that information.   Thus, Kik's provision of Defendant's subscriber information to the Government likely falls within an exception to the general prohibition under the ECPA.   More importantly, however, is that even if the ECPA was violated when Kik provided Defendant's subscriber information to the Government, suppression of that information in a criminal proceeding is not a possible remedy.  *Beckett*, 369 F. App'x at 55–56 (citing *Steiger*, 318 F.3d at 1051); *see also* 18 U.S.C. §§ 2707–08, 2712.

In response, Defendant cites several cases that do not address the ECPA but discuss privacy protection given to email addresses under other statutes.  *See* (DE 13 at 9 (citing privacy protections for email addresses under FOIA, the Drivers Privacy Protection Act, and state codes)).  These cases have no bearing on the ECPA.  Thus, evidence obtained as a result of Kik providing Defendant's subscriber information to the Government will not be suppressed due to any hypothetical violation of the ECPA.

    b.  <u>Probable Cause in Search Warrant Application for Residence</u>

Under the Fourth Amendment, "absent certain exceptions, police [must] obtain a warrant from a neutral and disinterested magistrate before embarking upon a search."  *Franks*, 438 U.S.

at 164. The warrant must "set forth particular facts and circumstances underlying the existence of probable cause." *Id.* at 165. To establish probable cause, the affidavit supporting the warrant application must contain "sufficient information to conclude that a fair probability exist[s] that seizable evidence would be found in the place sought to be searched." *Martin*, 297 F.3d at 1314 (internal quotations omitted) (citation omitted). This "fair probability" is the "kind . . . on which 'reasonable and prudent [people,] not legal technicians, act." *Florida v. Harris*, 568 U.S. 237, 244 (2013) (citations and internal quotations omitted) (alteration in original). "Specifically, the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *Martin*, 297 F.3d at 1314. When the government conducts a search under the Fourth Amendment without a warrant supported by probable cause, the exclusionary rule applies so that "[e]vidence seized as a result of [the] illegal search may not be used by the government in a subsequent criminal prosecution." *Id.* at 1312 (citing *Franks*, 438 U.S. at 171).

Evidence that the Government obtained from its search of the residence at 1189 S.W. Edinburgh Drive, Port St. Lucie, FL 34953 should not be suppressed because sufficient probable cause existed in the Government's warrant application to search the residence. The affidavit supporting the warrant, which was ultimately issued by a neutral and detached magistrate, (DE 14-1 at 14–17), established a connection between Defendant and the residence, and between the residence and Defendant's criminal activity.

First, the Government provided sufficient facts and circumstances in its search warrant affidavit to amount to probable cause that Defendant engaged in criminal activity, namely, receiving and distributing child pornography with a minor. (*Id.* at 8–11). The affidavit explained that Defendant called himself by his first name, "Scott," on Say Hi, the application that

he used to send explicit messages, photos, and video to the minor. (*Id.* at 8). It also explained that one of the pictures that Defendant sent to the minor included a picture with Defendant's face that matched the face of the man in Defendant's profile picture on Say Hi. (*Id.* at 9). The affidavit represented that on his Say Hi profile, "Scott" listed his username for a second social media application, Kik. (*Id.*). It also represented that the profile picture Defendant used to identify himself on Kik matched: (1) the profile picture he used on Say Hi, (2) the picture of the man's face that Defendant sent to the minor on Say Hi, (*id.*), and (3) Defendant's driver's license photograph, (*id.* at 10). In addition, Defendant had previously been arrested twice for offenses related to child pornography and molestation, in 2012 and again in December 2016. (*Id.*). On its face, the allegations contained in the search warrant affidavit represent facts and circumstances sufficient to connect Defendant with criminal activity.

The Government also listed sufficient facts in its affidavit to connect Defendant's criminal activity to the residence searched. It stated the address of the residence, 1189 S.W. Edinburgh Drive, Port St. Lucie, FL 34953, is listed by Comcast as the subscriber address for the IP address 76.110.46.234. (*Id.* at 9). It provided that the IP address 76.110.46.234 is the one from which Defendant logged onto his Kik account on the same date that he had the explicit conversation with a minor on Say Hi. (*Id.* at 8–9). The affidavit represented that the residence address is also the same address that Defendant listed as his mailing address with the Florida DHSMV. (*Id.* at 10). Given that the standard for probable cause is merely a "fair probability" that evidence of a crime will be found at a residence as judged by a reasonable person, *Harris*, 568 U.S. at 244, the facts and circumstances in the affidavit support a connection between Defendant's criminal activity and the residence sufficient for probable cause to search.

Defendant argues that the facts in the affidavit supporting the search warrant represented a "hunch" "insufficient [to demonstrate] probable cause." (DE 13 at 12). To support his argument, Defendant cites *United States v. Contreras-Rodriguez*, 291 F. App'x 989 (11th Cir. 2008), for the proposition that a warrant is deficient when there is insufficient probable cause connecting a residence to illegal activity. (DE 13 at 13). As previously noted, there is sufficient probable cause here connecting the searched residence to Defendant's criminal activity because (1) the residence was listed as Defendant's mailing address with the Florida DHSMV; (2) the IP address from which Defendant accessed Kik on the same date that Defendant exchanged child pornography on Say Hi was registered to a subscriber at that residence; (3) Defendant's photograph on his driver's license, Kik profile, and Say Hi profile all matched the photograph of the man's face that he sent the minor when exchanging child pornography; and (4) Defendant used his real first name, Scott, to chat on Say Hi. (DE 14-1 at 8–10). Thus, there were sufficient facts contained in the search warrant affidavit to establish a nexus between Defendant's criminal activity and the residence to amount to probable cause for a search warrant.

c.  Hearing

Defendant requests an evidentiary hearing and oral argument of the issues, but provides no support for this request. (DE 13 at 15). "[W]here a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing independent of the trial to receive evidence on any issue necessary to the determination of the motion." *United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) (quoting *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984)). As already demonstrated, whether the subscriber information from Kik was a Fourth Amendment search and whether the Government's warrant to search the residence was supported by probable cause are questions of

law that can be finally decided based on the facts before this Court.  Since Defendant does not

allege facts which, if proved, would require relief for Defendant, an evidentiary hearing is not

necessary.  Accordingly it is hereby

    **ORDERED and ADJUDGED** that:

1) Defendant's Motion (DE 13) is hereby **DENIED.**

2) Defendant's request for an evidentiary hearing is **DENIED.**

    **DONE and ORDERED** in Chambers in West Palm Beach, Florida, this _25_ day of

September, 2017.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

CC: Counsel of Record

# DE-21

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 2:17-cr-14047-MIDDLEBROOKS

UNITED STATES OF AMERICA

vs.

SCOTT JOSEPH TRADER,

      Defendant.

_____/

FILED BY ___CGA___

Deputy Clerk

**Sep 29, 2017**

STEVEN M. LARIMORE
CLERK U.S. DISTRICT CT.
S.D. OF FLA. Fort Pierce

## PLEA AGREEMENT

The United States Attorney's Office for the Southern District of Florida ("this Office") and SCOTT JOSEPH TRADER (hereinafter referred to as the "defendant") enter into the following agreement:

1.    The defendant agrees to plead guilty to all five counts of the Indictment, which charge him with: Enticement of a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b) (Count One); Distribution of material containing visual depictions of sexual exploitation of minors, in violation of 18 U.S.C. §§ 2252(a)(2) & (b)(1) (Count Two); Possession of matter containing visual depictions of sexual exploitation of minors, in violation of 18 U.S.C. §§ 2252(a)(4)(B) & (b)(2) (Count Three); and Production of material containing visual depictions of sexual exploitation of minors, in violation of Title 18 U.S.C §§ 2251(a) & (e) (Counts Four and Five).

2.    The defendant is aware that the sentence will be imposed by the Court after considering the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter

1

"Sentencing Guidelines").  The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered.   The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines.   The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

3.      As to Count One, the Court may impose a term of imprisonment of up to life, and must impose a term of imprisonment of at least ten (10) years, followed by a term of supervised release of at least five (5) years and up to life.   In in addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $250,000.00.

As to Count Two, the Court may impose a term of imprisonment of up to twenty (20) years, and must impose a term of imprisonment of at least five (5) years, followed by a

2

term of supervised release of at least five (5) years and up to life.   In in addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $250,000.00.

As to Count Three, the Court may impose a term of imprisonment of up to twenty (20) years, followed by a term of supervised release of at least five (5) years and up to life.   In in addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $250,000.00.

As to Counts Four & Five each, the Court may impose a term of imprisonment of up to thirty (30) years and must impose a term of imprisonment of at least fifteen (15) years, followed by a term of supervised release of at least five (5) years and up to life.   In in addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $250,000.00.

4.    The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this agreement, a special assessment in the amount of $100.00 will be imposed on the defendant as to each count (so $500 total).   The defendant agrees that any special assessment imposed shall be paid at the time of sentencing.   If the defendant is financially unable to pay the special assessment, the defendant agrees to present evidence to this Office and the Court at the time of sentencing as to the reasons for the defendant's failure to pay.

5.    This Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the

defendant's background.   Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

6.    The Office agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1 of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility.   If at the time of sentencing the defendant's offense level is determined to be 16 or greater, the government will file a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently.  However, the Office will not be required to make these sentencing recommendations if the defendant: (1) fails or refuses to make full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the Office prior to entering this Agreement; or (3) commits any misconduct after entering into this Agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

7.    The United States and the defendant agree that pursuant to Fed. R. Crim. P. 11(a)(2), the defendant reserves his right to appeal the District Court's Order (Docket Entry

15), denying defendant's Motion to Suppress (Docket Entry 13).   This reservation of appellate rights is limited to the Fourth Amendment issues that the defendant raised, that is: (a) whether the government's obtaining of subscriber information (namely, an IP address and email address) from a social media company is a search under the Fourth Amendment, and (b) whether the search warrant in this case was supported by probable cause.   The United States and the defendant agree that, should the defendant prevail on appeal, he shall be allowed to withdraw/vacate his plea of guilty to the Indictment. The defendant also knowingly and voluntarily waives any claims or defenses that he may have to the post-appeal reinstatement of the Indictment, whether those claims or defenses arise pursuant to a statute of limitations, the Speedy Trial Act, or the Sixth Amendment's speedy trial provision.

8.     The defendant is aware that the sentence has not yet been determined by the Court.   The   defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the Court. The defendant understands and acknowledges, as previously acknowledged in paragraph 2 above, that the defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

9.     The defendant also understands and acknowledges that pursuant to the Mandatory Restitution for Sex Crimes section of the Violence Against Women Act of 1994 (VAWA), codified in Title 18, United States Code, Section 2259, the Court must order

restitution be paid to "victims," in an amount that will be determined at sentencing or in a separate restitution hearing.   Defendant agrees that the offenses set forth in the Indictment are crimes involving the sexual exploitation of minors, which relate to and gave rise to this plea agreement.   The defendant agrees to pay any restitution that may be ordered by this Court.

10.     Defendant agrees to forfeit to the United States voluntarily and immediately all of his right, title and interest to any and all property which is subject to forfeiture pursuant to Title 18, United States Code, Section 2253, including the following:

a) One (1) Samsung SM-G920T smartphone;
b) One (1) LG G6 smartphone;
c) One (1) 16GB San Disk SD card;
d) One (1) WD My Passport Ultra external hard drive;
e) One (1) Samsung SGH-T999 smartphone;
f) Nine (9) media storage cards (consisting of two SD cards, four micro SD cards, and three SIM cards); and
g) One (1) Toshiba C655D-S5202 Laptop Computer

11.     The defendant agrees that the above listed property represents a visual depiction, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped or received in violation of the law, or property used or intended to be used to commit or to promote the commission of the offense to which the defendant is pleading guilty.

12.     Defendant further agrees to fully cooperate and assist the Government in the forfeiture of the listed property and to take whatever steps are necessary to pass clear title to the United States, including, but not limited to, the surrender of documents of title, execution of any documents necessary to transfer his interest in any of the above property to the United States, execution of a consent to forfeiture or other documents as may be needed to fully accomplish the forfeiture and vest title in the United States.   Defendant further knowingly

6

and voluntarily waives the following rights as to property subject to forfeiture: (1) all constitutional, legal and equitable defenses to the forfeiture of the assets in any judicial or administrative proceeding; (2) any judicial or administrative notice of forfeiture and related deadlines; (3) any jeopardy defense or claim of double jeopardy, whether constitutional or statutory; (4) any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of excessive fine, to the forfeiture of the property by the United States; and (5) any right to appeal any order of forfeiture entered by the Court pursuant to this plea agreement. Defendant further understands that the forfeiture of the property shall not be treated as satisfaction or offset against any fine, restitution, cost of imprisonment, or any other penalty this court may impose on the defendant.

13.    Defendant understands that by pleading guilty, he will be required to register as a sex offender upon his release from prison as a condition of supervised release pursuant to 18 U.S.C. § 3583(d).  Defendant also understands that independent of supervised release, he will be subject to federal and state sex offender registration requirements, and that those requirements may apply throughout defendant's life.  Defendant understands that he shall keep his registration current, shall notify the state sex offender registration agency or agencies of any changes to defendant's name, place of residence, employment, or student status, or other relevant information. Defendant shall comply with requirements to periodically verify in person defendant's sex offender registration information.  Defendant understands that he will be subject to possible federal and state penalties for failure to comply with any such sex offender registration requirements.  If defendant resides in Florida following release from prison, defendant will be subject to the registration requirements of Florida State Statute

7

sections 775.21, 943.0435, and any related statutes governing Florida registration requirements. Defendant further understands that, under 18 U.S.C. § 4042(c), notice will be provided to certain law enforcement agencies upon defendant's release from confinement following conviction.

14.     As a condition of supervised release, defendant shall initially register with the state sex offender registration in Florida, and shall also register with the state sex offender registration agency in any state where defendant resides, is employed, works, or is a student, as directed by the Probation Officer. Defendant shall comply with all requirements of federal and state sex offender registration laws, including the requirement to update defendant's registration information. Defendant shall provide proof of registration to the Probation Officer within 72 hours of release from imprisonment.

15.     This is the entire agreement and understanding between this Office and the defendant. There are no other agreements, promises, representations, or understandings.

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

Date: 9/29/14          By: _____

MARTON GYIRES
ASSISTANT UNITED STATES ATTORNEY

Date: 9/28/17          _____

FLETCHER PEACOCK
ATTORNEY FOR DEFENDANT

Date: 9/26/17          _____

SCOTT JOSEPH TRADER
DEFENDANT

8

# DE-23

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 17-CR-14047-MIDDLEBROOKS/MAYNARD

UNITED STATES OF AMERICA,

      Plaintiff,

v.

SCOTT JOSEPH TRADER,

      Defendant.

_____/

```
FILED by _____ D.C.

    OCT 0 2 2017

   STEVEN M. LARIMORE
   CLERK U.S. DIST. CT.
  S.D. OF FLA. - FT. PIERCE
```

### REPORT AND RECOMMENDATION ON CHANGE OF PLEA

    **THIS CAUSE** comes before this Court upon an Order of Reference from the District Court for this Court to conduct a proceeding for acceptance of a guilty plea by the Defendant in the above referenced case. Having conducted a change of plea hearing on September 29, 2017, this Court recommends to the District Court as follows:

    1.    On September 29, 2017, this Court convened a hearing to permit the Defendant to change his plea in this criminal case. At the hearing's outset, this Court advised the Defendant of his right to have the District Judge assigned to this case conduct this proceeding. This Court advised the Defendant that it was conducting the Change of Plea Hearing at the request of the Defendant, the Defendant's attorney, and the Assistant United States Attorney assigned to this case. This Court advised the Defendant that the District Judge assigned to this case will be the sentencing judge, will make all findings and rulings concerning the Defendant's sentence, and will schedule and conduct the Sentencing Hearing.

    2.    This Court advised the Defendant that he did not have to permit the undersigned United States Magistrate Judge to conduct this hearing but could request a United States District Judge to conduct the Change of Plea hearing instead. The Defendant, the Defendant's attorney, and

the Assistant United States Attorney assigned to the case all agreed on the record and consented to this Court conducting the Change of Plea hearing.

3.      This Court conducted the plea colloquy in accordance with the outline set forth in the Bench Book for District Judges.

4.      There is a written Plea Agreement which has been entered into by the parties in this case.  This Court reviewed that Plea Agreement on the record and had the Defendant acknowledge that he signed the Plea Agreement.  This Court reviewed with the Defendant the possible maximum sentence as set forth in the Plea Agreement.  This Court also reviewed with the Defendant the mandatory minimum penalties applicable in this case.   The Defendant acknowledged that he understood the charges against him, the possible maximum penalties, and the mandatory minimum penalties that could be imposed in this case.

5.      The Defendant pled guilty to all five counts of the Indictment. Count One charges him with enticement of a minor to engage in sexual activity in violation of Title 18, United States Code, Section 2422(b). Count Two charges him with distribution of material containing visual depictions of sexual exploitation of minors in violation of Title 18, United States Code, Sections 2252(a) and (b)(1).  Count Three charges him with possession of matter containing visual depictions of sexual exploitation of minors in violation of Title 18, United States Code, Sections 2252(a)(4)(B) and (b)(2). Counts Four and Five charge him with production of material containing visual depictions of sexual exploitation of minors in violation of Title 18, United States Code, Sections 2251(a) and (e).

6.      The Plea Agreement contains a conditional plea provision under Federal Rule of Criminal Procedure 11(a)(2).  In that provision, both parties agree to Defendant reserving his right to appeal the District Court's Order [D.E. 15] denying Defendant's motion to suppress [D.E. 13].

2

This Court reviewed the conditional nature of the plea with Defendant, who acknowledged that he understood. This Court approved the conditional nature of the plea on the record.

7.     The Plea Agreement contains a provision regarding restitution, which the undersigned reviewed with the Defendant. The Defendant acknowledged his understanding that restitution is mandatory and the amount will be determined by the District Court at sentencing or in a separate hearing.

8.     The Plea Agreement contains a forfeiture provision, which was reviewed with the Defendant. The Defendant acknowledged that he is voluntarily abandoning to law enforcement all right, title and interest in the property described in the Plea Agreement.

9.     The Plea Agreement contains a provision regarding sex offender requirements, which the undersigned reviewed with the Defendant. The Defendant acknowledged his understanding that he will be required to register as a sex offender upon release from prison, and will be subject to federal and state sex offender registration requirements.

10.    The parties submitted a written Stipulation of Facts and Acknowledgement of Offense Elements in Support of Guilty Plea, which was signed by counsel for the government, counsel for the Defendant, and the Defendant. The Defendant acknowledged that he has read the Stipulation and discussed it with his attorney. The Defendant further acknowledged that he completely understands the Stipulation and agreed that it accurately sets forth the facts in his case as he understands them to be. This Court finds that the Stipulation sets forth all of the essential elements of the crimes to which the Defendant is pleading guilty as well as any sentencing enhancements and/or aggravating factors that may be applicable. Counsel for the government and counsel for the Defendant agreed that the Stipulation need not be read into the record since the

3

original has been signed by all parties, including the Defendant, and the original would be filed with the Court.

11.     Based on the foregoing and the plea colloquy that this Court conducted, this Court recommends to the District Court that the Defendant be found to have freely and voluntarily entered his guilty plea to Counts One, Two, Three, Four, and Five, and that the Defendant be adjudicated guilty of the offenses.

12.     The United States Probation Office will conduct a pre-sentence investigation and will issue a report for sentencing purposes. This Court notes that the Sentencing Hearing is set for **Thursday, November 30, 2017 at 11:00 a.m. before District Judge Donald M. Middlebrooks at the United States District Courthouse, 701 Clematis Street, 2nd Floor, West Palm Beach, Florida**.

**ACCORDINGLY**, this Court recommends to the District Court that the Defendant's conditional plea of guilty to Counts One, Two, Three, Four, and Five of the Indictment be accepted; that the Defendant be adjudicated guilty of the offenses to which he pleads guilty; and that a sentencing hearing be conducted for final disposition of this case.

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Donald M. Middlebrooks, the United States District Judge assigned to this case. Pursuant to Federal Rules of Criminal Procedure Rule 59(b)(2), failure to file a timely objection to this Report and Recommendation waives the party's right to review, and it bars the party from attacking on appeal any legal rulings or fact findings contained herein.

**DONE AND SUBMITTED** in Chambers at Fort Pierce, Florida, this 2nd day of October, 2017.

SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE

Copies furnished:
Hon. Donald M. Middlebrooks
Marton Gyires, AUSA
Fletcher Peacock, AFPD
U.S. Probation
U.S. Marshal

# DE-30

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 2:17-cr-14047-MIDDLEBROOKS

**UNITED STATES OF AMERICA**

**vs.**

**SCOTT JOSEPH TRADER,**

        **Defendant.**
_____/

### JOINT CORRECTIONS AND DEFENSE OBJECTIONS TO THE PSR

The United States of America through the undersigned Assistant United States Attorney, and the defendant personally, and through his defense attorney, Assistant Federal Public Defender Fletcher Peacock, jointly agree that the following changes/corrections should be made to the presentence investigation report ("PSR").

1. **Paragraph 11:**  The substantive content of the chats between the defendant and "Victim #1" that are copied in paragraph 11 of the PSR, which include minor edits, should be replaced with a more accurate/complete depiction of the chats, which was produced by a software program.   The software program's version of the chats is being sent via email to the assigned probation officer in order to revise the PSR.

2. **Paragraph 12:**  The next to last sentence should be changed to reflect that Mr. Trader received a withhold of adjudication, not a conviction, for his felony child neglect charge.

3. **Paragraph 15:**  The portion of the last sentence in paragraph 15 that says "dated September 9, 2016," should be changed to instead say: "written to an SD card on

September 9, 2016."

4. **Paragraph 19:**    The portion of the first sentence in paragraph 19 that says "from November 5, 2015 through **April 24**, 2016" should be changed to instead say "from November 5, 2015 through **April 28**, 2016."

5. **Paragraph 19:**    The substantive content of the chats between the defendant and an adult female that are copied in paragraph 19 of the PSR, which include minor edits, should be replaced with a more accurate/complete depiction of the chats, which was produced by a software program.   The software program's version of the chats is being sent via email to the assigned probation officer in order to revise the PSR.

6. **Paragraph 21:**    The portion of the first sentence in paragraph 21 that says "between **June 26**, 2013 and May 30, 2017," should be changed to instead say; "between **June 17**, 2013 and May 30, 2017."

7. **Paragraph 21:**    A sentence should be added to the end of paragraph 21 to say: "the word 'minors' in this paragraph refers to people representing themselves to be minors."

8. **Paragraph 21:**    The portion of the last sentence in paragraph 21 that says "pornographic images of Victim #2 and/or Victim #3" should be changed to instead say: "pornographic images involving Victim #2 and/or Victim #3."

9. **Paragraph 22:**    The substantive content of the chats between the defendant and a minor female that are copied in paragraph 22 of the PSR, which include minor edits, should be replaced with a more accurate/complete depiction of the chats, which was produced by a software program.   The software program's version of the chats is being sent via email to the assigned probation officer in order to revise the PSR.

10. **Paragraphs 26 and 27:**  The substantive content of the chats between the defendant and a minor female that are copied in paragraphs 26 and 27 of the PSR, which include minor edits, should be replaced with a more accurate/complete depiction of the chats, which was produced by a software program.   The software program's version of the chats is being sent via email to the assigned probation officer in order to revise the PSR.

11. **Paragraphs 32 and 34:**  The defendant reserves a challenge to restitution and the amounts stated in those paragraphs.   The parties agree that the Court should consider any restitution claim at a subsequent hearing not more than 90 days after the sentencing.

### DEFENDANT'S OBJECTIONS OPPOSED BY THE GOVERNMENT

The defendant also makes the following additional objections to the PSR, to which the government is opposed:

    a.  **Paragraph 57:**  The defendant objects to the statements that:  a) he threw Leanne Marchant against a mirror door; b) punched her on the back of her head; and c) told her that he was going to knock her teeth off and throw her down the stairs.

    b.  **Paragraph 59:**  The defendant believes he received a withheld adjudication instead of an adjudication of guilt.  He also objects to the statement that he grabbed Elizabeth Rutkowski around the neck.

    c.  **Paragraph 64:**  The defendant denies the underlying factual allegations.

    d.  **Paragraph 66:**  The defendant denies the underlying factual allegations.

    e.  **Paragraph 67:**  The defendant denies the underlying factual allegations.

    f.  **Paragraph 70:**  The defendant was born in Queens, N. Y., rather than the

Bronx.

**g.  Paragraph 77:**  The defendant believes that he met Leanne Drew when she was 16 years old.  Mr. Trader denies that he was physically, mentally and emotionally abusive toward Ms. Drew.  He also contends that Ms. Drew was an equal and willing partner in any sexual role playing in which they participated.

**h.  Paragraph 78:**  Mr. Trader denies that he ever physically abused Ms. Varner.

**i.  Paragraph 87:**  Mr. Trader believes he left high school in the ninth grade, rather than the tenth.

**j.  Paragraph 118:**  Mr. Trader requests that the Court permit supervised contact with his daughters during the term of his supervised release.

Respectfully submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY
By:   /s/ Marton Gyires                                    /s/ Fletcher Peacock
MARTON GYIRES                                   Fletcher Peacock, AFPD
AUSA                                                        Florida Bar No. 441996
Court ID No.: A5501696                          Attorney for Defendant
101 South U.S. Hwy. 1, Ste. 3100            109 North Second Street
Fort Pierce, Florida 34950                       Fort Pierce, Florida 34950
Telephone: 772-293-0952                         Tel: 772-489-2123
Marton.Gyires@usdoj.gov                       Fletcher_Peacock@fd.org

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

By: _____/s/_____
Marton Gyires
Assistant United States Attorney
A#5501696
Email: marton.gyires@usdoj.gov
United States Attorney's Office
101 South U.S. Hwy. 1, Ste. 3100
Fort Pierce, Florida 34950
Telephone: 772-293-0952
Facsimile: 772-466-1020

# DE-34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-14047-CR-MIDDLEBROOKS

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

SCOTT JOSEPH TRADER,

     Defendant.

_____/

## MOTION FOR DOWNWARD VARIANCE

The defendant Scott Trader, through counsel, hereby requests that the Court vary downward from the sentencing guideline range upon the following grounds:

The parties agree that the sentencing guideline range in this case is "Life," based upon an offense level of 43 and a criminal history category of III.

Notwithstanding the computed sentencing guideline range, the Court must impose a sentence that is sufficient, but not greater than necessary, to comply with the sentencing purposes listed in 18 U.S.C. § 3553(a).  The purpose of §3553(a) is to 1) "reflect the seriousness of the offense," 2) "promote respect for the law," 3) provide just punishment," 4) "afford adequate deterrence," 5) protect the public from further crimes of the defendant," and 6) "provide the defendant with any needed training and treatment in the most effective manner."  "The task is a holistic endeavor that requires the district court to consider a variety of factors: (1) the nature and circumstances of the offense, (2) the defendant's history and characteristics, (3) the

kinds of sentences available, (4) the applicable sentencing guidelines range, (5) pertinent policy statements of the Sentencing Commission, (5) the need to provide restitution to any victims, and (6) the need to avoid unwarranted sentencing disparities." *United States v. Rosales-Bruno*, 789 F. 3d 1249, 1254 (11th Cir. 2015).

The sentencing guideline range is only one factor, among many, that the Court must consider. *United States v. Gall*, 552 U.S. 38, 49 (2007) ("[T]he sentencing guidelines should be the starting point and the initial benchmark."); *United States v. Rita*, 551 U.S. 338, 350 (2007) (sentencing guideline range reflects only a "rough approximation" of the objectives of § 3553(a)). Although the Court must consider all of the § 3553(a) factors, including the sentencing guidelines, it need not give equal weight to each. "Instead, the sentencing court 'is permitted to attach 'great weight' to one factor over others.'" *Rosales-Bruno*, 789 F.3d at 1254 (11th Cir. 2015) (quoting *Gall*, 552 U.S. 38, 57). There is no particular weight or appropriate deference assigned the sentencing guidelines. *United States v. Irey*, 612 F.3d 1160, 1217; *United States v. Hunt*, 459 F.3d 1180, 1184 (11th Cir. 2006). A sentencing court may vary from the guidelines based on its disagreement with the severity of a particular guideline range. *Kimbrough v. United States*, 552 U.S. 85 (2007). Finally, a district court has substantial discretion in weighing the §3553(a) factors to arrive at a reasonable sentence. *Rosales-Bruno*, 789 F.3d at 1254.

In the instant case, the defendant contends that the guideline range is excessive when compared to the guideline ranges of even more serious offenses. Additionally, the defendant's personal characteristics and relevant psychological

research indicate that a sentence less than "life" will satisfy 3553(a)'s concerns for public safety and deterrence.  Finally, Mr. Trader's early and complete acceptance of responsibility for his actions in this case supports a sentence less than "life."

Although the Court must consider all of the § 3553(a) factors, the defendant emphasizes those below.

### 1.      The Nature and Circumstances of the Offense

There is no doubt that the offense in this case is extremely serious.  However, it is certainly no more serious than many other offenses addressed by the guidelines.  And those equally, or more serious, offenses have significantly lower offense levels.

According to the probation officer's calculations, Mr. Trader accrued 51 offense level points.  His offense level was then reduced to 43, *after acceptance*, because 43 is the highest level permitted under the guidelines.

Numerous offenses of equal or greater seriousness have lower offense levels. First degree murder is such an offense.  Under U.S.S.G. § 2A1.1, the offense level for first degree murder, *before acceptance*, is 43.  With a three point reduction for acceptance it is level 40.  Given Mr. Trader's criminal history category of III, he would have a guideline range of 360 months to life if he had been convicted of first degree murder.  Second degree murder (§ 4A1.2) would carry a total offense level of 35 after acceptance, with a range of 210 – 262 months.  Attempted murder for pecuniary gain, causing permanent bodily injury, would result in an offense level of 38 after acceptance and a guideline range of 292 – 365 months.

Likewise, kidnapping (§4A4.1) with permanent bodily injury, use of a firearm, and sexual exploitation of the victim would result in an offense level of 41 after acceptance and a guideline range of 360 – life.  Hijacking (§4A5.1) resulting in death has an offense level of 40 after acceptance and a guideline range of 360 – life.

Perhaps most informative in this regard is the guideline for "Criminal Sexual Abuse" (§2A3.1).  A defendant convicted of criminal sexual abuse of a prepubescent minor in his care and custody, would have an offense level of 37 after acceptance and a guideline range of 262 – 327 months.  Even if the "pattern" enhancement from U.S.S.G. § 4B1.5(b) were applied, the offense level would be 42 after acceptance.

All of these offenses are equally serious, or more serious, than the production of child pornography or enticement of a minor offenses under the facts of this case.  Consequently, the undersigned urges that a sentence lower than "life" is appropriate.

## 2.     The Defendant's History and Characteristics

Mr. Trader is a 32 year old married man with two children.  Prior to his arrest, he resided with his wife, children, mother, father, step-father and brother in a single family home in Port St. Lucie, Florida.  As indicated in the presentence report, the Traders are a close knit family.  Mr. Trader's step-father is totally blind and suffers from dementia.  Mr. Trader's brother, Keith, age 34, suffers from mid-level autism.  Mr. Trader has always assisted his mother in caring for his step-

father and brother.  The family had always planned that Mr. Trader would be his brother's caretaker once the parents were unable to do so.

Notwithstanding his actions in this case, Mr. Trader has always been involved in his children's lives.  He has always paid his child support.  He was regularly involved in their schooling.

Mr. Trader has a good work history.  From 2004 until 2012, he was employed by Walmart.  He rose from a stock clerk to a department manager.  From January 2016 until his arrest, Mr. Trader worked as a pool technician for Treasure Coast Pools.

As reflected in his psychological evaluation, Mr. Trader suffers from pedophilia and depression.  *See* 8/12/17 report of Dr. Michael Brannon, Psy.D. However, Dr. Brannon also concluded that Mr. Trader's risk of reoffending, while perhaps high at this time, will be below average at the age of 60.  "Individuals with the same score reoffend at a rate of 2.8% over a period of five years." *Id*.  Thus the Court can be reasonably confident that upon release from what is sure to be a lengthy sentence of imprisonment, Mr. Trader is very unlikely to reoffend.

Finally, Mr. Trader reports that he too was a victim of sexual molestation at the age of nine.  See PSI, at paragraph 70.

### 3.    The Kinds of Sentences Available

This Court has great discretion in determining an appropriate sentence for this serious offense. In its sentencing memorandum, the government has cited several district and circuit cases in which the sentencing court imposed extremely

severe sentences for similar offenses.  However, the undersigned can also cite cases of similar seriousness in this district in which the court imposed a much lower sentence than in those cited by the government.  For example, *United States v. James Byrne*, 09-14059-Cr-KMM (Defendant sexually molested and photographed a ten year old mentally impaired girl entrusted to his care over a period of several months. Sentence: 360 months.); *United States v. Scott Smith*, 09-60322-Cr-Dimitrouleas (Defendant sexually molested and filmed two young boys entrusted to his care.  Sentence: 360 months.); *United States v. Ronald Kovacs,* 12-60313-Cr-Dimitrouleas (Defendant produced multiple videos of him sexually molesting a six year old female resulting in 51 offense level points.  Sentence: 405 months.); and *United States v. Martin Van Duerzen*, 15-14075-Cr-RLR (Defendant videoed his sexual molestation of his mentally impaired nephew over a one year period. Sentence: 360 months.).

Once again, the Court has great discretion in the sentence it finds appropriate.  But many courts in this district have rejected the government's request of a "life" sentence under similar circumstances.

### 4.   Deterrence

The defendant respectfully suggests that any sentence in excess of 25 years is an adequate deterrent to Mr. Trader and the public at large.  Such a sentence would likely ensure that Mr. Trader is incarcerated for most of his adult life.  Such a sentence will send a clear message to anyone considering such an offense that they

will suffer a severe punishment if apprehended.  A sentence of longer than 30 years will do little or nothing to enhance the deterrent effect.

WHEREFORE the defendant requests that the Court impose a downward variance from the sentencing guideline range.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER


By:    s/Fletcher Peacock
       Fletcher Peacock
       Assistant Federal Public Defender
       Florida Bar No. 441996
       109 North Second Street
       Fort Pierce, Florida 34950
       Tel:  772-489-2123
       Fax: 772-489-3997
       E-Mail: Fletcher_Peacock@fd.org

### CERTIFICATE OF SERVICE

I HEREBY certify that on December 6, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


By:  s/Fletcher Peacock, AFPD
      Fletcher Peacock

<u>**SERVICE LIST**</u>

**UNITED STATES v. SCOTT JOSEPH TRADER
Case No. 17-14047-CR-MIDDLEBROOKS
United States District Court, Southern District of Florida**

**Fletcher Peacock
Fletcher_Peacock@fd.org
Assistant Federal Public Defender**
109 North Second Street
Fort Pierce, FL 34950
Tel: 772-489-2123
Fax: 772-489-3997
Attorney for Trader
Notices of Electronic Filing

**Marton Gyires
marton.gyires@usdoj.gov
Assistant United States Attorney**
United States Attorney's Office
101 South U.S. Hwy 1, Suite 3100
Fort Pierce, Florida 34950
Tel:  772-293-0952
Fax: 772-595-3606
Notice of Electronic Filing

**DE-38**

 Activity in Case 2:17-cr-14047-DMM USA v. Trader Order on Report and
Recommendations
cmecfautosender
to:
flsd_cmecf_notice
12/07/2017 03:42 PM
Bcc:
Deborah Cooley
Hide Details
From: cmecfautosender@flsd.uscourts.gov
To: flsd_cmecf_notice@flsd.uscourts.gov
Bcc: Deborah Cooley/FLSF/11/FDO

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## Southern District of Florida

## Notice of Electronic Filing

The following transaction was entered on 12/7/2017 at 3:42 PM EST and filed on 12/7/2017
**Case Name:**       USA v. Trader
**Case Number:**    2:17-cr-14047-DMM
**Filer:**
**Document Number:** 38(No document attached)

**Docket Text:**
**ENDORSED ORDER ADOPTING REPORT AND RECOMMENDATIONS as to Scott Joseph Trader for [23] Report and Recommendations on Guilty Plea - Motions terminated: [23] REPORT AND RECOMMENDATIONS on Plea of Guilty as to Scott Joseph Trader. Signed by Judge Donald M. Middlebrooks on 12/7/2017. (gm1)**

**2:17-cr-14047-DMM-1 Notice has been electronically mailed to:**

Antonia J. Barnes    antonia.barnes@usdoj.gov, CaseView.ECF@usdoj.gov, Elaine.Coleman@usdoj.gov, katie.chirikjian@usdoj.gov, USAFLS-BRDKT@usdoj.gov

Fletcher Peacock     fletcher_peacock@fd.org, deborah_cooley@fd.org

Marton Gyires     marton.gyires@usdoj.gov, CaseView.ECF@usdoj.gov,
kelly.corless@usdoj.gov, USAFLS-HQDKT@usdoj.gov

**2:17-cr-14047-DMM-1 Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

# DE-40

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                                 Page 1 of 6

# UNITED STATES DISTRICT COURT
## Southern District of Florida
### Fort Pierce Division

**UNITED STATES OF AMERICA**
v.
**SCOTT JOSEPH TRADER**

**JUDGMENT IN A CRIMINAL CASE**

Case Number: **17-14047-CR-MIDDLEBROOKS**
USM Number: **16118-104**

Counsel For Defendant: **Fletcher Peacock**
Counsel For The United States: **Marton Gyires**
Court Reporter: **Diane Miller**

**The defendant pleaded guilty to count(s) One through Five.**

The defendant is adjudicated guilty of these offenses:

| TITLE & SECTION | NATURE OF OFFENSE | OFFENSE ENDED | COUNT |
|---|---|---|---|
| 18 U.S.C. §2422(b) | Enticement of a minor to engage in sexual activity | 05/31/2017 | 1 |
| 18 U.S.C. §2252(a)(2),(b)(1) | Distribution of material containing visual depictions of sexual exploitation of minors | 05/30/2017 | 2 |
| 18 U.S.C. §2252(a)(4)(B),(b)(2) | Possession of matter containing visual depictions of sexual exploitation of minors | 06/01/2017 | 3 |
| 18 U.S.C. §2251(a),(e) | Production of material containing visual depictions of sexual exploitation of minors | 05/31/2017 | 4 |
| 18 U.S.C. §2251(a),(e) | Production of material containing visual depictions of sexual exploitation of minors | 11/28/2015 | 5 |

The defendant is sentenced as provided in the following pages of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Date of Imposition of Sentence: **12/7/2017**

**Donald M. Middlebrooks**
**United States District Judge**

Date: _____12/8/17_____

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                                          Page 2 of 6

DEFENDANT: **SCOTT JOSEPH TRADER**
CASE NUMBER: **17-14047-CR-MIDDLEBROOKS**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of **LIFE. This term consists of Life as to Count One, 240 Months as to each of Counts Two and Three and 360 Months as to each of Counts Four and Five, all to be served concurrently.**

**The court makes the following recommendations to the Bureau of Prisons:**

1. **The Defendant participate in the Sex Offender Management Program located in the BOP at Marianna, Florida.**

2. **The Defendant be designated to a facility in or as close to Northern Florida (Marianna) as possible.**

**The defendant is remanded to the custody of the United States Marshal.**

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.


_____
UNITED STATES MARSHAL


_____
DEPUTY UNITED STATES MARSHAL

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                                              Page 3 of 6

DEFENDANT: **SCOTT JOSEPH TRADER**
CASE NUMBER: **17-14047-CR-MIDDLEBROOKS**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **LIFE. This term consists of Life as to each of Counts One through Five, to run concurrently**.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

**The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.**

**The defendant shall cooperate in the collection of DNA as directed by the probation officer.**

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1. The defendant shall not leave the judicial district without the permission of the court or probation officer;
2. The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first fifteen days of each month;
3. The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4. The defendant shall support his or her dependents and meet other family responsibilities;
5. The defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6. The defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7. The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8. The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9. The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10. The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11. The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13. As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case _____ Page 4 of 6

DEFENDANT: **SCOTT JOSEPH TRADER**
CASE NUMBER: **17-14047-CR-MIDDLEBROOKS**

## SPECIAL CONDITIONS OF SUPERVISION

Adam Walsh Act Search Condition - The defendant shall submit to the U.S. Probation Officer conducting periodic unannounced searches of the defendant's person, property, house, residence, vehicles, papers, computer(s), other electronic communication or data storage devices or media, include retrieval and copying of all data from the computer(s) and any internal or external peripherals and effects at any time, with or without warrant by any law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of probation or supervised release. The search may include the retrieval and copying of all data from the computer(s) and any internal or external peripherals to ensure compliance with other supervision conditions and/or removal of such equipment for the purpose of conducting a more thorough inspection; and to have installed on the defendant's computer(s), at the defendant's expense, any hardware or software systems to monitor the defendant's computer use.

Computer Possession Restriction - The defendant shall not possess or use any computer; except that the defendant may, with the prior approval of the Court, use a computer in connection with authorized employment.

Data Encryption Restriction - The defendant shall not possess or use any data encryption technique or program.

Employer Computer Restriction Disclosure - The defendant shall permit third party disclosure to any employer or potential employer, concerning any computer-related restrictions that are imposed upon the defendant.

Mental Health Treatment - The defendant shall participate in an approved inpatient/outpatient mental health treatment program. The defendant will contribute to the costs of services rendered (co-payment) based on ability to pay or availability of third party payment.

No Contact with Minors - The defendant shall have no personal, mail, telephone, or computer contact with children/minors under the age of 18 or with any victim. The Court does not have any objection if the victim wanted to be in contact with the defendant but has to be at the initiation of the victim.

No Involvement in Youth Organizations - The defendant shall not be involved in any children's or youth organization.

Restricted from Possession of Sexual Materials - The defendant shall not buy, sell, exchange, possess, trade, or produce visual depictions of minors or adults engaged in sexually explicit conduct. The defendant shall not correspond or communicate in person, by mail, telephone, or computer, with individuals or companies offering to buy, sell, trade, exchange, or produce visual depictions of minors or adults engaged in sexually explicit conduct.

Sex Offender Registration - The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.

Sex Offender Treatment - The defendant shall participate in a sex offender treatment program to include psychological testing and polygraph examination. Participation may include inpatient/outpatient treatment, if deemed necessary by the treatment provider. The defendant will contribute to the costs of services rendered (co-payment) based on ability to pay or availability of third party payment.

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                    Page 5 of 6

DEFENDANT: **SCOTT JOSEPH TRADER**
CASE NUMBER: **17-14047-CR-MIDDLEBROOKS**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| TOTALS | $500.00 | $0.00 | $TBD |

**The determination of restitution is deferred until TBD . An Amended Judgment in a Criminal Case (AO 245C) will be entered after such determination.**

**If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.**

| NAME OF PAYEE | TOTAL LOSS* | RESTITUTION ORDERED | PRIORITY OR PERCENTAGE |
|---|---|---|---|
|  |  | TBD |  |

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**Assessment due immediately unless otherwise ordered by the Court.

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case

DEFENDANT: **SCOTT JOSEPH TRADER**
CASE NUMBER: **17-14047-CR-MIDDLEBROOKS**

### SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A. Lump sum payment of $500.00 due immediately.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

This assessment/fine/restitution is payable to the CLERK, UNITED STATES COURTS and is to be addressed to:

**U.S. CLERK'S OFFICE**
**ATTN: FINANCIAL SECTION**
**400 NORTH MIAMI AVENUE, ROOM 08N09**
**MIAMI, FLORIDA 33128-7716**

The assessment/fine/restitution is payable immediately. The U.S. Bureau of Prisons, U.S. Probation Office and the U.S. Attorney's Office are responsible for the enforcement of this order.

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

| CASE NUMBER<br>DEFENDANT AND CO-DEFENDANT NAMES<br>(INCLUDING DEFENDANT NUMBER) | TOTAL AMOUNT | JOINT AND SEVERAL<br>AMOUNT |
|---|---|---|
| | | |

**The defendant shall forfeit the defendant's interest in the following property to the United States: Defendant's right, title and interest to the property identified in the plea agreement and in the Preliminary Order of Forfeiture (D.E. 25) which has been entered by the Court on October 20, 2017 and is incorporated by reference herein, is hereby forfeited.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# DE-44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 17-14047-CR-MIDDLEBROOKS

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

SCOTT JOSEPH TRADER,

        Defendant.

_____/

## NOTICE OF APPEAL

Notice is hereby given that Scott Joseph Trader, defendant in the above named case, hereby appeals to the United States Court of Appeals for the Eleventh Circuit from the final judgment and commitment (DE 40) entered in this action on the 8th day of December, 2017.

        Respectfully submitted,

        MICHAEL CARUSO
        Federal Public Defender

By:    s/Fletcher Peacock_____
        Assistant Federal Public Defender
        Florida Bar No. 441996
        109 North 2nd Street
        Fort Pierce, Florida  34950
        (772) 489-2123 - Telephone
        (772) 489-3997 - Fax
        *Fletcher_Peacock@fd.org*

## CERTIFICATE OF SERVICE

I HEREBY certify that on December 18, 2017 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


By   *s/Fletcher Peacock*_____

<u>**SERVICE LIST**</u>

**UNITED STATES OF AMERICA V. SCOTT JOSEPH TRADER**
**Case No. 17-14047-CR-MIDDLEBROOKS**
**United States District Court, Southern District of Florida**

Fletcher Peacock
Fletcher_Peacock@fd.org
Assistant Federal Public Defender
109 North Second Street
Fort Pierce, FL 34950
Tel: 772-489-2123
Fax: 772-489-3997
Attorney for Trader
Notices of Electronic Filing

Marton Gyires
marton.gyires@usdoj.gov
Assistant United States Attorney
United States Attorney's Office
101 South U.S. Hwy 1, Suite 3100
Fort Pierce, Florida 34950
Tel:  772-293-0952
Fax: 772-595-3606
Notice of Electronic Filing

# DE-52

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2
                    17-14047-CR-MIDDLEBROOKS/MAYNARD
 3

 4
   UNITED STATES OF AMERICA,      )
 5                                )
                  PLAINTIFF,      )
 6                                )
           VS.                    )
 7                                )
   SCOTT JOSEPH TRADER,           )
 8                                )
                  DEFENDANT.      )
 9   _____)

10              (TRANSCRIPT BY DIGITAL RECORDING)

11

12        TRANSCRIPT OF CHANGE OF PLEA HAD BEFORE THE HONORABLE

13   SHANIEK MAYNARD, IN FORT PIERCE, SAINT LUCIE COUNTY, FLORIDA,

14   ON SEPTEMBER 29, 2017, IN THE ABOVE-STYLED MATTER.

15

16

17   APPEARANCES:

18   FOR THE GOVERNMENT:  MARTON GYIRES, A.U.S.A.
                          101 SOUTH HIGHWAY 1, SUITE 3100
19                        FORT PIERCE, FL 34950 - 772 293-0952

20   FOR THE DEFENDANT:   FLETCHER PEACOCK, A.F.P.D.
                          109 NORTH 2ND STREET
21                        FORT PIERCE, FL 34950 - 772 489-2123

22

23              CARL SCHANZLEH, RPR - CM
                CERTIFIED COURT REPORTER
24              9960 SW 4TH STREET
                PLANTATION, FLORIDA 33324
25              954 424-6723
```

```
 1   (FORT PIERCE, SAINT LUCIE COUNTY, FLORIDA;  SEPTEMBER 29, 2017,

 2   IN OPEN COURT.)

 3        THE COURT:  THE NEXT CASE IS UNITED STATES OF AMERICA

 4   VERSUS SCOTT JOSEPH TRADER, CASE NUMBER

 5   17-14047-CRIMINAL-MIDDLEBROOKS.

 6        APPEARANCES, PLEASE.

 7        MR. GYIRES:  GOOD MORNING, YOUR HONOR.  MARTON GYIRES

 8   FOR THE UNITED STATES.

 9        THE COURT:  GOOD MORNING, SIR.

10        MR. PEACOCK:  GOOD MORNING AGAIN, JUDGE.  FLETCHER

11   PEACOCK ON BEHALF OF MR. TRADER WHO IS ALSO PRESENT.

12        YOUR HONOR, IF I MAY HAVE JUST A MINUTE WITH

13   MR. TRADER --

14        THE COURT:  SURE.

15        MR. PEACOCK:  -- TO CONFIRM SOME THINGS?

16        THE COURT:  YES.

17        MR. PEACOCK:  THANK YOU, YOUR HONOR.

18   WE'RE READY TO PROCEED.

19        THE COURT:  OKAY.  VERY GOOD.

20        MR. GYIRES:  MAY I HAVE JUST ONE SECOND, YOUR HONOR?

21        THE COURT:  SURE.

22        THE COURT:  GOOD MORNING, MR. TRADER.

23        THE DEFENDANT:  GOOD MORNING.

24        THE COURT:  YOUR ATTORNEY ADVISES ME THAT YOU ARE

25   PREPARED TO PLEAD GUILTY IN THIS MATTER.
```

USCA11 Case: 17-15611     Document: 24     Date Filed: 09/10/2018     Page: 132 of 215

1 AND SO THE PURPOSE OF THIS HEARING IS FOR ME TO ASK

2 YOU SOME QUESTIONS TO MAKE SURE YOU UNDERSTAND YOUR DECISION,

3 MAKE SURE YOU UNDERSTAND THE POSSIBLE CONSEQUENCES AND MAKE

4 SURE YOU UNDERSTAND THE RIGHTS YOU ARE GIVING UP.

5 DO YOU UNDERSTAND?

6 THE DEFENDANT: YES, MA'AM.

7 THE COURT: OKAY. IF YOU COULD RAISE YOUR RIGHT HAND

8 THE COURTROOM DEPUTY WILL PLACE YOU UNDER OATH.

9 (DEFENDANT SWORN)

10 THE DEFENDANT: YES, MA'AM.

11 THE CLERK: PLEASE STATE YOUR NAME FOR THE RECORD.

12 THE DEFENDANT: MY NAME IS SCOTT JOSEPH TRADER.

13 THE CLERK: THANK YOU.

14 THE COURT: MR. TRADER, DO YOU UNDERSTAND THAT YOU ARE

15 NOW UNDER OATH AND THAT IF YOU ANSWER ANY OF MY QUESTIONS

16 FALSELY YOUR ANSWERS CAN SUBJECT YOU TO FUTURE CHARGES FOR

17 PERJURY OR FALSE STATEMENT?

18 THE DEFENDANT: I DO.

19 THE COURT: DO YOU UNDERSTAND THAT I AM CONDUCTING

20 THIS CHANGE OF PLEA PURSUANT TO AN ORDER OF REFERENCE FROM A

21 DISTRICT JUDGE IN YOUR CASE AND I AM NOT THE JUDGE THAT WILL

22 SENTENCE YOU.

23 DO YOU UNDERSTAND THAT?

24 THE DEFENDANT: YES, YOUR HONOR.

25 THE COURT: DO YOU UNDERSTAND THAT I AM A UNITED

1 STATES MAGISTRATE JUDGE AND I CAN ONLY ACCEPT YOUR PLEA IF YOU

2 CONSENT TO ME DOING SO.

3 DO YOU UNDERSTAND THAT?

4 THE DEFENDANT: YES, YOUR HONOR.

5 THE COURT: DO YOU UNDERSTAND THAT IF YOU DO CONSENT

6 TO ME DOING SO YOU'RE WAIVING YOUR RIGHT TO HAVE THE DISTRICT

7 JUDGE ACCEPT YOUR PLEA.

8 THE DEFENDANT: I DO, YOUR HONOR.

9 THE COURT: SO DO YOU CONSENT TO MY TAKING YOUR CHANGE

10 OF PLEA IN THIS CASE?

11 THE DEFENDANT: YES, YOUR HONOR.

12 THE COURT: MR. PEACOCK?

13 MR. GYIRES: YES, MA'AM.

14 THE COURT: MR. GYIRES?

15 MR. GYIRES: YES, YOUR HONOR.

16 THE COURT: MR. TRADER, HOW OLD ARE YOU?

17 THE DEFENDANT: I AM 32.

18 THE COURT: AND HOW FAR DID YOU GO IN SCHOOL?

19 THE DEFENDANT: I GOT MY GED.

20 THE COURT: HAVE YOU BEEN TREATED RECENTLY FOR ANY

21 MENTAL ILLNESS OR ADDICTION TO NARCOTIC DRUGS?

22 THE DEFENDANT: NO, MA'AM.

23 THE COURT: ARE YOU CURRENTLY UNDER THE INFLUENCE OF

24 ANY DRUG, OR MEDICATION, OR ALCOHOLIC BEVERAGE?

25 THE DEFENDANT: NO, MA'AM.

1  THE COURT:  HAVE YOU REVIEWED WITH YOUR ATTORNEY ALL
2  OF THE DOCUMENTS IN DISCOVERY IN THIS CASE?
3  THE DEFENDANT:  I DID, MA'AM.
4  THE COURT:  HAVE YOU RECEIVED A COPY OF THE INDICTMENT
5  PENDING AGAINST YOU AND HAVE YOU BEEN ABLE TO READ IT AND FULLY
6  DISCUSS THOSE CHARGES AND THE CASE WITH YOUR ATTORNEY?
7  THE DEFENDANT:  I DID AND I HAVE, MA'AM.
8  THE COURT:  ARE YOU FULLY SATISFIED WITH THE COUNSEL,
9  REPRESENTATION AND ADVICE GIVEN TO YOU BY YOUR ATTORNEY IN THIS
10 CASE?
11 THE DEFENDANT:  YES, YOUR HONOR.
12 THE COURT:  IS YOUR WILLINGNESS TO PLEAD GUILTY THE
13 RESULT OF DISCUSSIONS THAT YOU OR YOUR ATTORNEY HAVE HAD WITH
14 THE GOVERNMENT?
15 THE DEFENDANT:  YES, YOUR HONOR.
16 THE COURT:  AND THOSE DISCUSSIONS HAVE BEEN -- IS
17 THERE A PLEA AGREEMENT IN THE CASE?
18 MR. PEACOCK:  THERE IS, JUDGE.  I PASSED THAT UP.
19 THE COURT:  OH.  THANK YOU.
20 IS THIS PLEA AGREEMENT THE RESULT OF THOSE DISCUSSIONS
21 BETWEEN YOUR ATTORNEY AND THE GOVERNMENT?
22 THE DEFENDANT:  YES, YOUR HONOR.
23 THE COURT:  THE DOCUMENT IS EIGHT PAGES, AND ON THE
24 LAST PAGE I RECOGNIZE THE SIGNATURES OF MR. GYIRES AND
25 MR. PEACOCK AND THERE IS A SIGNATURE ON THE THIRD LINE RIGHT

1  ABOVE YOUR NAME.
2  IS THAT YOUR SIGNATURE, SIR?
3  THE DEFENDANT:  YES, MA'AM.
4  THE COURT:  HAVE YOU BEEN ABLE TO REVIEW THIS DOCUMENT
5  AND READ IT AND FULLY DISCUSS IT WITH YOUR ATTORNEY?
6  THE DEFENDANT:  I HAVE.
7  THE COURT:  HAVE YOU BEEN ABLE TO GET ANY QUESTIONS
8  THAT YOU HAVE ABOUT THE DOCUMENT ANSWERED?
9  THE DEFENDANT:  I HAVE.
10 THE COURT:  DID THIS PLEA AGREEMENT REPRESENT IN ITS
11 ENTIRETY YOUR UNDERSTANDING THAT YOU HAVE WITH THE GOVERNMENT?
12 THE DEFENDANT:  YES, MA'AM.
13 THE COURT:  I'M GOING TO GO OVER SOME OF THE
14 PROVISIONS TO MAKE SURE YOU UNDERSTAND THEM.  WE'RE NOT GOING
15 TO TALK ABOUT EVERYTHING BUT I DO HAVE SOME PARAGRAPHS I WANT
16 TO TALK TO YOU ABOUT.
17 IN PARAGRAPH ONE IT SAYS THAT YOU ARE AGREEING TO
18 PLEAD GUILTY TO ALL FIVE COUNTS OF THE INDICTMENT WHICH CHARGE
19 YOU WITH ENTICEMENT OF A MINOR TO ENGAGE IN SEXUAL ACTIVITY,
20 DISTRIBUTION OF MATERIAL WITH (INAUDIBLE) DEPICTIONS OF SEXUAL
21 EXPLOITATION OF MINORS, POSSESSION OF MATTER CONTAINING VISUAL
22 DEPICTION OF SEXUAL EXPLOITATION OF MINORS.
23 AND THEN THE LAST TWO COUNTS BOTH CHARGE PRODUCTION OF
24 MATERIAL CONTAINING VISUAL DEPICTION OF SEXUAL EXPLOITATION OF
25 MINORS.

USCA11 Case: 17-15611    Document: 24    Date Filed: 09/10/2018    Page: 134 of 215

1  DO YOU UNDERSTAND THAT THOSE ARE THE CHARGES THAT YOU

2  ARE PLEADING GUILTY TO?

3  THE DEFENDANT:  YES, MA'AM.

4  THE COURT:  PARAGRAPH THREE SETS FORTH THE POSSIBLE

5  MAXIMUM PENALTIES FOR EACH OF THOSE CHARGES.

6  AS TO COUNT 1 THE COURT MAY IMPOSE A TERM OF

7  IMPRISONMENT OF UP TO LIFE AND MUST IMPOSE A TERM OF

8  IMPRISONMENT OF AT LEAST 10 YEARS FOLLOWED BY SUPERVISED

9  RELEASE OF AT LEAST FIVE YEARS AND UP TO LIFE IN ADDITION TO A

10  FINE OF UP TO $250,000.

11  AS TO COUNT 2 THE COURT MAY IMPOSE A TERM OF

12  IMPRISONMENT OF UP TO 20 YEARS AND MUST IMPOSE A TERM OF

13  IMPRISONMENT OF AT LEAST FIVE YEARS FOLLOWED BY SUPERVISED

14  RELEASE OF AT LEASE FIVE YEARS AND UP TO LIFE AND MAY IMPOSE A

15  FINE OF UP TO $250,000.

16  AS TO COUNT 3 THE COURT MAY IMPOSE A TERM OF

17  IMPRISONMENT OF UP TO 20 YEARS FOLLOWED BY SUPERVISED RELEASE

18  OF AT LEAST FIVE YEARS AND UP TO LIFE IN ADDITION TO A FINE OF

19  UP TO $250,000.

20  AND THEN AS TO COUNTS 4 AND 5 EACH THE COURT MAY

21  IMPOSE A TERM OF IMPRISONMENT OF UP TO 30 YEARS AND MUST IMPOSE

22  A TERM OF IMPRISONMENT OF AT LEAST 15 YEARS FOLLOWED BY A TERM

23  OF SUPERVISED RELEASE OF AT LEAST FIVE YEARS AND UP TO LIFE IN

24  ADDITION TO A FINE OF UP TO $250,000.

25  MR. TRADER, DO YOU UNDERSTAND THAT THOSE ARE THE

1  POSSIBLE MAXIMUM PENALTIES THAT YOU ARE FACING IN THIS CASE?

2  THE DEFENDANT:  I DO, YOUR HONOR.

3  THE COURT:  AND DO YOU UNDERSTAND THAT SOME OF THOSE

4  ALSO HAVE A MANDATORY MINIMUM ASSOCIATED WITH THEM?

5  THE DEFENDANT:  YES, YOUR HONOR.

6  THE COURT:  PARAGRAPH FOUR INDICATES THAT IN ADDITION

7  TO THE POSSIBLE SENTENCES WE JUST DISCUSSED A SPECIAL

8  ASSESSMENT IN THE AMOUNT OF $100 AS TO EACH COUNT WILL BE

9  IMPOSED.  SO $500 TOTAL.

10  DO YOU UNDERSTAND THAT?

11  THE DEFENDANT:  YES, MA'AM.

12  THE COURT:  PARAGRAPH SIX IS WHAT WE CALL THE

13  ACCEPTANCE OF RESPONSIBILITY OF THAT.

14  AND IT SAYS THAT THE GOVERNMENT IS GOING TO RECOMMEND

15  A SENTENCE THAT YOU GET AT LEAST TWO LEVELS OFF OF YOUR

16  SENTENCING GUIDELINE RANGE AND THREE LEVELS IF YOUR RANGE IS 16

17  OR MORE AS LONG AS YOU DO CERTAIN THINGS, AND I WANT TO MAKE

18  SURE THAT WE GO OVER WHAT THOSE THINGS ARE THAT YOU MUST DO OR

19  CANNOT DO SO THAT YOU DON'T LOSE THAT ACCEPTANCE OF

20  RESPONSIBILITY (INAUDIBLE)

21  IT SAYS, THE GOVERNMENT WILL NOT BE REQUIRED TO MAKE

22  THESE RECOMMENDATIONS IF THE DEFENDANT, ONE, FAILS OR REFUSES

23  TO MAKE FULL, ACCURATE AND COMPLETE DISCLOSURE TO THE PROBATION

24  OFFICE ABOUT THE CIRCUMSTANCES SURROUNDING THE OFFENSE.

25  NUMBER TWO, IF THE DEFENDANT IS FOUND TO HAVE

USCA11 Case: 17-15611 Document: 24 Date Filed: 09/10/2018 Page: 135 of 215

1 MISREPRESENTED FACTS TO THE GOVERNMENT PRIOR TO ENTERING THE

2 PLEA AGREEMENT.

3     AND NUMBER THREE, IS IF THE DEFENDANT COMMITS ANY

4 MISCONDUCT AFTER ENTERING THIS AGREEMENT, WHICH INCLUDES

5 VIOLATING THE LAW OR MAKING FALSE STATEMENTS OR

6 MISREPRESENTATIONS.

7     SO DO YOU UNDERSTAND THAT IF YOU DO ANY OF THOSE THREE

8 THINGS THE GOVERNMENT WILL NOT BE REQUIRED TO RECOMMEND THREE

9 LEVELS OFF FOR ACCEPTANCE OF RESPONSIBILITY?

10     THE DEFENDANT: YES, MA'AM, I AGREE.

11     THE COURT: NUMBER SEVEN SAYS THAT YOU AND THE

12 GOVERNMENT HAVE AGREED THAT YOU ARE RESERVING YOUR RIGHT TO

13 APPEAL THE DISTRICT COURT'S ORDER THAT DENIES YOUR (INAUDIBLE)

14 REQUEST, AND THAT YOUR RESERVATION OF THESE RIGHTS ARE LIMITED

15 TO THE FOURTH AMENDMENT ISSUE THAT YOU FACE, WHICH WERE WHETHER

16 THE GOVERNMENT OBTAINING A SUBSCRIBER INFORMATION FROM THE

17 SOCIAL MEDIA COMPANY FOR THE SEARCH UNDER THE FOURTH AMENDMENT

18 AND WHETHER THE SEARCH WARRANT IN THIS CASE WAS SUPPORTED BY

19 PROBABLE CAUSE.

20     THE PARAGRAPH FURTHER SAYS THAT YOU AND THE GOVERNMENT

21 AGREE THAT IF YOU PREVAIL ON APPEAL YOU WILL BE ALLOWED TO

22 WITHDRAW OR VACATE THIS GUILTY PLEA.

23     DO YOU UNDERSTAND THAT, SIR?

24     THE DEFENDANT: YES, MA'AM.

25     THE COURT: PARAGRAPH NINE SAYS THAT YOU UNDERSTAND

1 AND ACKNOWLEDGE THAT PURSUANT TO THE MANDATORY RESTITUTION FOR

2 SEX CRIMES SECTION OF THE VIOLENCE AGAINST WOMAN'S ACT OF 1994,

3 THE COURT MUST ORDER RESTITUTION IN (INAUDIBLE) VICTIMS IN THIS

4 CASE, AND THAT AMOUNT WILL BE DETERMINED AT SENTENCING OR AT A

5 SEPARATE RESTITUTION HEARING, AND THAT YOU AGREE TO PAY ANY

6 RESTITUTION THAT MAY BE ORDERED BY THE COURT.

7     DO YOU UNDERSTAND THAT, SIR?

8     THE DEFENDANT: YES, MA'AM.

9     THE COURT: PARAGRAPH 10 SAYS THAT YOU ARE AGREEING TO

10 FORFEIT TO THE UNITED STATES VOLUNTARILY AND IMMEDIATELY ALL OF

11 YOUR RIGHT, TITLE, OR INTEREST IN CERTAIN PROPERTY. AND THERE

12 IS A LIST OF THAT PROPERTY THAT I'M GOING TO READ TO YOU TO

13 MAKE SURE THAT YOU UNDERSTAND ARE AGREEING THAT YOU ARE

14 ABANDONING YOUR RIGHT TO THAT STUFF.

15     THE FIRST IS A SAMSUNG SMARTPHONE.

16     NEXT IS AN LG G6 SMARTPHONE.

17     A 16 GIGABYTE SAN DISK SD CARD.

18     A WD MY PASSPORT ULTRA EXTERNAL HARD DRIVE.

19     A SAMSUNG SMARTPHONE.

20     NINE MEDIA STORAGE CARDS, AND

21     ONE TOSHIBA LAPTOP COMPUTER.

22     SIR, DO YOU UNDERSTAND THAT YOU ARE AGREEING TO

23 FORFEIT YOUR RIGHTS TO THAT PROPERTY?

24     THE DEFENDANT: YES, MA'AM.

25     THE COURT: AND PARAGRAPH 13 INDICATES THAT YOU

1 UNDERSTAND THAT BY PLEADING GUILTY YOU WILL BE REQUIRED TO

2 REGISTER AS A SEX OFFENDER UPON YOUR RELEASE FROM PRISON AS A

3 CONDITION OF YOUR SUPERVISED RELEASE.

4     DO YOU ALSO UNDERSTAND THAT INDEPENDENT OF YOUR

5 SUPERVISED RELEASE YOU WILL ALSO BE SUBJECT TO FEDERAL AND

6 STATE SEX OFFENDER REGISTRATION REQUIREMENT.

7     AND THE PARAGRAPH GOES ON TO DISCUSS WHAT SOME OF

8 THOUGHTS REQUIREMENTS ARE.

9     DO YOU UNDERSTAND THAT, SIR?

10     THE DEFENDANT: YES, MA'AM.

11     THE COURT: SIR, DO YOU UNDERSTAND ALL OF THE TERMS IN

12 THIS PLEA AGREEMENT?

13     THE DEFENDANT: I DO, MA'AM.

14     THE COURT: HAS ANYONE MADE ANY OTHER PROMISES OR

15 ASSURANCES TO YOU OF ANY KIND TO GET YOU TO PLEAD GUILTY IN

16 THIS CASE?

17     THE DEFENDANT: NO, MA'AM.

18     THE COURT: DO YOU UNDERSTAND THAT THE TERMS OF THE

19 PLEA AGREEMENT ARE MERELY RECOMMENDATIONS TO THE DISTRICT

20 COURT, AND THAT THE DISTRICT JUDGE CAN REJECT ANY OF THOSE

21 RECOMMENDATIONS WITHOUT PERMITTING YOU TO WITHDRAW YOUR PLEA OF

22 GUILTY.

23     DO YOU UNDERSTAND THAT?

24     THE DEFENDANT: YES, MA'AM.

25     THE COURT: DO YOU UNDERSTAND THAT YOU COULD -- THE

1 DISTRICT JUDGE COULD IMPOSE A SENTENCE ON YOU THAT'S MORE

2 SEVERE THAN YOU ANTICIPATE?

3     THE DEFENDANT: YES, MA'AM.

4     THE COURT: DO YOU UNDERSTAND THAT YOUR LAWYER, THE

5 GOVERNMENT, NO ONE CAN PREDICT WITH CERTAINTY WHAT THE SENTENCE

6 IS GOING TO BE IN THIS CASE.

7     DO YOU UNDERSTAND THAT?

8     THE DEFENDANT: YES, MA'AM.

9     THE COURT: HAS ANYONE ATTEMPTED IN ANY WAY TO FORCE

10 YOU TO PLEAD GUILTY IN THIS CASE?

11     THE DEFENDANT: NO, MA'AM.

12     THE COURT: ARE YOU PLEADING GUILTY OF YOUR OWN FREE

13 WILL BECAUSE YOU ARE IN FACT GUILTY?

14     THE DEFENDANT: YES, MA'AM.

15     THE COURT: DO YOU UNDERSTAND THAT THE OFFENSES THAT

16 YOU ARE PLEADING GUILTY TO ARE FELONY OFFENSES AND THAT IF YOUR

17 PLEA IS ACCEPTED YOU WILL BE ADJUDICATED GUILTY OF THOSE

18 OFFENSES AND YOU WILL HAVE TO GIVE UP CERTAIN RIGHTS THAT YOU

19 HOLD, SUCH AS THE RIGHT TO VOTE, THE RIGHT TO POSSESS WEAPONS,

20 THE RIGHT TO SERVE ON A JUROR, OR THE RIGHT TO HOLD PUBLIC

21 OFFICE.

22     DO YOU UNDERSTAND THAT?

23     THE DEFENDANT: YES, MA'AM.

24     THE COURT: IS THERE A FACTUAL BASIS STIPULATION IN

25 THIS CASE?

USCA11 Case: 17-15611 Document: 24 Date Filed: 09/10/2018 Page: 136 of 215

1    MR. PEACOCK:  THE GOVERNMENT HAS -- WE DIDN'T HAVE
2  TIME TO GET THAT FINALIZED BUT I HAVE SEEN IT.  I HAVE REVIEWED
3  IT AND WE DO AGREE TO IT.
4        AT THE TIME THAT I LAST SAW MR. TRADER IT WASN'T
5  FINALIZED SO HE HAS NOT BEEN ABLE TO READ IT AND SIGN IT.  I
6  DON'T KNOW WHAT THE COURT PREFERS US TO DO, HAVE HIM DO THAT
7  NOW OR JUST READ IT INTO THE RECORD.
8        THE COURT:  I'M GOING TO HAVE MR GYIRES READ THE
9  FACTUAL BASIS INTO THE RECORD.
10        AND, MR. TRADER, I WANT YOU TO LISTEN VERY CAREFULLY
11 BECAUSE AFTERWARDS I'M GOING TO ASK YOU ASK IF YOU AGREE THAT
12 THOSE ARE THE FACTS THE GOVERNMENT COULD PROVE AGAINST YOU IF
13 THIS WENT TO TRIAL.  OKAY?
14        MR. PEACOCK:  MAY I HAVE JUST ONE MINUTE, YOUR HONOR?
15        THE COURT:  SURE.
16        MR. GYIRES:  IT WILL BE ME -- IT'S FAIRLY LONG.  IT'S
17 ABOUT -- JUST SO THE COURT KNOWS IT'S ONE, TWO, -- TWO AND A
18 HALF PAGES SINGLE SPACED.
19        THE COURT:  THAT'S FINE.
20        MR. PEACOCK:  THANK YOU, JUDGE.
21        THE COURT:  OKAY.
22        MR. GYIRES, GO AHEAD.
23        MR. GYIRES:  HAD THIS CASE PROCEEDED TO TRIAL THE
24 UNITED STATES WOULD HAVE PROVEN AT LEAST THE FOLLOWING FACTS
25 BEYOND A REASONABLE DOUBT.

1        AND FOR THE RECORD THESE DO NOT CONTAIN ALL OF THE
2  FACTS KNOWN TO THE GOVERNMENT IN THIS CASE, YOUR HONOR.
3        ON OR ABOUT MAY 30TH, 2017, THE THOMASVILLE, NORTH
4  CAROLINA POLICE DEPARTMENT RECEIVED A COMPLAINT FROM THE
5  PARENT/GUARDIAN OF A NINE YEAR OLD FEMALE VICTIM WHO IS VICTIM
6  NUMBER ONE IN COUNT 1 OF THE INDICTMENT.
7        THE PARENT/GUARDIAN REPORTED HIS DISCOVERY OF SEXUALLY
8  EXPLICIT CHAT COMMUNICATIONS BETWEEN THE VICTIM AND HER CHAT
9  PARTNER NAMED SCOTT, WHO WAS LATER IDENTIFIED AS THE DEFENDANT
10 SCOTT JOSEPH TRADER WHO WAS IN FLORIDA.  THOSE CHATS WERE ON A
11 SMARTPHONE OF THE VICTIM ON AN APPLICATION CALLED SAYHI,
12 S-A-Y-H-I.
13        THE PARENT/GUARDIAN PROVIDED THE VICTIM'S MOBILE
14 DEVICE TO POLICE FOR EXAMINATION.  THE THOMASVILLE DEPARTMENT
15 REQUESTED THE ASSISTANCE OF HSI WINSTON-SALEM IN FURTHERING THE
16 INVESTIGATION.
17        HSI THERE -- THEIR EXAMINATION OF THE VICTIM'S DEVICE
18 REVEALED SAYHI SEXUALLY EXPLICIT COMMUNICATIONS WITH THE
19 DEFENDANT DURING THE MONTH OF MAY, INCLUDING ON THE EVENING OF
20 MAY 30TH, 2017 AND INTO THE MORNING HOURS OF MAY 31.  HSI SAW
21 CHATS FROM THE GOVERNMENT TO THE VICTIM THAT INCLUDED, AMONG
22 OTHER THINGS, NUMEROUS REQUESTS FROM HIM FOR THE VICTIM TO SEND
23 HIM NUDE IMAGES.
24        AT FIRST THE VICTIM PROVIDED TRADER SEVERAL PICTURES
25 OF HER FULLY CLOTHED WHICH CLEARLY INDICATED SHE WAS A PRETEEN

USCA11 Case: 17-15611    Document: 24    Date Filed: 09/10/2018    Page: 138 of 215

1  FEMALE.  THE DEFENDANT TRADER ALSO ASKED THE VICTIM, AMONG

2  OTHER THINGS, HOW OLD SHE WAS AND SHE TOLD HIM SHE WAS NINE, TO

3  WHICH HE REPLIED, AH, YOU LOOK -- I'M SORRY.  AH, YOU'RE VERY

4  PRETTY FOR YOUR AGE.  YOU LOOK SEXY IN THOSE PAJAMAS.

5       IN RESPONSE TO TRADER'S REQUESTS THE VICTIM EVENTUALLY

6  SENT AT LEAST ONE PHOTO OF HER VAGINA AND ONE PHOTO OF HER

7  PULLING HER SHIRT UP EXPOSING HER NIPPLES.

8       TRADER, THE DEFENDANT, ALSO SENT THAT SAME VICTIM A

9  CHILD PORNOGRAPHY VIDEO USING SAYHI.  THIS VIDEO WAS 37 SECONDS

10 LONG AND SHOWED AN ADULT MALE RUBBING HIS PENIS ON THE VAGINA

11 OF A PREPUBESCENT FEMALE.  THE DEFENDANT TOLD THE VICTIM THAT

12 THE FEMALE DEPICTED IN THE VIDEO WAS HIS DAUGHTER, ALTHOUGH IT

13 APPEARS THAT THE VICTIM IN THAT VIDEO IS NOT THE DEFENDANT'S

14 DAUGHTER NOR IS THAT THE DEFENDANT IN THE VIDEO -- IN THAT

15 VIDEO.  THE DEFENDANT ALSO SENT A VIDEO OF HIMSELF MASTURBATING

16 TO THE VICTIM ALONG WITH A STILL IMAGE WHICH DEPICTED TRADER'S

17 FACE IN HIS BEDROOM ALONG WITH NUMEROUS OTHER PHOTOS.

18      AFTER SEEING THE VICTIM'S PHONE, HSI BEGAN TRYING TO

19 IDENTIFY THE DEFENDANT.  THE VICTIMS PHONE SHOWED THAT THE

20 DEFENDANT HAD A PROFILE ON SAYHI THAT HAD A PICTURE OF HIS FACE

21 ALONG WITH AN APPARENT MINOR FEMALE.  THE FACE DEPICTED IN

22 THE -- IN THAT STILL -- IN THE STILL IMAGE SENT TO THE NINE

23 YEAR OLD VICTIM MATCHED THE PROFILE IMAGE FOR SCOTT ON SAYHI.

24      SCOTT'S PROFILE ALSO LISTED HIS USER NAME FOR ANOTHER

25 SMARTPHONE APPLICATION CALLED KIK, K-I-K.  THE KIK PROFILE

1  PICTURE ALSO MATCHED THE AFOREMENTIONED SCOTT SAYHI PROFILE AND

2  STILL IMAGE PICTURES.

3       KIK RESPONDED TO AN EMERGENCY DISCLOSURE REQUEST FOR

4  THE SUBSCRIBER INFORMATION ASSOCIATED WITH THE USER NAME

5  INDICATING THE -- IN THAT RESPONSE TOLD HSI THE E-MAIL ACCOUNT

6  ASSOCIATED WITH THAT ACCOUNT WHICH WAS STRADER0227@YAHOO.COM.

7  KIK ALSO PROVIDED A LOGIN HISTORY INDICATING THERE WERE LOGONS

8  TO THE ACCOUNT FROM IP ADDRESS SEVEN 76.110.46.234 STARTING MAY

9  1, 2017 THROUGH MAY 31, 2017 AT 6:36 UTC TIME.

10      THE IP ADDRESS WAS REGISTERED TO COMCAST.  COMCAST

11 RESPONDED IDENTIFYING THE SUBSCRIBER'S NAME AND HOME ADDRESS IN

12 PORT SAINT LUCIE, FLORIDA, WHICH I WILL CALL THE TARGET

13 RESIDENCE.

14      A CHECK OF THE FLORIDA DEPARTMENT OF HIGHWAY SAFETY

15 AND MOTOR VEHICLE RECORDS INDICATED THAT THE DEFENDANT LISTED

16 HIS MAILING ADDRESS AS THE TARGET RESIDENCE.  THE DEFENDANT'S

17 DRIVER'S LICENSE PHOTOGRAPH MATCHED THE AFOREMENTIONED SCOTT

18 USER PROFILE AND THE IMAGES TRANSMITTED TO THE VICTIM, ALTHOUGH

19 THE ADDRESS ON THE DEFENDANT'S ACTUAL LICENSE WAS A DIFFERENT

20 ADDRESS.

21      A CRIMINAL HISTORY CHECK REVEALED THAT IN 2012 TRADER

22 WAS ARRESTED BY THE PORT SAINT LUCIE POLICE DEPARTMENT FOR

23 PROMOTING A SEXUAL PERFORMANCE BY A CHILD, LEWD BEHAVIOR AND

24 POSSESSION OF CHILD PORNOGRAPHY.  THOSE CHARGES WERE DROPPED,

25 ABANDONED, AND TRADER PLEADED NO CONTEST HAD AN ADJUDICATION

1  WITHHOLD OF ONLY FELONY CHILD NEGLECT.

2      RECORDS CHECK ALSO SHOWED THAT IN DECEMBER OF 2016

3  TRADER WAS ARRESTED FOR LEWD BEHAVIOR, MOLESTING A VICTIM LESS

4  THAN 12 YEARS OF AGE.

5      HSI FORT PIERCE, FLORIDA, ESTABLISHED SURVEILLANCE

6  AT -- OF THE TARGET RESIDENCE.  A FEMALE CHILD APPROXIMATELY

7  TWO YEARS OF AGE WAS SEEN ENTERING THE RESIDENCE AROUND 11:51

8  P.M.  FEDERAL MAGISTRATE JUDGE WILLIAM MATTHEWMAN SIGNED A

9  SEARCH WARRANT AUTHORIZING THE SEARCH OF THE TARGET RESIDENCE

10 TO INCLUDE COMPUTERS, SMARTPHONES AND OTHER ELECTRONIC STORAGE

11 DEVICES.  THE WARRANT WAS EXECUTED AROUND 1:10 A.M. ON JUNE 1.

12     THE DEFENDANT, MR. TRADER, WAS LOCATED INSIDE THE

13 RESIDENCE.  INSIDE THE HOUSE NUMEROUS ELECTRONIC STORAGE

14 DEVICES WERE FOUND THAT CONTAINED CHILD PORNOGRAPHY INCLUDING A

15 SAMSUNG SM-G920T SMARTPHONE, AN LG G6 SMARTPHONE, A 16 GIGABYTE

16 SAN DISK SD SMARTPHONE, NINE MEDIA STORAGE CARDS CONSISTING OF

17 TWO SD CARDS, FOUR MICRO SD CARDS, AND THREE SIM CARDS, A

18 TOSHIBA C655D-S5202 LAPTOP COMPUTER.

19     THOSE DEVICES ARE LISTED IN THE PLEA AGREEMENT, YOUR

20 HONOR, FOR SPELLING PURPOSES.

21     ALL OF THESE DEVICES WERE MANUFACTURED OUTSIDE THE

22 STATE OF FLORIDA, AND THEREFORE PREVIOUSLY TRAVELED IN

23 INTERSTATE OR FOREIGN COMMERCE.  MANY OF THE DEVICES WERE FOUND

24 ON OR NEAR THE FLOOR UNDER A DVD STORAGE CABINET IN THE

25 DEFENDANT'S BEDROOM CONCEALED BEHIND ABOARD.

1      SOME OF THE CHILD PORNOGRAPHY FOUND ON THESE DEVICES

2  WAS PRODUCED BY THE DEFENDANT AND SOME HAD BEEN DOWNLOADED FROM

3  THE INTERNET BY THE DEFENDANT OR SENT BY ANOTHER PERSON OVER

4  THE INTERNET TO THE DEFENDANT.

5      ONE OF THE SD CARDS REVEALED TRADER'S SEXUAL ABUSE OF

6  MINOR FEMALES, INCLUDING VICTIM NUMBER TWO IN COUNT 4 OF THE

7  INDICTMENT, AND VICTIM NUMBER THREE IN COUNT 5 OF THE

8  INDICTMENT.

9      VICTIM NUMBER TWO AND THE VICTIM NUMBER THREE ARE THE

10 BIOLOGICAL DAUGHTERS OF THE DEFENDANT WHICH SEXUAL ABUSE

11 OCCURRED DURING THE TIMEFRAMES ALLEGED IN COUNTS 4 AND 5 OF THE

12 INDICTMENT, AND WHICH ABUSE WAS RECORDED BY OR TRANSFERRED ONTO

13 ELECTRONIC DEVICES THAT PREVIOUSLY TRAVELED IN INTERSTATE OR

14 FOREIGN COMMERCE.

15     THE SD CARD ALSO REVEALED MORE OF TRADER'S ONLINE

16 CHILD PORNOGRAPHY ACTIVITY AND HIS COLLECTION OF ONLINE CHILD

17 PORNOGRAPHY.  THE SD CARD APPEARED TO BE USED AS ADDITIONAL

18 STORAGE FOR THE PHONE WITH FOLDERS FOR VARIOUS APPLICATIONS.

19     ONE OF THE FOLDERS WAS FOR THE KIK APP.  IN THAT PHOTO

20 WAS AN IMAGE DATED OCTOBER 5, 2016, WHICH SHOWED TRADER, THE

21 DEFENDANT, SEATED ON A COUCH WITH HIS PANTS PULLED DOWN

22 EXPOSING HIS ERECT PENIS WITH THE VICTIM NUMBER TWO IN THE

23 INDICTMENT HUGGING THE DEFENDANT AND LOOKING AT THE CAMERA AS

24 THE DEFENDANT TOOK A SELFIE STYLE PHOTOGRAPH OF THE VICTIM

25 INCHES AWAY FROM HIS ERECT PENIS.  THE FOLDER ALSO CONTAINED

USCA11 Case: 17-15611   Document: 24   Date Filed: 09/10/2018   Page: 139 of 215

1　VIDEOS, FOR EXAMPLE, ONE DATED SEPTEMBER 9, 2016 OF THE

2　DEFENDANT DIGITALLY PENETRATING THE VAGINA OF A PRETEEN GIRL,

3　(INAUDIBLE) THE USE OF FINGERS, WHO IS VICTIM NUMBER THREE IN

4　THE INDICTMENT.

5　　　　A PRELIMINARY EXAM OF THE WESTERN DIGITAL HARD DRIVE

6　REVEALED THAT IT CONTAINED MULTIPLE FOLDERS WITH OVER A

7　THOUSAND IMAGES AND VIDEOS OF CHILD PORNOGRAPHY.  ONE OF THE

8　FOLDERS WAS TITLED PICS OF ME WITH KIDS.  THE FOLDER CONTAINED

9　NUMEROUS IMAGES OF THE DEFENDANT ENGAGED IN SEXUAL EXPLICIT

10　CONDUCT WITH VICTIM NUMBER TWO IN THE INDICTMENT, INCLUDING THE

11　VICTIM'S MOUTH ON TRADER'S PENIS.  THE IMAGES DATE ALL THE WAY

12　FROM AT LEAST THE SEPTEMBER 2015 TIMEFRAME WHEN VICTIM NUMBER

13　TWO WAS TWO YEARS OLD.

14　　　　PRELIMINARY FORENSIC ANALYSIS OF THE SD CARDS AND

15　OTHER SEIZED ELECTRONIC STORAGE DEVICES OR MEDIA ALSO REVEALED

16　AT LEAST THE FOLLOWING.

17　　　　PHOTOS AND VIDEOS OF THE DEFENDANT TOUCHING AND

18　DIGITALLY PENETRATING AND MANIPULATING THE VAGINA OF VICTIM

19　NUMBER THREE.

20　　　　PHOTOS AND VIDEOS OF THE DEFENDANT PULLING BACK

21　UNDERWEAR ON VICTIM NUMBER THREE.

22　　　　PHOTOS AND VIDEOS OF THE DEFENDANT'S ERECT PENIS IN

23　CLOSE PROXIMITY OF VICTIM NUMBER TWO.

24　　　　VIDEOS OF THE DEFENDANT EJACULATING NEXT TO VICTIM

25　NUMBER THREE'S HEAD AND DIGITALLY PENETRATING HER VAGINA.

1　　　　VIDEOS OF THE DEFENDANT TELLING VICTIM NUMBER TWO WHO

2　WAS ABOUT TWO YEARS OLD AT THE TIME TO KISS HIS PENIS, AND SHE

3　DOES.

4　　　　THOUSANDS OF PHOTOS AND VIDEOS OF CHILD PORNOGRAPHY

5　DOWNLOADED FROM THE INTERNET, INCLUDING THE SEXUAL ABUSE OF

6　INFANTS AND TODDLERS.

7　　　　AND ONLINE CHATS BETWEEN THE DEFENDANT AND OTHER

8　INDIVIDUALS INVOLVING THE EXCHANGE OF CHILD PORNOGRAPHY.

9　　　　AND AGAIN THESE FACTS, YOUR HONOR, DO NOT CONSTITUTE

10　ALL THE FACTS KNOWN TO THE GOVERNMENT IN THIS CASE.  THE VOLUME

11　OF CHILD PORNOGRAPHY CONTAINED ON THE DEVICES SEIZED IN THIS

12　CASE IS LARGE.  AND I HAVE THE ELEMENTS LISTED.  THEY'RE QUITE

13　LENGTHY.  I CAN GO OVER THEM OR HOWEVER THE COURT WOULD LIKE TO

14　DO THAT.

15　　　　THE COURT:  IF YOU COULD JUST GO OVER THE ELEMENTS OF

16　EACH COUNT.

17　　　　MR. GYIRES:  YES, YOUR HONOR.

18　　　　THE COURT:  YOU DON'T HAVE TO GO OVER THE OTHER

19　DISCUSSION BUT JUST THE BASIC ELEMENTS OF EACH COUNT.

20　　　　MR. GYIRES:  YES, YOUR HONOR.

21　　　　AS TO COUNT 1, WHICH CHARGES ENTICEMENT OF A MINOR TO

22　ENGAGE IN SEXUAL ACTIVITY, IN VIOLATION OF 18 U.S. CODE,

23　SECTION 2422(B), THE GOVERNMENT HAS TO PROVE FIRST THAT THE

24　DEFENDANT KNOWINGLY PERSUADED, INDUCED, ENTICED, OR COERCED

25　VICTIM NUMBER ONE IN THE INDICTMENT TO ENGAGE IN SEXUAL

USCA11 Case: 17-15611　Document: 24　Date Filed: 09/10/2018　Page: 140 of 215

USCA11 Case: 17-15611  Document: 24  Date Filed: 09/10/2018  Page: 141 of 215

1    ACTIVITY.  AND THE TERM SEXUAL ACTIVITY IS DEFINED IN THE JURY

2    INSTRUCTIONS.

3        IN WHICH INCLUDES LASCIVIOUS EXHIBITION OF THE

4    GENITALS OR PUBIC AREA.  AND THERE IS A SIX FACTOR TEST THAT'S

5    IN THE JURY INSTRUCTIONS.

6        SECOND, THE DEFENDANT -- SECOND, THE GOVERNMENT HAS TO

7    PROVE THAT THE DEFENDANT USED A FACILITY OF INTERSTATE COMMERCE

8    TO DO SO, WHICH INCLUDES A TELEPHONE, A CELLPHONE, A COMPUTER

9    AND THE INTERNET.

10       THIRD, WHEN THE DEFENDANT DID THESE ACTS VICTIM NUMBER

11   ONE IN THE INDICTMENT WAS LESS THAN 18 YEARS OLD.

12       AND FOURTH, THAT ONE OR MORE OF THE INDIVIDUALS

13   ENGAGING IN THE SEXUAL ACTIVITY COULD HAVE BEEN CHARGED WITH A

14   CRIMINAL OFFENSE UNDER THE LAW OF FLORIDA.

15       IN THIS PARTICULAR INSTANCE, AS ONE EXAMPLE WOULD BE

16   FLORIDA STATUTE 827.071 ONE WHICH PENALIZES SEXUAL PERFORMANCE

17   BY A CHILD.

18       A PERSON IS GUILTY OF PROMOTING A SEXUAL PERFORMANCE

19   BY A CHILD, FOR EXAMPLE, WHEN HE PRODUCES, DIRECTS, OR PROMOTES

20   ANY PERFORMANCE OF SEXUAL CONDUCT BY A CHILD WHICH INCLUDES

21   ACTUAL LEWD EXHIBITION OF THE GENITALS.

22       FOR EXAMPLE, IT IS UNLAWFUL UNDER FLORIDA LAW FOR ANY

23   PERSON TO KNOWINGLY POSSESS, CONTROL, OR INTENTIONALLY REVIEW A

24   PHOTOGRAPH, VIDEO, OR IMAGE, OR OTHER PRESENTATION WHICH HE

25   KNOWS TO INCLUDE ANY SEXUAL CONDUCT BY A CHILD.  AND AGAIN

1    SEXUAL CONDUCT IS DEFINED.  THAT'S COUNT 1.

2        COUNT 2, YOUR HONOR, THE ELEMENTS FOR DISTRIBUTION OF

3    MATERIAL CONTAINING VISUAL DEPICTIONS OF SEXUAL EXPLOITATION OF

4    MINORS, IN VIOLATION OF 18, USC, SECTIONS 2252(A)(2) AND

5    (B)(1);

6        FIRST, THE GOVERNMENT WOULD HAVE TO PROVE THAT THE

7    DEFENDANT KNOWINGLY DISTRIBUTED A VISUAL DEPICTION.

8        SECOND, THE DEPICTION WAS SHIPPED OR TRANSPORTED IN

9    INTERSTATE OR FOREIGN COMMERCE BY ANY MEANS INCLUDING COMPUTER

10   OR INTERNET.

11       THIRD, PRODUCING THE VISUAL DEPICTION INVOLVED USING A

12   MINOR ENGAGED IN SEXUALLY EXPLICIT CONDUCT.

13       FOURTH, THE DEPICTION IS OF A MINOR ENGAGED IN

14   SEXUALLY EXPLICIT CONDUCT.

15       AND, FIVE, THE DEFENDANT KNEW THAT AT LEAST ONE

16   PERFORMER IN THE VISUAL DEPICTION WAS A MINOR AND KNEW THAT THE

17   DEPICTION SHOWED THE MINOR ENGAGED IN SEXUALLY EXPLICIT

18   CONDUCT.

19       AND AGAIN THE TERM SEXUALLY EXPLICIT CONDUCT IS

20   DEFINED IN THE JURY INSTRUCTIONS TO INCLUDE LASCIVIOUS

21   EXHIBITION OF THE GENITALS OR PUBIC AREA AMONG OTHER THINGS.

22       COUNT 3, YOUR HONOR, CHARGES POSSESSION OF MATTER

23   CONTAINING VISUAL DEPICTIONS OF SEXUAL EXPLOITATION OF MINORS,

24   IN VIOLATION OF TITLE 18, U.S. CODE, SECTIONS 2252(A)(4)(B)

25   AND (B)(2).

1    THE GOVERNMENT HAS TO PROVE, FIRST, THAT THE DEFENDANT

2  KNOWINGLY POSSESSED A VISUAL DEPICTION.

3    SECOND, THE DEPICTION WAS SHIPPED OR TRANSPORTED IN

4  INTERSTATE OR FOREIGN COMMERCE BY ANY MEANS INCLUDING THE

5  INTERNET.

6    THIRD, PRODUCING THE VISUAL DEPICTION INVOLVED USING A

7  MINOR ENGAGED IN SEXUALLY EXPLICIT CONDUCT.

8    FOURTH, THE DEPICTION IS OF A MINOR ENGAGED IN

9  SEXUALLY EXPLICIT CONDUCT.

10    AND, FIFTH, THE DEFENDANT KNEW THAT AT LEAST ONE

11  PERFORMER IN THE VISUAL DEPICTION WAS A MINOR AND KNEW THAT THE

12  DEPICTION SHOWED THAT THE MINOR ENGAGED IN SEXUALLY EXPLICIT

13  CONDUCT.

14    COUNTS 4 AND 5 CHARGE THE SAME STATUTE, PRODUCTION OF

15  MATERIAL CONTAINING VISUAL DEPICTIONS OF SEXUAL EXPLOITATION OF

16  MINORS, IN VIOLATION OF TITLE 18, U.S. CODE, SECTIONS 2251(A)

17  AND (E).

18    THE GOVERNMENT FOR THOSE COUNTS HAS TO PROVE, FIRST,

19  THAT AN ACTUAL MINOR, THAT IS A REAL PERSON WHO WAS LESS THAN

20  18 YEARS OLD WAS DEPICTED.

21    SECOND, THE DEFENDANT EMPLOYED, USED, PERSUADED,

22  INDUCED, ENTICED, OR COERCED THE MINOR TO ENGAGE IN SEXUALLY

23  EXPLICIT CONDUCT FOR THE PURPOSE OF PRODUCING A VISUAL

24  DEPICTION.

25    AND, THIRD, THAT THE VISUAL DEPICTION WAS PRODUCED

---

1  USING MATERIALS THAT HAD BEEN MAILED, SHIPPED, OR TRANSPORTED

2  IN INTERSTATE OR FOREIGN COMMERCE BY ANY MEANS INCLUDING BY

3  COMPUTER.

4    THE TERM PRODUCING MEANS, PRODUCING, DIRECTING,

5  MANUFACTURING, ISSUING, PUBLISHING, OR ADVERTISING.  AND

6  PRODUCTION IS NOT LIMITED TO THE MOMENT OF RECORDING.  IT ALSO

7  ENCOMPASSES EMBODYING AN IMAGE OR VIDEO IN DIGITAL MEDIA, SUCH

8  AS A HARD DRIVE OR DISC.

9    THE COURT:  MR. TRADER, DID YOU HEAR THE FACTS THAT

10  THE GOVERNMENT SAID IT COULD PROVE AGAINST YOU IF THIS MATTER

11  WENT TO TRIAL?

12    THE DEFENDANT:  I DID, MA'AM.

13    THE COURT:  AND DO YOU AGREE THAT THE GOVERNMENT COULD

14  PROVE THOSE FACTS AGAINST YOU?

15    MR. PEACOCK:  I'M SORRY, JUDGE.  MAY I SPEAK TO

16  MR. TRADER?

17    THE COURT:  SURE.

18    MR. PEACOCK:  YOUR HONOR, I THINK WE'RE FINE.

19    THE GOVERNMENT HAS REFERRED TO SOME VERY SPECIFIC

20  INCIDENTS, AND MR. TRADER HAS -- I HAVE REVIEWED THE EVIDENCE

21  BUT MR. TRADER HAS NOT.  AND HE IS HAVING SOME DIFFICULTY

22  CONFIRMING THE SPECIFIC INCIDENTS THAT THE GOVERNMENT IS

23  REFERRING TO.

24    FOR PURPOSES OF THIS HEARING WE ARE CERTAINLY PREPARED

25  TO CONCEDE ALL OF THE ALLEGATIONS WITH REGARD TO VICTIM NUMBER

USCA11 Case: 17-15611    Document: 24    Date Filed: 09/10/2018    Page: 143 of 215

1   ONE.  WE CAN PUT THOSE ASIDE.

2           WITH VICTIMS TWO AND THREE, WE ARE CERTAINLY WILLING

3   TO CONCEDE THAT THERE IS EVIDENCE -- SPECIFIC EVIDENCE OF

4   SEXUAL ABUSE WHICH WOULD QUALIFY UNDER THE CHARGING STATUTES.

5           HOWEVER, AS TO THE SPECIFIC INCIDENTS MR. TRADER HAS

6   SOME CONCERN ABOUT THOSE.  AND AS THE COURT HEARD, SOME OF

7   THOSE THEY DATE BACK TO 2015.

8           SO WE COULD DO A COUPLE OF THINGS.

9           I THINK AGENT RAY MAY HAVE SPECIFIC PHOTOGRAPHS WHICH

10  WOULD SUBSTANTIATE THAT WHICH WE COULD POSSIBLY VIEW HERE -- OR

11  MR. TRADER COULD.

12          THE COURT:  SO WHAT I THINK WE SHOULD DO BECAUSE IT IS

13  A LENGTHY PROFFER WITH SOME VERY SPECIFIC, VERY SERIOUS

14  DETAILS.

15          SO I THINK THAT WE SHOULD SET THIS OVER FOR YOU ALL TO

16  COME TO A WRITTEN STIPULATION THAT HE IS WILLING TO SIGN.

17          MR. PEACOCK:  AND IT MAY BE THAT ONCE HE SEES THE

18  PHOTOGRAPHS WE CAN SIGN THAT STIPULATION.

19          THE COURT:  OKAY.  WHICH WILL BE FINE.

20          MR. PEACOCK:  IT WOULD TAKE ABOUT FIVE MINUTES TO DO

21  THAT IF THE COURT WOULD INDULGE US.

22          THE COURT:  WHY DON'T WE TAKE -- WELL, WE WILL TAKE A

23  15 MINUTE BREAK?

24          MR. PEACOCK:  YES, MA'AM.

25          THE COURT:  AND WE'LL COME BACK IN 15 MINUTES.

1           MR. PEACOCK:  NORMALLY --

2           THE COURT:  BUT I DON'T WANT -- IF THERE IS GOING TO

3   BE EXCEPTIONS THAT HE TAKES TO THE PROFFER THEN I DON'T WANT TO

4   DO IT VERBALLY.

5           I THINK THIS SHOULD BE SOMETHING THAT HE SIGNS OR YOU

6   CAN TAKE CERTAIN THINGS OUT, WHATEVER THE GOVERNMENT IS WILLING

7   TO TAKE OUT.  BUT I DON'T WANT TO GET INTO A THING WHERE WE'RE

8   SORT OF PARSING; WE AGREE TO THIS PART, WE DON'T AGREE WITH

9   THAT PART.

10          MR. PEACOCK:  VERY WELL.

11          THE COURT:  OKAY.  WE ARE IN RECESS.

12          [WHEREUPON, THERE WAS A BRIEF RECESS]

13          THE COURT:  THIS IS THE CASE OF THE UNITED STATES OF

14  AMERICA VERSUS SCOTT JOSEPH TRADER, CASE NUMBER

15  17-14047-CRIMINAL-MIDDLEBROOKS.

16          MAY I HAVE APPEARANCES FOR THE RECORD, PLEASE.

17          MR. GYIRES:  GOOD MORNING AGAIN, YOUR HONOR.  MARTON

18  GYIRES FOR THE UNITED STATES.

19          MR. PEACOCK:  FLETCHER PEACOCK ON BEHALF OF MR. TRADER

20  WHO IS ALSO PRESENT.

21          THE COURT:  OKAY.  SO WHERE ARE WE WITH RESPECT TO THE

22  FACTUAL PROFFER?

23          MR. PEACOCK:  YOUR HONOR, WE WERE ABLE TO DO A FEW

24  THINGS.

25          WE WERE ABLE TO VIEW SOME MORE OF THE DISCOVERY.  WE

USCA11 Case: 17-15611    Document: 24    Date Filed: 09/10/2018    Page: 144 of 215

1  WERE ALSO ABLE TO MODIFY THE FACTUAL PROFFER WHICH WE HAVE

2  SIGNED AND FORWARDED TO THE COURT.  AND WE ARE SATISFIED WITH

3  THAT PROFFER.  I THINK ALL PARTIES ARE.

4          AND, JUDGE, I JUST WANT TO BE CLEAR.  IF I MISSPOKE

5  BEFORE, I HAD INDICATED THAT MR. TRADER HADN'T SEEN THE

6  DISCOVERY.  WHAT I WAS REFERRING TO WERE THE ACTUAL

7  PHOTOGRAPHIC IMAGES.  HE HAS REVIEWED THE OTHER DISCOVERY.

8          THERE WAS A TEXT OF A CHAT, A SAYHI CHAT, WHICH THE

9  GOVERNMENT DID GIVE ME DURING THE INTERIM BREAK AND WE DID

10  REVIEW THAT AS WELL.

11          THE COURT:  OKAY.  VERY GOOD.

12          THANK YOU, MR. PEACOCK.

13          OKAY.  MR. TRADER, I RECEIVED A DOCUMENT ENTITLED,

14  STIPULATION OF FACTS AND ACKNOWLEDGEMENT OF OFFENSE ELEMENTS IN

15  SUPPORT OF A GUILTY PLEA.

16          ON THE LAST PAGE I SEE THREE SIGNATURES.  THE FIRST

17  TWO I RECOGNIZE AS MR. GYIRES AND MR. PEACOCK, AND THEN ON THE

18  THIRDS LINE I SEE A SIGNATURE ABOVE YOUR NAME.

19          IS THAT YOUR SIGNATURE, SIR?

20          THE DEFENDANT:  YES, MA'AM.

21          THE COURT:  HAVE YOU HAD THE OPPORTUNITY TO READ THIS

22  DOCUMENT IN ITS ENTIRETY?

23          THE DEFENDANT:  YES, MA'AM.

24          THE COURT:  HAVE YOU HAD THE OPPORTUNITY TO TALK TO

25  YOUR ATTORNEY ABOUT IT AND ASK HIM ANY QUESTIONS THAT YOU MAY

1  HAVE?

2          THE DEFENDANT:  YES, MA'AM.

3          THE COURT:  OKAY.  SIR, DO YOU AGREE THAT THIS

4  DOCUMENT SETS FORTH THE FACTS THE GOVERNMENT COULD PROVE

5  AGAINST YOU IF THIS MATTER PROCEEDED TO TRIAL?

6          THE DEFENDANT:  I DO, MA'AM.

7          THE COURT:  AND DO YOU AGREE THAT THE FACTS IN THIS

8  DOCUMENT MEET THE ESSENTIAL ELEMENTS THAT THEY  WOULD HAVE TO

9  PROVE AGAINST YOU?

10          THE DEFENDANT:  YES, MA'AM.

11          THE COURT:  OKAY.

12          MR. PEACOCK:  YOUR HONOR, JUST SO THE COURT IS AWARE.

13          WHEN MR. GYIRES ORIGINALLY READ THE PROFFER TO THE

14  COURT, HE WAS READING FROM ESSENTIALLY THE SAME DOCUMENT.  WE

15  REMOVED THE SENTENCE FROM THAT AND WE ADDED.  I DON'T KNOW IF

16  THE COURT WANTS TO SEE THE MODIFICATIONS, BUT THAT'S WHAT YOU

17  HAVE IN FRONT OF YOU.

18          THE COURT:  OKAY.  I'M JUST GOING TO REVIEW THIS

19  ONE --

20          MR. PEACOCK:  OKAY.

21          THE COURT:  -- SINCE THIS IS THE ONE THAT EVERYONE HAS

22  AGREED TO.

23          MR. PEACOCK:  IF YOU ARE SATISFIED THAT'S FINE, JUDGE.

24          THE COURT:  THANK YOU.

25          AND ARE BOTH PARTIES COMFORTABLE WITH THIS DOCUMENT

1 BEING FILED IN THE RECORD?

2           MR. PEACOCK: YES, MA'AM.

3           MR. GYIRES: YES, YOUR HONOR.

4           THE COURT: THE COURT HAS REVIEWED THE FACTUAL

5 STIPULATION AND AGREES THAT IT SETS FORTH A SUFFICIENT FACTUAL

6 BASIS TO PROVE THE CHARGES AGAINST THE DEFENDANT.

7           SIR, ARE YOU A CITIZEN OF THE UNITED STATES OF

8 AMERICA.

9           THE DEFENDANT: YES, MA'AM.

10          THE COURT: DO YOU UNDERSTAND THE POSSIBLE

11 CONSEQUENCES OF THIS GUILTY PLEA?

12          THE DEFENDANT: I DO, MA'AM.

13          THE COURT: DO YOU UNDERSTAND THAT IF YOU ARE

14 SENTENCED TO SUPERVISED RELEASE AS A PART OF THE PUNISHMENT IN

15 THIS CASE, AND IF YOU VIOLATE ANY OF THOSE TERMS OF SUPERVISED

16 RELEASE YOU CAN BE GIVEN ADDITIONAL TIME IN PRISON?

17          THE DEFENDANT: I DO, MA'AM.

18          THE COURT: PURSUANT TO THE SENTENCING REFORM ACT OF

19 1984, THE UNITED STATES SENTENCING COMMISSION HAS ISSUED

20 GUIDELINES FOR JUDGES TO FOLLOW IN DETERMINING THE SENTENCE IN

21 A CRIMINAL CASE.

22          DO YOU UNDERSTAND THAT THE SENTENCING GUIDELINES HAVE

23 BEEN FOUND TO BE ADVISORY AND ARE NOT BINDING ON THE DISTRICT

24 COURT JUDGE IN SENTENCING YOU?

25          THE DEFENDANT: YES.

1           THE COURT: DO YOU UNDERSTAND THAT SINCE THESE

2 ADVISORY SENTENCING GUIDELINES ARE NOT MANDATORY THE SENTENCING

3 JUDGE IS NOT OBLIGATED TO FOLLOW THEM IN YOUR CASE?

4           THE DEFENDANT: YES.

5           THE COURT: HAVE YOU AND YOUR ATTORNEY TALKED ABOUT

6 HOW THE SENTENCING GUIDELINES MIGHT APPLY TO YOUR CASE?

7           THE DEFENDANT: YES.

8           THE COURT: DO YOU UNDERSTAND THAT IN DETERMINING YOUR

9 SENTENCE THE DISTRICT JUDGE WILL BE OBLIGATED TO CALCULATE THE

10 APPLICABLE SENTENCING GUIDELINE RANGE AS WELL AS POSSIBLE

11 DEPARTURES UNDER THE SENTENCING GUIDELINES AND OTHER SENTENCING

12 FACTORS?

13          THE DEFENDANT: YES, MA'AM.

14          THE COURT: DO YOU UNDERSTAND THAT THE DISTRICT JUDGE

15 WILL NOT BE ABLE TO DETERMINE THE ADVISORY GUIDELINE SENTENCE

16 UNTIL AFTER A PRESENTENCE REPORT HAS BEEN PREPARED BY THE

17 PROBATION OFFICE AND YOU AND THE GOVERNMENT HAVE HAD THE

18 OPPORTUNITY TO CHALLENGE THE FACTS AND THE APPLICATIONS OF THE

19 GUIDELINES THAT THE PROBATION OFFICE RECOMMENDS?

20          DO YOU UNDERSTAND THAT?

21          THE DEFENDANT: YES, MA'AM.

22          THE COURT: DO YOU UNDERSTAND THAT THE SENTENCE

23 ULTIMATELY IMPOSED MAY BE DIFFERENT FROM ANY ESTIMATE YOUR

24 ATTORNEY MAY HAVE GIVEN YOU?

25          THE DEFENDANT: I DO, YOUR HONOR.

USCA11 Case: 17-15611    Document: 24    Date Filed: 09/10/2018    Page: 145 of 215

USCA11 Case: 17-15611    Document: 24    Date Filed: 09/10/2018    Page: 146 of 215

1    THE COURT:  DO YOU UNDERSTAND THAT AFTER YOUR ADVISORY

2    GUIDELINE RANGE HAS BEEN DETERMINED THE DISTRICT JUDGE HAS THE

3    AUTHORITY IN SOME CIRCUMSTANCES TO DEPART FROM THE GUIDELINE

4    RANGE AND IMPOSE A SENTENCE THAT IS EITHER MORE SEVERE OR

5    LEGALS SEVERE THAN THE SENTENCE CALLED FOR BY THE GUIDELINES?

6         THE DEFENDANT:  I DO.

7         THE COURT:  DO YOU UNDERSTAND THAT THE DISTRICT JUDGE

8    HAS THE AUTHORITY TO DEPART FROM THE SENTENCING GUIDELINES AND

9    SENTENCE YOU UP TO THE STATUTORY MAXIMUMS PERMITTED BY LAW IN

10   THIS CASE?

11        THE DEFENDANT:  YES, MA'AM.

12        THE COURT:  DO YOU UNDERSTAND THAT PAROLE HAS BEEN

13   ABOLISHED, AND IF YOU ARE SENTENCED TO A TERM OF IMPRISONMENT

14   YOU WILL NOT BE RELEASED ON PAROLE?

15        THE DEFENDANT:  YES, MA'AM.

16        THE COURT:  DO YOU UNDERSTAND THAT UNDER SOME

17   CIRCUMSTANCES YOU OR THE GOVERNMENT MAY HAVE THE RIGHT TO

18   APPEAL ANY SENTENCE IN THIS CASE?

19        THE DEFENDANT:  YES.

20        THE COURT:  SIR, DO YOU UNDERSTAND THAT YOU HAVE THE

21   RIGHT TO PLEAD NOT GUILTY AND TO PERSIST IN THAT PLEA?

22        THE DEFENDANT:  I DO.

23        THE COURT:  AND THAT IF YOU PLEAD NOT GUILTY YOU WOULD

24   HAVE THE RIGHT TO A TRIAL BY JURY.

25        DO YOU UNDERSTAND THAT?

---

1         THE DEFENDANT:  YES, I DO.

2         THE COURT:  AND YOU WOULD HAVE THE RIGHT TO AN

3    ATTORNEY TO ASSIST YOU IN PRESENTING YOUR DEFENSE.

4         DO YOU UNDERSTAND THAT?

5         THE DEFENDANT:  YES.

6         THE COURT:  AT THAT TRIAL YOU WOULD BE PRESUMED

7    INNOCENT AND THE GOVERNMENT WOULD HAVE TO PROVE YOUR GUILT

8    BEYOND A REASONABLE DOUBT.

9         DO YOU UNDERSTAND THAT?

10        THE DEFENDANT:  YES.

11        THE COURT:  YOU WOULD HAVE THE RIGHT TO CROSS-EXAMINE

12   ALL OF THE WITNESSES.  YOU WOULD HAVE THE RIGHT ON YOUR OWN

13   PART TO DECLINE TO TESTIFY OR TO PRESENT ANY EVIDENCE IF YOU

14   DECIDED TO DO SO AND THAT COULD NOT BE HELD AGAINST YOU.

15        DO YOU UNDERSTAND THAT YOU HAVE THOSE RIGHTS?

16        THE DEFENDANT:  YES, MA'AM.

17        THE COURT:  DO YOU UNDERSTAND THAT YOU ALSO THE RIGHT

18   TO ISSUE SUBPOENAS AND BRING YOUR OWN WITNESSES IN HERE AND PUT

19   ON EVIDENCE IF YOU CHOSE TO DO SO?

20        THE DEFENDANT:  YES, MA'AM.

21        THE COURT:  DO YOU UNDERSTAND THAT IF YOU PLEAD GUILTY

22   TO THESE OFFENSES THAT YOU ARE WAIVING YOUR RIGHT TO A JURY

23   TRIAL AND ALL THOSE OTHER RIGHTS THAT WE JUST DISCUSSED?

24        THE DEFENDANT:  I DO.

25        THE COURT:  DO YOU UNDERSTAND THAT BY ENTERING A PLEA

USCA11 Case: 17-15611  Document: 24  Date Filed: 09/10/2018  Page: 147 of 215

1  OF GUILTY THE ONLY THING THAT WILL BE LEFT WILL BE FOR THE

2  DISTRICT JUDGE TO SENTENCE YOU.

3       THE DEFENDANT:  YES.

4       THE COURT:  SIR, HOW DO YOU NOW PLEAD TO COUNTS 1, 2,

5  3, 4 AND 5 OF THE INDICTMENT, DO YOU PLEAD GUILTY OR NOT

6  GUILTY?

7       THE DEFENDANT:  GUILTY, YOUR HONOR.

8       THE COURT:  IT IS THE RECOMMENDATION OF THIS COURT IN

9  THE CASE OF UNITED STATES OF AMERICA VERSUS SCOTT JOSEPH TRADER

10 THAT THE DEFENDANT IS FULLY COMPETENT AND CAPABLE OF ENTERING

11 AN INFORMED PLEA, THAT THE DEFENDANT IS AWARE OF THE NATURE OF

12 THE CHARGES AND THE CONSEQUENCES OF PLEADING GUILTY, AND THAT

13 THE PLEA OF GUILTY IS A KNOWING AND VOLUNTARY PLEA SUPPORTED BY

14 AN INDEPENDENT BASIS IN FACT CONTAINING EACH OF THE ESSENTIAL

15 ELEMENTS OF THE OFFENSES CHARGED.

16      THIS COURT FURTHER RECOMMENDS THAT THE PLEA BE

17 ACCEPTED AND THAT THE DEFENDANT BE ADJUDGED GUILTY OF THESE

18 OFFENSES.

19      DO YOU UNDERSTAND THAT A WRITTEN PRESENTENCE REPORT

20 WILL BE PREPARED BY THE PROBATION OFFICE TO ASSIST THE DISTRICT

21 JUDGE IN SENTENCING YOU?

22      THE DEFENDANT:  YES, MA'AM.

23      THE COURT:  DO YOU UNDERSTAND THAT YOU WILL BE ASKED

24 TO GIVE INFORMATION FOR THE REPORT AND YOUR ATTORNEY MAY BE

25 PRESENT AT THAT TIME IF YOU WISH?

1       THE DEFENDANT:  YES, MA'AM.

2       THE COURT:  DO YOU UNDERSTAND THAT THE COURT WILL

3  PERMIT YOU AND YOUR ATTORNEY TO READ THE PRESENTENCE REPORT AND

4  TO FILE ANY OBJECTIONS YOU MAY HAVE TO THE REPORT BEFORE

5  SENTENCING?

6       THE DEFENDANT:  I DO, YOUR HONOR.

7       THE COURT:  DO YOU UNDERSTAND THAT YOU AND YOUR

8  ATTORNEY WILL HAVE THE OPPORTUNITY TO SPEAK TO THE DISTRICT

9  JUDGE AT YOUR SENTENCING IF YOU DECIDE TO DO SO?

10      THE DEFENDANT:  YES.

11      THE COURT:  DO YOU UNDERSTAND THAT IF THERE ARE ANY

12 VICTIMS TO THESE OFFENSES, THOSE VICTIMS WILL ALSO BE GIVEN THE

13 OPPORTUNITY TO BE HEARD AT THE SENTENCING HEARING?

14      THE DEFENDANT:  YES.

15      THE COURT:  I HAVE RECEIVED A NOTICE OF SENTENCING

16 DATE IN THIS CASE WHICH INDICATES THAT SENTENCING WILL BE HELD

17 ON THURSDAY, NOVEMBER 30TH, 2017, AT ELEVEN A.M. IN FRONT OF

18 JUDGE MIDDLEBROOKS AT THE FEDERAL COURTHOUSE IN WEST PALM

19 BEACH.

20      MR. PEACOCK:  YES, MA'AM.

21      THE COURT:  MR. PEACOCK, IS THERE ANYTHING ELSE IN

22 THIS MATTER?

23      MR. PEACOCK:  YOUR HONOR, I HAVE SPOKEN TO MR. GYIRES.

24      I DON'T KNOW WHETHER THE COURT REVIEWED THE SIGNATURES

25 ON THE FACTUAL STIPULATION OR NOT.

1    THE COURT:  I THINK I DID BUT LET ME JUST DO IT ONCE

2  MORE TO MAKE SURE.

3    OKAY.  I HAVE THIS DOCUMENT THAT WAS PREPARED DURING

4  THE BREAK THAT WE TALKED ABOUT.  YOU SAID YOU HAD A CHANCE TO

5  REVIEW IT, CORRECT?

6    THE DEFENDANT:  YES.

7    THE COURT:  ON THE THIRD PAGE I SEE THREE SIGNATURES.

8  I RECOGNIZE THE FIRST TWO AS MR. GYIRES AND MR. PEACOCK.  ON

9  THE THIRD LINE THERE IS A SIGNATURE ABOVE THE NAME SCOTT JOSEPH

10  TRADER.

11    IS THAT YOUR SIGNATURE, SIR?

12    THE DEFENDANT:  IT IS.

13    THE COURT:  OKAY.  AND YOU DID REVIEW THIS DOCUMENT

14  AND YOU DID AGREE THAT THE GOVERNMENT COULD PROVE THIS AGAINST

15  YOU, CORRECT?

16    THE DEFENDANT:  YES, MA'AM.

17    THE COURT:  OKAY.  ANYTHING ELSE, MR. GYIRES?

18    MR. GYIRES:  THERE IS ONE OTHER THING, YOUR HONOR.

19    THE PLEA AGREEMENT CONTAINS AN AGREEMENT TO -- THAT

20  THE PARTIES AGREE THAT THE DEFENDANT CAN RESERVE HIS APPELLATE

21  RIGHTS AS TO TWO ISSUES.

22    THE COURT:  YES.

23    MR. GYIRES:  SO THIS IS A CONDITIONAL PLEA.  AND

24  CONDITIONAL PLEAS, YOUR HONOR, I HAVE THE CASES, REQUIRE THE

25  COURT'S EXPLICIT APPROVAL.

1    SO I THINK WE NEED TO MAKE AN EXTRA FINDING THAT WE

2  NORMALLY DON'T DO, THAT THAT PROVISION OF THE PLEA AGREEMENT IS

3  PROPER.

4    AND THE -- AND IF THE COURT WOULD LIKE TO KNOW THAT

5  THE CASE THAT SAYS -- THAT SAYS EXPRESSED APPROVAL IS REQUIRED

6  IS UNITED STATES VERSUS PIERRE, P-I-E-R-R-E, 120 F.3D 1152,

7  ELEVENTH CIRCUIT, 1997.

8    AND THE CASE LAW DISCUSSES THE -- WHETHER IT'S

9  PROPER IS -- THERE IS REALLY TWO -- I THINK TWO IMPORTANT

10  THINGS.

11    ONE IS THAT IT'S CASE DISPOSITIVE, THAT IF THE

12  DEFENDANT WINS THEN BASICALLY THE LIKELIHOOD OF THE CASE BEING

13  DISMISSED IS PRETTY HIGH; AND, TWO, THAT IT'S A QUESTION OF LAW

14  AND NOT FACT.

15    AND THOSE ARE BOTH THE CASE HERE BECAUSE THE FOURTH

16  AMENDMENT ISSUES, AND IF THE GOVERNMENT -- ISSUE NUMBER ONE IS

17  WHETHER SUBSCRIBER INFORMATION -- RECEIVING SUBSCRIBER

18  INFORMATION OF THE SEARCH UNDER THE FOURTH AMENDMENT, AND IF IT

19  IS THAT -- THAT MIGHT END UP MEANING THE CASE GETS DISMISSED.

20    AND THE SECOND ISSUE WAS WHETHER THERE IS PROBABLE

21  CAUSE IN THE SEARCH WARRANT.  AND SINCE I THINK ALL OF THE

22  EVIDENCE, OR MOST -- CERTAINLY ALL OF THE EVIDENCE OR MOST OF

23  THE EVIDENCE WAS AS A RESULT OF THAT SEARCH WARRANT.  AGAIN

24  THAT WOULD MEAN BASICALLY THE LIKELIHOOD OF THE CASE GETTING

25  DISMISSED IS HIGH.

USCA11 Case: 17-15611  Document: 24  Date Filed: 09/10/2018  Page: 148 of 215

1  AND BOTH ISSUES ARE QUESTIONS OF LAW.  JUDGE
2  MIDDLEBROOKS ISSUED AN ORDER WITHOUT A HEARING CITING THE
3  REASONS THAT THEY ARE QUESTIONS OF LAW.  SO I THINK IT'S --
4  THOSE ARE THE REASONS THE GOVERNMENT -- OUR APPELLATE SECTION
5  APPROVED IT SPECIFICALLY AS BEING PROPER FOR CONDITIONAL PLEAS
6  WHICH WE OFTEN DON'T DO.
7  THE COURT:  OKAY.
8  MR. PEACOCK:  WE CONCUR, YOUR HONOR.
9  THE COURT:  OKAY.  SO WE TALKED ABOUT (INAUDIBLE)
10 WHICH IS YOUR RIGHT TO APPEAL.  AND WE TALKED ABOUT HOW THE
11 GOVERNMENT AGREED TO ALLOW YOUR APPEAL (INAUDIBLE) THE JUDGE'S
12 ORDER, THE LIMITED RIGHT OF APPEAL.  AND IT'S RESERVED TO TWO
13 ISSUES WHICH WE HAVE DISCUSSED, AND WHICH ARE IN THE PLEA
14 AGREEMENT.
15 DO YOU RECALL THAT DISCUSSION, SIR?
16 THE DEFENDANT:  YES.
17 THE COURT:  AND DO YOU UNDERSTAND THAT PROVISION?
18 THE DEFENDANT:  YES, I DO.
19 THE COURT:  OKAY.
20 AND, MR. GYIRES, ARE YOU SAYING THAT BEYOND ME FINDING
21 THAT THAT WAIVER OR THAT -- THAT HE UNDERSTANDS AND HAS
22 VOLUNTARILY AGREED TO THAT.  IS THERE ANOTHER SPECIFIC FINDING
23 THAT I NEED TO MAKE?
24 MR. GYIRES:  YES.  THAT THE COURT APPROVES -- APPROVES
25 THE PLEA AGREEMENT -- EXPRESSIVELY APPROVES THE CONDITIONAL

1  NATURE OF THE PLEA AGREEMENT.
2  THE COURT:  OKAY.  THE COURT WILL GO AHEAD AND APPROVE
3  THE CONDITIONAL NATURE OF THAT PLEA AGREEMENT.
4  THE COURT FURTHER FINDS THAT YOU UNDERSTAND THAT AND
5  THAT YOU'RE AGREEING TO IT IS KNOWING AND VOLUNTARY.
6  IS THAT GOOD, MR. GYIRES?
7  MR. GYIRES:  THANK YOU, YOUR HONOR.
8  YES.
9  THE COURT:  ALL RIGHT.  VERY GOOD.
10 GOOD LUCK TO YOU, SIR.
11 THE DEFENDANT:  THANK YOU, MA'AM.
12 MR. PEACOCK:  THANK YOU, JUDGE.
13 THE CLERK:  ALL RISE.
14 THE COURT IS IN RECESS.
15
16        - - -
17
18
19
20
21
22
23
24
25

USCA11 Case: 17-15611  Document: 24  Date Filed: 09/10/2018  Page: 149 of 215

C E R T I F I C A T E

UNITED STATES OF AMERICA

SOUTHERN DISTRICT OF FLORIDA

I, CARL SCHANZLEH, OFFICIAL COURT REPORTER OF THE UNITED
STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, DO
HEREBY CERTIFY THAT THE FOREGOING 38 PAGES CONSTITUTE A TRUE
TRANSCRIPT OF THE PROCEEDINGS HAD BEFORE THE SAID COURT HELD IN
THE CITY OF FORT PIERCE, FLORIDA, IN THE MATTER THEREIN STATED.

IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS
12TH DAY OF JANUARY 2018.

                        /S/CARL SCHANZLEH
                        CARL SCHANZLEH, RPR-CM
                        CERTIFIED COURT REPORTER
                        9960 SW 4TH STREET
                        PLANTATION, FL 33324
                        TELEPHONE 954 424-6723

# DE-56

1

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                 CASE NO. 17-4047-CR-MIDDLEBROOKS


UNITED STATES OF AMERICA,

           Plaintiff,              DECEMBER 7, 2017
     vs.
                             WEST PALM BEACH, FLORIDA
SCOTT JOSEPH TRADER,

           Defendant.              PAGES 1 - 125
_____/



             TRANSCRIPT OF SENTENCING HEARING
     BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:    MARTON GYIRES, AUSA
                       Office of U.S. Attorney
                       400 Australian Avenue
                       West Palm Beach, Florida  33401


FOR THE DEFENDANT:     FLETCHER PEACOCK, AFPD
                       Office of U.S. Public Defender
                       450 Australian Avenue
                       West Palm Beach, Florida  33401




REPORTED BY:           DIANE MILLER, RMR, CRR, CRC
                       Official Court Reporter
                       701 Clematis Street
                       West Palm Beach, Florida  33401
                       561-514-3728
                       diane_miller@flsd.uscourts.gov
```

I-N-D-E-X

| WITNESSES | PAGE |
|---|---|
| **SPECIAL AGENT BRIAN RAY** | |
| Direct Examination by My Gyires | 9 |
| Cross-Examination by Mr. Peacock | 41 |
| **DR. MICHAEL BRANNON** | |
| Direct Examination by MR. PEACOCK | 45 |
| Cross-Examination by Mr. Gyires | 53 |
| Redirect Examination by Mr. Peacock | 62 |
| **KATRINA VARNER** | |
| Direct Examination by Mr. Gyires | 63 |
| **LEEANN DREW** | 68 |
| **SHELLY TRADER** | 72 |

Thursday, December 7, 2017.

USCA11 Case: 17-15611    Document: 24    Date Filed: 09/10/2018    Page: 153 of 215

3

```
1                P-R-O-C-E-E-D-I-N-G-S
2          THE COURT:  Good morning; please be seated.
3          This is sentencing in the case of the United States
4   versus Scott Joseph Trader, case number is 17-14047.
5          Can we have appearances?
6          MR. GYIRES:  Good morning, Your Honor; Marton Gyires
7   for the United States.  Alongside me is the case agent, HSI
8   Special Agent Brian Ray.
9          THE COURT:  Good morning.
10         MR. PEACOCK:  Good morning, Your Honor; Fletcher
11  Peacock on behalf of Mr. Trader who is also present before the
12  Court.
13         THE COURT:  Good morning, Mr. Peacock.
14         Okay.  First is the report recommendation on the
15  change of plea.
16         Any issue as to that, Mr. Peacock?
17         MR. PEACOCK:  There is not, sir.
18         THE COURT:  Okay.  I will adopt the report and
19  adjudge Mr. Trader guilty of the crimes charged.
20         I have also reviewed the presentence investigation
21  report; the joint corrections and Defense objections; the plea
22  agreement which calls for acceptance, reserves Mr. Trader's
23  right to appeal the motion to suppress, and calls for
24  forfeiture of the smart phones and computers.  There was a
25  Government sentencing memorandum in support of a light
```

Thursday, December 7, 2017.

4

```
1   sentence, a report of Dr. Brannon, a victim impact statement by
2   a mother of the victim -- a victim, and there is a motion for
3   downward departure and letters.
4          Does that cover the filings?
5          MR. GYIRES:  Yes, Your Honor.
6          MR. PEACOCK:  That's correct, Your Honor.  I did not
7   file Dr. Brannon's report because --
8          THE COURT:  Well, I read it.  I don't know quite how
9   I got it then.
10         MR. PEACOCK:  Well, I sent it to you, Judge; but with
11  those reports, I didn't know what the Court's pleasure was.  I
12  can file that, but I think it should be filed under seal.  I
13  did send a copy to the Government as well.
14         THE COURT:  All right.
15         MR. PEACOCK:  I don't -- for my purposes, I don't
16  think it needs to be an exhibit.  I just want the Court to have
17  some information ahead of time.
18         THE COURT:  Well, I read it, so I think it ought to
19  be filed under seal, since I did look at it.
20         MR. PEACOCK:  That's fine.
21         THE COURT:  Apparently, you are calling Brannon, as
22  I'm told, by phone.
23         MR. PEACOCK:  That's correct, sir, with the Court's
24  permission.
25         THE COURT:  What do you all plan to do in terms of
```

Thursday, December 7, 2017.

5

1  witnesses or people or --

2       MR. GYIRES:  Yes, Your Honor.  The Government, we

3  have prepared a presentation, if you will, in the form of the

4  testimony of Brian Ray, and a disk that has evidence on it that

5  we would like to present to the Court.  I think that's probably

6  -- we practiced it a couple of times so it goes smoothly and

7  everything.  I'm thinking 20 minutes, and then maybe some

8  argument from the Government, and I think there is probably two

9  witnesses who have -- two of the victims' mothers, I think they

10 plan on saying something to the Court.

11      Am I missing anything?

12      I think that's it from the Government.

13      THE COURT:  All right.  What do you plan to do

14 besides Dr. Brannon?

15      MR. PEACOCK:  Your Honor, I anticipate Dr. Brannon

16 will take about 10 to 15 minutes.  I would also ask the Court

17 to hear from Mr. Trader's mother.  I will be making an

18 elocution as well; and then, of course, Mr. Trader has the

19 opportunity to elocute.

20      THE COURT:  All right.  Well, let's start.  Is there

21 some particular time you want to call Brannon, or do you want

22 to -- normally, we would just hear from the Government first

23 and then turn to you, unless Brannon is unavailable.

24      MR. PEACOCK:  If the Government can give me about a

25 five-minute heads up, I need to text him and tell him to be

Thursday, December 7, 2017.

6

1  ready so we have a smooth transition, so about five minutes

2  before the Government is done.  That will be great.

3       THE COURT:  Okay.  All right.  Mr. Gyires, go ahead.

4       MR. GYIRES:  Okay.  And, Your Honor, the CD is

5  mostly, if not all, contraband child pornography.  So I don't

6  know if we can somehow do it, if not sidebar, somehow in a way

7  where Your Honor can see the computer screen.

8       THE COURT:  Well, there is one here, if you are going

9  to use the -- this system.

10      MR. GYIRES:  Right.  We can try it, but I'm concerned

11 that it might be projected onto here or something over there.

12 That's my concern is I don't want these screens to show it.  If

13 you can accomplish that or the screen -- the laptop screen is

14 pretty big.

15      THE COURT:  Apparently, she can do it.  Genny can do

16 most anything, I guess.

17      Again, if this is -- if you want me to see it and I

18 want it available, you are going to have to file it under seal

19 for the Eleventh Circuit.

20      MR. GYIRES:  Yes, Your Honor.

21      THE COURT:  I don't want to be looking at things that

22 an appellate court can't see.

23      MR. GYIRES:  Absolutely, Your Honor.  And it's a disk

24 that I have marked as Government's Exhibit 1.  I have spoken

25 with Mr. Peacock.  We can either admit it now, or we can admit

Thursday, December 7, 2017.

7

1  it after we show it; however -- we can move it into evidence
2  now, if that's all right.
3          MR. PEACOCK:  No objection, Your Honor.
4          THE COURT:  All right.  What are you calling it?
5          MR. GYIRES:  Government's Exhibit 1.
6          THE COURT:  All right, 1 is admitted.
7          MR. GYIRES:  It is a CD.
8      (Evidence admitted as Government Exhibit No. 1)
9          MR. PEACOCK:  May we watch from up there, Judge?
10         THE COURTROOM DEPUTY:  The only thing that I can do,
11  as far as it appearing on the monitors, it will not appear in
12  the jury box.  It will not appear in that.  It may still appear
13  on your table, counsel table.
14         MR. PEACOCK:  Thank you.
15         May I suggest we do it sidebar on the laptop, Your
16  Honor?
17         THE COURT:  Why don't you just turn it away from the
18  audience, yours?  Won't that work?
19         I mean, sidebar, this screen is here.  I don't know
20  how I can do it sidebar.
21         MR. PEACOCK:  I just don't want to break it.  I don't
22  want to have to pay for it.
23         THE COURT:  You can probably turn monitors off, can't
24  you, also, if you wanted to?
25             If you want to sit in the witness chair, look at it

Thursday, December 7, 2017.

8

1  there.  You obviously could, too, if that's easier for you.
2      (Break in the proceedings.)
3          MR. GYIRES:  Also, Your Honor, there is, obviously,
4  audio as well.  I don't know if that matters.
5          THE COURTROOM DEPUTY:  It is not showing up there
6  now.  I think you got it because it's not showing up.  It is on
7  all of these monitors.
8          Mr. Peacock, I think you are okay because if it's not
9  showing up, it should be okay.  You can also wheel it and turn
10  it around.  It does have wheels.
11         MR. GYIRES:  Your Honor, can Your Honor see it?
12         THE COURT:  Yes.
13         MR. GYIRES:  We are just going to test the sound real
14  quick, if that's okay.
15         MR. PEACOCK:  It is not on this one, gentlemen.
16         THE COURTROOM DEPUTY:  I have it turned off.
17         THE COURT:  Do you want it there?
18         MR. PEACOCK:  No, I'll move around.
19         MR. GYIRES:  Can Your Honor hear that ding in the
20  audio where he is testing the audio?
21         THE COURT:  I heard a noise.
22         MR. GYIRES:  All right.  May I proceed, Your Honor?
23         THE COURT:  Sure.
24         MR. GYIRES:  Special Agent Ray, if you can tell us
25  your name and spell it.

Thursday, December 7, 2017.

9

```
 1            THE COURT:  Let's administer the oath to your agent.
 2            BRIAN RAY, GOVERNMENT WITNESS, SWORN.
 3                    DIRECT EXAMINATION
 4   BY MR. GYIRES:
 5   Q.  Okay.  Sir, can you tell us your name and spell it, please?
 6   A.  Brian Ray, R-A-Y.
 7   Q.  And how are you employed?
 8   A.  As a special agent for Homeland Security Investigations.
 9   Q.  For how long?
10   A.  Since the department's founding in 2003.  Prior to that, I
11   was a customs special agent; prior to that, I was a deputy
12   sheriff.
13   Q.  Do you have any specialized training or expertise?
14   A.  Yes, sir.
15   Q.  What is that?
16   A.  In 2010, I attended the Treasury Law Enforcement Computer
17   Forensic Programs basic evidence recovery training -- computer
18   evidence recovery training.  In 2011, I attended the -- it's
19   also the Treasury Computer Forensic Programs advanced computer
20   evidence recovery training, and I have also taken --
21            MR. PEACOCK:  I'm sorry.  The Defense will stipulate
22   to Agent Ray's qualifications as a computer forensic expert.
23            MR. GYIRES:  Okay.  Thank you, Your Honor.
24   BY MR. GYIRES:
25   Q.  So moving on, you -- obviously, you investigate child
```

Thursday, December 7, 2017.

10

```
 1   exploitation cases, correct?
 2   A.  That's correct.
 3   Q.  And you are the case agent on this case?
 4   A.  Yes.
 5   Q.  Now, let's just get right to it.  Did you review electronic
 6   devices that were seized from the defendant?
 7   A.  Yes.
 8   Q.  And those devices were what kind of devices?  Cellphones?
 9   SD cards?  Stuff like that?
10   A.  Cellphones, SD cards, and some computers, yes, sir.
11   Q.  And an SD card is what?
12   A.  Secured digital card, it's a small electronic piece of
13   media that will hold storage.  You can put them in cellphones.
14   You can also attach them to computers.
15   Q.  All right.  So did you -- and you have looked through a lot
16   of it yourself, correct?
17   A.  Yes.
18   Q.  And that's through the use of computer programs as well,
19   right?
20   A.  Yes.
21   Q.  All right.  So did you recover evidence of the defendant
22   sexually abusing his two daughters?
23   A.  Yes.
24   Q.  All right.  If you could go ahead and show the Court some
25   of those examples.
```

Thursday, December 7, 2017.

11

```
 1              And for the purposes of the record, we are looking at
 2  Government's Exhibit 1, and there is a file -- a folder called
 3  "Encase," E-N-C-A-S-E, Encase report.  Inside of there, if you
 4  could show us file numbers 18, 19, 20, 21 and 22?
 5  A.  All right.  Within the Encase report folder, there is a
 6  file called the "Trader Sentencing."  Double click that, it
 7  opens up the -- these are -- these were files that were
 8  bookmarked using my forensic software, and each individual file
 9  has a number associated with it.  You can see up there
10  beginning with number one -- and we are looking at which file
11  numbers?
12  Q.  Eighteen, 19.
13  A.  This is file number 18, which is a video.
14      (Video recording played in open court.)
15  BY MR. GYIRES:
16  Q.  Okay.  That's the defendant on there?
17  A.  Yes, sir.
18  Q.  And that's the defendant's penis, obviously?
19  A.  Yes.
20  Q.  And you viewed a lot of this stuff, and you're comfortable
21  with making that voice identification and the penis
22  identification?
23  A.  Yes.
24  Q.  And the child in there is the defendant's daughter,
25  correct?
```

Thursday, December 7, 2017.

12

```
 1  A.  That's correct.
 2  Q.  All right, go ahead with 19.
 3  A.  Which is also a video file.
 4      (Video recording played in open court.)
 5  BY MR. GYIRES:
 6  Q.  Okay.  And for the purposes of the record, if you could
 7  briefly describe so the transcript -- the transcript reflects
 8  what's on these two videos?
 9  A.  The first video is approximately a 15-second video
10  depicting Mr. Trader's younger child, RT, masturbating him and
11  kissing his penis.
12          The second video is also an approximately 15-second
13  video with our victim, RT, masturbating Mr. Trader.
14  Q.  Does she say, "Hi, Ash"?
15  A.  Yes.
16  Q.  And what does "Ash" mean in your investigation?
17  A.  It is a reference to Ashley Maddox, who is a suspect in
18  California, who has been arrested based on the information we
19  recovered from Mr. Trader.
20  Q.  Was the defendant, Mr. Trader, trading child pornography
21  with that Ash person?
22  A.  Yes.  He was creating child pornography, which he sent it
23  to her.  She created some child pornography, which she sent to
24  him.
25  Q.  Okay.  If you can go ahead and move on to numbers 21, 22.
```

Thursday, December 7, 2017.

13

1   A.   Twenty-one or --

2   Q.   I'm sorry, 20, 21, and 22.

3   A.   Twenty is also a -- file 20 is also a video.  This is an

4   approximately 14-second video.

5   Q.   If you can describe it while it's going on.

6   A.   Depicting the victim, RT, nuzzling Mr. Trader's penis.

7        (Video recording played in open court.)

8   BY MR. GYIRES:

9   Q.   And her hands are on it as well?

10  A.   Her hands are on it, her face is touching it, and

11  Mr. Trader is commenting "good girl."

12  Q.   Number 21?

13  A.   Twenty-one is also a video.  It's approximately a 14-second

14  video with Mr. Trader masturbating himself with victim R-T's

15  hand above his.  And at this point, the victim is solely

16  touching Mr. Trader's penis when he comments "good girl."

17  Q.   She is gripping the penis, correct?

18  A.   That is correct.

19  Q.   Okay.  That was 21?

20  A.   Excuse me?

21  Q.   Was that 21?

22  A.   I'm sorry.

23  Q.   I'm sorry, that was 21.  Go ahead with 22.

24       (Video recording played in open court.)

25            THE WITNESS:  This is also a 14-second video.

Thursday, December 7, 2017.

14

1   Mr. Trader's hand is on victim R-T's hand, and he is

2   masturbating his penis using her hand.

3   BY MR. GYIRES:

4   Q.   Did the defendant say, "Sam, do you want to touch it too?"

5        Did you hear him say that?

6   A.   I didn't.

7   Q.   One more time.

8   A.   I was speaking.  I didn't recall if that was on this one.

9   Q.   Go ahead, play it again.

10       (Video recording played in open court.)

11            THE WITNESS:  Yes, which is a reference to his older

12  daughter, victim ST.

13  BY MR. GYIRES:

14  Q.   And again, for the transcript purposes, how old does this

15  victim here, RT, appear to be in the video, approximately?

16  A.   Approximately two.

17  Q.   Okay.  If you could show us file number 52898.

18            That is located in the separate folder -- or yeah, I

19  don't know how -- this is how we noted it.

20  A.   Yes.  I'm now going into a folder on the exhibit disk

21  called "Select Chats."  There's a separate folder, and it's

22  marked "Samsung G920T, Pikek chats."

23  Q.   I'm sorry.  Can you spell that, and let's talk slower.

24  A.   Pikek is P-I-K-E-K, all one word, which is a reference to a

25  chat program that was being used in this instance.  Opening

Thursday, December 7, 2017.

15

```
 1  that, there is a chat associated with it, but we are going
 2  directly into the videos which are labeled "Chat Vids." And
 3  there is a folder labeled "Chat Vids," and we are looking first
 4  at number -- file that begins --
 5  Q.  Five two eight nine eight.  It's the G920 chat?
 6  A.  Yes.  This is an approximately 16-second video that depicts
 7  Mr. Trader performing oral sex on RT.
 8  Q.  You mean -- okay.  And licking what?
 9  A.  Licking R-T's vagina.
10  Q.  Okay.  And you are comfortable in your identification that
11  that's the defendant?
12  A.  Yes.
13  Q.  Okay.  Go ahead with number 40330.
14  A.  The file -- both of these files, that's the starting.  They
15  are very long alphanumeric file names, so these names are just
16  the starting part which uniquely identifies them.  So this is
17  40330, and this is another approximately 20-second video
18  depicting the victim, RT, lying on the bed with Mr. Trader
19  inserting his penis in the vaginal opening.
20  Q.  Okay.  What was the -- do you recall the -- or maybe you
21  can tell me if I'm right or wrong if the earliest date that you
22  recovered the recording of RT being abused, was that December
23  23, 2014?  Is that the earliest that your forensic analysis on
24  the devices -- that's the earliest that you found the video
25  dated?
```

Thursday, December 7, 2017.

16

```
 1  A.  Yes.
 2  Q.  And the latest for victim RT, was that May 18, 2017?
 3  A.  That's correct.
 4  Q.  Okay.  Now, if you go ahead to another victim, the
 5  defendant's other daughter, ST.  If you could show us Encase,
 6  E-N-C-A-S-E, Encase report number 12?
 7  A.  We are going back to the Encase folder in the Trader
 8  sentencing file and -- what number?
 9  Q.  Twelve?
10  A.  Number 12, which is a video.  It is approximately a
11  14-second video depicting ST asleep, apparently, in her bed
12  with Mr. Trader masturbating next to her bed.
13  Q.  All right.  And go ahead with number 13.
14  A.  Thirteen, also a video, another video of Mr. Trader --
15  well, at this point, he is ejaculating on her sheets.  It's
16  approximately a 14-second video with the victim ST lying asleep
17  in the bed.
18  Q.  And approximately how old is ST in the video?  How old is
19  she now?
20  A.  She is 10, I believe, almost about to turn 11.
21  Q.  Okay.  Is the earliest that you got videos of ST being
22  molested or abused, was that in November 21st, 2014?
23  A.  That's correct.
24  Q.  And the latest was January 19, 2016?
25  A.  That's correct.
```

Thursday, December 7, 2017.

1  Q.  Okay.  Now, go back.  A couple more videos of that, number

2  14?

3  A.  Right.  Number 14 is actually the still shot that's visible

4  on the screen right now, which is ejaculate on the bed sheets

5  next to the victim, ST, which is -- appears to be a separate

6  incident from what we just saw on the video because the

7  ejaculate is in a different location.

8  Q.  Did he send these to other people online -- or not these

9  specific ones necessarily, but videos of ST or photos of ST?

10  A.  He sent photos and videos of both ST and RT to other

11  people, yes.

12  Q.  Go ahead with number 30.

13  A.  Thirty is also a video.  It's approximately a 14-second

14  video depicting ST lying, apparently asleep in the bed, on her

15  stomach with Mr. Trader pulling back her underwear and

16  inserting his fingers in her vagina or at least manipulating

17  her vagina.

18  Q.  All right.  Now, is there something called the, quote,

19  unquote, "Sammie" folder, S-A-M-M-Y, folder?

20  A.  It's actually S-A-M-M-I-E.

21  Q.  Okay.

22  A.  There was a folder recovered on several of his devices.

23  One was on an external hard drive.  The copies of this folder

24  were also on some of the SD cards.

25  Q.  And who entitled it "Sammie" folder?

Thursday, December 7, 2017.

1  A.  It would have been the user, Mr. Trader.

2  Q.  Go ahead.  If you could show us inside of that folder.  You

3  definitely don't show us all of them, but there is a range of

4  126 to 408.  If you can just pull that up and just scroll down

5  and show a couple of them.

6  A.  Did you want that or the folder view itself?

7  Q.  Either one, whichever you think is better, the folder

8  view.

9  A.  I took the -- copied the full folders out of the location

10  onto the disk.  They are the full folders from WD passport,

11  HDD.  When you open that up, there is the "Sammie" folder.

12  This was exported as it was on the hard drive, and so there is

13  the range of abuse material.

14  Q.  And you are looking at a list of thumbnails that show

15  images, correct?

16  A.  That's correct.  There is thumbnail images depicting the

17  abuse of ST.  There are a few in here which depict RT as well.

18  It's 285 files.  This is Exhibit 1.

19  Q.  The CD?

20  A.  When you open the disks, there is a file called -- titled

21  "Full Folder" from WD Passport HDD.

22  Q.  And if you want to just pick a couple of them.  They are

23  really small.  I don't think we can see them.  Pick a couple to

24  show the Court, couple of examples.

25  A.  Yes.  There were a lot of -- there are multiple ones that

Thursday, December 7, 2017.

1  have dates associated with them.  The settings are all
2  consistent.  I'll pull one up here.  The first one --
3  Q.  Well, let me stop you.  When you say "settings," you mean
4  like the bed sheets, the underwear, the surrounding area and
5  stuff like that?
6  A.  That's correct.
7  Q.  You mention that because the full body of the victim wasn't
8  necessarily in the video.  Are you saying that you -- having
9  looked at all of the stuff in this case, you are comfortable
10 saying that's the victims, right?
11 A.  That's correct.
12 Q.  Okay.
13 A.  I was going to do still images.
14 Q.  That's fine.
15 A.  Still images such as one that's titled "20150412"
16 underscore 231940.  It's a jpeg image which is a close-up shot
17 of ST's vagina.
18       And I now scrolled down to the bottom of the screen,
19 so all of the thumbnails have been displayed.
20 Q.  And the thumbnails include finger penetration of the
21 vaginas by the defendant, correct?
22 A.  Yes.
23 Q.  All right.  We can move on.
24       Did the defendant also have a folder entitled "Pics
25 With Me With Kids"?

Thursday, December 7, 2017.

1  A.  Yes.
2  Q.  All right.  Let's move on to online distribution and online
3  communications.  Approximately -- was the defendant involved in
4  communicating with other people online and exchanging child
5  pornography?
6  A.  Yes.
7  Q.  By "online" meaning using the phone, for example, using
8  apps on the phone or a computer?
9  A.  It's primarily phone communications.  Actually, it's all
10 phone communication, using applications on the phone.
11 Q.  Okay.  Now, approximately, how many people who were minors
12 or represented themselves to be minors and appeared to be
13 minors were -- was he communicating and exchanging with -- or
14 communicating sexually with -- let me put it that way, just
15 communicating sexually, not necessarily getting them to send
16 him something but trying.  Was that at least a hundred?
17 A.  It was over a hundred, yes, sir.
18 Q.  And how many times did he succeed in getting minors to send
19 him stuff that you found?
20 A.  I found examples of at least 44 minors that either
21 transmitted child pornography to Mr. Trader, or Mr. Trader
22 transmitted child pornography to them.
23 Q.  And did he send -- some of them, did he send his own
24 produced material?
25 A.  Yes.

Thursday, December 7, 2017.

21

1  Q. And now how young were these -- were they mostly girls?

2  A. They were -- there were a few communications with other

3  adults that he was trading child pornography with, but the

4  majority of the communications were with girls representing

5  themselves to be under the age of 18.

6  Q. As young as eight?

7  A. That was the youngest, eight years old.

8  Q. And did they look that young on the videos and photos that

9  they sent? Did they look like they were eight years old, or

10  nine years old, or ten years old?

11  A. Yes, they did.

12  Q. And was the majority of them prepubescent?

13  A. Yes -- excuse me, for the -- for the sending child

14  pornography, I don't know that I can say the majority were, but

15  there were plenty of them that were prepubescent, yes, sir.

16  Q. Okay. All right. I think on the exhibit here, Exhibit 1,

17  the CD, we have -- if you can pull up the visual overview that

18  sort of shows the chats. It sort of just gives a visual

19  representation of what it looks like on the software program to

20  give the Court an idea. It's the T999 cell?

21  A. For the record here, I already opened that because it takes

22  it a little while to open up, but to follow the path to get to

23  it, if you go to the -- to the exhibit disk, there is a folder

24  labeled "Trader Smart Phones." When you open it up, there are

25  forensic copies of materials that was bookmarked from several

Thursday, December 7, 2017.

22

1  of his phones. One of them is the Samsung GSM SM920T Galaxy X6

2  phone. When you open that folder, there is a file titled "UFED

3  Reader," which is the forensic software that is used to look at

4  this particular image which is titled the same as the phone.

5  So I have already opened this up. Once you open it

6  up, it comes up with a screen that gives you an extraction

7  summary. It gives you some details about the phone.

8  On the left-hand side, there is a frame that gives

9  several different things that are available to view that have

10  bookmarked. One of them is labeled Chats. So if we open up

11  the chat view, there is a visual representation. These are all

12  of the separate chats that were bookmarked during my review of

13  this particular phone.

14  Q. Separate people that he is chatting with?

15  A. Correct.

16  Q. Okay. And what are these red dots or yellow dots on the

17  side -- or in the middle or on the side there now?

18  A. The yellow dot was how I identified it from -- because

19  there were over 3,000 chats on this phone. These dots

20  identified ones that were -- that I reviewed that included

21  something of evidentiary value, speaking with an underage child

22  was the main point.

23  Q. And the red dot?

24  A. That was child pornography that had gone either two or from

25  Mr. Trader.

Thursday, December 7, 2017.

23

1  Q.  All right.  If you want to scroll down, just to give a

2  sense of how many we are talking about.

3  A.  These are the -- there are 108 chats that are bookmarked in

4  this particular instance.  So scrolling down --

5  Q.  Okay.

6  A.  -- the approximate number where child pornography was

7  trafficked.

8  Q.  All right.

9  A.  Some of the earlier chats from the 2013, there are

10 references to the child pornography going back and forth, but I

11 wasn't able to recover the actual image.

12 Q.  Okay.  If you could show us an example that we have.

13 A.  Scrolling down to the end, you can see as we get to the

14 end, chats 81.  They are ordered by time, so as we get to the

15 older chats, there is less child pornography recovered.

16 Q.  All right.  Can you show us an example in the form of the

17 Kenia Benitez?

18 A.  Yes.  Opening that, it's the second chat on this list.  The

19 other user was Kenia Benitez.  When you click on that --

20 Q.  Can you spell that for our court reporter?

21 A.  Yes, K-E-N-I-A, last name, B-E-N-I-T-E-Z.

22 Q.  Okay.  Go ahead.

23 A.  When you click on that chat, it opens up on the right-hand

24 side.  You can see the conversation bubble is on the right-hand

25 side, in order to make this a little bit bigger.

Thursday, December 7, 2017.

24

1  Q.  Let me ask you to talk a little slower.

2  A.  Sorry.

3  Q.  Go ahead.

4  A.  Just above the conversation bubbles are -- there is a gray

5  bar that's titled "Conversation."  And when you go over to

6  the -- one of the icons on the right, talking -- conversation

7  view.  Clicking on that, you are able to pull up a much larger

8  version of the chat --

9  Q.  Okay.

10 A.  -- which the chat begins, it is dated January 26, 2017.

11     And just a few exchanges into it, Mr. Trader, on that

12 day at 8:09:06 p.m., asks how old she is, asking if she is

13 eight; and the girl replies, "I'm ten years old."

14 Q.  Okay.  Go ahead.

15 A.  If you scroll all the way to the bottom --

16 Q.  Yes.

17 A.  -- of the chat, there is lengthy chat here discussing

18 sexual activity.  He was wanting her to produce child

19 pornography in exchange for getting some shoes and some phones,

20 and things of that nature.

21     In order to view the video on these chats, we have to

22 open the video frame and then copy the title of this video,

23 which was transmitted on 1/27/17 at 9:19 and 40 seconds.  Go to

24 the video frame and paste the name, and the video that was

25 displayed or that the child sent comes up, and he would be

Thursday, December 7, 2017.

1  playing the video.  It's approximately an 8-second long video
2  of a girl who appears to be approximately ten years old fully
3  nude standing in front of a bathroom mirror with a tablet-type
4  device and displaying her body in a full-length mirror turning
5  side to side and to show her buttocks as well.
6  Q.  And her vagina?
7  A.  Yes, her vagina is visible.
8  Q.  Were there any -- do you want to show us an example of a
9  video that defendant sent of himself just so we can see a video
10 of him, if that's easy to access.  I don't know if you -- or
11 not necessarily with this victim, I mean?
12 A.  Yes, there are others.
13 Q.  Do you have a video of him talking to the camera, just so
14 we get a sense of how he spoke?
15 A.  Yes.  If we go back to the Encase report, this is file
16 number 429 which is a video file.
17    (Video recording played in open court.)
18 BY MR. GYIRES:
19 Q.  You don't necessarily know who he was talking about, do
20 you?
21 A.  Not in that particular video, no, sir.
22 Q.  Okay.  Now, if you want to go to the Ashley Maddox chats
23 next, to give us some -- just one or two more examples of chats
24 with adults, one would be with Ashley Maddox.  That's --
25 A.  Yes.  When you open the sentencing disk, there is a folder

1  labeled "Select Chats."  You open the "Select Chats".  There is
2  a folder labeled "Ashley Maddox Arrested."  Ashley Maddox is
3  A-S-H-L-E-Y, M-A-D-D-O-X.
4     Opening that, there are two folders:  One for 2015
5  chats, a separate one for 2016 chats.
6     We are opening the 2016 chat.  There is a PDF file
7  titled "Report."
8  Q.  Why don't I just have you read that, pages one and two, if
9  you wanted to read that into the record.
10 A.  Okay.  I have opened the report that has those chats.
11 Q.  And this is a conversation between the defendant and an
12 adult woman who has been since arrested named Ashley Maddox?
13 A.  That's correct.
14 Q.  Go ahead.
15 A.  It starts off with messages from Miss Maddox who I'll refer
16 to as "she"; Mr. Trader, I'll refer to as "he".
17    She starts out, "That's how I got too.  It sucks,
18 LOL."
19    He replies, "Yes, it does, but eventually you get the
20 confidence and you get horny enough to where you are just going
21 to do it regardless."
22    She says, "But I can't have her now."
23    He says -- I believe this is mistyped.  It's typed
24 A-B-D; I believe he meant "and".
25    "And she won't.  Sam didn't know.  Well, she is not

USCA11 Case: 17-15611    Document: 24    Date Filed: 09/10/2018    Page: 165 of 215

1  telling me she knows.  And by the way, I still have another
2  child, LOL.  Whenever you want to cam with her, just let me
3  know, ha, ha."
4          She replied, "Yes.  I love when you had her suck your
5  cock."
6          He relied, "I know you did.  I want to have her do it
7  again for you."
8          She replies, "Yes, baby," followed by "please."
9          He said, "Whenever you have free time, baby.  Can't
10 be the next few days, but after that, I should be home for a
11 few days."
12         She said, "Well, just let me know when you have the
13 ability to," followed by, "I'm usually pretty free in the
14 evenings."
15         He said, "Okay.  I want to show you her pussy.  I've
16 been looking at it a lot lately.  She is getting to that age
17 now.  She just turned three, so I'm going to start with her
18 before she is four."
19         She replied.  "Start with her," question mark.
20 Followed by, "I love her little pussy.  You showed me a little
21 of it."
22         He replied, "Playing with her clit and licking her
23 pussy.  Maybe a -- maybe a finger, if I can.  I know I have
24 before, but I T-I show you more."
25 Q.  I want to show you more?

Thursday, December 7, 2017.

1  A.  "Want to show you more," just an another probable
2  misspelling.
3          She replied, "O-M-G," for oh, my god.  "Baby, I would
4  die to see you licking her clit," followed by "god."
5          He replied, "Then that's what I'm going to do to her
6  when we Skype."
7          She asked, "Can you do that while she is awake and
8  there is light?  LOL."
9          He replied, "Yes."
10         She replied, "God, babe, I would die."
11         And then the chat continues from there.
12 Q.  Okay.  Let me also, 13, the last two pages, I think we also
13 want to highlight.  If you can read 12 and 13.  I think it
14 starts at the end of 12 and then 13 and 14.  Getting to the
15 spot we had marked.
16 A.  All right.  This chat, we are beginning on page 12 at
17 date/time, we're at 4/22/16 at 1659.
18         He said, "LOL, I'm going to have to figure something
19 out B-C" -- which is short for because -- "I want to see you.
20 So this weekend, we're going to have seven girls sleeping over
21 my house between the age of seven to ten.  I'm going out of my
22 mind with ideas of things I'm going to do.  One of them, a
23 ten-year-old, loves to take off her clothes.  This is going to
24 be fun."
25         She replied, "Oh, my god, are you going to message me

Thursday, December 7, 2017.

1  when you do?"

2  He replied, "Ha, ha, I wouldn't have it any other

3  way."

4  She said, "Oh, I miss you."

5  He followed that with, "I know.  I miss you too.  I

6  really need to start getting more porn and playing with Sammie

7  again.  I'm craving her pussy."

8  She replied, "I want that too," followed by, "You

9  haven't been," question mark.

10  He said, "Nope, not for a while.  We have all been so

11  busy lately.  She is getting little boobies now too."

12  She replied, "Oh, my god, LOL."

13  He said -- it was an explanation, yeah.  "She is

14  growing up so quickly and so sexy."

15  She replied, "Man, I can't wait to see."

16  He typed, "I can't wait to show you," and then asked,

17  "How is Kay?  I dreamed about raping her last week, you know."

18  Kay is a reference to the California woman's

19  six-year-old child.  I believe she was six.

20  She replied, "Did you really?  Why didn't you message

21  me?  We could have gotten off on it together;" followed by, "I

22  still haven't touched her.  I probably never will, to be

23  honest."

24  He replied to that saying, "LOL, yes, I didn't, and

25  actually, you were watching me do it and getting off on it.  I

1  didn't message you because I don't come on here much.  Kik is

2  on my old phone.  I have Kik on my new one, but that's just to

3  talk to Sammie.  Everyone and everything else is on here.  I

4  want to F-B message" -- which is Facebook message -- "you

5  sometimes, but I don't for some reason.  And don't say you

6  won't, I'll make you one day."

7  Q.  And Kik is K-I-K, a social media app, right?

8  A.  That's correct.

9  Q.  Go ahead.

10  A.  She replied, "Well, I'm always here.  You can always

11  Facebook me," followed by "One day."

12  And then he replies, "Ha, ha.  Have you been watching

13  anything good lately?  I haven't traded in a while."

14  She replied, "Just the same old stuff, nothing

15  weird."

16  Then there is a break in the chat from the 22nd to

17  the 24th.  She initiates the conversation at the time indicated

18  of 12:30 a.m.

19  She says, "It's this weekend, and you're not

20  messaging me."

21  He replied by sending a video which was several girls

22  playing in the living room area of his home.  He replied,

23  "Because half of them aren't asleep."

24  She replied, "LOL, makes sense."

25  He then sent a video of several girls sleeping in the

31

bedroom in the defendant's home. And in the video, he goes to
one of the little girls who is sleeping on the floor --

Q. That's not his daughter?

A. That's not his daughter.

       -- and pulls back her pajama top and starts to expose
her breasts. When the girl stirs, he stops.

       She replied, "Ha, ha."

       He said, "The rest of them are."

       She said, "You almost got caught."

       He replied, "LOL. You saw it, huh."

       She replied, "LOL, yep. Looks like fun over there."

       He said, "Yeah, I have seven girls here, LOL."

       She replied, "Heaven, LOL."

       He said, "I'm going out of my fucking mind. I want
to fuck literally all of them."

Q. You want to play that video real quick, the 12 seconds long
where he goes into the bedroom?

A. All right. Going to that video; again, it's on the Encase
report.

       This is file -- do we have the file number?

Q. Number six?

A. Number six, number six of the Encase report.

Q. All right.

       (Video recording played in open court.)

       THE WITNESS: That was what I previously described. The

Thursday, December 7, 2017.

32

video is about a 10-second clip, which I described earlier,
with him pulling back the top on the sleeping child.

BY MR. GYIRES:

Q. Now, I'm not going to ask you to read another set of chats,
but if you could just briefly explain another example involving
a woman named "Gomez" without necessarily showing us, just to
save a little time; if you'll explain.

A. That's a chat from May of this year. In that chat, he was
communicating with another woman who we since arrested and
rescued her child. That was also a six-year-old child in
Alabama.

       During that chat, he sent videos of RT masturbating
him to her. She sent child pornography that she created to
him, and he indicated that he wanted to -- the quote from the
chat was that he wanted to have sex, basically, in front of the
children, and he wanted to use the woman's cum as lubricant for
him to put his penis inside of the six-year-old victim in
Alabama. He also said, "We have to make this happen. I've
been thinking about it nonstop."

Q. All right. And that chat is on Government's Exhibit 1
disk, correct?

A. It is. It's in the "Select Chats" folder, the "Anna Gomez"
folder.

Q. All right. Let's move on.

       Let's go ahead and move on to just another category

Thursday, December 7, 2017.

1  of conduct let's say -- he was also just downloading, so to

2  speak, just downloading amounts of child pornography that he

3  didn't produce but just getting it online and storing it,

4  correct?

5  A.  That's correct.

6  Q.  Now, can you show us a couple of examples of that?  Did it

7  include child pornography involving beastiality?

8  A.  Yes.

9  Q.  Okay.  If you can show us maybe one example, 407 to 410 is

10  the numbers on that one.

11  A.  Okay.  This first one, file 407, is a video which we are

12  opening up.  It's a 16-minute and 41-second video which starts

13  with the girl undressing.

14  Q.  Minor girl?

15  A.  Yeah, she is obviously a minor girl.

16      (Video recording played in open court.)

17      THE WITNESS:  We skip ahead to one minute into the

18  video, and the dog is licking her vagina.

19  BY MR. GYIRES:

20  Q.  Okay.  Do you want to show us maybe one more.  We will stop

21  the video at this point.

22      Were there other ones involving dogs?

23  A.  Yes.

24  Q.  All right.  Do you want to show us a couple of the sadism

25  masochism?  Maybe one is probably enough.

Thursday, December 7, 2017.

1      MR. PEACOCK:  Your Honor, for the record, we have not

2  posed an objection under the guidelines that the videos contain

3  sadomasochistic material.  I think that's resolved.

4      THE COURT:  All right.

5      MR. GYIRES:  This will be brief, Your Honor.

6  BY MR. GYIRES:

7  Q.  If you can play one.

8  A.  We'll just play one to give you an example.

9      This is file number 443, which is a video.

10      (Video recording playing in open court.)

11      THE WITNESS:  It is a minute 30-second video which

12  depicts a toddler suspended by her legs on her bed and a

13  woman that is manipulating her, is aggressively inserting a

14  dildo into the child's vagina.

15      MR. PEACOCK:  I object to that.  I have never seen

16  this video before.

17      THE COURT:  I'm not sure of the objection.  I guess

18  they were produced to you.

19      MR. PEACOCK:  No.

20      THE COURT:  You just didn't want to watch it, which I

21  could understand.

22      MR. PEACOCK:  There was a volume of material that we

23  -- we did take many, many hours looking at the discovery in

24  this case, and I don't want to imply --

25      Can you cut that off, please.

Thursday, December 7, 2017.

35

```
 1          I didn't want to imply that the Government wasn't
 2   forthcoming with discovery, but we didn't look at each and
 3   every video.  What we did was we looked to make sure that the
 4   guidelines complied with as far as what -- how the computations
 5   would go, but I have not seen these videos that we are looking
 6   at today.
 7          THE COURT:  Well, if they were produced.  Frankly, I
 8   don't need to see any of them.  The Government chooses to
 9   present its case.  If you have seen them, I'll overrule the
10   objection, but.
11          MR. GYIRES:  I'll move on.
12          THE COURT:  All right.
13   BY MR. GYIRES:
14   Q.  And don't show us any more, but there is, obviously in his
15   possession, his collection, there was infants and toddlers
16   child pornography as well, right?
17   A.  That's correct.
18   Q.  Let's move on.
19          Now I just want to explain to the Court because I'm
20   not sure it's 100 percent clear in the PSR.  Do you have an
21   understanding of his prior court cases and his offense conduct
22   during the course of those court proceedings?
23   A.  Yes.
24   Q.  Okay.  And stuff that we have charged that's in our
25   evidence, right?
```

36

```
 1   A.  Yes.
 2   Q.  Now, he was arrested, according to the PSR, it is your
 3   understanding he was arrested April 2012, right?
 4   A.  That's correct.
 5   Q.  And those were for allegations involving child pornography,
 6   possession, and the victim ST's allegations, right?
 7   A.  That's correct.
 8   Q.  Okay.  And now -- he got a withhold adjudication
 9   October 4th, 2012, correct?
10   A.  Yes.
11   Q.  And then the following year, in October, was there a family
12   court case pending?
13   A.  Yes.
14   Q.  All right.  What happened in October 2013, in that family
15   law case involving child custody?
16   A.  He was evaluated by a psychologist.
17   Q.  Named Gary Edwards?
18   A.  That's correct.
19   Q.  And what was his conclusion, meaning the psychologist's?
20   A.  On page 31 of the report, a copy of which was on
21   Mr. Trader's electronic media, on page 31 of the report, the
22   doctor opined that Mr. Trader was not a threat to Sammie.
23   Q.  Okay.  And the photos of that evaluation are on
24   Government's Exhibit 1, right?
25   A.  That's correct.  Under the -- the folder is titled "October
```

37

1    2013 Evaluation."

2    Q.  Okay.  Now, the family law judge, relying at least in part

3    on that report, eventually allowed the defendant at least

4    partial custody in the relationship of his children, correct?

5           MR. PEACOCK:  Object to the relevance, Your Honor, of

6    the state court's determination.

7           MR. GYIRES:  Recidivism, Your Honor --

8           MR. PEACOCK:  We are not objecting that the case

9    happened, just to go into all of the details of it, I object.

10          MR. GYIRES:  I'm almost done with it, Your Honor --

11          THE COURT:  The objection is overruled.

12          MR. GYIRES -- understand that he was continually

13   doing this throughout all of this.

14   BY MR. GYIRES:

15   Q.  So he was given permission to continue his custody, at

16   least in part, in relationship with his children, right?

17   A.  That's correct.

18   Q.  He was on probation for his 2012 arrest still during that

19   time, correct?

20   A.  That's correct.

21   Q.  Now, in December -- when did that probation end?  Was that

22   December 2015?

23   A.  Yes.

24   Q.  Okay.  Now, so the point is between April 2012 -- starting

25   April 2012, he was arrested and had these proceedings.  Now,

                    Thursday, December 7, 2017.

38

1    what is the earliest that you have recovered of him downloading

2    child pornography, the hardcore, sadomasochist child

3    pornography?  Is that November 6, 2013?  Is that correct?

4    A.  Yes.  A month after the evaluation -- the psychological

5    evaluation, that's the earliest recovery of child pornography.

6    The earliest dated child pornography that I have recovered on

7    the media.

8    Q.  Okay.  So that's a month after the psychological

9    evaluation.  Let's go before the psychological evaluation, June

10   2013.  Do you have him -- did you recover sexual chats with

11   minors online that he was involved in, in June 2013, a couple

12   of months before the psyche eval?

13   A.  Yes.

14   Q.  While he had a family court petition pending, correct?

15   A.  That's correct.

16   Q.  All right.

17   A.  And he was on probation.

18   Q.  All right.

19          And then so his probation in 2013 -- he was arrested

20   a second time, correct, for similar allegations in December

21   2016?

22   A.  That's correct.

23   Q.  Okay.  And --

24   A.  Allegations involving ST.

25   Q.  And that case is still pending?

                    Thursday, December 7, 2017.

39

```
 1  A.  It is.
 2  Q.  And while that case has been pending for a bit, he was
 3  arrested on our case, in this case, July of this year, right?
 4  A.  June.
 5  Q.  June?
 6  A.  June 1st.
 7  Q.  The night of May 31st, the early morning hours of June 1st?
 8  A.  Correct.
 9  Q.  So his arrest was, let's say, six months before that,
10  ballpark?
11  A.  Yes.
12  Q.  And he was on probation and bond or what?
13  A.  He was not on probation.  He would have been on bond from
14  the State charge.
15  Q.  And do you have him engaged in molesting his children, or
16  at least one of them, during that period of bond?
17  A.  Yes.
18  Q.  All right.  And I think the last thing I just want to show
19  the Court is a jail call that is somewhat relevant.  A -- you
20  have reviewed numerous jail calls between the defendant and
21  mostly his mother, right?
22  A.  That's correct.
23  Q.  Other people as well, right?
24  A.  Yes.
25  Q.  If you can just play one.  Before we play it, who is
```

Thursday, December 7, 2017.

40

```
 1  LeeAnn?
 2  A.  That is the mother of ST, victim ST.
 3  Q.  Okay.  And the jail call you are about to play, the
 4  participants are who?
 5  A.  Mr. Trader and his mother.
 6  Q.  Okay.
 7  A.  I don't know that this is going to play on the speakers, so
 8  I want to move this over here as well.  The program is the --
 9  the jail call program is a little weird so.
10      (Audio recording played in open court.)
11  BY MR. GYIRES:
12  Q.  Play it, and I'll have you explain it.
13      (Audio recording played in open court.)
14  BY MR. GYIRES:
15  Q.  Okay.  And just in case that wasn't audible, all of it,
16  just briefly tell us what that was about?
17  A.  That was Mr. Trader telling that he told the mental health
18  unit at St. Lucie County Jail --
19  Q.  Slow down.
20  A.  -- that if he ever got out of prison, that he was going to
21  kill Miss Drew.
22  Q.  Anything else?
23  A.  That's it.
24      MR. GYIRES:  That's it, Your Honor.  I would just
25  reserve argument, if the Court would like.
```

Thursday, December 7, 2017.

41

```
 1           THE COURT:  Do you want him to take the witness
 2   stand?  Are you going to cross-examine the agent?
 3           MR. PEACOCK:  Just one second, judge.  If I could --
 4   if I can make that quick text right now, that would be great.
 5           THE COURT:  All right.
 6           MR. PEACOCK:  Very briefly, Your Honor.
 7           MR. GYIRES:  I just also want to remind -- I don't
 8   want to forget to give the two mothers an opportunity to speak,
 9   just a reminder.
10           THE COURT:  All right.  Why don't you go ahead and
11   take the witness stand.
12           THE WITNESS:  Yes, sir.
13                     CROSS-EXAMINATION
14   BY MR. PEACOCK:
15   Q.  Good morning, Agent Ray.
16   A.  Good morning, sir.
17   Q.  You just played a jail call involving Mr. Trader making a
18   threat about his -- about LeeAnn?
19   A.  Yes, sir.
20   Q.  Okay.  At that point, he also said he was suicidal,
21   correct?
22   A.  Yes, sir.
23   Q.  He was pretty distraught?
24   A.  Yes, sir.
25   Q.  Not logical?
```

Thursday, December 7, 2017.

42

```
 1   A.  I don't know that I would consider him not logical or
 2   logical, but he was upset.
 3   Q.  How about being suicidal?  Is that logical, in your
 4   opinion?
 5           MR. GYIRES:  Objection, Your Honor, argumentative.
 6           THE COURT:  Sustained, pretty speculative.
 7           MR. PEACOCK:  I'll move on, Your Honor.
 8   BY MR. PEACOCK:
 9   Q.  Let's go back to the evaluation that you and Mr. Gyires
10   highlighted that came from the state court case?
11   A.  Yes, sir.
12   Q.  And you emphasized that there was a psychological
13   evaluation done by what doctor?
14   A.  Dr. Edwards.
15   Q.  Dr. Edwards.  And Dr. Edwards concluded that Mr. Trader was
16   not a threat --
17   A.  Correct.
18   Q.  -- to Samantha?
19   A.  Correct.
20   Q.  I'm sorry, to ST?
21   A.  Yes, sir.
22           MR. PEACOCK:  I think we probably ought to strike
23   that from the transcript, Your Honor.
24   BY MR. PEACOCK:
25   Q.  Do you know if Mr. Trader ever received any treatment as a
```

Thursday, December 7, 2017.

43

1  result of that psychological evaluation?

2  A. I don't know.

3  Q. Do you know if the doctor recommended treatment for his

4  condition?

5  A. He -- I don't recall him diagnosing him with any particular

6  condition. He did recommend further counseling, yes.

7  Q. Okay. And do you know if that counseling took place?

8  A. I don't know.

9  Q. And the counseling would have been for what, specifically?

10 A. For reintegration of ST into Mr. Trader's home.

11 Q. But it would have involved Mr. Trader having some

12 counseling, correct?

13 A. I believe, if memory serves on that document, which is on

14 the exhibit, I believe -- I believe he also recommended it for

15 Mrs. Drew. He --

16 Q. I understand for others, but for Mr. Trader as well?

17 A. Yes, sir.

18         MR. PEACOCK: Okay. Thank you.

19         THE COURT: Any redirect?

20         MR. GYIRES: No, Your Honor.

21         THE COURT: All right. Thank you, sir.

22         THE WITNESS: Thank you. Shall I just leave the

23 electronic?

24         THE COURT: I think we are finished with it.

25         MR. GYIRES: And the Government's only other

Thursday, December 7, 2017.

44

1  witnesses would be the two mothers, if now is a good time, Your

2  Honor.

3         THE COURT: Sure.

4         MR. GYIRES: I don't know if Mr. Fletcher's witness

5  wants to go.

6         MR. PEACOCK: Well, that might be better, Judge, to

7  do Dr. Brannon out of order, if that would be okay.

8         THE COURT: All right.

9    (Dr. Brannon appeared telephonically.)

10         MR. PEACOCK: Dr. Brannon.

11         THE WITNESS: Yes.

12         MR. PEACOCK: This is Fletcher Peacock from the

13 Honorable Donald Middlebrooks' courtroom, in West Palm Beach.

14 Are you available to testify at this time?

15         THE WITNESS: Yes, sir, I am.

16         MR. PEACOCK: I believe that the Court would want to

17 put you under oath.

18         THE WITNESS: Okay.

19         MICHAEL BRANNON, PSY.D., DEFENSE WITNESS, SWORN.

20         MR. GYIRES: The Government stipulates to -- I don't

21 know how to characterize his expertise, psychology, whatever it

22 is that Mr. Peacock represents.

23         MR. PEACOCK: Your Honor, we would be offering

24 Dr. Michael Brannon as an expert in forensic psychology.

25 Dr. Brannon conducted the evaluation that has been put before

Thursday, December 7, 2017.

45

1  the Court.

2      THE COURT:  All right, please proceed.  The

3  Government, apparently, has no objection.

4      MR. PEACOCK:  Thank you, Judge.

5          DIRECT EXAMINATION

6  BY MR. PEACOCK:

7  Q.  Dr. Brannon, would you state your name for the court?

8  A.  Sure, Michael Brannon, B-R-A-N-N-O-N.

9  Q.  Where are you right now, Dr. Brannon?

10 A.  I'm in Miami.  I'm in a court hearing in Miami, which I

11 stepped out of, in Dade County.

12 Q.  Okay.  Can you hear us okay?

13 A.  I can, yes.

14 Q.  All right.  Now, Dr. Brannon, did you have the occasion to

15 do an evaluation of Scott Trader?

16 A.  Yes, sir, I did.

17 Q.  And how did you come about doing that evaluation?

18 A.  At your request, Mr. Peacock, I did a sex offender risk

19 assessment on Mr. Trader.

20 Q.  And where did you do your evaluation of Mr. Trader?

21 A.  This was at the St. Lucie County Jail in Fort Pierce.

22 Q.  And do you feel that you had an adequate opportunity to

23 examine Mr. Trader and come to a conclusion regarding his

24 psychological state?

25 A.  Yes, sir, I do.

Thursday, December 7, 2017.

46

1  Q.  Did you issue a report that reflects your findings from

2  that evaluation?

3  A.  I did, yes, sir.

4  Q.  And is that report dated August 12th, 2017?

5  A.  Yes, sir, it is.

6      MR. PEACOCK:  Your Honor, at this time, we would

7  offer that report as Defendant's Exhibit 1.

8      MR. GYIRES:  No objection.

9      THE COURT:  Defendant's 1 is admitted.

10    (Evidence admitted as Defense Exhibit No. 1.)

11 BY MR. PEACOCK:

12 Q.  Now, I want to narrow down our focus here, Dr. Brannon.

13     MR. PEACOCK:  And if the Court does not object, I

14 might lead him a little bit to get through the topic a little

15 quicker.

16     THE COURT:  That's fine.

17 BY MR. PEACOCK:

18 Q.  Did you diagnose Mr. Trader as suffering from adjustment

19 disorder with depression and anxiety?

20 A.  Yes, sir, I did.

21 Q.  Did you also diagnose him as suffering from pedophilia?

22 A.  Yes, sir, I did.

23 Q.  Could you explain to the Court what pedophilia is, briefly?

24 A.  Sure.  It is a primary interest in prepubescent children --

25 primary sexual interest in prepubescent children, so that's the

Thursday, December 7, 2017.

47

1   very best definition.  There is a paraphilia.  It's diagnosed
2   as a paraphilia or a sexual disorder in the diagnostic and
3   statistical manual definition.
4   Q.  Now, so just to be clear, does the diagnostic and
5   statistical manual recognize pedophilia as a legitimate
6   disability?
7   A.  It does.  It is one of the paraphilias, one of the sexual
8   disorders.
9   Q.  Now, is the diagnostic statistical manual the book that you
10  go by in diagnosing psychological disorders?
11  A.  Yes, sir.  It is the accepted standard for both
12  psychologists and psychiatrists in terms of classification of
13  mental disorders or providing diagnosis.
14  Q.  And using those criteria, you determined that Mr. Trader
15  was suffering from pedophilia?
16  A.  Yes, sir.  By the criteria that was the source of
17  information that were provided to me; my interview with him as
18  well as case-related information meaning videos, sets, things
19  that were found on his phone and in other areas certainly
20  establishing what that diagnosis -- clearly establishing that
21  diagnosis.
22  Q.  Now let me ask you this:  Are there treatments for
23  pedophilia?
24  A.  There certainly are treatments in regards to getting people
25  to adjust their behavior so that they don't engage in behaviors

Thursday, December 7, 2017.

48

1   that match up with their sexual desires.  So you don't change
2   the person's sexual desires, what you hope to do, through
3   treatment and very successful treatment for those conditions,
4   is that you attempt to change behavior, so have the person not
5   act on their sexual desires.
6   Q.  And just briefly, how can a person, let's say in the
7   future, restrain from acting on those sexual desires?
8   A.  Well, they have to engage in what is called, you know,
9   reliable other behaviors.  Reliable other behaviors are
10  alternatives.  Although they are having fantasies, there are
11  maybe other ways they can adjust or in any way address those
12  fantasies.  Self-stimulation or masturbation is one of those,
13  or learning alternative behaviors when they are feeling a
14  sexual desire, or in other ways distracting themselves from
15  those desires; also, by not going to areas or being in areas
16  where there are easy-victim accessibility.  So all of those are
17  things that they would learn, hopefully in treatment to be able
18  to inhibit not only desire but to be able to distract
19  themselves or respond to desire in a different way that's not
20  unlawful.
21  Q.  And is it your testimony, once again, that there is
22  clinical evidence that with satisfactory treatment and
23  participation, an individual suffering from pedophilia can
24  restrain those desires?
25  A.  Well, yes.  That's the whole purpose of treatment.  The

Thursday, December 7, 2017.

1 diagnosis does not determine the behavior. So in other words,
2 you can't look at someone -- any diagnosis for that matter --
3 and determine what behavior they were engaged in.
4      All we know with pedophilia is that a person will
5 remain with sexual desires of prepubescent children, but we
6 can't predict the course of their behavior. We do know if they
7 are involved in good, reliable sex offender treatment, it
8 lowers the probability of any acting on those desires.
9 Q. And are you familiar with the Bureau of Prisons' sexual
10 treatment programs?
11 A. I am.
12 Q. And does the Bureau of Prisons have sexual treatment --
13 sexual offender treatment programs which would treat
14 pedophilia?
15 A. Well, it can treat sexual desires in general, so certainly
16 pedophilia being one of those, yes.
17 Q. And are those programs comprehensive?
18 A. They are comprehensive, some better than others, but they
19 certainly are comprehensive in terms of addressing those
20 conditions.
21 Q. Are they comprehensive even to the point of being totally
22 residential programs?
23 A. Yes.
24 Q. Now, Doctor, do you have a psychological instrument that
25 you use to predict future dangerousness?

Thursday, December 7, 2017.

1 A. Well, yes. There is a standard that is used by people in
2 my profession. I belong to an organization called the
3 Association for the Treatment of Sexual Abusers. That is a
4 national organization, and there are standards that are
5 involved in terms of risk assessment tools. The standard risk
6 assessment tool for any contact offense, meaning anybody who
7 has touched a child or attempted to touch a child, is an
8 actuarial instrument called the Static-99R. So it is the most
9 frequently used and most well-researched instrument that we
10 have in terms of sex offender risk assessments.
11 Q. And did you do a Static-99R test on Mr. Trader when you
12 evaluated him?
13 A. Yes, I did.
14 Q. And is that reflected in your report?
15 A. Yes, sir, it is.
16 Q. Is that on page 7 of your report?
17 A. Yes, sir.
18 Q. Now, in conducting your Static-99R test on Mr. Trader, what
19 did you find?
20 A. The assessment that I did was I have to be able to evaluate
21 what he will be when he has an opportunity towards other
22 victims. So assuming for the sake of argument that
23 incarceration -- a period of incarceration would be at least
24 until the age of 60 or longer, he would be at a very low risk
25 at that point in time. So if we extrapolate the numbers for

Thursday, December 7, 2017.

51

1  the Static-99R to what is reasonable, that he be out of
2  incarceration, if he is going to be released at some point at
3  the age of 60 or older, he would score a zero on the
4  Static-99R, and his risk potential over a period of five years
5  post release would be 2.8 percent.
6  Q.  Let me break that down, just briefly.  Is zero the lowest
7  score one can have on the Static-99R?
8  A.  No.  You can actually have to a negative three, so you can
9  actually get pretty low.  This falls in the below average
10  range.  We found out from really the last ten years of research
11  that the most robust factor, other than prior offenses, the
12  second most robust or telling factor, salient factor, is age.
13  So we know that once people reach the age of 60 or older, that
14  there is a significant drop off in sexual offenses, even if
15  there was a number of sexual offenses prior to that time.
16  Q.  Okay.  Now, you mentioned that he would have a risk factor
17  of 2.8 percent of reoffending.  And that's over a period of
18  five years after release, correct, sir?
19  A.  Well, sure.  Let me tell you how that works.  The 2.8 would
20  be the standardization for the people who have similar factors
21  as he does.  And the factors are all listed in my report, but
22  similar factors assuming 60 years of age or older, and there
23  are other factors like prior contact offenses, unrelated
24  victims, those types of things that are listed in the report.
25  So if you look at those, people who are similar to him with the

Thursday, December 7, 2017.

52

1  same factors reoffend at a rate of 2.8 percent over a five-year
2  period.  So that's the category or classification he falls
3  into.
4  Q.  So would I be correct in saying or would the Court be
5  correct in concluding that he is a risk right now?
6  A.  Yes.  His risk score would be different, if I scored him
7  now as opposed to when he was 60 or older, his risk score would
8  be much different now.
9  Q.  But by the time he is 60, he will drop into that 2.8
10  percent group?
11  A.  That's correct.  And we are making the assumption, of
12  course, that he would have no access to any victim, like a
13  child victim, because he is incarcerated.  So making that
14  assumption that he is incarcerated for that period of time, no
15  access to other victims, then yes, he would fall to a zero
16  score when he is released.
17  Q.  Now, is the ability to participate in the Bureau of
18  Prisons' programs while he is incarcerated, would that enhance
19  or potentially enhance and even further -- could that even
20  further lower his risk?
21  A.  It could, depending on his responsiveness to treatment and
22  things like that.  So not everyone is responsive to treatment,
23  but those who are responsive to treatment, no matter what their
24  diagnosis is, it can be a protective factor that could further
25  lower risk at some later point in the future.

Thursday, December 7, 2017.

53

```
 1        MR. PEACOCK:  Thank you, Dr. Brannon.
 2        Your witness.
 3                 CROSS-EXAMINATION
 4  BY MR. GYIRES:
 5  Q.  Good morning -- or good afternoon, Doctor.  My name is
 6  Martin Gyires.  I'm the prosecutor on the case.
 7  A.  Yes, sir, good afternoon.
 8  Q.  Your testimony, correct, is that your opinion is based on
 9  looking at certain facts in this case, correct?
10  A.  Yes, sir.
11  Q.  Okay.  Now, your report says that the sources of
12  information that you reviewed were the criminal complaint,
13  correct?
14  A.  Yes, sir.
15  Q.  And the indictment?
16  A.  Yes, sir.  I actually quote the exact things I rely upon in
17  the course of my report.
18  Q.  It says "criminal complaint, indictment, penalty sheet,
19  affidavit of Mr. Brian Ray, and interview with the defendant's
20  mother, and then psychological authorities," correct?
21  A.  That's correct.
22  Q.  So it seems to me that the information you had might -- I
23  just want to clarify.  I want to understand the level of
24  knowledge you have about this case because I'm getting the
25  impression that you weren't given a whole lot of information,
```

Thursday, December 7, 2017.

54

```
 1  so.
 2        Were you aware that the defendant has two minor
 3  daughters?
 4  A.  Yes.
 5  Q.  Did you know that he sexually abused both of them starting
 6  when at least one of them was two years old?
 7  A.  Yes.
 8  Q.  Okay.  Did you know that the defendant previously has been
 9  in criminal court proceedings?
10  A.  Yes.  It's in my report.
11  Q.  Okay.
12  A.  All of his priors, he was forthcoming.  You know, I didn't
13  reveal this in my report, but he was very forthcoming about
14  that.  So everything you just said, he was forthcoming about in
15  his statements.
16  Q.  Are you familiar with the nature of the sexual abuse that
17  he did with his daughters?
18  A.  Yes, sir, I am.  And I'm also, under the "recent
19  allegations" part, it actually talks about having videos, you
20  know, of juvenile -- not juveniles, but a four-year-old,
21  actually, performing oral sex on him, so there certainly is
22  documented evidence of what's happened.
23  Q.  Okay.  Now, did you know the defendant was arrested in 2012
24  for similar allegations?
25  A.  Yes, sir, I was.
```

Thursday, December 7, 2017.

55

Q. Okay. And that he was evaluated by a psychologist, a
Dr. Gary Edwards, back then in 2013 who said he was not a
danger to his children, were you aware of that?

A. No, I wasn't aware of that prior evaluation, but I do have
it under my section that says "legal," I record all those prior
sexual abuse charges are there.

Q. Okay. Did you know that while he was being evaluated by
Dr. Gary Edwards, unbeknownst to anybody in the criminal
justice system, he was downloading child pornography, molesting
his children, and communicating online with minors even getting
them to send him child pornography while those proceedings were
pending? Did you know that?

A. I was aware he did all of those things. I was not aware of
when it was occurring, so I didn't know it was occurring at
that time.

Q. Would that increase the odds of recidivism if you knew that
he was offending while under court proceedings and on bond in
the past?

A. Well, yes, sir, it would be a factor now. I mean, it
wouldn't be a factor when he is 60 or older, but right now, if
I were to do the assessment now, I would say he is a high risk,
and it's based on all of those factors you just mentioned. So
if you are asking me to give a risk assessment for now and
factor all of that in and say he is a high risk --

Q. No, I'm talking about when he is 60. I mean, are there any

Thursday, December 7, 2017.

56

factors that affect -- or what happens when he's 60? Or do all
60 year olds just have 2.8 percent chance, or are you talking
particularly about our defendant?

A. Well, I'm talking about our defendant; and if you look
under "actuarial assessment," you can actually score it
yourself. It is not hard to score. But in terms of the actual
factors, once he is 60, that drops off so significantly the
other factors become accounted for.

Q. Okay.

A. So I'm not -- we are not saying he poses no risk, we are
just saying he poses a low risk at that point or below average
risk.

Q. Two point eight percent is pretty low, but I'm trying to
understand the -- are there factors that would actually -- if I
were to give you certain facts, would there be certain facts,
hypothetically, that would increase that 2.8 percent; or, are
you saying no, no matter what you tell me, it's 2.8 percent?

A. Well, again, all of the factors that would be used to
determine this are listed there.

Q. I understand, sir. I'm trying -- you reviewed the criminal
complaint affidavit. Did you review the evidence that HSI has?

A. Only what -- the information that I have there and what I
was told by the defendant, so any other factors -- if you are
asking me -- if your question is: Is there additional
information you could give me that I didn't have that would

Thursday, December 7, 2017.

57

1 increase the static score, the answer to that is yes.

2 Q. Okay. So what types of categories of information would

3 increase the risks?

4 A. All of the factors that are listed under "actuarial

5 assessments."

6 Q. Do you know those or do you want me to look it up?

7 A. Well, no, sir. I'm looking at it right now. So prior --

8 it's on page -- if you look at my report, it's right above

9 "conclusions" that are actuarial assessment, and those factors

10 are -- I'll read them out for the Court, but they're in my

11 report: Prior sex offenses, prior sentencings dates,

12 convictions for noncontact sex offenses, index nonsexual

13 violence, prior nonsexual violence, any unrelated victims, any

14 stranger victims, any male victims young -- in this case, we

15 would be talking about under 60 -- and ever lived with a person

16 for two years or more.

17      So those are the factors that are going into the

18 static scoring.

19 Q. Okay. So if I told you that he has had, over the course of

20 several years, online sexual communications with over 100

21 minors and got at least 44 of them to send him child

22 pornography, would that increase the risk?

23 A. For right now, it certainly would; for later on, the fact

24 that he was over 60 would get him a deduction of three points.

25 So you take three points off of his scoring. So that's what

Thursday, December 7, 2017.

58

1 happens when you get older. So I would say to you it depends

2 on when you ask me that. So if you ask me that now, I would

3 say it poses him as a high risk. If you ask me that over the

4 age of 60, I would say he gets three points off because the

5 research tells us 60 or over drops off dramatically. So based

6 on that, you'd account for some of those prior offenses and

7 prior victims.

8 Q. Okay.

9 A. The "when" is an important question. When you want to know

10 if he is a risk or not is an important question.

11 Q. I'm talking about when he is 60.

12 A. Yes, sir, I understand.

13 Q. So is the odds of him reoffending at the age of 60

14 increased, if I told you that he had communications online with

15 that many victims?

16 A. Well no, because it's already accounted for in those other

17 factors. Yes, increased risk, but I have already accounted for

18 that in my score.

19 Q. Oh, so you knew that?

20 A. Well, even with you telling me, I knew there were prior

21 victims, so that's already accounted for in this, in this

22 report. Those prior victims, unrelated victims, stranger

23 victims in there, meaning in terms of pornography, so all of

24 those would be factored in. So you can just count those up

25 yourself and then subtract three points for 60 or over, and you

Thursday, December 7, 2017.

59

```
 1   come up with the same zero score.
 2   Q.  Are you telling us that you knew that he communicated with
 3   over 100 victims?  You knew that?
 4   A.  The number doesn't matter.
 5   Q.  Did you know that or not, sir?
 6   A.  No, I didn't know over 100.
 7   Q.  Okay.
 8   A.  But it wouldn't matter on the static scoring.
 9   Q.  All right.
10   A.  The fact that he has communicated at all gives him a point.
11   So if there is one or a hundred, he still gets a point for
12   that.
13   Q.  Okay.  What if it was a million, still one point?
14   A.  Well, the research says the numbers don't matter in terms
15   of risk.  So as a matter of fact, there is even some research
16   that says -- yes, sir.  The more contact a person has or the
17   more pornography they have, the less time they are spent
18   actually offending somebody.  So what you are really more
19   concerned about is the actual touch offenses.
20   Q.  Okay.  What if I told you that he communicated with other
21   adults online, adult woman, who molested their children and
22   then they would trade, the defendant would trade with these
23   adults?  Did you know he did that?
24   A.  Yes, sir.  It's in my report, yes, sir.
25   Q.  Okay.  So you did know that?
```

Thursday, December 7, 2017.

60

```
 1   A.  Yes.  It's in my report.
 2   Q.  Okay.  Did you know that he would threaten the online minor
 3   victims if they didn't continue to send him stuff, that he
 4   would post their naked pictures online, and, in fact, did when
 5   they didn't comply?  Did you know that?
 6   A.  No, I did not.
 7   Q.  Would that increase the odds of reoffending at 60?
 8   A.  No, no.  It would be factored into the same static score,
 9   so no, that would not be a factor.  That's not listed as one of
10   the factors.
11   Q.  Sounds like there is nothing I can tell you that would
12   increase this number, basically, is what you are saying?
13   A.  I disagree with that.  If you tell me there were male
14   victims that he had contact with, if you told me that there was
15   prior nonsexual violence, if you told me that absolutely, if
16   you told me that there were other, you know, stranger victims,
17   if -- told me he never lived with anyone for two years or
18   more -- I mean, all of those things are factors, and they are
19   the opposite.  If you gave me any of those categories, I would
20   say it increases risks.
21   Q.  Are you familiar with his criminal history at all?
22   A.  I'm familiar with what he told me, which is listed in my
23   report.
24   Q.  Okay.  Did you know that he had, at the age of 18, he was
25   convicted of battery -- I'm sorry, no, he wasn't.  He was
```

Thursday, December 7, 2017.

61

1  arrested.  Did you know he was arrested for a battery incident
2  at the age of 18?
3  A.  No.  The only things I'm aware of are the things that are
4  listed in my report under "legally".
5  Q.  Did you know that he had a battery conviction in 2010 at
6  the age of 25?  Did you know that?
7  A.  He told me he had two domestic violence incidents that are
8  in my report.  They are after "lewd, lascivious behavior."
9  Q.  Did you know he also had a 2007 battery conviction?
10  A.  He told me he had two domestic violence incidents.
11  Q.  So I guess that's the two.
12       Did you know he had a violation of injunction in
13  2007?
14  A.  Yes, sir.  That's in my report.  I didn't know the date.
15  That's in my report.
16  Q.  Okay.
17       THE COURT:  Mr. Gyires, you may have exhausted this.
18       MR. GYIRES:  Okay.  All right.
19       All right.  Okay.  Thank you, sir.
20       THE WITNESS:  Thank you.
21       Thank you, Your Honor, for letting me testify by
22  telephone.
23       THE COURT:  Wait a second.  Mr. Peacock may have
24  another question.
25       MR. PEACOCK:  I have two.

Thursday, December 7, 2017.

62

1                    REDIRECT EXAMINATION
2  BY MR. PEACOCK:
3  Q.  Dr. Brannon, is the Static-99R an accepted and reliable
4  test of future dangerousness.
5  A.  It is the standard for sex offender contact, sex offender
6  treatment; not internet, but for contact offenders, it is the
7  standard in our profession.
8  Q.  The factors you listed are the factors that are accepted in
9  performing that test?
10  A.  Yes, sir.  They are the ten factors that are the highest in
11  terms of predicting future sexual, violent behavior.
12  Q.  And in assessing this case, are you confident that your
13  Static-99R score is correct?
14  A.  Well, based on the information that I had, and I then
15  factored that into every one of my static scoring, so based on
16  the information I had, yes, sir.
17       MR. PEACOCK:  Thank you.
18       THE COURT:  All right.  Thank you, Dr. Brannon.
19       THE WITNESS:  Thank you very much, Your Honor.
20   (Witness excused.)
21       MR. PEACOCK:  Thank you, Judge, for doing that over
22  the phone.
23       THE COURT:  All right.  Let's get back to the
24  Government, and I will point out y'all's estimate is not very
25  accurate.

Thursday, December 7, 2017.

1       MR. GYIRES: Sorry, Your Honor.

2       Miss Katrina, K-A-T-R-I-N-A, Varner, V-A-R-N-E-R. I

3 believe Miss Varner would like to speak, Your Honor.

4       THE COURT: Do you want these people under oath,

5 Mr. Peacock?

6       MR. PEACOCK: I do, sir.

7       THE COURT: You do?

8       MR. PEACOCK: Yes, sir.

9       THE COURT: Let's have them then take the witness

10 stand.

11       THE COURTROOM DEPUTY: Please raise your right hand.

12       KATRINA VARNER, GOVERNMENT WITNESS, SWORN.

13       THE COURTROOM DEPUTY: Please state your full name

14 for the record.

15       THE WITNESS: Katrina Varner.

16           DIRECT EXAMINATION

17 BY MR. GYIRES:

18 Q. Good morning, ma'am.

19 A. Good morning.

20 Q. Who -- who is your daughter?

21 A. Rebecca Trader, the four-year-old.

22 Q. And did you prepare a statement you would like to read to

23 the Court?

24 A. Yes.

25       MR. GYIRES: With the Court's permission, Your Honor.

Thursday, December 7, 2017.

1 BY MR. GYIRES:

2 Q. Go ahead.

3 A. Your Honor and everybody in this courtroom, it has taken a

4 lot of time and thinking exactly what I wanted to say. My

5 daughter, who is four years old, is a victim, but I'm the one

6 hurting the most right now. We are both victims. She is

7 physically the victim and, at this point in time, I'm

8 emotionally the victim.

9       Mr. Trader, who has recently signed his rights over,

10 is the biological father of my daughter. I am now a single mom

11 of a four-year old daughter that has been sexually abused by

12 her father.

13       Him and I were together for just under six years and

14 married for almost two. I never would have imagined this would

15 have happened to my daughter. He has not only destroyed her

16 innocence but both of our wellbeings.

17       Yes, my daughter is the one that endured the abuse,

18 but I'm the one going through all of the emotions and all the

19 understanding of it. My four-year-old does not comprehend what

20 has been done to her. Trying to teach her that what has been

21 done to her is not okay and not right has been hard, especially

22 since the last two years she has been taught by daddy that what

23 daddy was doing was okay. She doesn't understand why daddy is

24 in jail for it.

25       And when I have to look at her in the face as she

Thursday, December 7, 2017.

65

1  cries, it hurts even more all because I want her to understand
2  so it is not as hard on myself, but at the same time, I remind
3  myself hopefully she is young enough to forget it all.
4      My daughter is in therapy once a week since July.
5  She has been diagnosed with anger and PTSD. She has come out
6  in recent months telling stories about what has happened to
7  her. With these stories, she never refers to herself but
8  always as a girl name Isabella having no eyes or mouth or
9  having eyes and mouth and loves to lick. In her mind, these
10  are her scary stories, and she doesn't understand that she has
11  been traumatized by all of this. She just thinks she is making
12  these stories up.
13      Because of all of this, I have moved back in with my
14  mother where my child has had to suffer more due to the tension
15  between me and his family. At times, she curls up in bed with
16  me saying she has nightmares but won't tell me what those
17  nightmares are. She says they are too scary.
18      She has trust issues with many people because she
19  doesn't want people to leave her. With me working, she feels
20  mommy is going to leave her, but I reassure her every day mommy
21  is not going anywhere and it is me and her against the world.
22      I'm in therapy to help me with everything as well. I
23  go once or twice a week, depending on how bad my anxiety gets
24  throughout the week. It really depends on how much my daughter
25  brings everything up. Because of my anxiety and panic attacks,

Thursday, December 7, 2017.

66

1  I had to miss a lot of work. I get too overwhelmed just by
2  doing my everyday job. I have the littlest things that trigger
3  my anxiety but nothing specific. I have left work. I have
4  called out and even taken off the first month-and-a-half after
5  he was arrested due to not being able to handle the everyday
6  tasks and to deal with the process of the federal
7  investigation.
8      Also, the bits of information I have found out over
9  the last six months has made my days even harder for me. I
10  have come to terms with the fact that this does not end today
11  when he is sentenced. My daughter and I will have to face this
12  for the rest of our lives. I will always have things that
13  remind me and bring me back to these horrible memories. I
14  also, one day, will have to explain this to my daughter when
15  she gets to the point of asking questions. It could be two
16  years from now, or it could be ten years from now. I can't
17  tell the future, but either way, it's going to be a hard
18  conversation. And from that point on, she will know what
19  happened to her. That day is the day I dread because as much
20  as I won't want to tell her, I know she will need to know the
21  truth.
22      I personally have my own trust issues. I'm not
23  comfortable leaving her with anybody, even people I trusted
24  before. I'm scared that it could happen to her again. The man
25  I trusted all of these years has betrayed me more than ever.

Thursday, December 7, 2017.

67

1   All of these years he had me believing that everything that was

2 being said about him doing these things were lies. He was good

3 at manipulating me to believe him, but not just me but

4 everybody around him.

5       Your Honor, if I could choose how long this man could

6 be behind bars, it would be as long as I could possibly think

7 of. I got a phone call the day. He got transferred because my

8 guardian ad litem didn't have the right info and said he was

9 released. I panicked and cried. My daughter's safety was the

10 only thing on my mind, and I don't want to ever go through that

11 again in my life.

12       Please give my daughter and her sister the justice

13 they deserve. They have and will go through too much in their

14 lives.

15       I'm done.

16       THE COURT: Do you have any additional questions,

17 Mr. Gyires?

18       MR. GYIRES: No, Your Honor.

19       THE COURT: Mr. Peacock, do you have questions?

20       MR. PEACOCK: No, sir.

21       THE COURT: Thank you, Miss Varner.

22   (Witness excused.)

23       MR. GYIRES: The next witness would be Miss LeeAnn

24 Drew, D-R-E-W.

25       LEEANN DREW, GOVERNMENT WITNESS, SWORN.

Thursday, December 7, 2017.

68

1       THE COURTROOM DEPUTY: Please state your full name

2 for the Court.

3       THE WITNESS: LeeAnn Drew.

4       Your Honor, I'm writing this statement on behalf of

5 my daughter who is now only 11 years old. I have alerted

6 multiple agencies that Mr. Trader was abusing my daughter but

7 was generally ignored.

8       The abuse done by the hands of Mr. Trader has

9 impacted my daughter in many different ways. Some examples are

10 many of the following. She is scared of the dark. She has

11 night terrors where she wakes up screaming and crying. She

12 gets frustrated and angry, escalating to the point of her

13 pulling out her hair while she is also screaming and crying.

14       My daughter has been diagnosed with PTSD, mood

15 disorder, and anxiety disorder.

16       She has undergone extensive therapy and

17 rehabilitation due to what Mr. Trader has put her through. She

18 currently receives comprehensive therapy sessions on a regular

19 basis just to be able to function normally.

20       Up until the point when she was informed that

21 Mr. Trader was in jail, she was scared that he would come and

22 take her away. She was scared to go into any stores for fear

23 of running into him or any of his family members, and she was

24 so scared when driving with her, she would fall into a panic

25 attack, hide on the floor of my car if she saw a car or a van

Thursday, December 7, 2017.

69

1 that looks like his.  One day, she thought she saw him in
2 school, and she ran and hid in the bathroom all the while
3 hysterically crying.
4        Now that his secrets have been discovered, I'm very
5 relieved; however, this has been such a terrible and difficult
6 tragedy for me to handle alone, always trying to console my
7 daughter in her time of angst.  It is so painful for me to deal
8 by myself with her anger towards Mr. Trader and her related
9 anxiety attacks.
10       There are no words to describe my real feelings for
11 what he has done to my daughter and her sister.  I just know he
12 absolutely disgusts me.  The abuse that my daughter suffered at
13 the hands of her father has left her scarred not only
14 emotionally but mentally as well.
15       She has an extremely hard time now understanding
16 personal boundaries because of Mr. Trader's abuse.  She will
17 never be able to regain her innocence or her childhood that he
18 stole from her.  What he did is unforgivable in both her eyes
19 and mine, and I'm amazed that he has gotten away with this
20 abuse for so long given the amount of family members that
21 reside in the house.  I'm very glad he got complacent.  A wise
22 man once told me that given enough rope, a person will hang
23 himself, and I'm glad he did exactly that.
24       Mr. Trader will never know how terribly tragic this
25 has been for my daughter.  First of all, because he was

Thursday, December 7, 2017.

70

1 supposed to be the man to love and protect her from evil like
2 this; instead, he was a predator who used his own daughter as
3 prey.  Second and last, because of his actions, this little
4 girl would have to grow up without a father.
5        Your Honor, I plead with you to give this man the
6 maximum allowable sentence.  I plead for justice not only for
7 my daughter but also for her sister and for any other children
8 who have suffered.  This man will never change if he is ever
9 allowed to reenter society.  I truly believe with all of my
10 being he will just continue to traumatize and abuse little,
11 innocent children.
12       Thank you for your time and your consideration.  I'm
13 done.
14       THE COURT:  Mr. Gyires, do you have any additional
15 questions?
16       MR. GYIRES:  No, Your Honor.
17       THE COURT:  Mr. Peacock?
18       MR. PEACOCK:  No, sir.
19       THE COURT:  All right.  Thank you, Miss Drew.
20       (Witness excused.)
21       MR. GYIRES:  The Government has no more evidence,
22 Your Honor.  I did need to admit, per Mr. Peacock's request,
23 just one exhibit.  It's Government's Exhibit 2.  He has looked
24 at it.  It's chat messages that were in the PSR, and
25 Mr. Peacock just requested that because the chats in the PSR

Thursday, December 7, 2017.

71

```
1  are shortened and edited for brevity, that we have the complete
2  version in the record as well, which is also on the
3  Government's disk, but Mr. Peacock is asking for it separately,
4  so I have it marked, and I move to admit.
5         MR. PEACOCK:  That's correct, Judge.  I believe we
6  have an agreement between the parties that if there ever is a
7  discrepancy between what is in the PSR and the exhibit, that
8  the exhibit controls.
9         MR. GYIRES:  Yes, Your Honor.
10        THE COURT:  All right.  Two is admitted.
11     (Evidence identified and admitted as Government's
12     Exhibit No. 2.)
13        MR. GYIRES:  And that's no more evidence from the
14  Government, Your Honor.
15        THE COURT:  All right.  Thank you.
16        Mr. Peacock.
17        MR. PEACOCK:  If I may, Judge.  I would like to call
18  Shelly Trader.
19        THE COURT:  Again, do the parties want her under
20  oath?  We normally don't do that unless you all plan to ask
21  questions, but it's up to you.
22        MR. GYIRES:  If she is just reading something, then
23  no but --
24        MR. PEACOCK:  That's correct, Judge.
25        MR. GYIRES:  That's fine.
```

Thursday, December 7, 2017.

72

```
1         THE COURT:  She can do that then from the podium.
2         MS. TRADER:  Good afternoon, Your Honor.
3         THE COURT:  Good afternoon.
4         MS. TRADER:  I am Scott Trader's mom, and I have a
5  statement that I would like to read.  Hopefully, I'll be able
6  to get through it.
7         MR. PEACOCK:  Your Honor --
8         MS. TRADER:  You will have to excuse me.
9         MR. PEACOCK:  -- I did submit the letter to the Court
10  as well.
11        MS. TRADER:  Your Honor, thank you.  Okay.
12        THE COURT:  I did read all of the letters, so if
13  you --
14        MS. TRADER:  No, I would like to.
15        THE COURT:  Choose what you want to do.  You can
16  either just speak or read it.
17        MS. TRADER:  I have to read it.
18        THE COURT:  All right.
19        MS. TRADER:  This letter that I am reading -- writing
20  now about my son Scott is very hard for me to do.  The person
21  that you see is not the person that I know.
22        A little over 32 years ago, I gave birth to my son --
23  my second son, Scott.  Two years prior, I had given birth to my
24  first son, Keith.  By all accounts, Keith was a normal child,
25  but he did not meet his milestones.  After further testing, we,
```

Thursday, December 7, 2017.

1  his father Dennis and I, found out he was autistic. Two years
2  later, Scott came along, and my family would say: How will you
3  manage with a second child if he is autistic?
4      My answer was, "I have Keith now, I'll have Scott,
5  you just do it."
6      Fortunately, Scott was a normal, healthy child; a
7  beautiful, normal child. Through their growing up years, Scott
8  had taken the role of responsibility of the older brother
9  showing and teaching Keith things that a brother would. When
10  he was a special needs child, everyone gets involved in his
11  life and it's not easy. As they grow older, Scott took more
12  and more of a role of the big brother, helping in every way
13  caring for his brother just like his father and I did.
14      As years went on, his father and I always thought
15  that Scott would be there for his brother when the time came
16  that either we were no longer able to or we had passed on.
17      Unless you were brought up in a family that has
18  someone with special needs, you don't know what it entails.
19  There are quirks and sounds and movements that his brother
20  does. There are ways that his brain thinks that only he
21  understands, and he lives in a repetitive way: Every day,
22  everything the same, done the same way every day of his life.
23      We never questioned that Scott would always be there
24  for his brother's life to help him live. We never thought of
25  putting Keith in a home or even an institution during the

Thursday, December 7, 2017.

1  duration. Scott has always been there for his brother, and I
2  hope he will be there for him, if the time comes as when we are
3  parents and no longer here. Our extended family are all older
4  and do not understand or know how to handle someone of this
5  nature and probably will not be around in years to come. We
6  have raised him virtually on our own with little help from
7  anyone else.
8      After their father and I divorced, we remained a
9  close-knit family working together for our children. As Scott
10  grew older, he started working, at age 16, working his way from
11  part-time to full-time at the airport in New York, a job that
12  he loved and that they liked his work ethic: Always on time
13  and never a problem.
14      The time came in 2003 that the children and myself
15  moved to Florida. Their father stayed in New York; but, as
16  parents, we still had a united front and were always a family.
17      In 2007, I remarried, and that man has special needs
18  too. Scott's stepfather Leon is blind. He has a degenerative
19  eye disease, and he has been blind since the mid '90s. Scott
20  has accepted Leon into his life with no problem. When needed,
21  Scott helped him learn the roles that we had at each house that
22  we had to live in and has always been there for him, making him
23  food and helping him pick out his clothes to wear, when I was
24  not able to.
25      As time went on, Leon was diagnosed with bipolar one

Thursday, December 7, 2017.

1    and, within the last two years, has been diagnosed with
2    dementia.  He has medication he takes throughout the day, every
3    day.  If I wasn't able to or not home, Scott would see to it
4    that Leon had his needs met and that his medicine was given.
5         Between these years, Scott started working in
6    Florida.  He had worked at two different call centers.  Each
7    one, he worked his hours he needed; and if needed, he'd work
8    more, if the company asked him to.
9         To further advance himself, he worked for Wal-Mart
10   and worked for the company for eight years.  He worked his way
11   from truck and loader to department manager for housewares.
12   Again, his work ethic was visible.  He did his work, never a
13   problem and always on time.
14        My health started deteriorating when I was diagnosed
15   with severe cervical stenosis of the spine in 2012.  In October
16   of that year, I had spine surgery.  I had two rods and screws
17   put in my spine and a bracket and screws in my front neck.  The
18   surgery took eight and half hours.  Had I not had the surgery,
19   I would have been paralyzed within a few months.  Scott's
20   father had come down to Florida from New York to help take care
21   of the family and our two dogs.  Between the two of them, they
22   made it work:  Bill paying, cleaning the house, food shopping
23   and prep, taking care of Leon, Keith, and the pets, et cetera.
24        Between the surgery and recuperation, it was nine to
25   ten months.  Scott was there the whole time giving of himself.

Thursday, December 7, 2017.

1    During that time, Scott's father Dennis had to go back to New
2    York, so the sole responsibility was on Scott with the little
3    help that I could do.
4         In 2014, Scott's father was moving to Florida, so
5    Scott and I flew to New York to help his father get things
6    ready for the move.  We drove back to Florida with a truck, and
7    Dennis stayed with us.  Dennis's health started to decline, and
8    then he was diagnosed with severe arthritis and the joints of
9    the knees, high blood pressure, and heart problems.  He is now
10   on medication.  It was then decided by all of us that Dennis
11   would continue to live with us since we all needed each other.
12   The situation has worked out well for everyone.  Dennis,
13   myself, Leon, Keith, and Scott have made it work with love and
14   unity.
15        Again, in 2016, my health declined having trouble
16   walking.  The diagnosis was that I needed a full hip
17   replacement.  In June of that year, I had my surgery.  It was
18   six to eight months of recovery; and again, Scott was there for
19   all of us.  I am able to walk now, not -- just not as good as
20   before.  And most times, I walk with a cane so that I can keep
21   steady and keep my balance.
22        Now again, in 2017, I am having more health problems.
23   I was diagnosed with lumbar spinal stenosis of the lower back
24   in which I will need surgery again to put in rods and screws in
25   all five vertebrae and that my spine will be fused.  The

Thursday, December 7, 2017.

77

1  details of this are being finalized and the surgery will be
2  scheduled. I know Scott will not be here since he will be
3  incarcerated.
4       To have you know this about my family dynamic is very
5  important. We are a family of love and compassion, and we will
6  be there for each other until the very end. I feel Scott has
7  learned that there are consequences for our actions that we
8  live in or daily lives. I feel that my son can redeem himself
9  with a -- and live a protective -- a productive life after
10 incarceration living in the family house with his family by his
11 side and with continued therapy -- I'm sorry.
12      Only the man above knows how much time each of us
13 have on this earth, but I hope my son will be able to see us
14 before that times comes, since we are in our twilight years. I
15 know Scott's future is in his hands as well as lessons learned,
16 and I know that his future is in your hands in terms of
17 confinement and about the time given and served.
18      That being said, having some knowledge of this
19 family, as you have read this letter and heard this letter,
20 hopefully gives you some insight of how important my son is --
21 my son Scott is to this family and how much he is loved and
22 needed. Thank you for your time, Your Honor.
23      THE COURT: Thank you, Miss Trader.
24      MR. PEACOCK: Your Honor, I don't have any further
25 evidence for the Court.

Thursday, December 7, 2017.

78

1       THE COURT: All right. If you both want to present
2  argument, go ahead. I have read both of your papers, of
3  course.
4       Mr. Gyires, the Government seeks life imprisonment;
5  is that right?
6       MR. GYIRES: Yes, Your Honor.
7       THE COURT: Do you want to present additional
8  argument?
9       MR. GYIRES: Very briefly, Your Honor.
10      I appreciate the Court's indulgence. And I did
11 file -- if the Court has read the sentencing memorandum, you
12 know, I don't have a whole lot to add to that. I just want to
13 highlight that this case has -- is different than most, I
14 think, in child exploitation cases because usually -- not
15 always, usually the case involves maybe one victim or two
16 victims or ten victims online, or something like that. This
17 defendant did just about everything you can -- not everything,
18 but every category of things you can do in child exploitation.
19 He did it to his own daughters.
20      He went online and was preying on little girls
21 online. He recorded -- he didn't just abuse his children, he
22 recorded it and stashed it, and hid it and kept it, and sent it
23 to other adults; sent it to other minors as young as eight
24 years old. These images of his own daughters are going to be
25 on the internet forever, and they are going to be traded

Thursday, December 7, 2017.

79

forever.  And the images of the 44 -- those are just the ones we found -- the 44 little girls who sent him naked images of exposing their genitalia, those images are going to be online forever.

These girls, when they didn't send him more stuff, he threatened them saying, "I'm going to post into these chat rooms, these pictures, if you don't send me more."  And then when they didn't, he actually did it.  That's in the PSR.  He posted it in the chat room and took a screen shot of it, sent it back to the victims saying, this is what happens when you don't do what I say -- I'm paraphrasing -- and that's traumatizing.

I mean, these little girls are going to grow up knowing that those images of them are out there.  And so the volume of stuff that he did and the different categories he did it:  The actual sexual abuse, the recording of that, distribution of that, receipt; he is involved with other adults, other minors.  He and his collection contained the most disturbing things that the agent and I have ever seen, and there is a lot of it.  It is not just like it was one video, it was a lot of it.  And he did all of this while fooling the court system.

He was arrested once in 2012.  He was -- he somehow got a withhold adjudication, no -- not jail time, I don't think, or it was very short -- but so withhold adjudication for

Thursday, December 7, 2017.

80

possessing child pornography and allegations involving his older daughter, and so that was his break.  He should have stopped and said, "oh, my goodness, what am I doing, I need to stop."  Instead, he kept doing it; immediately, he went back to it.  And while a family court proceeding to determine what to do with his child custody was pending, he kept doing it.

And he was evaluated by a psychologist who was fooled who said, "I don't think he is a danger to his kids or any other kid, and he was, meanwhile, online doing this stuff.  And then he is put on probation, and during that probation period, continues to do this stuff.

Then he is arrested again for the same exact stuff in December of 2016, and he is let out on bond somehow, unimaginably let out on bond and continues to do it again.  That's outrageous, Your Honor.  And so that's just one factor out of many.

And if people engage in this sort of behavior in our society, they have to know they are doing it under the penalty of a life sentence, at least this amount of behavior; otherwise, I don't know what the criminal justice system is saying about how much we care about our children; and so, the only sentence that we feel is reasonable is a life sentence.  Even if there is a chance that he won't do it again when he is out, that's not justice for the victims, and I don't buy that he is not going to do it again.  This is all he has done for

Thursday, December 7, 2017.

81

1  the past five years.

2       He didn't have a job for four years because he was on

3  probation.  He couldn't get a job.  He sat at home doing this

4  all day long it seems like, so I don't -- I just don't know how

5  a term of years would be -- would provide justice, Your Honor;

6  and so that's what we are asking for in this case, Your.

7       Honor.  Thank you.

8       THE COURT:  All right.

9       MR. PEACOCK:  Judge, I readily admit that emotions

10 are a strong feeling, and there are a lot of emotions in this

11 case.  And I sympathize with the Court having to separate the

12 emotions from the reality and apply the law, but I suggest to

13 you that emotion doesn't have any place in the law and that the

14 Government's appeal to you, in this case, is primarily by

15 tugging at the emotional strings.

16      We are not here to say this is not a serious case.

17 We are not here to say that these weren't terrible things that

18 occurred; they were.  No one has ever said that.

19      Mr. Trader has pled guilty.  He has accepted

20 responsibility.  I believe he is going to speak to the Court.

21 We understand the gravity of the situation, but we do implore

22 the Court not to treat this case with emotion but to treat it,

23 as it should be, under the law.

24      In my memorandum, the first thing I pointed out was

25 how unfairly these cases are scored under the guidelines.  By

Thursday, December 7, 2017.

82

1  scoring the guidelines, Mr. Trader came up with an offense

2  level of 51 points; after acceptance, it was 48.

3       Judge, if he had killed his victims, his offense

4  level would have been a 40 after acceptance of responsibility.

5  That's first degree murder.  I don't think the Government can

6  sit here and say that Mr. Trader has committed a crime that

7  equates with first degree murder.

8       I listed the others:  Second degree murder,

9  kidnapping, and sexual abuse of the victim with a firearm, and

10 permanent bodily injury.  It doesn't come out anywhere near

11 what the guidelines come out to on this case right here.  And

12 that's what I think is the Court's obligation in considering

13 the 3553 factors to sort of separate the wheat from the chaff

14 and to come up with an unemotional but a legally-sound sentence

15 in this case.

16      And I don't need to tell you your job, Judge; of

17 course, you know that, but I'm saying -- my point being is that

18 the Government's recommendation of life is based on emotion and

19 not based on sensibility.

20      THE COURT:  Of course, the recidivism problem is

21 different in the crimes you suggest than this one.  Basically,

22 here, you pretty much depend on, I guess, the fact in

23 Dr. Brannon's view that above 60, people don't act on their

24 impulses which remain with them, apparently, for the rest of

25 their lives in great number.  Isn't that pretty much what

Thursday, December 7, 2017.

1  Brannon has suggested?

2          MR. PEACOCK:  I believe it is.

3          THE COURT:  A cure of the desire is unlikely but that
4  they are -- basically, age takes care of that.

5          MR. PEACOCK:  I believe that is accurate, Your Honor,
6  with the added part that I think Dr. Brannon testified that
7  treatment can also have a effect.  In other words, enabling the
8  person who suffers from pedophilia to recognize those
9  situations and to be able to have mechanisms in place where
10 they can respond to them.

11         And I understand, I want to get to the dangerousness
12 part, Your Honor, because I do think that's important, and I
13 know that weighs heavy in the Court's decision.

14         Mr. Trader suffers from pedophilia.  It's not
15 something that he chose.  It's not something that he, you know,
16 ordered.  It's something that he suffers from.  It is the way
17 his brain is wired, and in my opinion, yes, the recidivism.
18 I'm going to address that, the Court's inquiry; but, you know,
19 if you compare it to something like first degree murder, you
20 are not wired to do first degree murder.  You do first degree
21 murder for a motive.

22         He is wired this way.  He can't help that.  That's
23 what he suffers from, and I think we have to be very careful
24 that we acknowledge that it is a disease.  It is something that
25 he has as a condition.  Now, is he allowed to act out on it?

Thursday, December 7, 2017.

1  No, he is not.  Is it horrendous to act out on it? Yes, it is;
2  it's terrible.  And is he going to get punished? Yes, he is
3  because I'm not going to come in here and ask the Court for
4  some lighter sentence.  I know the Court is going to impose a
5  very serious sentence in this case, but I think we have to
6  always keep track of the fact that this is a disease that he
7  suffers from, that it can be treated, but it is something that
8  he didn't ask for.

9          Getting to the Court's point, yes.  I think -- I
10 mean, the best tools that we have, Your Honor -- and there is
11 actually quite a bit of study on this -- is that this Static-99
12 test will be able to predict within a certain percentage point
13 what a person's future dangerousness is.  That's not his future
14 dangerousness right now; but, then again, we are not asking the
15 Court to release him right now.  We are asking the Court to
16 release him when he is 60.

17         So if he is released when he is 60, he is in a group
18 of people that clinically are documented to have reoffended
19 over a five-year period at I think it's 2.38 percent.

20         I don't have my glasses on.  Sorry, 2.8 percent, Your
21 Honor.  That's a low -- that's a low amount.  Even Mr. Gyires
22 had to acknowledge, standing up here, that's a pretty low
23 amount.  He is actually lower, at that point, because of
24 the age dropoff.  And I'm not a psychologist, but I trust
25 Dr. Brannon, and I trust psychologists who have studied it

Thursday, December 7, 2017.

1  clinically and performed studies that, once a person reaches 60
2  years of age, the desire falls off.
3          But, Your Honor, that's not all there is.  This Court
4  has mechanisms on supervised release which can account for
5  whether somebody is reoffending.  This Court has the ability to
6  polygraph Mr. Trader when he is released.  In 30 years, we will
7  probably have more telling instruments by that time.  But the
8  point is, he will be supervised.  He will also be subject to
9  further treatment if and when he is ever released, and that
10 brings me to the point of BOP.
11         Obviously, Mr. Trader is going to go into BOP
12 custody, and BOP has some of the best sexual offender treatment
13 programs that are available.  In fact, I'm going to ask Your
14 Honor to recommend the sex offender management program at FCI
15 in Marianna, Florida, where Mr. Trader's housing in this case.
16 My understanding, that program is an intensive two-year program
17 with treatment following up after that where the person engages
18 in group sessions and single sessions with qualified
19 psychologists.  They face their issues -- in this case, the
20 pedophilia would be it -- and they learn those coping
21 mechanisms, and they learn how to identify situations that
22 would get them into problems if they encounter them in the
23 future.  The Bureau of Prisons is very proud of that program.
24         Your Honor, the Government has cited many cases where
25 there have been very severe sentences.  In fact, one of them is

Thursday, December 7, 2017.

1  a sentence by Your Honor; but I went back and I read that
2  transcript, and one of the Court's concerns was future
3  dangerousness, and I don't think the defense presented anything
4  to Your Honor in that regard in that sentencing.  I wanted to
5  make sure that we did present something sound and structural to
6  the Court in that regard, and Dr. Brannon's report, the
7  treatment, the BOP situation, the monitoring after he is
8  released on supervised release, I think all of those things
9  went into the Court's concerns in that case.
10         You know -- and I have cited cases where the Court
11 didn't imply or didn't impose that high of a sentence, and the
12 Court's read those and the Court is well aware of those cases.
13 You have great discretion here, Your Honor, under the
14 guidelines.
15         Deterrence is an important factor in this case.
16 Obviously, Mr. Trader will be very deterred.  It goes to future
17 dangerousness, obviously.  I won't rehash that, but he will --
18 Your Honor, if you sentence him in the area of 20 to 30 years,
19 he will be deterred.  I don't think anyone can stand here
20 before this Court and say that will not deter him.  I also
21 don't think anyone could say it will not deter anyone else who
22 thought twice about committing such an offense.
23         Finally, Judge, Mr. Trader has accepted
24 responsibility and has pled guilty in this case.  He waived his
25 constitutional right to go to trial.  It seems to me that if

Thursday, December 7, 2017.

1  the Court imposed a life sentence in this case, the Court would

2  not be acknowledging that he had accepted responsibility, that

3  he had admitted his offense, and that he had forgone his right

4  to trial and not required people to come and testify and put

5  them through all of that, which he could have done and which

6  people do all of the time. But he didn't do that. He accepted

7  responsibility, and I do think he should get some credit in

8  that regard, Your Honor.

9       I'm asking the Court to impose a sentence of 336

10  months. That's 28 years. He is 32. He is a little over 32

11  now. That would make him 60. That's what the psychological

12  data shows where the risk dropoff occurs, and I think that's an

13  appropriate sentence in this case, Judge. That's 28 years.

14  That's no light sentence. That's a very serious, extremely

15  sentence -- extremely serious sentence for a serious case.

16       Thank you.

17       THE COURT: All right. Thank you.

18       Mr. Trader, do you wish to speak? You are not

19  required to, but I want to make sure you know you have the

20  opportunity.

21       THE DEFENDANT: Yes, Your Honor.

22       THE COURT: Go ahead. Pull the microphone over for

23  him. You can keep your seat, just do it there.

24       THE DEFENDANT: Your Honor, over the last 190 days, I

25  have had the unfortunate opportunity to sit back helplessly and

Thursday, December 7, 2017.

1  watch as my life, the lives of everyone I have ever loved and

2  cared about in family life has just been torn apart and

3  destroyed by my actions. There are no words that I can say

4  that would ever be able to justify any choice that I have made

5  that has brought me here today.

6       While the Government and I do not agree on any of the

7  accusations made against me and against my character, there is

8  enough truth to them that I cannot stand here today without

9  taking responsibility for my actions. I would admit to

10  anything I have ever done. What I have done is inexcusable and

11  enormously selfish. The people I have hurt most deserve more

12  from me.

13       I wish I could have been a better son to my parents,

14  and I wish I could have been a better husband to my wife, and I

15  definitely wish I could have been a better father to my

16  children, and friend to all of my friends.

17       I am truly sorry to all of you in any way I have

18  affected. I wish I could take it all back, but I cannot. All

19  I can do now is reflect on my life and what I had, and what I

20  have done, and what I have lost in order to make any changes to

21  insure that this does not happen again.

22       Please understand it was never my intention to hurt

23  anyone. That is not the kind of person that I am. I am the

24  kind of man that would do anything for anyone, to help anybody

25  in need. I do, however, make bad choices frequently, and I

Thursday, December 7, 2017.

1  understand now that what I have done has had unimaginable
2  consequences far beyond what I ever thought possible.
3          My children, my two amazing kids, have to grow up
4  without a father.  My youngest will not even remember me while
5  my oldest is left to be raised feeding off all of the hatred
6  that her mother has for me, which is obviously learned
7  behavior.  I'm going to miss their entire lives.  I will never
8  know them.  In contrast, I was always involved in every aspect
9  of their lives prior to this and not one decision was made
10  without me.
11          My wife -- my ex-wife, Katrina, the woman I love now
12  as much as I did years ago, will eventually remarry.  She is
13  the most amazing woman that anybody could ask for, and she will
14  eventually have the life she deserves, the life I should have
15  given her that I couldn't because I took it for granted.
16          My mom, my dad, and my stepdad are all going to pass
17  away, and I won't be able to attend their funeral.  There will
18  be no more family moments, no more Christmas for me, and no
19  more New Year's countdowns.  My dad and I won't ever watch a
20  baseball game.  My mom and I will have lost our best friend in
21  each other.
22          My brother, who I was supposed to take care of since
23  he can't take care of himself, will find himself in some
24  government home, assuming there is one for someone like him,
25  once my parents can no longer take care of him and pass away.

1          I have always had a large amount of friends, some of
2  which are here today, and they are good people who have always
3  stuck by my side through thick and thin, and they are now gone.
4  They are just a memory of a former life, and I can't say that I
5  blame them.  I have let everyone down, and I'm sorry.
6          My family and friendship to me is everything, so in
7  reality, I suffered more than my heart can take, and I will
8  continue to suffer the rest of my life.
9          If I were to get out today, I wouldn't have anything
10  that I care about left because it is all gone.  All I ever
11  wanted was to be a father and a husband.  Not being either,
12  that, to me, is a fate worse than prison and a fate worse than
13  death.  That's why I stand here today.  I'm ashamed and I'm
14  embarrassed, and I am at your mercy because whether I am
15  sentenced to 30 years, 40 years, or life, the punishment that I
16  have to live with, and that's a sentence worse than prison and
17  worse than death to me.
18          Once again, I am truly sorry to all of those affected
19  by my actions, especially my family and more specifically my
20  children.  I love them both, and I always will.  They are my
21  world.
22          Thank you.
23          THE COURT:  Thank you, sir.
24          All right.  Let me adopt the findings of the
25  presentence investigation report with the exception --

91

1    I think, Mr. Peacock, you advised the probation
2  officer paragraph 60 is the case last week, and so that's, I
3  think, a one point addition to criminal history rather than
4  two, but it doesn't affect the guidelines.
5        MR. PEACOCK:  That's correct.
6        THE COURT:  And so I -- please change paragraph 60
7  appropriately.
8        With that, the offense level is 43, the criminal
9  history category is III, the advisory guideline is life.
10       I have considered the advisory guidelines as well as
11 the statutory factors and the arguments of Counsel.  Of the
12 3553 factors, important are the nature -- serious nature of the
13 offense, the characteristics nature of the offense, and the
14 characteristics of the offender, and also the need to protect
15 the public.
16       Mr. Trader sexually molested his own children and at
17 a very young age -- a two-year-old and a nine-year-old -- for
18 an extensive period of time.  He sent child pornography, which
19 he created, of his children to others.  He also communicated
20 with over 100 minors, solicited child pornography from them,
21 sent pornography to them; apparently, over 44 of them did send
22 him pornography.  He sent child pornography to other adults.  I
23 have no confidence that he will stop this behavior because he
24 continued it while on bond from a state court proceeding and
25 even while he was being evaluated by medical professionals who

Thursday, December 7, 2017.

92

1  he was, apparently, able to fool into believing he didn't
2  present a threat to his children at the same time he was
3  committing crimes against those children.
4        And so for all of those reasons, I considered and I
5  take seriously Mr. Peacock's arguments about the possibility
6  that age may provide protection, but I -- given the history in
7  this case, I'm not convinced of that.  I note he also, in a
8  jail call, promised that he would kill his ex-wife and the
9  mother of one of the victims.  And so for all of those reasons,
10 it is the judgment of the Court, the defendant, Scott Joseph
11 Trader, is committed to the Bureau of Prisons for life.  This
12 term consists of life as to Count 1, 240 months of imprisonment
13 as to each of Counts 2 and 3, and 360 months imprisonment as to
14 each of Counts 4 and 5, all to be served concurrently.
15       I recommend that, if qualified, he receive sex
16 behavior treatment with the Bureau of Prisons.
17       Since victims' losses are not yet ascertainable, I'll
18 set a date for any determination of victims' losses not to
19 exceed 90 days after sentencing.  I do note that given the
20 sentence, it is unlikely that he will be able to pay
21 restitution.
22       It's also the finding of the Court the defendant is
23 not able to pay a fine or the additional special assessment
24 pursuant to 18 U.S. Code Section 3014(a)(3), and so neither a
25 fine or additional special assessment will be imposed.

Thursday, December 7, 2017.

1    Despite the life sentence, I'm obligated to give a --
2  to order supervised release in case things were to change in
3  any event.
4    So upon release from imprisonment, if that happens,
5  the defendant shall be placed on supervised release for a term
6  of life.  This term consists of life as to each of Counts 1
7  through 5, for all such terms to run concurrently.  Within 72
8  hours of release, the defendant shall report in person to the
9  probation office in the district to which he is released.
10 While on supervised release, the defendant shall not commit any
11 crimes, shall be prohibited from possessing a firearm or other
12 dangerous device, and shall not possess a controlled substance.
13    In addition, he shall cooperate in the collection of
14 DNA and comply with standard conditions of supervised release
15 including the following special conditions:  Data encryption
16 restriction, computer possession restriction, employer computer
17 restriction, disclosure, mental health treatment, no contact
18 with minors, no involvement in youth organizations, sex
19 offender treatment, restriction from possession of sexual
20 materials, the Adam Walsh Act search condition, and sex
21 offender registration as noted in part G of the presentence
22 report.
23    The defendant's right, title, and interest to the
24 phones and computer equipment identified in the plea agreement
25 is hereby forfeited.  And has there been a preliminary order of

Thursday, December 7, 2017.

1  forfeiture in that?
2    MR. GYIRES:  Yes, Your Honor, docket entry 25 dated
3  October 20, 2017.
4    THE COURT:  All right.  So that -- those materials
5  are hereby forfeited.
6    So the total sentence is life imprisonment,
7  restitution to be determined, life supervised release, a $500
8  special assessment.
9    Now that sentence has been imposed, does the
10 defendant or his counsel object to the Court's findings of fact
11 or the manner in which sentence was pronounced?
12    MR. PEACOCK:  Your Honor, we would preserve an
13 objection subject to the reasonableness of the sentence, and I
14 also have issue regarding the supervised release conditions.
15    THE COURT:  All right.  Give me a second.
16    Mr. Trader, you have a right to appeal the sentence
17 imposed.  Any notice of appeal must be filed within 14 days.
18 Failure to file a notice within that period would constitute a
19 waiver of your right to appeal.
20    THE COURT:  Go ahead, Mr. Peacock.
21    MR. PEACOCK:  Thank you, Your Honor.
22    THE COURT:  And also, you suggest that Marianna and
23 the sexual behavior treatment.  Given the sentence, is that
24 still where you would -- you want me to recommend he be
25 incarcerated?

Thursday, December 7, 2017.

95

1    MR. PEACOCK: Yes, sir.

2    THE COURT: There are probably places closer to

3 family.

4    MR. PEACOCK: There are not, sir.

5    THE COURT: All right. So your recommendation is

6 North Florida and receipt of the sexual behavior treatment.

7    MR. PEACOCK: Right. I did some research in it. The

8 sex offender management programs are throughout the United

9 States. The one that's closest to us is in Marianna, Florida,

10 at FCI.

11    THE COURT: All right. I'll recommend that.

12    MR. PEACOCK: Judge, with regard to the special

13 condition of supervised release, just so that -- you had

14 indicated no contact with minors. In the PSI, it says "no

15 contact with minors or victims." Theoretically, of course, in

16 this case, it could get to a point where one of the victims is

17 an adult and wants to have contact with Mr. Trader but she

18 would not be allowed to, if the Court imposed that victim

19 restriction.

20    THE COURT: Well, if any of the victims would like to

21 be in touch with him, I have no objection to that. The -- but

22 I think its got to be at their initiation.

23    MR. PEACOCK: I understand, sir. That's fine.

24 That's all, Your Honor.

25    THE COURT: Okay. All right. Thank you all. Good

Thursday, December 7, 2017.

96

1 luck to you, sir.

2 (PROCEEDINGS ADJOURNED AT 12:16 p.m.)

3    C-E-R-T-I-F-I-C-A-T-E

4    I hereby certify that the foregoing is

5    an accurate transcription and proceedings in the

6    above-entitled matter.

7

8 *1/26/2018*
  DATE                    /s/DIANE MILLER

9                          DIANE MILLER, RMR, CRR, CRC
                           Official Court Reporter
                           United States District Court
10                         701 Clematis Street, Room 259
                           West Palm Beach, FL 33401
11                         561-514-3728

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Thursday, December 7, 2017.

BY MR. GYIRES: [16]
9/3 9/23 11/14 12/4
13/7 14/17 14/12 25/17
34/15 35/12 37/13 40/10
40/13 53/3 63/16 63/25
BY MR. PEACOCK: [7]
41/13 42/7 42/23 45/5
46/10 46/16 62/1
MR. GYIRES: [42]  3/5
4/4 5/1 6/3 6/9 6/19
6/22 7/4 7/6 8/2 8/10
8/12 8/18 8/21 8/23
9/22 34/4 35/10 37/6
37/9 40/23 41/6 42/4
43/19 43/24 44/3 44/19
46/7 61/17 62/25 63/24
67/17 67/22 70/15
70/20 71/8 71/12 71/21
71/24 78/5 78/8 94/1
MR. PEACOCK: [59]
3/16 4/5 4/9 4/14 4/19
4/22 5/14 5/23 7/2 7/6
7/13 7/20 8/14 8/17
9/20 33/25 34/14 34/17
34/21 37/4 37/7 41/2
41/5 43/6 43/11 43/17
44/5 44/9 44/11 44/15
44/21 45/4 45/5 46/12
52/25 61/24 62/16
62/20 63/5 65/3 67/19
70/17 71/4 71/16 71/23
72/9 72/18 81/8 83/1
83/4 91/4 94/11 94/20
94/25 95/3 95/6 95/11
95/22
MS. TRADER: [7]  72/1
72/3 72/7 72/10 72/13
72/16 72/18
THE COURT: [82]  3/1
3/8 3/12 3/17 4/7 4/11
4/17 4/20 4/24 5/12
5/19 6/2 6/7 6/14 6/20
7/3 7/5 7/16 7/22 8/11
8/16 8/20 8/22 8/25
34/3 34/16 34/19 35/6
35/11 37/10 40/25 41/4
41/9 42/5 43/18 43/20
42/23 44/2 44/7 45/3
46/8 46/15 61/21 62/15
62/17 62/22 63/3 63/6
63/8 67/15 67/18 67/20

70/13 71/16 70/18 71/9
71/14 71/18 71/25 72/2
77/14 77/17 77/19 77/20
77/22 77/25 78/6 81/7
82/19 83/2 87/16 87/21
90/22 91/5 94/3 94/14
94/19 94/21 95/1 95/4
95/10 95/19 95/24
THE COURTROOM DEPUTY:
[6]  7/9 8/4 8/15
63/10 63/12 67/25
THE DEFENDANT: [2]
87/20 87/23
THE WITNESS: [11]
12/34 14/10 41/11
43/21 44/10 44/14
44/17 61/19 62/18
63/14 68/2

$
$500 [1]  94/7

'
'90s [1]  74/19

/
/s/DIANE [1]  96/7

1
1/26/2018 [1]  96/7
1/27/17 [1]  24/23
10 [2]  5/16 16/20
10-second [1]  32/1
100 [5]  35/20 57/20
59/3 59/6 91/20
108 [1]  23/3
11 [2]  16/20 68/5
12 [6]  16/6 16/10
28/13 28/14 28/16
31/16
125 [1]  1/7
126 [1]  18/4
12-minute [1]  96/2
12:30 [1]  10/18
12th [1]  46/4
13 [4]  16/13 28/12
28/13 28/14
14 [4]  17/7 28/13 29/14
94/17
14-second [6]  13/4
13/13 13/25 16/11
16/16 17/13
14047 [1]  3/4

15 [1]  5/16
15-second [2]  12/9
12/12
16 [2]  28/17 74/10
16-minute [1]  33/12
16-second [1]  15/6
1659 [1]  28/17
17 [1]  24/23
17-14047 [1]  3/4
17-4047-CR-MIDDLEBROOKS
[1]  1/2
18 [7]  11/4 11/13 16/2
21/5 60/24 61/2 92/24
19 [4]  11/4 11/12 12/2
16/24
190 [1]  87/24
1st [2]  39/6 39/7

2
2.38 [1]  84/19
2.8 [9]  51/5 51/17
51/19 52/9 52/9 56/2
56/16 56/17 84/20
20 [6]  5/7 11/4 13/2
3/13 86/18 94/3
20-second [1]  15/17
2003 [2]  9/10 74/14
2007 [3]  61/9 61/13
74/17
2010 [2]  9/16 61/5
2011 [1]  9/18
2012 [8]  36/3 36/9
37/18 37/24 37/25
54/23 75/15 79/23
2013 [8]  23/9 36/14
37/1 38/3 38/10 38/11
38/19 55/2
2014 [3]  9/11 16/20
76/4
2015 [2]  26/4 37/22
20150412 [1]  19/15
2016 [6]  16/24 26/5
26/6 38/21 76/15 80/13
2017 [6]  1/4 16/2
24/10 46/4 76/22 94/3
2018 [1]  96/7
21st [1]  36/9
22 [4]  11/4 12/22 13/2
13/23
22nd [1]  30/16

2
23 [1]  15/23
231940 [1]  19/16
240 [1]  92/12
24th [1]  30/17
25 [2]  61/6 94/2
259 [1]  96/9
26 [1]  24/10
28 [2]  87/10 87/13
28S [1]  18/18

3
3,000 [1]  22/19
30 [4]  17/12 85/6
86/18 90/15
30-second [1]  34/11
3014 [1]  92/24
31 [2]  36/20 36/21
31st [1]  39/7
32 [3]  72/22 87/10
87/10
33401 [4]  1/16 1/19
1/24 96/10
336 [1]  87/9
3553 [2]  82/13 91/12
360 [1]  32/3
3728 [2]  1/24 96/10

4
4/22/16 [1]  28/17
40 [3]  24/23 82/4
90/15
400 [1]  1/15
40330 [2]  15/13 15/17
407 [2]  33/9 33/11
408 [1]  18/4
41 [1]  2/5
41-second [1]  33/12
410 [1]  33/9
429 [1]  25/16
43 [1]  91/8
44 [5]  20/20 57/21
79/1 79/2 91/21
443 [1]  34/9
45 [1]  2/7
450 [1]  91/8
48 [1]  82/2
4th [1]  36/9

5
51 [1]  82/2
52898 [1]  14/17
53 [1]  2/8

561-514-3728 [2]  1/24
96/10

6
60 [26]  50/24 51/3
51/13 51/22 52/7 52/9
56/7 57/15 57/24 58/4
58/5 58/11 58/13 58/25
60/7 82/23 84/16 84/17
85/1 87/11 91/2 91/6
62 [1]  2/9
63 [1]  2/11
68 [1]  2/13

7
701 [2]  1/23 96/9
72 [2]  2/14 93/7

8
8-second [1]  25/1
81 [1]  23/14
8:09:06 [1]  24/12

9
90 [1]  92/19
99 [1]  84/11
99R [8]  50/8 50/11
50/18 51/1 51/4 51/7
62/3 62/13
9:19 [1]  24/23

A
A-B-D [1]  26/24
A-S-H-L-E-Y [1]  26/3
a.m [1]  30/18
ability [1]  27/13
able [2]  23/11 24/7
48/17 48/18 50/20 66/5
68/19 69/17 72/5 73/16
74/24 75/3 76/19 77/13
80/9 84/12 88/4 89/17
92/1 92/20 92/23
above [6]  17/12 24/4
57/8 77/12 82/23 96/6
above-entitled [1]
96/6
absolutely [3]  6/23
60/15 69/12
abuse [13]  18/13 18/17
54/16 55/6 64/17 68/8
69/16 69/16 69/20

70/10 78/21 79/16 82/9
54/5 64/11
abused [4]  15/22 16/22
Abusers [1]  50/3
abusing [2]  10/22 68/6
acceptance [3]  3/22
82/2 82/7
accepted [8]  47/11
62/3 62/8 74/20 81/19
86/23 87/2 87/6
access [3]  25/10 52/12
52/15
accessibility [1]
accomplish [1]  6/13
according [2]  36/2
account [2]  58/6 85/4
accounted [4]  56/8
58/16 58/17 58/21
accounts [1]  72/24
accurate [2]  62/25
83/5 96/5
accusations [1]  88/7
acknowledge [2]  83/24
84/22
acknowledging [1]  87/2
act [5]  48/5 82/23
83/25 84/1 93/20
acting [2]  48/7 49/8
actions [5]  70/3 77/7
88/3 88/9 90/19
activity [1]  24/18
actual [4]  23/11 56/6
53/9 79/16
actually [15]  17/3
17/20 20/9 29/25 51/8
51/9 53/16 54/19 56/1
56/5 56/14 59/18 79/8
79/8
actuarial [4]  50/8
ad [1]  67/8
Adam [1]  93/20
add [1]  78/12
added [1]  83/6
addition [2]  91/3
93/13
additional [6]  56/24
67/6 70/14 78/7 92/23
92/25
address [2]  48/11
83/18

**A**

addressing [1] 49/19
adequate [1] 45/22
ADJOURNED [1] 96/2
adjudge [1] 3/19
adjudication [3] 36/8 79/24 79/25
adjust [2] 47/25 48/11
adjustment [1] 46/18
administer [1] 9/1
admit [6] 6/25 6/25 70/22 71/4 81/9 88/9
admitted [7] 7/6 7/8 46/9 46/10 71/10 71/11 87/3
adopt [2] 3/18 90/24
adult [3] 26/12 59/21 95/17
adults [7] 21/3 25/24 59/21 59/23 78/23 79/17 91/22
advance [1] 75/9
advanced [1] 9/19
advised [1] 91/1
advisory [2] 91/9 91/10
affect [2] 56/1 91/4
affected [2] 88/18 90/18
affidavit [2] 53/19 56/21
AFPD [1] 1/17
after [15] 7/1 27/10 38/4 38/8 51/18 61/8 66/4 72/25 74/8 77/9 82/2 82/4 85/17 86/7 92/19
afternoon [4] 53/5 53/7 72/2 72/3
again [3] 6/17 14/9 14/14 27/7 29/7 31/18 48/21 56/18 66/24 67/11 71/19 75/12 76/15 76/18 76/22 76/24 80/12 80/25 84/14 88/21 90/18
against [4] 65/21 88/7 88/7 92/3
age [19] 21/5 27/16 28/21 50/24 51/3 51/12 51/13 51/22 58/4 58/13

60/24 61/2 61/6 74/10 83/4 84/24 85/2 91/17 92/6
agencies [1] 68/6
agent [12] 2/3 3/7 3/8 8/24 9/1 9/8 9/11 9/22 10/3 41/2 41/15 79/19
aggressively [1] 34/13
ago [2] 72/22 89/12
agree [1] 88/6
agreement [3] 3/22 71/6 93/24
ahead [24] 4/17 6/3 10/24 12/2 12/25 13/23 14/9 15/13 16/4 16/13 17/12 18/2 23/22 24/3 24/14 26/14 30/9 32/25 33/17 41/10 64/2 78/2 87/22 94/20
airport [1] 74/11
Alabama [2] 32/11 32/18
alerted [1] 68/5
allegations [7] 36/5 36/6 38/20 38/24 54/19 54/24 80/1
allowable [1] 70/6
allowed [4] 37/3 70/9 83/25 95/18
almost [4] 16/20 37/10 37/10 64/14
alone [1] 69/6
along [1] 73/2
Alongside [1] 3/7
alphanumeric [1] 15/15
already [5] 21/21 22/5 58/16 58/17 58/21
also [45] 3/11 3/20 5/16 7/24 8/3 8/9 9/19 22/9 13/13 13/25 16/14 17/13 17/24 19/24 28/12 28/12 32/10 32/18 33/1 41/7 41/20 43/14 46/21 48/15 54/18 61/9 66/8 66/14 68/13 70/7 71/2 83/7 85/8 86/20 91/14 91/19 92/7 92/22 94/14 94/22
alternative [1] 48/13
alternatives [1] 48/10

Although [1] 48/10
always [18] 30/10 30/10 65/8 66/12 69/6 73/14 73/23 74/1 74/12 74/14 74/22 75/13 78/15 84/6 89/8 90/1 90/2 90/20
am [16] 5/11 44/15 49/11 54/18 64/10 72/4 72/19 76/19 76/22 80/3 88/17 88/23 88/23 92/25 94/8
amazed [1] 69/19
amazing [2] 89/3 89/13
AMERICA [1] 1/3
amount [5] 69/20 80/19 84/21 84/23 90/1
amounts [1] 33/2
analysis [1] 15/23
anger [2] 65/5 69/8
angry [1] 68/12
angst [1] 69/7
Anna [1] 32/22
another [10] 15/17 16/4 16/14 27/1 28/1 32/4 32/5 32/9 32/25 61/24
answer [2] 57/1 73/4
anticipate [1] 5/15
anxiety [6] 46/19 65/23 65/25 66/3 68/15 69/9
anybody [5] 50/6 55/8 66/23 88/24 89/13
anyone [7] 60/17 74/7 86/19 86/21 86/21 88/23 88/24
anything [8] 5/11 6/16 30/13 40/22 86/3 88/10 88/24 90/9
anywhere [2] 65/21 82/10
apart [1] 88/2
app [1] 30/7
apparently [8] 4/21 6/15 16/11 17/14 45/3 92/24 91/21 92/1
appeal [5] 3/23 81/14 94/14 94/17 94/19
appear [4] 7/11 7/12 7/12 14/15
appearances [2] 1/13

**A**

appearances... [1] 3/5
appeared [2] 20/12
appearing [1] 7/11
appears [2] 17/5 25/2
appellate [1] 6/22
applications [1] 20/10
apply [1] 81/12
appreciate [1] 78/10
appropriate [1] 87/13
appropriately [1] 91/7
approximate [1] 23/6
approximately [16] 12/9 12/12 13/4 13/13 14/15 14/16 15/6 15/17 16/10 16/16 16/18 17/13 20/3 20/11 25/1 25/2
apps [1] 20/8
April [3] 36/3 37/24 37/25
are okay [1] 8/8
area [3] 19/4 30/22
areas [3] 47/19 48/15 48/15
aren't [1] 30/23
argument [5] 5/8 40/25 50/22 78/2 78/8
argumentive [1] 42/5
arguments [2] 91/11 92/5
around [4] 8/10 8/18 67/4 74/5
arrest [2] 37/18 39/9
arrested [15] 12/18 26/2 26/12 32/9 36/2 36/3 37/25 38/19 39/3 54/23 61/1 61/1 66/5 79/23 80/12
arthritis [1] 76/8
ascertainable [1] 92/17
Ash [3] 12/14 12/16 12/21
ashamed [1] 90/13
Ashley [6] 12/17 25/22 25/24 26/2 26/2 26/12 75/8
asked [3] 28/7 29/16 75/8
asking [9] 24/12 55/22

56/24 66/15 71/3 81/6 84/14 84/15 87/9
asks [1] 24/12
asleep [4] 16/11 16/16 17/14 30/23
aspect [1] 89/8
assessing [2] 62/12
assessment [11] 41/9 50/5 50/6 50/20 55/21 55/23 56/5 57/9 92/23 92/25 94/8
assessments [2] 50/10 57/5
associated [3] 11/9 15/1 19/1
Association [1] 50/3
assuming [1] 50/22
assumption [2] 52/11 52/14
attach [1] 10/14
attack [1] 68/25
attacks [2] 65/25 69/9
attempt [1] 48/4
attempted [1] 50/7
attend [1] 89/17
attended [2] 9/16 9/18
Attorney [1] 1/15
audible [1] 40/15
audience [1] 50/3
audio [5] 8/4 8/20 8/20 40/10 40/13
August [1] 46/4
AUSA [1] 1/14
Australian [2] 1/15 1/18
authorities [1] 53/20
autistic [2] 73/1 73/3
available [4] 6/18 22/9 44/14 85/13
Avenue [2] 1/15 1/18
average [2] 51/9 56/11
awake [1] 28/7
aware [7] 54/12 55/3 55/4 55/13 55/13 61/3 12/21
away [5] 7/17 68/22 69/19 89/17 89/25

**B**

B-C [1] 28/19
B-E-N-I-T-E-Z [1] 23/21

B-R-A-N-N-O-N [1] 45/8
babe [1] 28/10
baby [3] 27/8 27/9 28/3
bad [2] 65/23 88/25
balance [1] 76/21
ballpark [1] 39/10
bar [1] 24/5
bars [1] 67/6
baseball [1] 89/20
based [8] 12/18 53/8 55/22 58/5 62/14 62/15 82/18 82/19
basic [1] 9/17
basically [4] 32/15 60/12 82/21 83/4
basis [1] 68/19
bathroom [2] 25/3 69/2
battery [4] 60/25 61/1 61/5 61/9
BEACH [6] 1/5 1/16 1/19 1/24 44/13 96/10
beastiality [1] 33/7
beautiful [1] 73/7
become [1] 56/8
bed [9] 15/18 16/11 16/12 16/17 17/17 17/4 19/4 34/12 65/15
bedroom [2] 31/1 31/17
before [15] 1/10 3/11 6/2 27/18 27/24 34/16 38/9 38/12 39/9 39/25 44/25 66/24 76/20 77/14 86/20
beginning [2] 11/10 28/16
begins [2] 15/4 24/10
behalf [2] 3/11 68/4
behavior [14] 47/25 48/4 49/1 49/3 49/6 61/8 62/11 80/17 88/7 91/23 92/16 94/23 95/6
behaviors [4] 47/25 48/9 48/9 48/13
behind [1] 41/7
believe [15] 16/20 26/23 26/24 29/19 43/13 43/14 43/14 44/16 63/3 67/3 70/9 71/5 81/20 83/2 83/5
believing [2] 67/1

JON vs. (SCOTT JOSEPH TRADER

**B**

believing... [1]  92/1
belong [1]  50/2
below [2]  51/9 56/11
Benitez [2]  23/17
  23/19
besides [1]  5/14
best [4]  47/1 84/10
  85/12 89/20
betrayed [1]  66/25
better [6]  18/7 44/6
  49/18 88/13 88/14
  88/15
between [10]  26/11
  28/21 37/24 39/20
  65/15 71/6 71/7 75/5
  75/21 75/24
beyond [1]  89/2
big [2]  6/14 73/12
bigger [1]  23/25
Bill [1]  75/22
biological [1]  64/10
bipolar [1]  74/25
birth [2]  72/22 72/23
bit [4]  23/25 39/2
  44/14 84/11
bits [1]  66/8
blame [1]  90/5
blind [2]  74/18 74/19
blood [1]  76/9
bodily [1]  82/10
body [2]  19/7 25/4
bond [5]  39/12 39/13
  39/16 55/17 80/13
  80/14 91/24
boobies [1]  29/11
book [1]  47/9
bookmarked [5]  11/8
  21/25 22/10 22/12 23/3
BOP [4]  85/10 85/11
  85/12 86/7
both [10]  15/14 17/10
  47/11 54/5 64/6 64/16
  69/18 78/1 78/2 90/20
bottom [2]  19/18 24/15
boundaries [1]  69/16
box [1]  7/12
bracket [1]  75/17
brain [2]  73/20 83/17
BRANNON [24]  2/6 4/1
  4/21 5/14 5/15 5/21
  5/23 44/7 44/9 44/10

44/19 44/24 44/25 45/7
  45/8 45/9 45/14 46/12
  53/1 62/3 62/18 83/1
  83/6 84/25
Brannon's [3]  4/7
  82/23 86/6
break [5]  7/21 8/2
  30/16 51/6 80/2
breasts [1]  31/6
brevity [1]  71/1
BRIAN [6]  2/3 3/8 5/4
  9/2 9/6 53/19
brief [1]  34/5
briefly [8]  12/7 32/5
  40/16 41/6 46/23 48/6
  51/6 78/9
bring [1]  66/13
brings [2]  65/25 85/10
brother [8]  73/8 73/9
  73/12 73/13 73/15
  73/19 74/1 89/22
brother's [1]  73/24
brought [2]  73/17 88/5
bubble [1]  23/24
bubbles [1]  24/4
Bureau [6]  49/9 49/12
  52/17 85/23 92/11
  92/16
busy [1]  29/11
buttocks [1]  25/5
buy [1]  80/24

**C**

C-E-R-T-I-F-I-C-A-T-E
  [1]  96/3
California [2]  12/18
  29/18
call [9]  5/21 39/19
  40/3 40/9 41/17 67/7
  71/17 75/6 92/8
called [9]  11/2 11/6
  14/21 17/18 18/20 48/8
  50/2 50/8 66/14
calling [2]  4/21 7/4
calls [3]  3/22 3/23
  39/20
cam [1]  27/2
came [5]  42/10 73/2
  73/15 74/14 82/1
camera [1]  25/13
can't [12]  6/22 7/23
  26/22 27/9 29/15 29/16
  49/2 49/6 66/16 83/22

89/23 90/4
cane [1]  76/20
cannot [2]  88/8 88/18
car [2]  68/25 68/25
card [2]  10/11 10/12
card [3]  10/9 10/10
  17/24
Care [8]  75/20 75/23
  80/21 83/4 89/22 89/23
  89/25 90/10
cared [1]  88/2
careful [1]  83/23
caring [1]  73/13
case [46]  1/2 3/3 3/4
  3/7 10/3 10/3 19/9
  34/24 35/9 36/12 36/15
  37/8 38/25 39/2 39/3
  39/3 40/15 42/10 47/18
  53/6 53/9 53/24 57/14
  62/12 78/13 78/15 81/6
  81/11 81/14 81/16
  81/22 82/11 82/15 84/5
  85/15 85/19 86/9 86/15
  86/24 87/1 87/13 87/15
  91/2 92/7 93/2 95/16
case-related [1]  47/18
cases [7]  10/1 35/21
  78/14 81/25 85/24
  86/10 86/12
categories [3]  57/2
  60/19 79/5
category [4]  32/25
  52/2 78/18 91/9
caught [1]  31/9
CD [4]  6/4 7/7 18/19
  21/17
cell [1]  21/20
cellphones [3]  10/8
  10/10 10/13
centers [1]  75/6
certain [4]  53/9 56/15
  55/15 84/12
certainly [6]  47/19
  47/24 49/15 49/19
  54/21 57/23
certify [1]  96/4
cervical [1]  75/15
cetera [1]  75/23
chaff [1]  82/13
chair [1]  7/25
chance [2]  56/2 80/23
change [6]  3/15 48/1

change... [4]  48/4
  70/8 91/6 93/2
changes [1]  88/20
character [1]  88/7
characteristics [2]
  91/13 91/14
characterize [1]  44/21
charge [1]  39/14
charged [2]  3/19 35/24
charges [1]  55/6
chat [24]  14/25 15/1
  15/2 15/3 15/5 22/11
  23/18 23/23 24/8 24/10
  24/17 24/17 26/6 28/11
  28/16 30/16 32/8 32/8
  32/12 32/15 32/20
  70/24 79/6 79/9
chats [22]  14/21 14/22
  21/18 22/10 22/12
  22/19 23/9 23/9 23/14
  23/15 24/21 25/22
  25/23 26/1 26/5 26/5
  26/5 26/10 32/4 32/22
  38/10 70/25
chatting [1]  22/14
child [53]  6/5 9/25
  11/24 12/10 12/20
  12/22 12/23 20/4 20/21
  20/22 21/3 21/13 22/21
  22/24 23/6 23/10 23/15
  24/18 24/25 27/2 29/19
  32/22 32/10 32/10 32/13
  33/2 33/7 35/16 36/5
  36/15 38/2 38/2 38/5
  38/6 50/7 50/7 52/13
  55/9 55/11 57/21 65/14
  72/24 73/3 73/6 73/7
  73/10 78/14 78/18 80/1
  80/6 91/18 91/20 91/22
child's [1]  34/14
childhood [1]  66/17
children [23]  32/16
  37/4 37/16 39/15 46/24
  46/25 49/5 55/3 55/10
  59/21 70/7 70/11 74/9
  74/14 78/21 80/21
  88/16 89/3 90/20 91/16
  91/19 92/2 92/3
choice [1]  88/4
choices [1]  88/25
choose [2]  67/5 72/15

chooses [1]  35/8
chose [1]  83/15
Christmas [1]  89/18
Circuit [1]  6/19
cited [2]  85/24 86/10
clarify [1]  53/23
classification [2]
  47/12 52/2
cleaning [1]  75/22
clear [2]  35/20 47/4
clearly [1]  47/20
Clematis [2]  1/23 96/9
click [3]  11/6 23/19
  23/23
Clicking [1]  24/7
clinical [1]  48/22
clinically [2]  84/18
  85/1
clip [1]  32/1
clit [2]  27/22 28/4
close [2]  19/16 74/9
close-knit [1]  74/9
close-up [1]  19/16
closer [1]  95/2
closest [1]  95/9
clothes [2]  28/23
  74/23
cock [1]  27/5
Code [1]  92/24
collection [3]  35/15
  79/18 93/13
comes [4]  22/6 24/25
  74/2 77/14
comfortable [4]  11/20
  15/10 19/9 66/23
commenting [1]  13/11
comments [1]  13/16
commit [1]  93/10
committed [2]  82/6
  92/11
committing [1]  86/22
  92/3
communicated [4]  59/2
  74/2 77/14
communicating [6]  20/4
  20/13 20/14 20/15 32/9
  55/10
communication [1]

20/10
communications [6]
  20/3 20/9 21/2 21/4
  57/20 58/14
company [2]  75/8 75/10
compare [1]  83/19
compassion [1]  77/5
complacent [1]  69/21
complaint [2]  53/12
  53/18 56/21
complete [1]  71/1
complied [1]  35/4
comply [2]  60/5 93/14
comprehend [1]  64/19
comprehensive [5]
  49/17 49/18 49/19
  49/21 68/18
computations [1]  35/4
computer [11]  6/7 9/16
  9/17 9/19 9/19 9/22
  20/18 20/8 93/16 93/16
  93/24
computers [3]  3/24
  10/10 10/14
concern [1]  6/12
concerned [2]  6/10
  59/19
concerns [2]  86/2 86/9
concluded [1]  42/15
concluding [1]  52/5
conclusion [2]  36/19
  45/23
conclusions [1]  57/9
concurrently [2]  92/14
  93/7
condition [5]  43/4
  43/6 83/25 93/20 95/13
conditions [5]  48/3
  49/20 93/14 93/15
  94/14
conduct [2]  33/1 35/21
conducted [1]  44/25
conducting [1]  50/18
confidence [2]  26/20
  91/23
confident [1]  62/12
confinement [1]  77/17
consequences [2]  77/7
  89/2
consider [1]  42/1
consideration [1]
  70/12

## Page 203

**C**

considered [2]  91/10 92/4
considering [1]  82/12
consistent [1]  19/2
consists [2]  92/12 93/6
console [1]  69/6
constitute [1]  94/18
constitutional [1]  86/25
contact [10]  50/6 51/23 59/16 60/14 62/5 62/6 93/17 95/14 95/15 95/17
contain [1]  34/2
contained [1]  79/18
continually [1]  37/12
continue [5]  37/15 60/3 70/10 76/11 90/8
continued [2]  77/11 91/24
continues [3]  28/11 80/11 80/14
contraband [1]  6/5
contrast [1]  89/8
controlled [1]  93/12
controls [1]  71/8
conversation [7]  23/24 24/4 24/5 24/6 26/11 30/17 66/18
convicted [1]  60/25
conviction [2]  61/5 61/9
convictions [1]  57/12
convinced [1]  92/7
cooperate [1]  93/13
copied [1]  18/9
copies [2]  17/23 21/25
coping [1]  85/20
copy [3]  4/13 24/22 36/20
corrections [1]  3/21
could [32]  8/1 10/24 11/4 12/6 14/17 16/5 18/2 23/12 29/21 32/5 34/21 41/3 46/23 52/19 52/21 52/24 56/25 66/15 66/16 66/24 67/5 67/5 67/6 76/3 86/21 87/5 88/13 88/14 88/15 88/18 89/13 95/16

couldn't [2]  81/3 89/15
counsel [3]  7/13 91/11 94/10
counseling [4]  43/6 43/7 43/9 43/12
count [2]  58/24 92/12
countdowns [1]  89/19
Counts [3]  92/13 92/14 93/6
County [3]  40/18 45/11 45/21
couple [9]  5/6 17/1 18/5 18/22 18/23 18/24 33/6 33/24 38/11
course [10]  5/18 35/22 49/6 52/12 53/17 57/19 78/3 82/17 82/20 95/15
court's [13]  4/11 4/23 37/6 63/25 78/10 82/12 83/13 83/18 84/9 86/2 86/9 86/12 94/10
courtroom [2]  44/13 64/3
cover [1]  4/4
CR [1]  1/2
craving [1]  29/7
CRC [2]  1/22 96/8
created [3]  12/23 32/13 91/19
creating [1]  12/22
credit [1]  87/7
cried [1]  67/9
cries [1]  65/1
crime [1]  82/6
crimes [4]  3/19 82/21 92/3 93/11
criminal [9]  53/12 53/18 54/9 55/8 56/20 60/21 80/20 91/3 91/8
criteria [2]  47/14 47/16
cross [2]  2/5 2/8 41/2 41/13 53/3
Cross-Examination [4]  2/5 2/8 41/3 53/3
cross-examine [1]  41/2
CRR [2]  1/22 96/8
crying [3]  65/11 68/13 69/3
cum [1]  32/16
cure [1]  83/3

curls [1]  65/15
currently [1]  68/18
custody [5]  36/15 37/4 37/15 80/6 85/12
customs [1]  9/11
cut [1]  34/25

**D**

D-R-E-W [1]  67/24
dad [2]  89/16 89/19
daddy [3]  64/22 64/23 64/23
Dade [1]  45/11
daily [1]  77/8
danger [2]  55/3 80/8
dangerous [1]  93/12
dangerousness [7]  49/25 62/4 83/11 84/13 84/14 86/3 86/17
dark [1]  68/10
data [2]  87/12 93/15
date [5]  15/21 28/17 61/14 92/18 96/8
date/time [1]  28/17
dated [5]  15/25 24/10 38/6 46/4 94/2
dates [2]  19/1 57/11
daughter [27]  11/24 14/12 16/5 31/3 31/4 63/20 64/5 64/10 64/11 64/15 64/17 65/4 65/24 66/11 66/14 67/12 68/5 68/6 68/9 68/14 69/7 69/11 69/12 69/25 70/2 70/7 80/2
daughter's [1]  67/9
daughters [5]  10/22 54/3 54/17 78/19 78/24
day [14]  24/12 30/6 30/11 65/20 66/14 63/16 66/19 67/7 69/1 73/21 73/22 75/2 75/3 81/4
days [6]  27/10 27/11 66/9 87/24 92/19 94/17
deal [2]  66/6 69/7
death [2]  90/13 90/17
DECEMBER [1]  1/4 15/22 37/21 37/22 38/20 80/13
decided [1]  76/10
decision [2]  83/13 89/9

**D**

decline [1]  76/7
declined [1]  76/15
deduction [1]  57/24
defendant [29]  1/7 1/17 10/6 10/21 11/16 12/20 14/4 15/11 19/21 19/24 20/3 25/9 26/11 37/3 39/20 54/2 54/8 54/23 56/3 56/4 56/23 59/22 78/17 92/10 92/22 93/5 93/8 93/10 94/10
defendant's [8]  11/18 11/24 16/5 31/1 46/7 46/9 53/19 93/23
Defender [1]  1/18
defense [5]  3/21 9/21 44/19 46/10 86/3
definitely [1]  18/3 88/15
definition [2]  47/1 47/3
degenerative [1]  74/18
degree [6]  82/5 82/7 82/8 83/19 83/20 83/20
dementia [1]  75/2
Dennis [5]  73/1 76/1 76/7 76/10 76/12
Dennis's [1]  76/7
department [1]  75/11
department's [1]  9/10
departure [1]  4/3
depend [1]  82/22
depending [2]  52/21 65/23
depends [2]  58/1 65/24
depict [2]  18/17
depicting [6]  12/10 13/6 15/18 16/11 17/14 18/16
depicts [2]  15/6 34/12
depression [1]  46/19
deputy [1]  9/11
describe [3]  12/7 13/5 69/10
described [2]  31/25 32/1
deserve [2]  67/13 88/11
deserves [1]  89/14
desire [5]  48/14 48/18

48/19 83/3 85/2
desires [9]  48/1 48/2 48/5 48/7 48/15 48/24 49/5 49/8 49/15
Despite [1]  93/1
destroyed [2]  64/15 88/3
details [3]  22/7 37/9 77/1
deter [2]  86/20 86/21
deteriorating [1]  75/14
determination [2]  37/6 92/18
determine [4]  49/1 49/3 56/19 80/5
determined [2]  47/14 94/7
deterred [2]  86/16 86/19
Deterrence [1]  86/15
device [2]  25/4 93/12
devices [5]  10/6 10/8 10/8 15/24 17/22
diagnose [2]  46/18 46/21
diagnosed [8]  47/1 65/5 68/14 74/25 75/1 75/14 76/8 76/23
diagnosing [2]  43/5 47/10
diagnosis [7]  47/13 47/20 47/21 49/1 49/2 52/24 76/16
diagnostic [3]  47/2 47/4 47/9
diane [4]  1/22 1/25 96/7 96/8
different [17]  28/4 28/10 77/7 22/9 48/19 52/6 52/8 68/9 75/6 78/13 79/15 82/21
difficult [1]  69/5
digital [1]  10/12
dildo [2]  14/4 14/4
ding [1]  8/19
Direct [6]  2/4 2/7 2/11 9/13 45/5 63/16
directly [1]  15/2
disability [1]  47/6
disagree [1]  60/13

disclosure [1]  93/17
discovered [1]  69/4
discovery [2]  34/23 35/2
discrepancy [1]  71/7
discretion [1]  86/13
discussing [1]  24/17
disease [3]  74/19 83/24 84/6
disgusts [1]  69/12
disk [8]  5/4 6/23 14/20 18/10 21/23 25/25 32/21 71/3
disks [1]  18/20
disorder [4]  46/19 47/2 68/15 68/15
disorders [3]  47/8 47/10 47/13
displayed [2]  19/19 24/25
displaying [1]  25/4
distract [1]  48/18
distracting [1]  48/14
distraught [1]  41/23
distribution [2]  20/2 79/17
district [5]  1/1 1/1 1/11 93/9 96/9
disturbing [1]  79/19
divorced [1]  74/8
DNA [1]  93/14
docket [1]  94/2
doctor [15]  36/22 42/13 43/3 49/24 53/5
document [1]  43/13
documented [2]  54/22 84/18
doesn't [7]  59/4 64/23 65/10 65/19 81/13 82/10 91/4
dog [1]  33/18
dogs [2]  33/22 75/21
doing [12]  37/13 45/17 62/21 64/23 66/2 67/2 80/3 80/4 80/6 80/9 80/18 81/3
domestic [2]  61/7
DONALD [2]  1/10 44/13
done [16]  6/2 37/10 42/13 64/20 64/21 67/15 68/8 69/11 70/13

USCA11 Case: 17-15611   Document: 24   Date Filed: 09/10/2018   Page: 204 of 215

**D**

done... [7]  73/22
80/25 87/5 88/10 88/10
88/20 89/1
dot [2]  22/18 22/23
dots [3]  22/16 22/16
22/19
Double [1]  11/6
down [10]  18/4 19/18
23/1 23/4 23/13 40/19
46/12 51/6 75/20 90/5
downloading [4]  33/1
33/2 38/1 55/9
downward [1]  4/3
DR [26]  2/6 4/1 4/7
5/14 5/15 42/14 42/15
42/15 44/7 44/9 44/10
44/24 44/25 45/7 45/9
45/14 46/12 53/1 55/2
55/8 62/3 62/18 82/23
83/6 84/25 86/6
dramatically [1]  58/5
dread [1]  66/19
dreamed [1]  29/17
DREW [7]  2/13 40/21
43/15 67/24 67/25 68/3
70/19
drive [2]  17/23 18/12
driving [1]  68/24
drop [2]  51/14 52/9
dropoff [2]  84/24
87/12
drops [2]  56/7 58/5
drove [1]  76/6
due [3]  65/14 66/5
68/17
duration [1]  74/1
during [8]  22/12 32/12
35/22 37/18 39/16
73/25 76/1 80/10
dynamic [1]  77/4

**E**

E-N-C-A-S-E [2]  11/3
16/6
each [11]  11/8 35/2
74/21 75/6 76/11 77/6
77/12 89/21 92/13
92/14 93/6
earlier [2]  23/9 32/1
earliest [7]  15/21
15/23 15/24 16/21 38/1

38/5 38/6
early [1]  39/7
earth [1]  77/13
easier [1]  8/1
easy [1]  25/10 48/16
73/11
easy-victim [1]  48/16
edited [1]  71/1
Edwards [1]  36/17
42/14 42/15 42/15 55/2
55/8
effect [1]  83/7
eight [11]  15/5 15/5
21/6 21/7 21/9 24/13
56/13 75/10 75/18
76/18 78/23
Eighteen [1]  11/12
either [8]  6/25 18/7
20/20 22/24 66/17
72/16 73/16 90/11
ejaculate [2]  17/4
17/7
ejaculating [1]  16/15
electronic [4]  10/5
10/12 36/21 43/23
Eleventh [1]  6/19
elocute [1]  5/19
elocution [1]  5/18
else [4]  30/3 40/22
74/7 86/21
embarrassed [1]  90/14
emotion [3]  81/13
81/22 82/18
emotional [1]  81/15
emotionally [2]  64/8
69/14
emotions [4]  64/18
81/9 81/10 81/12
emphasized [1]  42/12
employed [1]  9/7
employer [1]  93/16
enabling [1]  83/7
Encase [9]  11/3 11/3
11/5 16/5 16/6 16/7
25/15 31/18 31/22
encounter [1]  85/22
encryption [1]  92/13
end [6]  23/13 23/14
28/14 37/21 66/10 77/6
endured [1]  64/17
Enforcement [1]  9/16
engage [3]  47/25 48/8

80/17
engaged [2]  39/15 49/3
engages [1]  85/17
enhance [2]  52/18
52/19
enormously [1]  88/11
enough [5]  26/20 33/25
65/3 69/22 88/8
entails [1]  73/18
entire [1]  37/4
entitled [3]  17/25
19/24 96/6
entry [1]  94/2
equates [1]  82/7
equipment [1]  93/24
escalating [1]  68/12
especially [2]  64/21
90/19
establishing [2]  47/20
47/20
estimate [1]  62/24
et [1]  75/23
ethic [2]  74/12 75/12
eval [1]  38/12
evaluate [1]  50/20
evaluated [6]  36/16
50/12 55/1 55/7 80/7
91/25
evaluation [15]  36/23
37/1 38/4 38/5 38/9
38/9 42/9 42/13 43/1
44/25 45/15 45/17
45/20 46/2 55/4
even [16]  49/21 51/14
52/19 52/19 55/10
58/20 59/15 65/1 66/4
66/9 66/23 73/25 80/23
84/21 89/4 91/25
evenings [1]  27/14
event [1]  93/3
eventually [4]  26/19
37/3 89/12 89/14
ever [16]  40/20 42/25
57/15 66/25 67/10 70/8
71/6 79/19 81/18 85/9
88/1 88/4 88/10 89/2
89/19 90/10
every [9]  35/3 62/15
65/20 73/12 73/21
73/22 75/2 78/18 89/8
everybody [2]  64/3
67/4

**E**

everyday [2]  66/2 66/5
everyone [6]  30/3
52/22 73/10 76/12 80/1
90/5
everything [10]  5/7
30/3 54/14 65/22 65/25
67/1 73/22 78/17 78/17
90/6
evidence [16]  5/4 7/1
7/8 9/17 9/18 9/20
10/21 35/25 46/10
48/22 54/22 56/21
70/21 71/11 71/13
77/25
evidentiary [1]  22/21
evil [1]  70/1
ex [2]  89/11 92/8
ex-wife [2]  89/11 92/8
exact [2]  53/16 80/12
exactly [2]  64/4 69/23
Examination [12]  2/4
2/5 2/7 2/8 2/9 2/11
9/3 41/13 45/5 53/3
62/1 63/16
examine [2]  41/2 45/23
example [7]  20/7 23/12
23/15 25/8 32/5 33/9
34/8
examples [6]  10/25
18/24 20/20 25/23 33/6
68/9
exceed [1]  92/19
exception [1]  90/25
exchange [1]  24/19
exchanges [1]  24/11
exchanging [2]  20/4
20/13
excuse [3]  13/20 21/13
72/8
excused [3]  62/20
67/22 70/20
exhausted [1]  61/17
exhibit [20]  4/16 6/24
7/5 7/8 11/2 14/20
18/18 21/16 21/16
21/23 32/20 36/24
43/14 46/7 46/10 70/23
70/23 71/7 71/8 71/12
expert [2]  9/22 44/24
expertise [2]  9/13
44/21

explain [6]  32/5 32/7
35/19 40/12 46/23
66/14
explanation [1]  29/13
exploitation [3]  10/1
78/14 78/18
exported [1]  18/12
expose [2]  31/5
exposing [1]  79/3
extended [1]  74/3
extensive [2]  68/16
91/18
external [1]  17/23
extraction [1]  79/3
extrapolate [1]  50/25
extremely [3]  69/15
87/14 87/15
eye [1]  89/11
eyes [3]  65/8 65/9
69/18

**F**

F-B [1]  30/4
face [4]  13/10 64/25
66/11 85/19
Facebook [2]  30/4
30/11
fact [10]  57/23 59/10
59/15 60/4 66/10 82/22
84/6 85/13 85/25 94/10
factor [11]  51/11
51/12 51/12 51/16
52/24 55/19 55/20
55/24 60/9 80/15 86/15
factored [3]  58/24
60/8 62/15
factors [24]  51/20
51/21 51/22 51/23 52/1
55/22 56/1 56/7 56/8
56/14 56/18 56/23 57/4
57/9 57/17 58/17 60/10
60/18 62/8 62/8 62/10
82/13 91/11 91/12
facts [3]  53/9 56/15
56/15
Failure [1]  94/18
fall [2]  52/15 68/24
falls [3]  51/9 52/2
85/2
familiar [4]  49/9
54/16 60/21 60/22
family [25]  36/11
36/14 37/2 38/14 65/15

68/23 69/20 73/2 73/17
74/3 74/9 74/16 75/21
77/4 77/5 77/10 77/10
77/19 77/21 80/5 88/2
89/10 90/6 90/19 95/3
fantasies [2]  48/10
48/12
far [3]  7/11 35/4 89/2
fate [2]  90/12 90/12
father [16]  64/10
64/12 69/13 70/4 73/1
73/13 73/14 74/8 74/15
75/20 76/1 76/4 76/5
88/15 89/4 90/11
FCI [2]  85/14 95/10
fear [1]  68/22
federal [1]  66/6
feeding [1]  89/5
feel [4]  45/22 77/6
77/8 80/22
feeling [2]  48/13
81/10
feelings [1]  69/10
feels [1]  65/19
few [6]  18/17 21/2
24/11 27/10 27/11
75/19
figure [1]  28/18
file [27]  4/7 4/12
6/18 11/2 11/4 11/6
11/8 11/10 11/13 12/3
13/3 14/17 15/4 15/14
15/15 16/18 18/20 22/2
25/15 25/16 26/6 31/20
31/20 33/11 34/9 78/11
94/18
filed [3]  4/12 4/19
94/17
files [3]  11/7 15/14
18/18
filings [1]  4/4
finalized [1]  77/1
Finally [1]  86/23
find [2]  50/19 89/23
finding [1]  92/22
findings [3]  46/1
90/24 94/10
fine [7]  4/20 19/14
46/16 71/25 92/23
92/25 95/23
finger [2]  19/20 27/23
fingers [1]  17/16

**F**

finished [1] 43/24
firearm [2] 82/9 93/11
first [15] 3/14 5/22
12/9 15/3 19/2 33/11
66/4 69/25 72/24 81/24
82/5 82/7 83/19 83/20
83/20
five [9] 5/25 6/1 15/5
51/4 51/18 52/1 76/5
81/1 84/19
five-minute [1] 5/25
five-year [2] 52/1
84/19
FL [1] 96/10
FLETCHER [3] 1/17 3/10
44/12
Fletcher's [1] 44/4
flew [1] 76/5
floor [2] 31/2 68/25
FLORIDA [13] 1/1 1/5
1/16 1/19 1/24 74/15
75/6 75/20 76/4 76/6
85/15 95/6 95/9
flsd.uscourts.gov [1]
1/25
focus [1] 46/12
folder [25] 11/2 11/5
14/18 14/20 14/21 15/3
16/7 17/19 17/19 17/22
17/23 17/25 18/2 18/6
18/7 18/11 18/21 19/24
21/23 22/2 25/25 26/2
32/22 32/23 36/25
folders [3] 18/9 18/10
26/1
follow [1] 21/22
followed [8] 27/8
27/13 27/20 28/4 29/5
29/8 29/21 30/11
following [4] 36/11
68/10 85/17 93/15
food [2] 74/23 75/22
fool [1] 92/1
fooled [1] 80/7
fooling [1] 79/21
foregoing [1] 96/4
forensic [8] 9/17 9/19
9/22 11/8 15/23 21/25
22/3 44/24
forever [1] 78/25 79/1
79/4

forfeited [2] 93/25
94/5
forfeiture [2] 3/24
94/1
forget [2] 41/8 65/3
forgone [1] 87/3
form [2] 5/3 23/16
former [1] 90/4
Fort [1] 45/21
forth [1] 23/10
forthcoming [4] 35/2
54/12 54/13 54/14
Fortunately [1] 73/6
found [8] 15/24 20/19
20/20 47/19 51/10 66/8
73/1 79/2
founding [1] 9/10
four [7] 27/18 54/20
63/21 64/5 64/11 64/19
81/2
four-year [1] 64/11
four-year-old [3]
54/20 63/21 64/19
frame [3] 22/8 24/22
24/24
Frankly [1] 35/7
free [2] 27/9 27/13
frequently [2] 50/9
88/25
friend [2] 88/16 89/22
friends [2] 88/16 90/1
friendship [1] 90/6
front [4] 25/3 32/15
74/16 75/17
frustrated [1] 68/12
fuck [1] 31/15
fucking [1] 31/14
full [9] 18/9 18/10
18/21 19/7 25/4 63/13
68/1 74/11 76/16
full-length [1] 74/11
full-time [1] 74/11
fully [1] 25/2
fun [2] 28/24 31/11
function [1] 68/19
funeral [1] 89/17
further [8] 43/6 52/19
52/20 52/24 72/25 75/9
77/24 85/9
fused [1] 76/25
future [13] 48/7 49/25
52/25 62/4 62/11 66/17

77/15 77/16 84/13
84/13 85/23 86/2 86/16

**G**

G920 [1] 15/5
G920T [1] 14/22
Galaxy [1] 22/1
game [1] 89/20
Gary [3] 36/17 55/2
55/8
gave [2] 60/19 72/22
general [1] 49/15
generally [1] 68/7
genitalia [1] 79/3
Genny [1] 6/15
gentlemen [1] 8/15
gets [6] 58/4 59/11
63/23 66/15 68/12
73/10
getting [13] 20/15
20/18 24/19 27/16
28/14 29/6 29/11 29/25
33/3 47/24 53/24 55/10
84/9
girl [10] 13/11 13/16
24/13 25/2 31/6 33/13
33/14 33/15 65/8 70/4
girls [11] 21/1 21/4
28/20 30/21 30/25 31/2
31/12 78/20 79/2 79/5
79/13
give [13] 5/24 21/20
23/1 25/23 34/8 41/8
55/23 56/15 56/25
67/12 70/5 93/1 94/15
given [11] 37/15 53/25
69/20 69/22 72/23 75/4
77/17 89/15 92/6 92/19
94/23
gives [6] 21/18 22/6
22/7 22/8 59/10 77/20
giving [1] 75/25
glad [2] 69/21 69/23
glasses [1] 84/20
god [5] 28/3 28/4
28/10 28/25 29/12
goes [4] 5/6 31/1
31/17 86/16
Gomez [2] 32/6 32/22
gone [2] 22/24 90/3
90/10
good [23] 3/2 3/6 3/9
3/10 3/13 13/11 13/16

**G**

good... [16] 30/13
41/15 41/16 44/1 49/7
53/5 53/5 53/7 63/18
63/19 67/2 72/22 72/3
76/19 90/2 95/25
goodness [1] 80/3
got [13] 4/9 8/6 16/21
26/17 31/9 36/8 40/20
57/21 67/7 67/7 69/21
79/24 95/22
gotten [2] 29/21 69/19
government [25] 1/14
3/25 4/13 5/2 5/8 5/12
5/22 5/24 6/2 7/8 9/2
35/1 35/8 44/20 45/3
62/24 63/12 67/25
70/21 71/14 78/4 82/5
85/24 88/6 89/24
Government's [11] 6/24
7/5 11/2 32/20 36/24
43/25 70/23 71/3 71/11
81/14 82/18
granted [1] 89/15
gravity [1] 81/21
gray [1] 32/4
great [4] 6/2 41/4
82/25 86/13
grew [1] 74/10
gripping [1] 13/17
group [3] 52/10 84/17
85/18
grow [4] 70/4 73/11
79/13 89/3
growing [2] 29/14 73/7
GSM [1] 22/1
guardian [1] 67/8
guess [4] 6/16 34/17
61/11 82/22
guideline [1] 91/9
guidelines [8] 34/2
35/4 81/25 82/7 82/11
86/14 91/4 91/10
guilty [3] 3/19 81/19
86/24
GYIRES [16] 1/14 2/4
2/8 2/11 3/6 6/3 32/3
33/19 37/12 42/9 53/6
61/17 67/17 70/14 78/4
84/21

**H**

ha [8] 27/3 27/3 29/2
29/2 30/12 30/12 31/7
74/6
hair [1] 68/13
half [3] 30/23 66/4
75/18
hand [8] 13/15 14/1
14/1 14/2 22/8 23/23
23/24 63/11
handle [3] 66/5 69/6
74/4
hands [6] 13/9 13/10
68/8 69/13 77/15 77/16
hang [1] 69/22
happen [3] 32/18 66/24
88/21
happened [6] 36/14
37/9 54/22 64/15 65/6
66/19
happens [4] 56/1 58/1
79/10 93/4
hard [8] 17/23 18/12
56/6 64/21 65/2 66/17
69/15 72/20
hardcore [1] 38/2
harder [1] 66/9
hatred [1] 89/5
have [169]
haven't [3] 29/9 29/22
30/13
having [10] 19/8 43/11
48/10 54/19 65/8 65/9
76/15 76/22 77/18
81/11
HDD [2] 18/11 18/21
he'd [1] 75/7
he's [1] 56/1
heads [1] 5/25
health [6] 40/17 75/14
76/7 76/15 76/22 93/17
healthy [1] 73/6
hear [5] 5/17 5/22
8/19 14/5 45/12
heard [2] 8/21 77/19
hearing [2] 1/10 45/10
heart [2] 76/9 90/7
Heaven [1] 31/13
heavy [1] 83/13
help [8] 65/22 73/24
74/6 75/20 76/3 76/5
83/22 88/24

helped [1] 74/21
helping [2] 73/12
74/23
helplessly [1] 87/25
her [80] 12/23 13/9
13/10 13/10 14/2 16/11
16/12 16/15 17/14
17/15 17/16 17/17
24/18 25/4 25/5 25/6
25/7 26/22 27/2 27/4
27/6 27/15 27/17 27/19
27/20 27/21 27/22 28/4
28/5 28/23 29/7 29/17
29/22 31/5 31/6 32/10
32/13 33/18 34/12
34/12 34/13 64/12
64/15 64/20 64/20
64/21 64/25 65/1 65/7
65/9 65/10 65/19 65/20
65/20 65/21 66/19
66/20 66/23 66/24
67/12 68/12 68/13
68/17 68/22 68/24 69/7
69/8 69/8 69/11 69/13
69/13 69/17 69/17
69/18 69/10 70/7 70/7
71/19 89/6 89/15
96/4
hereby [3] 93/25 94/5
96/4
herself [1] 65/7
Hi [1] 12/14
hid [2] 69/2 78/22
hide [1] 68/25
high [5] 55/21 55/24
58/3 76/9 86/11
highest [1] 62/10
highlight [2] 28/13
78/13
highlighted [1] 42/10
him [60] 5/25 5/25
12/10 12/24 14/5 20/16
20/19 25/10 25/13 32/2
32/13 32/14 32/17 38/1
38/10 39/15 41/1 42/1

**H**

him... [42]  43/5 43/5
46/14 46/21 47/17
50/12 51/25 52/6 54/21
55/11 57/21 57/24 58/3
58/13 59/10 60/3 64/13
67/2 67/3 67/4 68/23
69/1 73/24 74/2 74/6
74/21 74/22 74/22
74/23 75/8 79/2 79/5
84/15 84/16 86/18
86/20 87/11 87/23
89/24 89/25 91/22
95/21

himself [8]  13/14 25/9
69/23 75/9 75/25 77/8
89/23 89/23

hip [1]  76/16

history [4]  60/21 91/3
91/9 92/6

hold [1]  10/13

home [8]  27/10 30/22
31/1 43/10 73/25 75/3
81/3 89/24

Homeland [1]  9/8

honest [1]  29/23

Honor [74]  3/6 3/10
4/5 4/6 5/2 5/15 6/4
6/7 6/20 6/23 7/3 7/16
8/3 8/11 8/11 8/19
8/22 9/23 34/1 34/5
37/5 37/7 37/10 40/24
41/6 42/5 42/7 42/23
43/20 44/2 44/23 46/6
61/21 62/19 63/1 63/3
63/25 64/3 67/5 67/18
68/4 70/5 70/16 70/22
71/9 71/14 72/2 72/7
72/11 77/22 77/24 78/6
78/9 80/15 81/5 81/7
83/5 83/12 84/10 84/21
85/3 85/14 85/24 86/4
86/4 86/13 86/18 87/8
87/21 87/24 94/2 94/12
94/21 95/24

HONORABLE [2]  1/10
44/13

hope [3]  48/2 74/2
77/13

hopefully [4]  48/17
65/3 72/5 77/20

horny [1]  26/20

**I** (top of column 2)

horrendous [1]  84/1

horrible [1]  66/13

hours [5]  34/23 39/7
75/7 75/18 93/8

house [5]  29/21 69/21
74/21 75/22 77/10

housewares [1]  75/11

housing [1]  85/15

however [3]  7/1 69/5
88/25

HSI [2]  3/7 56/21

huh [1]  31/10

hundred [3]  20/16
20/17 59/11

hurt [2]  88/11 88/22

hurting [1]  64/6

hurts [1]  65/1

husband [2]  88/14
90/11

hypothetically [1]
56/16

hysterically [1]  69/3

**I**

I'll [14]  8/18 19/2
26/15 26/16 30/6 35/9
35/11 40/12 42/7 57/10
72/5 73/4 92/17 95/11

I'm [68]  4/22 5/7 6/10
9/21 13/2 13/22 13/23
14/20 14/23 15/21
24/13 27/13 27/17 28/5
28/18 28/21 28/22 29/7
30/10 31/14 32/4 34/17
35/19 37/10 42/20
45/10 45/10 53/6 53/24
54/18 55/25 56/4 56/10
56/13 56/20 57/7 58/11
60/22 60/25 61/3 64/5
64/24 67/15 68/4 69/4
69/19 69/21 69/23
70/12 77/11 79/6 79/11
82/17 83/18 84/3 84/24
85/13 87/9 89/7 90/5
90/13 90/13 92/7 93/1

I've [2]  27/15 32/18

I-N-D-E-X [1]  2/1

icons [1]  24/6

idea [1]  21/20

ideas [1]  26/22

identification [3]
11/21 11/22 15/10

identified [4]  22/18
22/20 71/11 93/24

identifies [1]  15/16

identify [1]  85/21

ignored [1]  68/7

III [1]  91/9

image [3]  19/16 22/4
23/11

images [9]  18/15 18/16
19/13 19/15 78/24 79/1
79/2 79/3 79/14

imagined [1]  64/14

immediately [1]  80/4

impact [1]  4/1

impacted [1]  68/9

implore [1]  81/21

imply [3]  34/24 35/1
86/11

important [7]  58/9
58/10 77/5 77/20 83/12
86/15 91/12

impose [3]  84/4 86/11
87/9

imposed [5]  87/1 92/25
94/9 94/17 95/18

impression [1]  53/25

imprisonment [5]  78/4
92/12 92/13 93/4 94/6

impulses [1]  82/24

incarcerated [5]  52/13
52/14 52/18 77/3 94/25

incarceration [4]
50/23 50/23 51/2 77/10

incident [2]  17/6 61/1

incidents [2]  61/7
61/10

include [2]  19/20 33/7

included [1]  22/20

including [1]  93/15

increase [7]  55/16
56/16 57/1 57/3 57/22
60/7 60/12

increased [2]  58/14
58/17

increases [1]  60/20

index [1]  57/12

indicated [3]  30/17
32/14 95/14

indictment [2]  53/15
53/18

individual [2]  11/8
48/23

**(page 2, column 1)**

**I**

38/24 41/17 80/1

is [356]

Isabella [1]  65/8

Isn't [1]  82/25

issue [3]  3/16 46/1
94/14

issues [3]  65/18 66/22
85/19

it [236]

it's [45]  6/23 8/6 8/8
9/18 10/12 13/5 13/13
14/21 15/5 16/15 17/13
17/20 18/18 19/16 20/9
20/9 21/20 23/18 25/1
26/23 30/19 31/18
32/22 33/12 35/20 47/1
54/10 55/22 56/17 57/8
57/8 58/16 59/24 60/1
66/17 70/23 70/24
71/21 73/11 83/14
83/15 83/16 84/2 84/19
92/22

its [2]  35/9 95/22

itself [1]  18/6

**J**

jail [11]  39/19 39/20
40/3 40/9 40/18 41/17
45/21 64/24 68/21
79/24 92/8

January [2]  16/24
24/10

job [5]  66/2 74/11
81/2 81/3 82/16

joint [1]  3/21

joints [1]  76/8

JOSEPH [1]  1/6 3/4
92/10

jpeg [1]  19/16

judge [17]  1/11 4/10
7/9 37/2 41/3 44/6
45/4 62/21 71/5 71/17
71/24 81/9 82/3 82/16
87/13 87/13 95/12

judgment [2]  92/10

July [2]  39/3 65/4

June [7]  38/9 38/11
39/4 39/5 39/6 39/7
76/17

jury [1]  7/12

justice [5]  59/5 67/12
70/6 80/20 80/24 81/5

justify [1]  88/4

**(page 2, column 2)**

juvenile [1]  54/20

juveniles [1]  54/20

**K**

K-A-T-R-I-N-A [1]  63/2

K-E-N-I-A [1]  23/21

K-I-K [1]  30/7

KATRINA [5]  2/10 63/2
63/12 63/15 89/11

Kay [2]  29/17 29/18

keep [4]  76/20 76/21
84/6 87/23

Keith [7]  72/24 72/24
73/4 73/9 73/25 75/23
76/13

Kenia [2]  23/17 23/19

kept [3]  78/22 80/4
80/6

kid [1]  80/9

kidnapping [1]  82/9

kids [3]  19/25 80/8
89/3

Kik [3]  30/1 30/2 30/7

kill [2]  40/21 92/8

killed [1]  82/3

kind [3]  10/8 88/23
88/24

kissing [1]  12/11

knees [1]  76/9

knew [5]  55/16 58/19
58/20 59/2 59/3

knit [1]  74/9

knowing [1]  79/14

knowledge [2]  53/24
77/18

knows [1]  27/1 77/12

**L**

labeled [6]  15/2 15/3
21/24 22/10 26/1 26/2

laptop [2]  6/13 7/15

large [1]  90/1

larger [1]  24/7

lascivious [1]  61/8

last [11]  23/21 28/12
29/17 39/18 51/10
64/22 66/9 70/3 75/1
87/24 91/2

lately [3]  27/16 29/11
30/13

later [3]  52/25 57/23
73/2

latest [2]  16/2 16/24

**L**

law [6]  9/16 36/15 37/2 81/12 81/13 81/23
lead [1]  46/14
learn [4]  48/17 74/21 85/20 85/21
learned [3]  77/7 77/15 89/6
learning [1]  48/13
least [11]  17/16 20/16 20/20 37/2 37/3 37/16 39/16 50/23 54/6 57/21 80/19
leave [3]  43/22 65/19 65/20
leaving [1]  66/23
LEEANN [6]  2/13 40/1 41/18 67/23 67/25 68/3
left [5]  22/8 66/3 69/13 89/5 90/10
left-hand [1]  22/8
legal [1]  55/5
legally [2]  61/4 82/14
legally-sound [1]  82/14
legitimate [1]  47/5
legs [1]  31/12
length [1]  25/4
lengthy [1]  24/17
Leon [6]  74/18 74/20 74/25 75/4 75/23 76/13
less [2]  23/15 59/17
lessons [1]  77/15
let [13]  19/3 20/14 24/1 27/2 27/12 28/12 47/22 51/6 51/19 80/13 80/14 90/5 90/24
let's [15]  5/20 9/1 10/5 14/23 20/2 32/24 32/25 33/1 35/18 38/9 39/9 42/9 48/6 62/23 63/9
letter [4]  72/9 72/19 77/19 77/19
letters [2]  4/3 72/12
letting [1]  61/21
level [4]  53/23 82/2 82/4 91/8
lewd [1]  61/8
lick [1]  65/9
licking [5]  15/8 15/9 27/22 28/4 33/18

lies [1]  67/2
life [27]  67/11 73/11 73/22 73/24 74/20 77/9 78/4 80/19 80/22 82/18 87/1 88/1 88/2 88/19 89/14 89/14 90/4 90/8 90/15 91/9 92/11 92/12 93/1 93/6 93/6 94/4 94/7
light [3]  3/25 28/6 87/14
lighter [1]  84/4
like [26]  5/5 10/9 19/4 19/5 21/9 21/19 31/11 40/25 51/23 52/12 52/22 60/11 63/3 63/22 69/1 70/1 71/17 72/5 72/14 73/13 78/16 79/20 81/4 83/19 89/24 95/20
liked [1]  74/12
list [2]  18/14 23/18
listed [9]  51/21 51/24 56/19 57/4 60/9 60/22 61/4 62/8 82/8
litem [1]  67/8
literally [1]  31/15
little [20]  21/22 23/25 24/1 27/20 27/20 29/11 31/2 32/7 40/9 46/14 46/14 70/3 70/10 72/22 74/6 76/2 78/20 79/2 79/13 87/10
littlest [1]  66/2
live [6]  73/24 74/22 76/11 77/8 77/9 90/16
lived [2]  57/15 60/17
lives [8]  66/12 67/14 73/21 77/8 82/25 88/1 17/14
living [2]  30/22 77/10
loader [1]  75/11
located [1]  14/18
location [2]  17/7 18/9
logical [4]  41/25 42/1 42/2 42/3
LOL [11]  26/18 27/2 28/18 29/12 29/24 30/24 31/10 31/11 31/12 31/13
long [8]  9/9 15/15 25/1 31/16 67/5 67/6

69/20 81/4
longer [4]  50/24 73/16 74/3 89/25
look [12]  4/19 7/25 21/8 21/9 22/3 35/2 49/2 51/25 56/4 57/6 57/8 64/25
looked [4]  10/15 19/9 35/3 70/23
looking [10]  6/21 11/1 11/10 15/3 18/14 27/16 34/23 35/5 53/9 57/7
looks [3]  21/19 31/11 69/1
losses [2]  92/17 92/18
lost [2]  88/20 89/20
lot [11]  10/15 11/20 18/25 27/16 53/25 64/4 66/1 78/12 79/20 79/21 88/1
love [7]  27/4 27/20 70/1 76/13 77/5 89/11 90/20
loved [3]  74/12 77/21 88/1
loves [2]  28/23 65/9
low [7]  50/24 51/9 56/11 56/13 84/21 84/21 84/22
lower [4]  52/20 52/25 76/23 84/23
lowers [1]  49/8
lowest [1]  51/6
lubricant [1]  32/16
Lucie [2]  40/18 45/21
luck [1]  96/1
lumbar [1]  76/23
lying [2]  15/18 16/16 17/14

**M**

M-A-D-D-O-X [1]  26/3
ma'am [1]  63/18
Maddox [7]  12/17 25/22 25/24 26/2 26/2 26/12 26/15
made [6]  66/9 75/22 76/13 88/4 88/7 88/9
main [1]  22/22
majority [3]  21/4 21/12 21/14
make [10]  23/25 30/6 32/18 35/3 41/4 86/5

**M**

make... [4]  87/11 87/19 88/20 88/25
makes [1]  30/24
making [7]  5/17 11/21 41/17 52/11 52/13 65/11 74/22
male [2]  57/14 60/13
man [10]  29/15 66/24 67/5 69/22 70/1 70/5 70/8 74/17 77/12 88/24
manage [1]  73/3
management [2]  85/14 95/8
manager [1]  75/11
manipulating [3]  17/16 34/13 67/3
manner [1]  94/11
manual [3]  47/3 47/5 47/9
many [11]  20/11 20/16 23/22 34/23 34/23 58/15 65/18 68/9 68/10 80/16 85/24
Marianna [3]  85/15 94/22 95/9
mark [2]  27/19 29/9
marked [4]  6/24 14/22 28/15 71/4
married [1]  64/14
Mart [1]  75/9
Martin [1]  53/6
MARTON [2]  1/14 3/6
masochism [1]  33/25
masturbating [6]  12/10 12/13 13/14 14/12 16/12 32/12
masturbation [1]  48/12
match [1]  48/1
material [4]  18/13 20/24 34/3 34/22
materials [3]  21/25 93/20 94/4
matter [8]  49/2 52/23 56/17 59/4 59/8 59/14 59/15 96/6
matters [1]  8/4
maximum [1]  70/6
maybe [9]  5/7 15/20 27/23 27/23 33/9 33/20 33/25 48/11 78/15
mean [10]  7/19 12/16

15/8 19/3 25/11 55/19 55/25 60/18 79/13 84/10
meaning [5]  20/7 36/19 47/18 50/6 58/23
meant [1]  26/24
meanwhile [1]  80/9
mechanisms [3]  83/9 85/4 85/21
media [4]  10/13 30/7 70/8 74/17
medical [1]  91/25
medication [2]  75/2 76/10
medicine [1]  75/4
meet [1]  72/25
members [2]  68/23 69/20
memorandum [3]  3/25 78/11 81/24
memories [1]  66/13
memory [2]  43/13 90/4
mental [3]  40/17 47/13 93/17
mentally [1]  69/14
mention [1]  19/7
mentioned [2]  51/16 55/22
mercy [1]  90/14
message [5]  28/25 29/20 30/1 30/4 30/4
messages [2]  26/15 70/24
messaging [1]  30/20
met [1]  75/4
Miami [2]  45/10 45/10
MICHAEL [4]  2/6 44/19 44/24 45/8
microphone [1]  87/22
mid [1]  74/19
middle [1]  22/17
MIDDLEBROOKS [2]  1/2 1/10
Middlebrooks' [1]  44/13
might [4]  6/11 44/6 46/14 53/22
milestones [1]  72/25
miller [1]  1/22 1/25
million [1]  59/13
mind [4]  28/22 31/14

65/9 67/10
mine [1]  69/19
minor [4]  33/14 33/15 54/2 60/2
minors [14]  20/11 20/12 20/13 20/18 20/20 38/11 55/10 57/21 78/23 79/18 91/20 93/18 95/14 95/15
minute [4]  5/25 33/12 33/17 34/11
minutes [3]  5/7 5/16 6/1
mirror [2]  25/3 25/4
miss [12]  26/15 29/4 29/5 40/21 63/2 63/3 66/1 67/21 67/23 70/19 77/23 89/7
Miss Maddox [1]  26/15
missing [1]  5/11
misspelling [1]  28/2
mistyped [1]  26/23
molested [3]  16/22 59/21 91/16
molesting [2]  39/15 55/9
mom [4]  64/10 72/4 89/16 89/20
moments [1]  89/18
mommy [2]  65/20 65/20
monitoring [1]  86/7
monitors [3]  7/11 7/23 65/16
month [3]  38/4 38/8 66/4
month-and-a-half [1]  66/4
months [10]  38/12 39/9 65/6 66/9 75/19 75/25 76/18 87/10 92/12 92/13
mood [1]  68/14
more [32]  14/7 17/11 25/23 27/24 27/25 28/1 29/6 33/20 35/14 57/16 59/16 59/17 59/18 60/18 65/1 65/14 66/25 70/21 71/13 73/11 73/12 75/18 76/22 79/5 79/7 85/7 88/11 89/18 89/18 89/19 90/7 90/19

## M

**morning [11]** 3/2 3/6 3/9 3/10 3/13 39/7 41/15 41/16 53/5 63/18 63/19
**most [11]** 6/16 50/8 50/9 51/11 51/12 64/6 76/20 78/13 79/18 88/11 89/13
**mostly [3]** 6/5 21/1 39/21
**mother [9]** 4/2 5/17 39/21 40/2 40/5 53/20 65/14 89/6 92/9
**mothers [3]** 5/9 41/8 44/1
**motion [2]** 3/23 4/2
**motive [1]** 83/21
**mouth [2]** 65/8 65/9
**move [5]** 7/1 8/18 12/25 19/23 20/2 32/24 32/25 35/11 35/18 40/8 42/7 71/4 76/6
**moved [2]** 65/13 74/15
**movements [1]** 73/19
**moving [2]** 9/25 76/4
**Mr [15]** 2/5 2/7 2/8 2/9 2/11 12/19 15/7 32/3 33/19 37/12 42/9 70/14 70/17 77/24 85/15
**Mr. [83]** 3/11 3/13 3/16 3/19 3/22 5/17 5/18 6/3 6/25 8/8 12/10 12/13 12/20 13/6 13/11 13/14 13/16 14/1 15/18 16/12 16/14 17/15 18/1 20/21 20/21 22/25 24/11 26/16 36/21 36/22 40/5 40/17 41/17 42/15 42/25 43/10 43/11 43/16 44/4 44/22 45/18 45/19 45/20 45/23 46/18 47/14 50/11 50/18 53/19 61/17 61/23 63/5 64/9 67/17 67/19 68/4 68/8 68/17 68/21 69/8 69/16 69/24 70/22 70/25 71/3 71/16 78/4 81/19 82/1 82/6 83/14 84/21 85/6 85/11 86/16

86/23 87/18 91/1 91/16 92/5 94/16 94/20 95/17
**Mr. Brian [1]** 53/19
**Mr. Fletcher's [1]** 44/4
**Mr. Gyires [5]** 6/3 61/17 67/17 78/4 84/21
**Mr. Peacock [14]** 3/13 3/16 6/25 8/8 44/22 45/18 61/23 63/5 70/25 71/3 71/16 91/1 94/20
**Mr. Peacock's [2]** 70/22 92/5
**Mr. Trader [51]** 3/11 3/19 5/18 12/13 12/20 13/11 13/14 15/18 16/12 16/14 17/15 18/1 20/21 20/21 22/25 24/11 26/16 36/22 40/5 40/17 41/17 42/15 42/25 43/11 43/16 45/19 45/20 45/23 46/18 47/14 50/11 50/18 64/9 68/8 68/17 68/21 69/8 69/24 81/19 82/1 82/6 83/14 85/6 85/11 86/16 86/23 87/18 91/16 94/16 95/17
**Mr. Trader's [9]** 3/22 5/17 12/10 13/6 13/16 14/1 36/21 43/10 69/16
**Mrs. [1]** 43/15
**Mrs. Drew [1]** 43/15
**much [13]** 24/7 30/1 52/8 62/19 65/24 66/19 67/13 77/12 77/21 80/21 82/22 82/25 90/8 74/14 76/13
**multiple [2]** 18/25 69/6
**murder [6]** 82/5 82/7 82/8 83/19 83/20 83/21
**must [1]** 94/17
**myself [5]** 65/2 65/3 69/8 74/14 76/13

## N

**naked [2]** 60/4 79/2
**name [1]** 8/25 9/5 23/21 24/24 45/7 53/5 63/13 65/8 68/1

**named [3]** 26/12 32/6 36/17
**names [1]** 15/15 15/15
**narrow [1]** 46/12
**national [1]** 50/4
**nature [6]** 24/20 54/16 74/5 91/12 91/12 91/13
**near [1]** 82/10
**necessarily [6]** 17/9 19/8 20/15 25/11 25/19 32/6
**neck [1]** 75/17
**need [10]** 5/25 29/6 35/8 66/20 70/22 76/24 80/3 82/16 88/25 91/14
**needed [6]** 74/20 75/7 75/7 76/11 76/16 77/22
**needs [5]** 4/16 73/10 73/18 74/17 75/4
**negative [1]** 51/8
**neither [1]** 92/24
**never [3]** 34/25 34/15 60/17 64/14 65/7 69/17 69/24 70/8 73/23 73/24 74/13 75/12 88/22 89/7 93/9
**new [7]** 30/2 74/11 74/15 75/20 76/1 76/5 89/19
**next [5]** 16/12 17/5 25/23 27/10 67/23
**night [2]** 39/7 68/11
**nightmares [2]** 65/16 65/17
**nine [4]** 15/5 21/10 75/24 91/17
**nine-year-old [1]** 91/17
**noise [1]** 8/21
**noncontact [1]** 57/12
**nonsexual [3]** 57/12 57/13 60/15
**nonstop [1]** 32/19
**Nope [1]** 29/10
**normal [3]** 27/24 73/6 73/7
**normally [3]** 5/22 68/19 71/20
**North [1]** 95/6
**not [112]**
**note [2]** 92/7 92/19
**noted [2]** 14/19 93/21
**nothing [3]** 30/14

---

## N

**nothing... [2]** 60/11 66/3
**notice [2]** 94/17 94/18
**November [2]** 16/22 38/3
**nude [1]** 25/3
**number [26]** 3/4 11/9 11/10 11/12 13/12 14/17 15/4 15/13 16/6 16/8 16/10 16/13 17/1 17/3 17/12 23/6 25/16 31/20 31/21 31/22 31/22 34/9 51/15 59/4 60/12 82/25
**number 40330 [1]** 15/13
**numbers [6]** 11/4 11/11 12/25 33/10 50/25 59/14
**numerous [1]** 39/20
**nuzzling [1]** 13/6

## O

**O-M-G [1]** 28/3
**oath [4]** 9/11 44/17 63/4 71/20
**object [5]** 34/15 37/5 37/9 46/13 94/10
**objecting [1]** 37/8
**objection [10]** 7/3 34/2 34/17 35/10 37/11 42/5 45/3 46/8 94/13 95/21
**objections [1]** 3/21
**obligated [1]** 93/1
**obligation [1]** 82/12
**obviously [10]** 8/1 8/3 9/25 11/18 33/15 35/14 85/11 86/16 86/17 89/6
**occasion [1]** 45/14
**occurred [1]** 81/18
**occurring [2]** 55/14 55/14
**occurs [1]** 87/12
**October [6]** 36/9 36/11 36/14 36/25 75/15 94/3
**odds [3]** 55/16 58/13 60/7
**off [15]** 7/23 8/16 26/15 28/23 29/21 29/25 34/25 51/14 56/7 57/25 58/4 58/5 66/4

**offender [12]** 45/18 49/7 49/13 50/10 62/5 62/5 85/12 85/14 91/4 93/19 93/21 95/8
**offenders [1]** 62/6
**offending [2]** 55/17 59/18
**offense [9]** 35/21 50/6 82/1 82/3 86/22 87/3 91/8 91/13 91/13
**offenses [8]** 51/11 51/14 51/15 51/23 57/11 57/12 58/6 59/19
**offer [1]** 46/7
**offering [1]** 44/23
**office [3]** 1/15 1/18 93/9
**officer [1]** 91/2
**Official [1]** 1/23 96/8
**oh [6]** 28/3 28/25 29/4 29/12 58/19 80/3
**old [26]** 14/14 16/18 16/18 21/7 21/9 21/10 51/3 51/13 51/22 52/7 52/20 58/1 73/8 73/11 74/3 74/10 80/2 **oldest [1]** 89/5
**olds [1]** 56/2
**once [1]** 22/5 48/21 51/13 56/7 65/4 65/23 69/22 79/23 85/1 89/25 90/18
**ones [5]** 17/9 18/25 27/10 33/22 79/1
**online [18]** 17/8 20/2 20/2 20/4 20/7 33/3 38/11 55/10 57/20 58/14 59/21 60/2 60/4 79/23 80/1 80/6 80/7 80/9
**only [13]** 7/10 43/25 48/18 56/22 61/3 64/15 67/10 68/5 69/13 70/6 73/20 77/12 80/22
**open [21]** 11/14 12/4

---

13/7 13/24 14/10 18/11 18/20 21/22 21/24 22/2 22/5 22/10 24/22 25/17 25/25 26/1 31/24 33/16 34/10 40/10 40/13
**opened [3]** 21/21 22/5 26/10
**opening [6]** 14/25 15/19 23/18 26/4 26/6 33/12
**opens [2]** 11/7 23/23
**opined [1]** 36/22
**opinion [3]** 42/4 53/8 83/17
**opportunity [6]** 5/19 41/8 45/22 50/21 87/20 87/25
**opposed [1]** 52/7
**opposite [1]** 60/19
**oral [2]** 15/7 54/21
**order [6]** 23/25 24/21 44/7 88/20 93/2 93/25
**ordered [2]** 23/14 83/16
**organization [2]** 50/2 50/4
**organizations [1]** 93/18
**other [37]** 16/5 17/8 17/10 20/4 21/2 23/19 29/2 33/22 39/23 43/25 47/19 48/9 48/9 48/11 48/14 49/1 50/21 51/11 51/23 52/15 56/8 56/23 58/16 59/20 60/16 70/7 76/11 77/6 78/23 78/23 79/17 79/18 80/9 83/7 89/21 91/22 93/11
**others [5]** 25/12 43/16 49/18 82/8 91/19
**otherwise [1]** 80/20
**ought [2]** 4/18 42/22
**out [30]** 18/9 26/17 28/19 28/21 31/14 40/20 44/7 45/11 51/1 51/10 57/10 62/24 65/5 66/4 66/8 68/13 73/1 74/23 76/12 79/14 80/13 80/14 80/16 80/24 81/24 82/20 82/11 83/25 84/1 90/9
**outrageous [1]** 80/15

**O**

over [28]   6/11 20/17
22/19 24/5 28/20 31/11
40/8 51/4 51/17 52/1
57/19 57/20 57/24 58/3
58/5 58/25 59/3 59/6
62/21 64/9 66/8 72/22
84/19 87/10 87/22
87/24 91/20 91/21
overrule [1]   35/9
overruled [1]   37/11
overview [1]   21/17
overwhelmed [1]   66/11
own [7]   20/23 66/22
70/2 74/6 78/19 78/24
91/16

**P**

P-I-K-E-K [1]   14/24
P-R-O-C-E-E-D-I-N-G-S
[1]   3/1
p.m [2]   24/12 96/2
page [6]   2/2 28/16
36/20 36/21 50/16 57/8
28/12
pages [3]   1/7 26/8
28/12
painful [1]   69/7
pajama [1]   31/5
PALM [6]   1/5 1/16 1/19
1/24 44/13 96/10
panic [2]   65/25 68/24
panicked [1]   67/9
papers [1]   78/2
paragraph [2]   91/2
91/6
paralyzed [1]   75/19
paraphilia [2]   47/1
47/2
paraphilias [1]   47/7
paraphrasing [1]   79/11
parents [4]   74/3 74/16
88/13 89/25
part [8]   15/16 37/2
37/16 54/19 74/11 83/6
83/12 93/21
part-time [1]   74/11
partial [1]   37/4
participants [1]   30/18
participate [1]   52/17
participation [1]
48/23
particular [6]   5/21

22/4 22/13 23/4 25/21
43/5
particularly [1]   56/3
parties [2]   71/6 71/19
pass [2]   89/16 89/25
passed [1]   73/16
passport [2]   18/10
18/21
past [2]   55/18 81/1
paste [1]   24/24
path [1]   21/22
pay [3]   7/22 92/20
92/23
paying [1]   75/22
PDF [1]   26/6
PEACOCK [22]   1/17 2/5
6/25 8/8 44/12 44/22
45/18 61/23 63/5 67/19
70/17 70/25 71/3 71/16
77/24 91/1 94/20
Peacock's [2]   70/22
92/5
pedophilia [12]   46/21
46/23 47/5 47/15 47/23
48/23 49/4 49/14 49/16
83/8 83/14 85/20
penalty [2]   53/18
80/18
pending [6]   36/12
38/14 38/25 39/2 55/12
80/6
penetration [1]   19/20
penis [9]   11/18 11/21
12/11 13/6 13/16 13/17
14/2 15/19 32/17
people [23]   5/1 17/8
17/11 20/4 20/11 22/14
39/23 47/24 50/1 51/13
52/10 51/25 63/4 65/18
65/19 66/23 80/17
82/23 84/18 87/4 87/18
88/11 90/2
per [1]   70/22
percent [11]   35/20
51/5 51/17 52/1 52/10
56/2 56/13 56/16 56/17
84/19 84/20
percentage [1]   84/12
performed [1]   85/1
performing [1]   15/7
54/21 62/9

period [10]   39/16
50/23 51/4 51/17 52/2
52/14 80/10 84/19
91/18 94/18
permanent [1]   82/10
permission [3]   4/24
37/15 63/25
person [14]   12/21 48/4
48/6 49/4 57/15 59/16
69/22 72/20 72/21 83/8
85/1 85/17 88/23 93/8
person's [2]   48/2
84/13
personal [1]   69/16
personally [1]   66/22
petition [1]   38/14
pets [1]   75/23
phone [15]   4/22 20/7
20/8 20/9 20/10 20/10
22/2 22/4 22/7 22/13
22/19 30/2 47/19 62/22
67/7
phones [5]   3/24 21/24
22/1 24/19 93/24
photos [4]   17/9 17/10
21/8 36/23
physically [1]   64/7
pick [3]   18/22 18/23
74/23
Pics [1]   19/24
pictures [2]   60/4 79/7
piece [1]   10/12
Pierce [1]   45/21
Pikek [2]   14/22 14/24
place [3]   43/7 81/13
83/9
placed [1]   93/5
places [1]   95/2
Plaintiff [1]   1/4
plan [4]   4/25 5/10
5/13 71/20
play [9]   14/9 31/16
34/7 34/8 39/25 39/25
40/3 40/7 40/12
played [11]   11/14 12/4
13/7 13/24 14/10 25/17
32/3 32/16 40/10 40/10
40/13 41/17
playing [5]   25/1 27/22
29/6 30/22 34/10
plea [3]   3/15 3/21
93/24

**P**

plead [2]   70/5 70/6
please [11]   3/2 9/5
63/13 67/12 68/1 88/22
91/6
pleasure [1]   4/11
pled [2]   81/19 86/24
plenty [1]   21/15
podium [1]   72/1
point [22]   13/15 16/15
22/22 33/21 37/24
41/20 49/21 50/25 51/7
52/25 56/11 56/13
59/10 59/11 59/13
62/24 64/7 66/15 66/18
68/12 68/20 82/17 84/9
84/12 84/23 85/8 85/10
91/23 95/16
pointed [1]   81/24
points [5]   57/24 57/25
58/4 58/25 82/2
polygraph [1]   85/6
porn [1]   29/6
pornography [34]   6/5
12/20 12/22 12/23 20/5
20/21 20/22 21/3 21/14
22/24 23/6 23/10 24/9
24/19 32/13 33/2 33/7
35/16 36/5 38/2 38/3
38/5 38/6 55/9 55/11
57/22 58/23 59/17 80/1
81/18 91/20 91/21
91/22 91/22
posed [1]   34/2
poses [3]   56/10 56/11
58/3
possess [1]   93/12
possessing [2]   80/1
93/11
possession [4]   35/15
36/6 93/16 93/19
possibility [1]   92/5
possible [1]   89/2
possibly [1]   67/6
post [3]   51/5 60/4
79/6
posted [1]   79/9
potential [1]   51/4
potentially [1]   52/19
practiced [1]   5/6
predator [1]   70/2

predict [3]   49/6 49/25
84/12
predicting [1]   62/11
preliminary [1]   93/25
prep [1]   75/23
prepare [1]   63/22
prepared [1]   5/3
prepubescent [5]   21/12
21/15 46/24 46/25 47/3
present [7]   3/11 5/5
35/9 78/1 78/7 86/5
92/2
Presentation [1]   5/3
presented [1]   86/3
presentence [3]   3/20
90/25 93/21
preserve [1]   94/12
pressure [1]   76/9
pretty [9]   6/14 27/13
41/23 42/6 51/9 56/13
82/22 82/25 84/22
previously [2]   31/25
54/8
prey [1]   70/3
preying [1]   78/20
Primarily [2]   20/9
81/14
primary [2]   46/24
46/25
prior [19]   9/10 9/11
35/21 51/11 51/15
52/23 55/4 55/5 57/7
57/11 57/11 57/13 58/6
58/7 58/20 58/22 60/15
72/23 89/9
priors [1]   54/12
prison [3]   40/20 90/12
90/16
Prisons [4]   49/12
85/23 92/11 92/16
Prisons' [2]   49/9
52/18
probability [1]   49/8
probable [1]   28/1
probably [9]   5/5 5/8
7/23 29/22 33/25 42/22
74/5 85/7 95/2
probation [11]   37/18
37/21 38/17 38/19
39/12 39/13 80/10
80/10 81/3 91/1 93/9
probation in [1]   38/19

problem [4]   74/13
74/20 75/13 82/20
problems [3]   76/9
76/22 85/22
proceed [2]   8/22 45/2
proceeding [2]   80/5
91/24
proceedings [8]   8/2
35/22 37/25 54/9 55/11
55/17 96/2 96/5
process [2]   66/6
produce [2]   24/18 33/3
produced [3]   20/24
24/18 35/7
productive [1]   77/9
profession [2]   50/2
62/7
professionals [1]
91/25
program [8]   14/25
21/19 40/8 40/9 85/14
85/16 85/16 85/23
programs [10]   9/17
9/19 10/18 49/10 49/13
49/17 49/22 52/18
85/13 95/8
prohibited [1]   93/11
projected [1]   6/11
promised [1]   92/8
pronounced [1]   94/11
prosecutor [1]   53/6
protect [2]   70/1 91/14
protection [1]   92/6
protective [2]   52/24
77/9
proud [1]   85/23
provide [2]   81/5 92/6
provided [1]   47/17
providing [1]   47/13
PSI [1]   95/14
PSR [6]   35/20 36/2
70/24 70/25 71/7 79/8
PSY.D [1]   44/19
psyche [1]   38/12
psychiatrists [1]
47/12
psychological [10]
38/4 38/8 38/9 42/12
43/1 45/24 47/10 49/24
52/20 87/11
psychologist [4]   36/16
55/1 80/7 84/24

USCA11 Case: 17-15611    Document: 24    Date Filed: 09/10/2018    Page: 210 of 215

**P**

psychologist's [1] 36/19
psychologists [3] 47/12 84/25 85/19
psychology [2] 44/21 44/24
PTSD [2] 65/5 68/14
pull [5] 18/4 19/2 21/17 24/7 87/22
pulling [3] 17/15 32/2 68/13
pulls [1] 31/5
punished [1] 84/2
punishment [1] 90/15
purpose [1] 48/25
purposes [4] 4/15 11/1 12/6 14/14
pursuant [1] 92/24
pussy [4] 27/15 27/20 27/23 29/7
putting [1] 73/25

**Q**

qualifications [1] 9/22
qualified [2] 85/18 92/15
question [6] 27/19 29/9 56/24 58/9 58/10 61/24
questioned [1] 73/23
questions [5] 66/15 67/16 67/19 70/15 71/21
quick [3] 8/14 31/16 41/4
quicker [1] 46/15
quickly [1] 29/14
quirks [1] 73/19
quite [2] 4/8 84/11
quote [3] 17/18 32/14 53/16

**R**

R-A-Y [1] 9/6
R-T's [3] 13/14 14/1 15/9
raise [1] 63/11
raised [2] 74/6 89/5
ran [1] 69/2

range [3] 18/3 18/13 51/10
raping [1] 29/17
rate [1] 52/1
rather [1] 91/3
RAY [8] 2/3 3/8 5/4 8/24 9/2 9/6 41/15 53/19
Ray's [1] 9/22
reach [1] 51/13
reaches [1] 85/1
read [17] 4/8 4/18 26/8 26/9 28/13 32/4 57/10 63/22 72/5 72/12 72/16 72/17 77/19 78/2 78/11 86/1 86/12
Reader [1] 22/3
readily [1] 81/9
reading [2] 71/22 72/19
ready [2] 6/1 76/6
real [3] 8/13 31/16 69/10
reality [2] 81/12 90/7
really [6] 18/23 29/6 29/20 51/10 59/18 65/24
reason [1] 30/5
reasonable [2] 51/1 80/22
reasonableness [1] 94/13
reasons [2] 92/4 92/9
reassure [1] 65/20
Rebecca [1] 63/21
recall [3] 14/8 15/20 43/5
receipt [2] 79/17 95/6
receive [1] 92/15
received [1] 42/25
receives [1] 68/18
recent [2] 54/18 65/6
recently [1] 64/9
recidivism [4] 37/7 55/16 82/20 83/17
recognize [2] 47/5 83/8
recommend [5] 43/6 85/14 92/15 94/24 95/11
recommendation [3] 3/14 82/18 95/5

recommended [2] 43/3 43/14
record [8] 11/1 12/6 21/21 26/9 34/1 55/5 63/14 71/2
recorded [2] 78/21 78/22
recording [13] 11/14 12/4 13/7 13/24 14/10 15/22 25/17 31/24 33/16 34/10 40/10 40/13 79/16
recover [3] 10/21 23/11 38/10
recovered [6] 12/19 15/22 17/22 23/15 38/1 38/6
recovery [5] 9/17 9/18 9/20 38/5 76/18
recuperation [1] 75/24
red [2] 22/16 22/23
redeem [2] 77/8
redirect [3] 2/9 43/19 62/1
reenter [1] 70/9
refer [2] 26/15 26/16
reference [4] 12/17 14/11 14/24 29/18
references [1] 23/10
refers [1] 65/7
reflect [1] 88/19
reflected [1] 50/14
reflects [2] 12/17 46/1
regain [1] 69/17
regard [4] 86/4 86/6 87/8 95/12
regarding [2] 45/23 94/14
regardless [1] 26/21
regards [1] 47/24
registration [1] 93/21
regular [2] 68/18 68/11
rehabilitation [1] 68/17
rehash [1] 86/17
reintegration [1] 43/10
related [2] 47/18 69/8
relationship [2] 37/4 37/16
release [15] 51/5 51/18 84/15 84/16 85/4

**R**

release... [10] 86/8 93/2 93/4 93/5 93/8 93/10 93/14 94/7 94/14 95/13
released [8] 51/2 52/16 67/9 84/17 85/6 85/9 86/8 93/9
relevance [1] 37/5
relevant [1] 39/19
reliable [4] 48/9 48/9 49/7 62/3
relied [1] 27/6
relieved [1] 69/5
rely [1] 53/16
relying [1] 37/2
remain [2] 49/5 82/24
remained [1] 74/8
remarried [1] 74/17
remarry [1] 89/13
remember [1] 89/4
remind [3] 41/7 65/2 66/13
reminder [1] 41/9
reoffend [1] 52/1
reoffended [1] 84/18
reoffending [4] 51/17 58/13 60/7 85/5
repetitive [1] 73/21
replacement [1] 76/17
replied [23] 27/4 27/19 27/22 28/3 28/5 28/9 28/10 28/25 29/2 29/8 29/12 29/15 29/20 29/24 30/10 30/14 30/21 30/22 30/24 31/7 31/10 31/11 31/13
replies [4] 24/13 26/19 27/8 30/12
report [41] 3/14 3/18 3/21 4/1 4/7 11/3 11/5 16/6 25/15 26/7 26/10 31/19 31/22 34/20 36/21 37/3 46/1 46/4 46/7 50/14 50/16 51/21 52/24 53/11 53/17 54/10 54/13 57/8 57/11 58/22 59/24 60/1 60/23 61/4 61/8 61/14 61/15 86/6 90/25 93/8 93/22
REPORTED [1] 1/22
reporter [3] 1/23

23/20 96/8
reports [1] 4/11
representation [2] 21/19 22/11
represented [1] 20/12
representing [1] 21/4
represents [1] 44/22
request [2] 45/18 70/22
requested [1] 70/25
required [2] 87/4 87/19
rescued [2] 32/10
research [5] 51/10 58/5 59/14 59/15 95/7
researched [1] 50/9
reserve [1] 40/25
reserves [1] 3/22
reside [1] 69/21
residential [1] 49/22
resolved [1] 34/3
respond [2] 48/19 83/10
responsibility [8] 73/8 76/2 81/20 82/4 86/24 87/2 87/7 88/9
responsive [2] 52/22 52/23
responsiveness [1] 52/21
rest [4] 31/8 66/12 22/24 90/8
restitution [2] 92/21 94/7
restrain [1] 48/7 48/24
restriction [5] 93/16 93/16 93/17 93/19 95/19
result [1] 43/1
revival [1] 54/13
review [3] 10/5 22/12 56/21
reviewed [5] 3/20 22/20 39/20 53/12 56/20
right-hand [2] 23/23 23/24
rights [1] 54/19
risk [24] 45/18 50/5 50/5 50/10 50/24 51/4 51/16 52/5 52/6 52/7

52/20 52/25 55/21 55/23 55/24 56/10 56/11 56/12 57/22 58/3 58/10 58/17 59/15 87/12
risks [2] 57/3 60/20
RMR [2] 1/22 96/8
robust [2] 51/11 51/12
rods [2] 75/16 76/24
role [2] 73/8 73/12
roles [1] 74/21
room [3] 30/22 79/9
rooms [1] 79/7
rope [1] 69/22
RT [11] 12/10 12/13 13/6 14/15 15/7 15/18 15/22 16/2 17/10 18/17 32/12
run [1] 93/7
running [1] 68/23

**S**

S-A-M-M-I-E [1] 17/20
S-A-M-M-Y [1] 17/19
sadism [1] 33/24
sadomasochist [1] 38/2
sadomasochistic [1] 34/3
safety [1] 67/9
said [21] 27/9 27/12 27/15 28/18 29/4 29/10 29/13 31/8 31/9 31/12 31/14 41/20 54/14 55/2 67/2 67/8 77/18 80/3 80/8 81/18
sake [1] 50/22
salient [1] 51/12
Sam [2] 14/4 26/25
Samantha [1] 42/18
same [10] 22/4 30/14 52/1 59/1 60/8 65/2 73/22 73/22 80/12 92/2
Sammie [6] 17/19 17/25 18/11 29/6 30/3 36/22
Samsung [2] 14/22 22/1
sat [1] 81/3
satisfactory [1] 48/22
save [1] 32/7
saw [4] 17/6 31/10 68/25 69/1
say [25] 12/14 14/4 14/5 19/3 21/14 30/5

IN RE: SCOTT JOSEPH TRADER    115

**S**

say... [19]  33/1 39/9 48/6 55/21 55/24 58/1 58/3 58/4 60/20 64/4 73/2 79/11 81/16 81/17 82/6 86/20 86/21 88/3 90/4
saying [14]  5/10 19/8 19/10 29/24 52/4 56/10 56/11 56/17 60/12 65/16 79/6 79/10 80/21 82/17
says [10]  26/22 26/23 30/19 53/11 53/18 55/5 59/14 59/16 65/17 95/14
scared [5]  66/24 68/10 68/21 68/22 68/24
scarred [1]  69/13
scary [2]  65/10 65/17
scheduled [1]  77/2
school [1]  69/2
score [12]  51/3 51/7 52/6 52/7 52/16 56/5 56/6 57/1 58/18 59/1 60/8 62/13
scored [2]  52/6 81/25
scoring [5]  57/18 57/25 59/8 62/15 82/17
SCOTT [28]  1/6 3/4 45/15 72/4 72/22 72/23 73/2 73/4 73/6 73/7 73/11 73/15 73/23 74/1 74/9 74/19 74/21 75/3 75/5 75/25 76/2 76/5 76/13 76/18 77/2 77/6 77/21 92/10
Scott's [5]  74/18 75/19 76/1 76/4 77/15
screaming [2]  68/11 68/13
screen [8]  6/7 6/13 6/13 7/19 17/4 19/18 22/6 79/9
screens [2]  6/12
screws [3]  75/16 75/17 76/24
scroll [3]  18/4 23/1 24/15
scrolled [1]  19/18
scrolling [2]  23/4 23/13

**S D [4]**  10/9 10/10 10/11 17/24
seal [3]  4/12 4/19 6/18
search [1]  93/20
seat [1]  87/23
seated [1]  3/2
second [25]  12/9 12/12 12/12 13/4 13/13 13/25 15/6 15/17 16/9 16/16 17/13 23/18 25/1 32/1 33/12 34/11 38/20 41/3 51/12 61/23 70/3 72/23 73/3 82/8 94/15
seconds [2]  24/23 31/16
secrets [1]  69/4
section [2]  55/5 92/24
Secured [1]  10/12
Security [1]  9/8
seeks [1]  78/4
seems [3]  53/22 81/4 86/25
seen [4]  34/15 35/5 35/9 79/19
seized [1]  10/6
Select [4]  14/21 26/1 26/1 32/22
Self [1]  48/12
Self-stimulation [1]  48/12
selfish [1]  88/11
send [12]  4/13 17/8 20/15 20/18 20/23 20/23 55/11 57/21 60/3 79/5 79/7 91/21
sending [2]  21/13 30/21
sense [3]  23/2 25/14 30/24
sensibility [1]  82/19
sent [17]  4/10 12/22 12/23 17/10 21/9 24/25 25/9 30/25 32/12 32/13 78/22 78/23 79/2 79/9 91/18 91/21 91/22
sentence [26]  4/1 70/6 80/19 80/22 80/22 82/14 84/4 84/5 86/1 86/11 86/18 87/1 87/9 87/13 87/14 87/15 87/15 90/16 92/20 93/1

94/6 94/9 94/11 94/13 94/16 94/23
sentenced [2]  66/11 90/15
sentences [1]  85/25
sentencing [9]  1/10 3/3 3/25 11/6 16/8 25/25 78/11 86/4 92/19
sentencings [1]  57/11
separate [8]  14/18 14/21 17/5 22/12 22/14 26/5 81/11 82/13
separately [1]  71/3
serious [6]  81/16 84/5 87/14 87/15 87/15 91/12
seriously [1]  92/5
served [2]  77/17 92/14
serves [1]  43/13
sessions [3]  68/18 85/18 85/18
set [2]  32/4 92/18
sets [1]  47/18
settings [1]  19/1 19/3
seven [3]  28/20 28/21 31/12
several [6]  17/22 21/25 22/9 30/21 30/25 57/20
severe [3]  75/15 76/8 85/25
sex [15]  15/7 32/15 45/18 49/7 50/10 54/21 57/11 57/12 62/5 62/5 85/14 92/15 93/18 93/20 95/8
sexual [28]  24/18 38/10 46/25 47/2 47/7 48/1 48/2 48/5 48/7 48/14 49/5 49/9 49/12 49/13 49/15 50/3 51/14 51/15 54/16 55/6 57/20 62/11 79/16 82/9 85/12 93/19 94/23 95/6
sexually [6]  10/22 20/14 20/15 54/5 64/11 91/16
sexy [1]  29/14
shall [7]  43/22 93/5 93/8 93/10 93/11 93/12 93/13
sheet [1]  53/18

---

IN RE: SCOTT JOSEPH TRADER    123

**S**

sheets [3]  16/15 17/4 19/4
SHELLY [2]  2/14 71/18
sheriff [1]  9/12
shoes [1]  24/19
shopping [1]  75/22
short [2]  28/19 79/25
shortened [1]  71/1
shot [3]  17/3 19/16 79/9
show [26]  6/12 7/1 10/24 11/4 14/17 16/5 18/2 18/3 18/5 18/14 18/24 23/12 23/16 25/5 25/8 27/15 27/24 27/25 28/1 29/16 33/6 33/9 33/20 33/24 35/14 39/18
showed [1]  27/20
showing [5]  8/5 8/6 8/9 32/6 73/9
shows [2]  21/18 87/12
side [9]  22/8 22/17 22/17 23/24 23/25 25/5 25/5 77/11 90/3
sidebar [4]  6/6 7/15 7/19 7/20
signed [1]  64/9
significant [1]  51/14
significantly [1]  56/7
similar [5]  38/20 51/20 51/22 51/25 54/24
since [12]  4/19 9/10 26/12 32/9 64/22 65/4 74/19 76/11 77/2 77/14 89/22 92/17
single [2]  64/10 85/18
sister [3]  67/12 69/11 70/7
sit [3]  7/25 82/6 87/25
situation [3]  76/12 81/21 86/7
situations [2]  83/9 85/21
six [11]  29/19 29/19 31/21 31/22 31/22 32/10 32/17 39/9 64/13 66/9 76/18
six-year-old [1]  29/19

32/10 32/17
skip [1]  33/17
Skype [1]  28/6
sleeping [1]  28/20
son [2]  30/25 31/2 32/2
slow [1]  40/19
slower [2]  14/23 24/1
SM920T [1]  22/1
small [2]  10/12 18/23
smart [2]  3/24 21/24
smooth [1]  6/1
smoothly [1]  5/6
social [1]  30/7
society [2]  70/9 80/18
software [3]  11/8 21/19 22/3
sole [1]  76/2
solely [1]  13/15
solicited [1]  91/20
some [29]  4/17 5/7 5/21 10/10 10/24 12/23 17/24 20/23 22/7 23/9 24/19 24/19 25/23 30/5 43/11 49/18 51/2 52/25 55/25 77/11 90/3
somebody [2]  59/18 85/5
somehow [4]  6/6 6/6 79/23 80/13
someone [4]  49/2 73/18 74/4 89/24
something [15]  5/10 6/11 17/18 20/16 22/21 28/18 71/22 78/16 83/15 83/16 83/19 83/24 84/7 86/5
sometimes [1]  30/5
somewhat [1]  39/19
son [9]  72/22 72/22 72/23 72/24 77/8 77/13 77/20 77/21 88/13
sorry [14]  91/21 13/2 13/22 13/23 14/23 24/2 42/20 60/25 63/1 77/11 84/20 88/17 90/5 90/18
sort [4]  21/18 21/18 80/17 82/13
sound [3]  8/13 82/14 86/5
sounds [2]  60/11 73/19

source [1]  47/16
sources [1]  53/11
SOUTHERN [1]  1/1
speak [6]  33/2 41/8 63/3 72/16 81/20 87/18
speakers [1]  40/7
speaking [2]  14/8 22/21
special [13]  2/3 3/8 8/24 9/8 9/11 73/10 73/18 74/17 92/23 92/25 93/15 94/8 95/12
specialized [1]  9/13
specific [2]  17/9 66/3
specifically [2]  43/9 90/19
speculative [1]  42/6
spell [4]  8/25 9/5 14/23 23/20
spent [1]  59/17
spinal [1]  76/23
spine [4]  75/15 75/16 75/17 76/25
spoke [1]  25/14
spoken [1]  6/24
spot [1]  28/15
ST [19]  14/12 16/5 16/11 16/16 16/18 16/21 17/5 17/9 17/9 17/10 17/14 18/17 38/24 40/2 40/2 40/18 42/20 43/10 45/21
ST's [2]  19/17 36/6
stand [6]  41/2 41/11 63/10 86/19 88/8 90/13
standard [6]  47/11 50/1 50/5 62/5 62/7 93/14
standardization [1]  51/20
standards [1]  50/4
standing [2]  25/3 84/22
start [4]  5/20 27/17 27/19 29/6
started [4]  74/10 75/5 75/14 76/7
starting [4]  15/14 15/16 37/24 54/5
starts [5]  26/15 26/17 28/14 31/5 33/12
stashed [1]  78/22

**Left page:**

**Column 1 (S):**

**S**

**state [8]** 37/6 39/14 42/10 45/7 45/24 63/13 68/1 91/24

**statement [4]** 4/1 63/22 68/4 72/5

**statements [1]** 54/15

**STATES [7]** 1/1 1/3 1/11 3/3 3/7 95/9 96/9

**static [14]** 50/8 50/11 50/18 51/1 51/4 51/7 57/1 57/18 59/8 60/8 62/3 62/13 62/15 84/11

**Static-99 [1]** 84/11

**Static-99R [8]** 50/8 50/11 50/18 51/1 51/4 51/7 62/3 62/13

**statistical [3]** 47/3 47/5 47/9

**statutory [1]** 91/11

**stayed [2]** 74/15 76/7

**steady [1]** 76/21

**stenosis [2]** 75/15 76/23

**stepdad [1]** 89/16

**stepfather [1]** 74/18

**stepped [2]** 45/11

**still [12]** 7/12 17/3 19/13 19/15 27/1 29/22 37/18 38/25 59/11 59/13 74/16 94/24

**stimulation [1]** 48/12

**stipulate [1]** 9/11

**stipulates [1]** 44/20

**stirs [1]** 31/6

**stole [1]** 69/18

**stomach [1]** 17/15

**stop [4]** 19/3 33/20 80/4 91/23

**stopped [1]** 80/3

**stops [1]** 31/6

**storage [1]** 10/13

**stores [1]** 68/22

**stories [4]** 65/6 65/7 65/10 65/12

**storing [1]** 33/3

**stranger [3]** 57/14 62/3 62/16

**Street [2]** 1/23 96/9

**strike [1]** 42/22

**strings [1]** 81/15

**strong [1]** 81/10

**structural [1]** 86/5

**stuck [1]** 90/3

**studied [1]** 84/25

**studies [1]** 85/1

**study [1]** 84/11

**stuff [13]** 10/9 11/20 19/5 19/9 20/19 30/14 35/24 60/3 79/5 79/15 80/9 80/11 80/12

**subject [2]** 85/8 94/13

**submit [1]** 72/9

**substance [1]** 93/12

**subtract [1]** 58/25

**succeed [1]** 20/18

**successful [1]** 48/3

**such [4]** 19/15 69/5 86/22 93/7

**suck [1]** 27/4

**sucks [1]** 26/17

**suffer [2]** 65/14 90/8

**suffered [2]** 69/12 70/8 90/7

**suffering [4]** 46/18 46/21 47/15 48/23

**suffers [5]** 83/8 83/14 83/16 83/23 84/7 84/22 92/4

**suggest [4]** 7/15 81/12 82/21 94/22

**suggested [1]** 83/1

**suicidal [2]** 41/20 42/3

**summary [1]** 22/7

**supervised [10]** 85/4 85/8 86/8 93/2 93/5 93/10 93/14 94/7 94/24 95/13

**support [1]** 3/25

**supposed [2]** 70/1 89/22

**suppress [1]** 3/23

**sure [10]** 8/23 34/17 35/3 35/20 44/3 45/8 46/24 51/19 86/5 87/19

**surgery [7]** 75/16 75/18 75/18 75/24 76/17 76/24 77/1

**surrounding [1]** 19/4

**suspect [1]** 12/17

**suspended [1]** 34/12

**Sustained [1]** 42/6

**SWORN [4]** 9/2 44/19 63/12 67/25

**sympathize [1]** 81/11

**system [4]** 6/9 55/9 79/22 80/20

**T**

**T's [3]** 13/14 14/1 15/9

**T-I [1]** 27/24

**T999 [1]** 21/20

**table [2]** 7/13 7/13

**tablet [1]** 25/3

**tablet-type [1]** 25/3

**take [15]** 5/16 28/23 34/23 41/1 41/11 57/25 63/9 68/22 75/20 88/18 89/22 89/23 89/25 90/7 92/5

**taken [4]** 9/20 64/3 66/4 73/8

**takes [3]** 21/21 75/2 83/4

**taking [2]** 75/23 88/9

**talk [3]** 14/23 24/1 30/3

**talking [9]** 23/2 24/6 25/13 25/19 55/25 56/2 56/4 57/15 58/11

**talks [1]** 54/19

**tasks [1]** 66/6

**taught [1]** 64/22

**teach [1]** 64/20

**teaching [1]** 73/9

**telephone [1]** 61/22

**telephonically [1]** 44/9

**tell [13]** 5/25 8/24 9/5 15/21 40/16 51/19 56/17 60/11 60/13 65/16 66/17 66/20 85/7

**telling [7]** 27/1 40/17 51/12 58/20 59/2 65/6 85/7

**tells [1]** 58/5

**ten [10]** 21/10 24/13 25/2 28/21 28/23 51/10 62/10 66/16 75/25 78/16

**ten-year-old [1]** 28/23

**tension [1]** 66/4

**term [4]** 81/5 92/12 93/5 93/6

**terms [12]** 4/25 47/12

**Right page:**

**Column 1 (T):**

**T**

**terms... [10]** 49/19 50/5 50/10 56/6 58/23 59/14 62/11 66/10 77/16 93/7

**terrible [3]** 69/5 81/17 84/2

**terribly [1]** 69/24

**terrors [1]** 68/11

**test [6]** 8/13 50/11 50/18 62/4 62/9 84/22 53/16 55/13 60/18 61/3 61/3 66/2 66/12 67/2 73/9 76/5 78/18 79/19 81/17 86/8 93/2

**testified [1]** 83/6

**testify [3]** 44/14 61/21 87/4

**testimony [3]** 5/4 48/21 53/8

**testing [2]** 8/20 72/25

**text [2]** 5/25 41/4

**than [11]** 49/18 51/11 66/25 78/13 82/21 90/7 90/12 90/12 90/16 90/17 91/3

**that [476]**

**their [19]** 47/25 48/1 48/5 49/6 52/23 59/21 60/4 67/13 73/7 74/8 74/15 79/3 82/23 82/25 85/19 89/7 89/9 89/17 95/22

**themselves [4]** 20/12 21/5 48/14 48/19

**Theoretically [1]** 55/5

**therapy [5]** 65/4 65/22 68/16 68/18 77/11

**there [115]**

**There's [1]** 14/21

**they [55]** 5/9 15/14 18/10 18/24 21/11 21/2 21/8 21/9 21/9 21/9 21/11 23/14 34/18 35/7 47/25 48/8 48/10 48/11 48/13 48/17 49/3 49/6 49/18 49/18 49/21 59/17 59/17 59/22 60/3 60/5 60/18 61/8 62/10 65/17 67/13 67/13 73/11 74/12 75/21 78/25 79/15 79/8 80/18 80/18 81/18 83/4 83/10 85/19 85/20 85/21 85/22 90/2 90/3 90/4

90/20

**they're [1]** 57/10

**thick [1]** 90/3

**thin [1]** 90/3

**thing [4]** 7/10 39/18 67/10 81/24

**things [23]** 6/21 22/9 24/20 28/22 47/18 48/17 51/24 52/22 53/16 55/13 60/18 61/3 61/3 66/2 66/12 67/2 73/9 76/5 78/18 79/19 81/17 86/8 93/2

**think [39]** 4/12 4/16 4/18 5/5 5/8 5/9 5/12 8/6 8/8 18/7 18/23 21/16 28/12 28/13 34/3 39/18 42/22 43/24 67/6 78/14 79/25 80/8 82/5 82/12 83/6 83/12 83/23 84/5 84/9 84/19 86/3 86/8 86/19 86/21 87/7 87/12 91/1 91/3 95/22

**thinking [3]** 5/7 32/19 64/4

**thinks [2]** 61/15 73/20

**Thirteen [1]** 16/14

**Thirty [1]** 17/13

**thought [5]** 69/1 73/14 73/24 86/22 89/2

**threat [4]** 36/22 41/18

**threaten [1]** 60/2

**threatened [1]** 79/6

**three [6]** 27/17 51/8 57/24 57/25 58/4 58/25

**throughout [4]** 37/13 65/24 75/2 95/8

**thumbnail [1]** 18/16

**thumbnails [3]** 18/14 19/13 19/22

**time [43]** 4/17 5/21 14/7 23/14 27/9 28/17 30/17 32/17 39/24 40/25 44/1 44/14 46/6 50/25 51/15 52/9 52/14 55/5 59/17 64/4 64/7 65/2 65/7 69/15 70/12 72/25 74/2 74/11 74/11 74/12 74/14 74/25 75/13 75/25 76/1 77/12 77/17 77/22 79/24 85/7 87/6

91/18 92/2

**times [5]** 5/6 20/18 65/15 76/20 77/14

**title [2]** 24/22 93/23

**titled [7]** 18/20 19/15 22/2 22/4 24/5 26/7 36/25

**today [7]** 35/6 66/10 85/5 88/8 90/2 90/9 90/13

**toddler [1]** 34/12

**toddlers [1]** 35/15

**together [3]** 29/21 64/13 74/9

**told [14]** 4/22 40/17 56/23 57/19 58/14 59/20 60/14 60/15 60/16 60/17 60/22 61/7 61/10 69/22

**too [10]** 8/1 14/4 26/17 29/5 29/8 29/11 65/17 66/17 67/13 74/18

**took [6]** 18/9 43/7 73/11 75/18 79/9 89/15

**tool [1]** 50/6

**tools [2]** 50/5 84/10

**top [2]** 31/5 32/2

**topic [2]** 46/14

**torn [1]** 88/2

**total [1]** 94/6

**totally [1]** 49/21

**touch [4]** 14/4 50/7 59/19 95/21

**touched [2]** 29/22 50/7

**touching [2]** 13/10 13/16

**towards [2]** 50/21 69/8

**track [1]** 84/6

**trade [2]** 59/22 59/22

**traded [2]** 30/13 78/25

**TRADER [64]** 1/6 2/14 11/6 12/13 12/19 12/20 13/11 13/14 15/7 15/18 16/7 16/12 16/14 17/15 18/1 20/21 20/21 21/24 22/25 24/11 26/16 36/22 40/5 40/17 41/17 42/15 42/25 43/11 43/16 45/15 45/19 45/20 45/23 46/18 47/14 50/11 50/18

## T

TRADER... [23] 63/21
64/9 68/6 68/8 68/17
68/21 69/8 69/24 71/19
77/23 81/19 82/1 82/6
83/14 85/6 85/11 86/16
86/23 87/18 91/16
92/11 94/16 95/17
Trader's [11] 3/22
5/17 12/10 13/6 13/16
14/1 36/21 43/10 69/16
72/4 85/15
trading [2] 12/20 21/3
trafficked [1] 23/7
tragedy [1] 69/6
tragic [1] 69/24
training [4] 9/13 9/17
9/18 9/20
transcript [6] 1/10
12/7 12/7 14/14 42/23
86/2
transcription [1] 96/5
transferred [1] 67/7
transition [1] 6/1
transmitted [3] 20/21
20/22 24/23
traumatize [1] 70/10
traumatized [1] 65/11
traumatizing [1] 79/12
Treasury [2] 9/16 9/19
treat [4] 49/13 49/15
81/22 81/22
treated [1] 84/7
treatment [26] 42/25
43/3 48/3 48/3 48/17
48/22 48/25 49/7 49/10
49/12 49/13 50/3 52/21
52/22 52/23 62/6 83/7
83/9 85/12 85/17 86/7
92/16 93/17 93/19
94/23 95/6
treatments [2] 47/22
47/24
trial [2] 86/25 87/4
trigger [1] 66/2
trouble [1] 76/15
truck [2] 75/11 76/6
truly [3] 70/9 88/17
90/18
trust [4] 65/18 66/22
84/24 84/25
trusted [2] 66/23

66/25
truth [2] 66/21 88/8
try [1] 6/10
trying [5] 20/16 56/13
56/20 64/20 69/6
tugging [1] 81/15
turn [5] 5/23 7/17
7/23 8/9 16/20
turned [2] 8/16 27/17
turning [1] 25/4
Twelve [1] 16/9
Twenty [3] 13/1 13/3
13/13
Twenty-one [2] 13/1
13/13
twice [2] 65/23 86/22
twilight [1] 77/14
two [38] 5/8 5/9 10/22
12/8 14/16 15/5 22/24
25/23 26/4 26/8 28/12
41/8 44/1 54/2 54/6
56/13 57/16 60/17 61/7
61/10 61/11 61/25
64/14 64/22 66/15
71/10 72/23 73/1 75/1
75/6 75/16 75/21 75/21
78/15 85/16 89/3 91/4
91/17
two-year [1] 85/16
two-year-old [1] 91/17
type [1] 25/3
typed [2] 26/23 29/16
types [2] 51/24 57/2

## U

U.S [3] 1/15 1/18
92/24
UFED [1] 22/2
unavailable [1] 5/23
unbeknownst [1] 55/8
under [2] 4/12 4/19
6/18 21/5 34/2 36/25
44/17 54/18 55/5 55/17
56/5 57/4 57/15 61/4
63/4 64/13 71/19 80/18
81/23 81/25 86/13
underage [1] 22/21
undergone [1] 68/16
underscore [1] 19/16
understand [16] 34/21
37/12 43/16 53/23
56/14 56/20 58/12
64/23 65/1 65/10 74/4

81/21 83/11 88/22 89/1
95/23
understanding [5]
35/21 36/3 64/19 69/15
85/16
understands [1] 73/21
underwear [2] 17/15
19/4
undressing [1] 33/13
unemotional [1] 82/14
unfairly [1] 81/25
unforgivable [1] 69/18
unfortunate [1] 87/25
unimaginable [1] 89/1
unimaginably [1] 80/14
uniquely [1] 15/16
unit [1] 40/18
united [8] 1/1 1/3
1/11 3/3 3/7 74/16
95/8 96/9
unity [1] 76/14
unlawful [1] 48/20
unless [3] 5/23 71/20
73/17
unlikely [2] 83/3
92/20
unquote [1] 17/19
unrelated [3] 51/23
57/13 58/22
until [3] 50/24 68/20
77/6
up [42] 5/25 7/9 8/5
18/11 19/7 11/9 18/4
21/22 21/24 22/5 22/6
22/6 22/10 23/23 24/7
24/25 29/14 33/12 48/1
57/6 58/24 59/1 65/12
65/15 65/25 68/11
68/20 70/4 71/21 73/7
73/17 79/13 82/1 82/14
84/22 85/17 89/3
upon [2] 53/16 93/4
upset [1] 42/2
us [28] 8/24 9/5 11/4
14/17 16/15 18/2 18/3
23/12 23/16 25/8 25/23
32/6 33/6 33/9 33/20
33/24 35/14 40/16
45/12 58/5 59/2 76/7
76/10 76/11 76/19
77/12 77/13 95/9

## U

use [4] 6/9 10/18
34/20 49/25
used [6] 14/25 22/3
50/1 50/9 56/18 70/2
user [2] 18/1 23/19
using [6] 11/8 14/2
20/7 20/7 20/10 47/14
usually [3] 27/13
78/14 78/15

## V

V-A-R-N-E-R [1] 63/2
vagina [5] 15/9 17/16
17/17 19/17 25/6 25/7
33/18 34/14
vaginal [1] 15/19
vaginas [1] 19/21
value [1] 22/21
van [1] 68/25
VARNER [6] 2/10 63/2
63/3 63/12 63/15 67/21
version [2] 24/8 71/2
versus [1] 3/4
vertebrae [1] 76/25
very [22] 15/15 41/6
47/1 48/3 50/24 54/13
62/9 62/24 69/4 69/25
72/20 77/4 77/6 78/9
79/25 83/23 84/5 85/23
85/25 86/16 87/14
91/17
victim [29] 4/1 4/2
4/2 12/13 13/6 13/24
13/15 14/1 14/12 14/15
15/18 16/2 16/4 16/16
52/19 57/11 25/21 32/17
36/6 40/2 48/16 52/12
52/13 64/5 64/7 64/8
78/15 82/9 95/18
victims [27] 19/10
50/22 51/24 52/15
57/13 57/14 57/14 58/7
58/15 58/21 58/22
58/22 58/23 59/3 60/3
63/8 73/6 64/6 64/8 78/16
78/16 79/10 80/24 82/2
92/9 95/15 95/16 95/20
victims' [3] 5/9 92/17
92/18
video [61] 11/13 11/14
12/3 12/4 12/9 12/9

12/12 12/13 13/3 13/4
13/7 13/13 13/14 13/24
13/25 14/10 14/15 15/6
15/17 15/24 16/10
16/11 16/14 16/14
16/16 16/18 17/6 17/13
17/14 19/8 24/21 24/22
24/22 24/24 24/24 25/1
25/1 25/9 25/9 25/13
25/16 25/17 25/21
30/21 30/25 31/1 31/16
31/18 31/24 32/1 33/11
33/12 33/16 33/18
33/21 34/9 34/10 34/11
34/16 35/3 79/20
videos [12] 12/8 15/2
16/21 17/1 17/9 17/10
21/8 32/12 34/2 35/5
47/18 54/19
Vids [2] 15/2 15/3
view [7] 18/6 18/8
22/9 22/11 24/7 24/21
82/23
viewed [1] 11/20
violation [1] 61/12
violence [5] 57/3
57/13 60/15 61/7 61/10
violent [1] 62/11
virtually [1] 74/6
visible [3] 17/3 25/7
75/12
visual [3] 21/17 21/18
22/11
voice [1] 11/21
volume [2] 34/22 79/15

## W

wait [3] 29/15 29/16
61/23
waived [1] 86/24
waiver [1] 94/19
wakes [1] 68/11
Wal [1] 75/9
Wal-Mart [1] 75/9
walk [2] 76/19 76/20
walking [1] 76/16
Walsh [1] 93/20
want [58] 4/16 5/21
5/21 6/12 6/17 6/18
6/21 7/21 7/22 7/25
8/17 14/14 18/6 18/22
23/1 25/8 25/22 27/2
27/6 27/15 27/25 28/1

28/13 28/19 29/8 30/4
31/14 31/16 33/20
33/24 34/20 34/24 35/1
35/19 39/18 40/8 41/1
41/7 41/8 44/16 46/12
53/23 53/23 57/6 58/9
63/4 65/1 65/19 66/20
67/10 71/19 72/15 78/1
78/7 78/12 83/11 87/19
94/24
wanted [8] 7/24 26/9
52/14 32/15 32/16 64/4
86/4 90/11
wanting [1] 24/18
wants [2] 44/5 95/17
was [165]
wasn't [7] 19/7 23/11
35/1 40/15 55/4 60/25
75/3
watch [4] 7/9 34/20
88/1 89/19
watching [2] 29/25
30/12
way [16] 6/6 20/14
24/15 27/1 29/3 48/11
48/19 66/17 73/12
73/21 73/22 74/10
75/10 83/16 83/22
88/17
ways [4] 48/11 48/14
68/9 73/20
WD [2] 18/10 18/21
we [111]
We'll [1] 34/8
we're [2] 28/17 28/20
wear [1] 74/23
week [5] 29/17 65/4
65/23 65/24 91/2
weekend [2] 28/20
30/19
weighs [1] 83/13
weird [2] 30/15 40/9
well-researched [1]
50/9
wellbeings [1] 64/16
went [6] 51/14 74/25
78/20 80/4 86/1 86/9
weren't [2] 53/25
87/17
WEST [6] 1/5 1/16 1/19
1/24 44/13 96/10
what's [2] 12/8 54/22

**W**

whatever [1]    44/21
wheat [1]    82/13
wheel [1]    8/9
wheels [1]    8/10
Whenever [2]    27/2 27/9
whether [2]    85/5 90/14
whichever [1]    18/7
while [20]    13/5 21/22
28/7 29/10 30/13 38/14
39/2 52/18 55/7 55/11
55/17 68/13 69/2 79/21
80/5 88/6 89/4 91/24
91/25 93/10
whole [4]    48/25 53/25
75/25 78/12
why [6]    7/17 26/8
29/20 41/10 64/23
90/13
wife [4]    88/14 89/11
89/11 92/8
wired [3]    83/17 83/20
83/22
wise [1]    69/21
wish [5]    87/18 88/13
88/14 88/15 88/18
withhold [3]    36/8
79/24 79/25
within [7]    11/5 75/1
75/19 84/12 93/7 94/17
94/18
without [5]    32/6 70/4
88/8 89/4 89/10
witnesses [4]    2/2 5/1
5/9 44/1
woman [7]    26/12 32/6
32/9 34/13 59/21 89/11
89/13
woman's [2]    29/18
32/16
won't [9]    7/18 26/25
30/6 65/16 66/20 80/23
86/17 89/17 89/19
word [1]    14/24
words [4]    49/1 69/10
83/7 88/3
work [9]    7/18 66/1
66/3 74/12 75/7 75/12
75/12 75/22 76/13
worked [6]    75/6 75/7
75/9 75/10 76/12
working [5]    65/19 74/9

74/10 74/10 75/5
works [1]    51/19
world [2]    65/21 90/21
worse [4]    90/12 90/12
90/16 90/17
wouldn't [4]    29/2
55/20 59/8 90/9
writing [2]    68/4 72/19
wrong [1]    15/21

**X**

X6 [1]    22/1

**Y**

y'all's [1]    62/24
yeah [4]    14/18 29/13
31/12 33/15
year [19]    28/23 29/19
32/8 32/10 32/17 36/11
39/3 52/1 54/20 56/2
63/21 64/11 64/19
75/16 76/17 84/19
85/16 91/17 91/17
Year's [1]    89/19
years [44]    21/7 21/9
21/10 21/10 24/13 25/2
51/4 51/10 51/18 51/22
54/6 57/16 57/20 60/17
64/5 64/13 64/22 66/16
66/16 66/25 67/1 68/5
72/22 72/23 73/1 73/7
73/14 74/5 75/1 75/5
75/10 77/14 78/24 81/1
81/2 81/5 85/2 85/6
86/18 87/10 87/13
89/12 90/15 90/15
yellow [2]    22/16 22/18
yep [1]    31/11
yes [115]
yet [1]    92/17
York [5]    74/11 74/15
75/20 76/2 76/5
you [360]
you'd [1]    58/6
you'll [1]    32/7
you're [2]    11/20 30/19
young [7]    21/1 21/6
21/8 57/14 65/3 78/23
91/17
younger [1]    12/10
youngest [2]    21/7 89/4
yours [1]    7/18
yourself [3]    10/16

56/6 58/25
youth [1]    93/18

**Z**

zero [4]    51/3 51/6
52/15 59/1

## CERTIFICATE OF SERVICE

I HEREBY certify that on  10th  day of September, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and sent two copies to the Clerk of the Court via third party commercial carrier for delivery within three days.  I also certify that the foregoing document is being served this day via CM/ECF on Emily M. Smachetti, Chief, Appellate Division, United States Attorney's Office, 99 N.E. 4th Street, Miami, Florida 33132.


 s/Fletcher Peacock
Fletcher Peacock, AFPD